## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-3417

HOLLY KLUTH,

 Plaintiff,

v.

TONY SPURLOCK, individually, and in his official capacity as Douglas County Sheriff,

 Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Holly Kluth, by and through counsel Felipe Bohnet-Gomez, Matthew J. Cron, and Siddhartha H. Rathod of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

### NATURE OF THE ACTION

This employment case concerns blatant and unlawful political retaliation by Defendant Tony Spurlock, the Douglas County Sheriff, against Plaintiff Holly Kluth, a longtime employee of the Douglas County Sheriff's Office ("DCSO"). Ms. Kluth is a career law enforcement professional and dedicated civil servant, who served the public honorably and over a distinguished 32-year career at the DCSO.

Ms. Kluth's impressive career was cut short when she found herself on the opposite side of Sheriff Spurlock in factional political dispute within the Douglas County Republican party. After months of internecine political turmoil stemming from Sheriff Spurlock's support of Colorado's red flag bill, Spurlock split from the Republican party and endorsed a Democratic candidate for Douglas County Commissioner. Ms. Kluth,

however, remained loyal to the Douglas County Republican party, and consistent with her political commitments and affiliation, engaged in constitutionally protected political activity and speech opposed to Sheriff Spurlock's Democratic endorsement, including discussions with Douglas County Republican party officials, and a post she made on her personal Facebook account, both while off duty.

Thereafter, Defendant Spurlock began a politically motivated campaign of retaliation against Ms. Kluth, including demoting her, making her working conditions more difficult, transferring and demoting her once again after Ms. Kluth announced her own candidacy for Sheriff, and ultimately firing her altogether. These retaliatory acts violated Ms. Kluth's rights to free speech and political association under the U.S. and Colorado Constitutions.

Additionally, Defendant Spurlock failed to provide Ms. Kluth the due process protections guaranteed by law and DCSO policy, including notice of the reason for her termination and an opportunity to be heard by the sheriff. These failures violated Ms. Kluth's due process rights under the U.S. and Colorado Constitutions and breached her implied contract with the DCSO.

## I.      JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Jurisdiction over Plaintiff's pendant state law claims is proper under 28 U.S.C. § 1367(a) because Plaintiff's claims arise from a common nucleus of operative fact.

3.      Venue is proper in this Court under both 28 U.S.C. § 1391(b)(1) or (2) as Defendant resides in this district, and all the events or omissions giving rise to the claims herein occurred in this district.

4.      Plaintiff Kluth is a resident of, and domiciled in, the State of Colorado.

5.      Douglas County Sheriff's Office ("DCSO") is the law enforcement agency of Douglas County.

6.      Defendant Spurlock was and remains the elected Sheriff of Douglas County.

7.      At all relevant times, Defendant Spurlock as a final policymaker for the DCSO with respect to personnel matters. *See Tonjes v. Park Cty. Sheriff's Office*, 300 F.Supp. 3d 1308, 1332 (D. Colo. 2018) ("C.R.S. § 30-10-506 plainly makes the sheriff the final policymaker for the Sheriff's Office with respect to employment of deputies.").

8.      At all relevant times Defendant Spurlock acted as an agent of the DCSO.

9.      At all relevant times, Sheriff Spurlock acted under color of state law in his capacity as the Sheriff of Douglas County.  *See* C.R.S. § 30-10-506 (vesting power of appointment in the office of sheriff).

## II.      FACTUAL ALLEGATIONS

**A.      Plaintiff Kluth's Extensive Career at the Douglas County Sheriff's Office**

10.      Plaintiff Holly Kluth was employed by the DCSO from 1989 until approximately May 25, 2021.

11.     During her 32-year career at the DCSO, Ms. Kluth held numerous different positions at the agency, and worked under four different sheriffs.

12.     In 2005, Ms. Kluth was promoted to Bureau Chief of Law Enforcement Bureau.

13.     In 2010, Ms. Kluth was assigned as Chief of Administrative Services Bureau.

14.     Defendant Tony Spurlock is the current Sheriff of Douglas County.

15.     Spurlock was first appointed as Douglas County Sheriff in mid-2014, was subsequently elected Douglas County Sheriff in November 2014, and was re-elected for a second term in November 2018.

16.     In both elections, Spurlock was the Republican party candidate.

17.     After Spurlock was appointed Sheriff in 2014 he appointed Ms. Kluth to the position of Undersheriff at the DCSO.

18.     Ms. Kluth was Undersheriff of the DCSO until November 17, 2020, when she was demoted to Captain of Patrol.

19.     Shortly after announcing her candidacy for Sheriff in February 2021, Ms. Kluth was further demoted to Captain of Detentions.

20.     Sheriff Spurlock discharged Ms. Kluth on or about May 25, 2021.

**B.     Plaintiff Kluth and Sheriff Spurlock Were on Opposite Sides of a Factional Political Dispute Dividing Douglas County Republicans**

21.     During the time Ms. Kluth was Undersheriff, she and Sheriff Spurlock frequently spoke about politics, political candidates and races, and political issues.

22.     Ms. Kluth intended to run for Douglas County Sheriff after Spurlock's term expired.

23.     Ms. Kluth discussed with Sheriff Spurlock, and Sheriff Spurlock knew of, Ms. Kluth's plans to run for Douglas County Sheriff after Spurlock's term expired.

24.     By 2019, many in the Douglas County Republican Party ("DCGOP") had begun to spurn Spurlock for his support of Colorado's new "red flag" gun bill, C.R.S. § 13-14.5-101, et seq., a law opposed by many Republicans in Douglas County.

25.     Spurlock was the only Republican elected official in Colorado who publicly supported the red flag bill during the 2019 legislative session.

26.     Some Douglas County Republican activists begun a campaign to recall Sheriff Spurlock following his public support for the "red flag" law.

27.     On or about March 30, 2019, the DCGOP passed a resolution condemning the red flag bill and Sheriff Spurlock.

28.     The DCGOP's resolution, in part, expressed "profound disappointment and disgust with Sheriff Tony Spurlock for actions against the Constitution of the United States of America and violation of his oath to uphold the Constitution of the United States of America."

29.     Among the Douglas County Republicans politically opposed to Sheriff Spurlock was George Teal.

30.     On or about December 11, 2019, Teal announced his candidacy for Douglas County Commissioner representing District 2.

31.     Sheriff Spurlock discussed his opposition to Teal's candidacy for Douglas County Commissioner with Ms. Kluth, and others in the DCGOP.

32.     Sheriff Spurlock supported Clint Dorris over Teal in the Republican primary for Douglas County Commissioner, District 2.

33.     On or about June 30, 2020, Teal won the Republican primary election for Douglas County Commissioner, District 2.

34.     Sheriff Spurlock discussed with Ms. Kluth and others his intent to endorse Teal's opponent, the Democratic party candidate for Douglas County Commissioner, Lisa Neal-Graves.

35.     DCGOP leaders were aware of Spurlock's intent to publicly endorse Neal-Graves's candidacy.

36.     DCGOP leaders tried to convince Spurlock not to endorse Graves, or to hold off on such an endorsement.

37.     These factional political disputes caused further tension between Spurlock and other Douglas County Republicans.

38.     Spurlock had discussions with Ms. Kluth in which he expressed that he was angry and upset at the Republican party members' requests regarding his endorsement of Neal-Graves' candidacy.

39.     In September 2020, Spurlock publicly endorsed Neal-Graves' candidacy.

40.     Following the endorsement, Sheriff Spurlock and Ms. Kluth had a conversation where Spurlock stated that he understood that Ms. Kluth would have to make a statement distancing herself from his endorsement.

**C.     Plaintiff Kluth's Protected Political Speech and Associational Activity**

41.     Shortly thereafter, while off-duty, and in her personal capacity, Ms. Kluth was contacted by Stu Parker and Tim Moore regarding Spurlock's endorsement of Neal-Graves.

42.     Ms. Kluth, Mr. Parker, and Mr. Moore were all officers in the DCGOP.

43.     Mr. Parker was Vice Chair of the DCGOP.

44.     Mr. Moore was the DCGOP's District Captain for Ms. Kluth's district.

45.     Ms. Kluth was an Assistant District Captain in the Douglas County Republican Party.

46.     As such, Parker and Moore were higher-ranking within the DCGOP than Ms. Kluth.

47.     Mr. Moore was also a Bureau Chief at the DCSO.

48.     Parker and Moore sought a statement from Ms. Kluth and other conservative law enforcement personnel to help the DCGOP respond to Spurlock's endorsement of Neal-Graves.

49.     The ensuing discussions among Parker, Moore, and Ms. Kluth did not result in any statement or other tangible action by the DCGOP.

50.     However, after numerous Party members contacted Ms. Kluth about Spurlock's endorsement, Ms. Kluth made Facebook post on her personal account.

51.     This post stated in part: "I will support and vote for conservative candidates that I think have the beliefs I do about Public Safety, Government, Rights, the law, the constitution, and our Country."

52.     Following Ms. Kluth's Facebook post, Sheriff Spurlock did not respond to Ms. Kluth's phone calls and text messages for several days.

53.     Ms. Kluth's Facebook post made Sheriff Spurlock very upset.

54.     Sheriff Spurlock believed Ms. Kluth's actions were politically opposed to him and undermined his authority.

55.     After Ms. Kluth finally had a chance to speak with Sheriff Spurlock after

making the Facebook post, and observed that he was very upset, she immediately took the post down and informed Mr. Parker that she would not be making a public statement regarding Spurlock's endorsement.

56.     Sheriff's Spurlock's reaction surprised Ms. Kluth, because Spurlock had previously stated that he understood Ms. Kluth would need to make such a statement to preserve her standing within the DCGOP.

57.     At some point thereafter, Sheriff Spurlock learned of the communications between Ms. Kluth, Mr. Parker, and Mr. Moore from a third party.

**D.     Defendant Spurlock's Unlawful Retaliation Against Plaintiff Kluth**

58.     Sheriff Spurlock now believed that Ms. Kluth was politically affiliated with his opposition within the DCGOP.

59.     Sheriff Spurlock then opened an internal affairs investigation into Ms. Kluth and Mr. Moore.

60.     The subject matter of the internal affairs investigation concerned the political activities of Ms. Kluth and Mr. Moore took on behalf of the DCGOP, and in opposition to Sheriff Spurlock's endorsement of Neal-Graves.

61.     In particular, the internal affairs investigation concerned the communications between Ms. Kluth, Mr. Parker, and Mr. Moore regarding a potential statement on behalf of the DCGOP, as well as Ms. Kluth's own Facebook post.

62.     On November 12, 2020, Sheriff Spurlock informed Ms. Kluth of the outcome of his investigation and provided her a written "Notification of Findings."

63.     Sheriff Spurlock was personally involved in the investigation of Ms. Kluth and authored the "Notification of Findings."

64.     Sheriff Spurlock provided Ms. Kluth the "Notification of Findings" at the same time as the pre-disciplinary hearing.

65.     As such, Ms. Kluth did not have time to prepare or to review the "Notification of Findings" before her hearing with Sheriff Spurlock.

66.     Spurlock concluded that Ms. Kluth's political activities were "contrary to the Sheriff" and violated DCSO policy.

67.     Spurlock also concluded that Ms. Kluth's conduct "call[ed] into question her judgment."

68.     During the November 12, 2020 pre-disciplinary hearing, Sheriff Spurlock stated that he intended to demote Ms. Kluth to Chief or Captain.

69.     In a disciplinary memorandum dated November 16, 2020, Sheriff Spurlock demoted Ms. Kluth to the rank of Captain, effective immediately.

70.     On November 17, 2020, Ms. Kluth informed Sheriff Spurlock that she did not intend to appeal his decision.

71.     Thereafter, Ms. Kluth's position at the DCSO was Captain of Patrol.

72.     As a result, Ms. Kluth's annual salary decreased by approximately $17,000.

73.     Moore was also demoted from Chief to Captain.

74.     Sheriff Spurlock's investigation and demotion of Ms. Kluth were motivated by her political affiliation and by her political speech.

75.     Contemporaneously with Ms. Kluth's demotion, Sheriff Spurlock promoted Kevin Duffy to Chief, where he became Ms. Kluth's direct supervisor.

76.     Duffy was previously pictured, and identified as a Captain in the DCSO, in a public endorsement of Neal-Graves's candidacy in a tweet that was "liked" by Stacey

Spurlock, Sheriff Spurlock's wife.

77.     Ms. Kluth was informed that he would be "co-captain" in the patrol division along with Captain Jim Jensen.

78.     This unusual staffing decision was calculated to make Ms. Kluth uncomfortable and to drive her out of the DCSO.

79.     Previously, Ms. Kluth had repeatedly attempted to discipline DCSO employee Shannon Jensen, who was Captain Jensen's wife.

80.     However, the Jensens were personal friends of the Spurlocks.

81.     As a result, Ms. Kluth's efforts to discipline Ms. Jensen were unsuccessful, and no formal disciplinary action was taken against Ms. Jensen, despite the recommendations of Ms. Kluth and other supervisors.

82.     Additionally, Ms. Kluth's new supervisor, Chief Duffy, repeatedly changed Ms. Kluth's work schedule.

83.     Duffy rearranged her duties so that she was in charge of short-staffed departments with little to no administrative staff.

84.     Duffy also repeatedly reprimanded Ms. Kluth for insignificant issues, such as copying the Sheriff on an email, questioning another Captain about a new program of the agency, and requesting to be present in meetings between Duffy and her own subordinates.

85.     These were deliberate attempts to make Ms. Kluth's working conditions difficult, so that she would resign her employment.

86.     On or about February 13, 2021, Ms. Kluth publicly announced that she was running for Sheriff of Douglas County.

87.     Shortly after Ms. Kluth announced her candidacy, Spurlock transferred her to Detentions, a less desirable position.

88.     Per DCSO policy, the Captain of Detentions is beneath the Captain of Patrol in the agency's order of authority.

89.     At the same time, Moore was demoted from Captain of Detention to a less desirable and newly created position at the Police Academy.

90.     In spite of Sheriff Spurlock's concerted, politically motivated campaign to drive her out of the DCSO, Ms. Kluth continued to do her utmost to serve the citizens of Douglas County in her new role.

91.     Then, on or about May 25, 2021, more than six months after her demotion, Ms. Kluth was abruptly terminated, without verbal or written warning, and without being provided any termination letter.

92.     Ms. Kluth was called into a conference room with Sheriff Spurlock, DCSO Human Resources Director Laura Leary, and Captain of Professional Standards Jason Kennedy.

93.     Spurlock stated to Ms. Kluth that "nothing has changed since last fall."

94.     By "last fall", Sheriff Spurlock was referring to Ms. Kluth's political affiliation, and her related political activities and speech.

95.     Spurlock also stated to Ms. Kluth that "you're not living up to my mission, vision, and values."

96.     Spurlock expressed to Ms. Kluth that he was discharging her from the DCSO.

97.     Ms. Kluth asked Sheriff Spurlock to explain what she had done, or had not

done, but Sheriff Spurlock only repeated "you're not living up to my mission, vision, and values."

98.     Sheriff Spurlock did not provide Ms. Kluth the reason for his decision to terminate Ms. Kluth's employment.

99.     Sheriff Spurlock offered Ms. Kluth severance in exchange for her resignation.

100.    Ms. Kluth stated that she did not intend to resign.

101.    Ms. Kluth asked what would happen if she did not resign.

102.    In response, she was told it was her last day.

103.    Ms. Kluth refused to resign and Sheriff Spurlock walked out of the meeting.

104.    Ms. Kluth's access to her emails and electronic files was immediately cut off, and she was listed as terminated with the County and State POST board.

105.    A few days later, Ms. Kluth texted Sheriff Spurlock to request retired officer credentials under the Law Enforcement Officer Safety Act ("LEOSA")

106.    Sheriff Spurlock denied Ms. Kluth's request for LEOSA credentials.

107.    Just before Ms. Kluth's termination, Sheriff Spurlock also terminated Mr. Moore.

108.    Mr. Moore's termination was also without verbal or written warning, and Mr. Moore was also not provided any termination letter.

**E.     DCSO Employees Engage in Similar Political Activities Without Consequence, So Long as They Are Politically Aligned with Sheriff Spurlock**

109.    Following Ms. Kluth's termination, DCSO Captain Darren Weekly announced his candidacy for Douglas County Sheriff.

110.     Captain Weekly has been endorsed by Sheriff Spurlock.

111.     Sheriff Spurlock, along with Undersheriff Dave Walcher, Chief Kevin Duffy, and several DCSO Captains, Lieutenants, and line Deputies, including subordinates of Captain Weekly, attended Captain Weekly's campaign kickoff event.

112.     Captain Weekly invited all his Facebook friends, including subordinates at the DCSO, to "like" his campaign's Facebook page.

113.     Several DCSO employees, including Captain Troy McCarty, have publicly endorsed Captain Weekly's candidacy.

114.     Upon information and belief, no DCSO employee has been disciplined or retaliated against for their political activity and speech supporting Weekly's candidacy, because Weekly is politically affiliated with Sheriff Spurlock and enjoys his support.

**F.     Allegations Relating to Plaintiff Kluth's Position and Job Duties**

115.     Per DCSO policy, the position of Captain of Patrol is the chief line officer of the patrol division and supervises the line functions of the division.

116.     Per DCSO policy, the position of Captain of Detentions is the chief line officer of the detentions division and supervises the line functions of the division.

117.     The position of Captain of Patrol does not report directly to the Sheriff.

118.     The position of Captain of Detentions does not report directly to the Sheriff.

119.     Hiring, terminations, and transfers are not within the scope of responsibility for the position of Captain of Patrol.

120.     Hiring, terminations, and transfers are not within the scope of responsibility for the position of Captain of Detentions.

121.     Per DCSO policy, the positions of Captain of Patrol and Captain of

Detentions are not part of the DCSO's Executive Command Staff.

122.    Per DCSO policy, the Chief Deputy of Law Enforcement Bureau is an executive officer of the DCSO and supervises the Patrol division, as well as other divisions.

123.    Per DCSO policy, the Chief Deputy of Administrative Services Bureau is an executive officer of the DCSO and supervises the Detentions division, as well as other divisions.

124.    The Sheriff is ultimately responsible for the overall fiscal management of the Douglas County Sheriff's Office.

125.    The day-to-day management of the Sheriff's Office fiscal affairs is overseen by the Budget Manager.

126.    The Budget Manager is responsible for the direction and coordination of the Sheriff's Office annual budget process, accounts payable processing, purchasing (including the formal RFP process), accounting, revenue and expenditure forecasting, financial analysis, contract administration, and grant administration in accordance with Douglas County and Sheriff's Office policies.

127.    Additionally, the Budget Manager provides guidance, recommendations, and assistance to executive management and cost center managers in financial decision-making and the monitoring and evaluating of their revenue and expenditure budgets throughout the year.

128.    The position of Captain of Patrol does not have inherent authority to commit county funds.

129.    The position of Captain of Detentions does not have inherent authority to

14

commit county funds.

130.    The position of Captain of Patrol does not assume the duties of the Sheriff in his or her absence.

131.    The position of Captain of Detention does not assume the duties of the Sheriff in his or her absence.

132.    The DCSO has a dedicated team of communications specialists and Public Information Officers whose job it is to communicate to the public on behalf of the Sheriff and the DCSO.

133.    The position of Captain of Patrol does not regularly communicate with the public on the Sheriff's behalf.

134.    The position of Captain of Detention does not regularly communicate with the public on the Sheriff's behalf.

135.    There are several layers of intermediate supervisory authority between the Sheriff and the position of Captain of Patrol.

136.    There are several layers of intermediate supervisory authority between the Sheriff and the position of Captain of Detentions.

137.    None of the job duties of the Captain of Patrol position relate to partisan political interests.

138.    Political affiliation with the incumbent sheriff is not necessary for the effective performance of the Captain of Patrol's job duties.

139.    None of the job duties of the Captain of Detention position relate to partisan political interests.

140.    Political affiliation with the incumbent sheriff is not necessary for the

effective performance of the Captain of Detention's job duties.

**G.  Allegations Relating to DCSO's Employment Policies**

141.   DCSO's Disciplinary / Corrective Action policy applies to all members of the DSCO other than probationary employees, term employees, and temporary employees.

142.   DCSO's Disciplinary / Corrective Action policy applied at all relevant times to Ms. Kluth.

143.   DCSO's Disciplinary / Corrective Action provides that DCSO members will be disciplined or discharged only for reasons substantively related to their job or official duties.

144.   Defendant did not terminate Ms. Kluth for such a job-related reason.

145.   DCSO's Disciplinary / Corrective Action policy requires that, prior to initiating any disciplinary action more severe than a 2-year letter of reprimand, or any suspension days, the affected employee must be given notice of a pre-disciplinary hearing at least 24 hours before the hearing time.

146.   Defendant failed to provide notice at least 24 hours in advance of Ms. Kluth's demotion to Captain of Patrol, and failed to provide any notice before her termination.

147.   DCSO's Disciplinary / Corrective Action policy requires that the pre-disciplinary notice include the nature of the charge(s) sustained against the member and a description of the intended sanctions.

148.   Defendant failed to provide Ms. Kluth a pre-disciplinary notice including the charges against her prior to her termination.

149.   DCSO's Disciplinary / Corrective Action policy provides that disciplinary

16

action is finalized only after the employee has had an opportunity to reply to the charges, and present mitigating information.

150.    Defendant failed to provide Ms. Kluth an opportunity to reply to the charges, and present mitigating information prior to her termination.

151.    DCSO's Disciplinary / Corrective Action policy requires the employee's response to the charges to be weighed by the supervisor in the decision-making process.

152.    Defendant failed to weigh Ms. Kluth's response prior to her termination, because she was not provided an opportunity to respond to the charges against her.

153.    DCSO's Disciplinary / Corrective Action policy requires that a written notice of the final disciplinary decision be prepared and provided to the affected employee after the pre-disciplinary hearing and required review of the employee's response to the charges.

154.    Defendant failed to provide Ms. Kluth with a written notice of the final disciplinary decision concerning her termination.

155.    In the case of a demotion or termination, DCSO's Disciplinary / Corrective Action policy requires that the affected employee be provided with a letter containing the effective date of the demotion or termination, as well as a statement citing the reason(s) for the demotion or termination.

156.    Defendant failed to provide Ms. Kluth with a letter containing the effective date of the demotion or termination, as well as a statement citing the reason(s) for the demotion or termination.

157.    DCSO's Disciplinary / Corrective Action policy provides a right to appeal a termination in writing within five business days of the disciplinary action.

158.    DCSO's Disciplinary / Corrective Action policy provides that a Captain's appeal of her termination will be set for hearing within three business days.

159.    Defendant failed to provide Ms. Kluth with a right to appeal her termination.

### III.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Retaliation**
**(Against Defendant Spurlock in his individual and official capacities)**

160.    Plaintiff hereby incorporates all of the paragraphs of this Complaint as if fully set forth herein.

161.    Defendant was acting under color of state law in his actions and inactions at all times relevant to this lawsuit.

162.    The First Amendment of the United States Constitution protects public employees from termination on the basis of their political speech, association, and beliefs.

163.    A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).

164.    In addition, "[p]atronage . . . is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (internal quotations omitted).

165.    As described herein, Ms. Kluth engaged in protected political affiliation and political speech protected by the First Amendment to the U.S. Constitution, including by affiliating with and communicating with DCGOP officials regarding the election for Douglas County Commissioner, and in posting to Facebook regarding the election for

Douglas County Commissioner, a matter of public concern.

166.    By his conduct described herein, Defendant interfered with Ms. Kluth's protected First Amendment freedoms of political association and speech, including by intentionally making her working conditions difficult, demoting or transferring her to Captain of Detentions, and ultimately terminating her employment.

167.    Defendant's conduct described herein was motivated by Ms. Kluth's constitutionally protected activities.

168.    Defendant's conduct caused Ms. Kluth to suffer injuries that would chill a person of ordinary firmness from engaging in such constitutionally protected activity.

169.    Defendant's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

170.     Defendant's conduct violated clearly established rights belonging to the Plaintiff of which reasonable persons in Defendant's position knew or should have known.

171.    Plaintiff was and continues to be damaged by Defendant's violation of her First Amendment rights.

172.    As a direct result of Defendant's unlawful actions, Plaintiff suffered actual economic and emotional injuries, in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment – Procedural Due Process
### (Against Defendant Spurlock in his individual and official capacities)

173.    Plaintiff hereby incorporates all of the paragraphs of this Complaint as if fully set forth herein.

174.    Defendant was acting under color of state law in his actions and inactions

at all times relevant to this lawsuit.

175.   The provisions of state law, C.R.S. § 30-10-506, together with the DCSO's employment policies, as well as the DCSO's longstanding custom and practice, give rise to a constitutionally protected property interest with respect to her employment at the DCSO.

176.   In particular, state law and DCSO policy, custom, and procedures created an understanding that DCSO employees would be terminated only based on an articulable job-related reason, and after notice and an opportunity to be heard.

177.   By his conduct described herein, Defendant subjected Plaintiff to the deprivation of her rights under the Fourteenth Amendment.

178.   In particular, Defendant failed to provide Ms. Kluth with notice of the reasons for her termination, and failed to provide Ms. Kluth with an opportunity to be heard regarding each such reason before the decision to terminate occurred.

179.   Defendant's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

180.    Defendant's conduct violated clearly established rights belonging to the Plaintiff of which reasonable law enforcement and/or elected officials knew or should have known.

181.   Plaintiff was and continues to be damaged by Defendant's violation of her Fourteenth Amendment rights.

182.   As a direct result of Defendant's unlawful actions, Plaintiff suffered actual economic and emotional injuries, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Civil Action for Deprivation of Rights
### (Against Defendant Spurlock in his individual capacity)

183.     Plaintiff hereby incorporates all of the paragraphs of this Complaint as if fully set forth herein.

184.     Defendant Spurlock is a peace officer as defined in C.R.S. 24-31-901(3).

185.     Defendant Spurlock was acting under color of state law in his actions and inactions at all times relevant to this lawsuit.

186.     Article 10 of the Colorado Constitution's Bill of Rights provides that "no law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject . . . ." Colo. Const. art. II., § 10. This constitutional provision "is an affirmative acknowledgement of the liberty of speech, and therefore of greater scope than that guaranteed by the First Amendment" and "provides greater protection of free speech than does the First Amendment." *Bock v. Westminster Mall Co.*, 819 P.2d 55, 59 (Colo. 1991).

187.     Article 25 of the Colorado Constitution's Bill of Rights also provides due process protections. Colo. Const. art. II., § 25.

188.     These provisions created binding obligations on Defendant Spurlock to respect Ms. Kluth's freedoms of association and speech, and to respect her due process rights.

189.     As described herein, Ms. Kluth engaged in protected political affiliation and political speech protected by Article 10 of the Colorado Constitution's Bill of Rights, including by affiliating with and communicating with DCGOP officials regarding the

election for Douglas County Commissioner, and in posting to Facebook regarding the election for Douglas County Commissioner, a matter of public concern.

190.    By his conduct described herein, Defendant Spurlock interfered with Ms. Kluth's freedoms of political association and speech protected by Article 10, including by intentionally making her working conditions difficult, demoting or transferring her to Captain of Detentions, and ultimately terminating her employment.

191.    Defendant Spurlock's conduct described herein was motivated by Ms. Kluth's constitutionally protected activities.

192.    Colorado law "unambiguously confers two due process rights on [sheriffs'] deputies," namely the right to receive notice of the reason of a proposed termination, and an opportunity to be heard by the sheriff regarding each such reason. *Cummings*, 440 P.3d at 1186.

193.    By his conduct as described herein, Defendant Spurlock deprived Ms. Kluth of due process rights protected under Article 25.

194.    In particular, Defendant Spurlock failed to provide Ms. Kluth with notice of the reasons for her termination, and failed to provide Ms. Kluth with an opportunity to be heard regarding each such reason before the decision to terminate occurred.

195.    Defendant Spurlock's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

196.    Plaintiff was and continues to be damaged by Defendant Spurlock's violation of her Article 10 and Article 25 rights.

197.    As a direct result of Defendant Spurlock's unlawful actions, Plaintiff suffered

actual economic and emotional injuries, in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(Against Defendant Spurlock in his individual and official capacities)**

198.    Plaintiff hereby incorporates all of the paragraphs of this Complaint as if fully set forth herein.

199.    Under Colorado law, county sheriffs may adopt policies that limit their ability to terminate employees. *Cummings v. Arapahoe Cty. Sheriff's Dep't*, 440 P.3d 1179 (Colo. App. 2018).

200.    In addition, Colorado law, C.R.S. § 30-10-506, expressly grants sheriffs' deputies nonwaivable due process rights to notice of the reason for a termination, and an opportunity to be heard by the sheriff prior to termination as to each such reason. *Id.* at 1187.

201.    The DCSO's termination and disciplinary policies, in part, effectuate deputies' statutory rights to notice and an opportunity to be heard.

202.    In addition, the DCSO policy manual provides other binding procedural and substantive rights to DCSO employees.

203.    Together, the DCSO's policy manual constituted a contract with Ms. Kluth, providing that, among other things, the DCSO would conduct terminations and disciplinary proceedings under specified procedures, and on the substantive grounds set forth by the policies.

204.    In promulgating the termination procedures, the DCSO made an offer to Ms. Kluth, and Ms. Kluth's continued employment constituted acceptance of and consideration for those procedures.

205.   The conduct of Defendant as described herein, including but not limited to failing to provide Ms. Kluth with a termination notice including the reason for her termination, and failing to provide an opportunity to be heard as to any such reason, constituted a breach of the implied contract between Ms. Kluth and the DCSO.

206.   Defendant's conduct was willful and wanton, and physical, mental and emotional distress damages were the foreseeable, natural and proximate consequences of such breach.

207.   As a direct result of Defendant's conduct, Plaintiff suffered actual economic and emotional injuries, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award her all relief as allowed by law, including, but not limited to the following:

a.   A declaration that Defendant has violated Plaintiff's First and Fourteenth Amendment rights under the United States Constitution;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

d.   Punitive damages for all claims allowed by law in an amount to be determined at trial;

e.   Front pay in lieu of reinstatement;

f.      Pre-judgment and post-judgment interest at the highest lawful rate;

g.      A tax offset for any damages award;

h.      Attorneys' fees and costs; and

i.      Such further relief as justice requires.


**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**


Respectfully submitted,

RATHOD | MOHAMEDBHAI LLC

*s/ Felipe Bohnet-Gomez*
Felipe Bohnet-Gomez
Matthew J. Cron
Siddhartha H. Rathod
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400
fbg@rmlawyers.com
mc@rmlawyers.com
sr@rmlawyers.com

*Attorneys for Plaintiff*