IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-CV-3417-NYW

_____

DEPOSITION OF HOLLY NICHOLSON-KLUTH
July 7, 2022

_____

HOLLY KLUTH,

Plaintiff,

vs.

TONY SPURLOCK, Individually and in
his official capacity as Douglas County
Sheriff,

Defendant.

_____


APPEARANCES:

      RATHOD|MOHAMEDBHAI, LLC
          By Matthew J. Cron, Esq.
             2701 Lawrence Street Suite 100
             Denver, Colorado  80205
               Appearing on behalf of Plaintiff

      WELLS, ANDERSON & RACE, LLC
          By William T. O'Connell, III, Esq.
             1700 Broadway, Suite 1020
             Denver, Colorado  80290
               Appearing on behalf of Defendant

Also Present: Tony Spurlock

1  questions, let me know, and I will do my very best

2  to put it in a form that you understand.

3      A    Okay.

4      Q    Unless you speak up, I'm going to

5  assume that you heard and understood the question.

6      A    Understood.

7      Q    If your attorney objects to any of my

8  questions, let him place his objection on the

9  record.  Unless he directs you not to answer, you

10  can go ahead and answer the question.

11      A    Okay.

12      Q    If you need to take a break at any

13  time, that's fine, just let me know.  The only

14  caveat to that is if I've asked a question, I need

15  you to provide a full and complete answer

16  before --

17      A    Okay.

18      Q    -- taking the break.

19      A    Okay.

20      Q    All right.  Do you understand those

21  instructions?

22      A    I do.

23      Q    On October 15, 2020, you were

24  interviewed by Lynn Johnson as part of Douglas

25  County Sheriff's Office's Internal Affairs

SPURLOCK Motion for Summary Judgment, Exhibit A

```
1   investigation 20IA-25, correct?

2       A    That sounds accurate.

3       Q    All statements you provided to

4   Mr. Johnson during that interview were true,

5   correct?

6       A    That's true, yes.

7       Q    On November 12, 2020, you met with

8   Sheriff Spurlock for a pre-disciplinary hearing as

9   part of IA -- excuse me -- as part of 20IA-25,

10  correct?

11      A    Yes.

12      Q    All statements you provided to

13  Sheriff Spurlock during that pre-disciplinary

14  hearing were true, correct?

15      A    Yes.

16      Q    On November 16, 2020, you met with

17  Sheriff Spurlock for a disciplinary hearing as

18  part of 20IA-25, correct?

19      A    That's true.  Can I clarify something?

20      Q    Sure.

21      A    On the 12th, I was given the findings

22  and a possible discipline.

23      Q    Okay.  But you --  But there was a

24  hearing with the sheriff on November 12th, right?

25      A    Yes.
```

```
1      Q     And the statements you provided to the
2  sheriff during that November 12, 2020 hearing were
3  true?
4      A     Yes.
5      Q     All right.  So on November 16, 2020,
6  you met with Sheriff Spurlock for a disciplinary
7  hearing as part of 20IA-25, right?
8      A     Yes.  Yes.
9      Q     All statements you provided during --
10 to the sheriff during that hearing were true,
11 correct?
12     A     Yes.
13     Q     You had no reason to lie during your
14 interview with Mr. Johnson, did you?
15     A     No.
16     Q     You had no reason to lie during the
17 November 12, 2020 pre-disciplinary hearing, did
18 you?
19     A     No.
20     Q     You had no reason to lie during the
21 November 16, 2020 disciplinary hearing, did you?
22     A     No.
23     Q     As Douglas County Undersheriff, you
24 were Sheriff Spurlock's right-hand person,
25 correct?
```

1      A     Yes.

2      Q     You were the second in command?

3      A     Yes.

4      Q     As undersheriff, you were supposed to

5  be in sync with Sheriff Spurlock on matters

6  related to the office, right?

7      A     Yes.

8      Q     While you were undersheriff, any

9  appearance of a rift in the office between you and

10  Sheriff Spurlock could have been disruptive to the

11  operations of the office, right?

12      A     It could have, yes.

13      Q     As undersheriff, were you a policy

14  maker for the sheriff's office?

15      A     I would write some policies or edit

16  them or approve of them up to my level.  The

17  sheriff, I think, was the final approval.

18      Q     Do you know if you had any policy

19  making authority as the undersheriff?

20      A     I believe that he had to approve all --

21  or had final approval of all policies.

22      Q     As the undersheriff, you had a high --

23  high public profile in Douglas County, didn't you?

24      A     Yes.

25      Q     You were the face and/or voice of the

1    organization in the absence of the sheriff?

2        A      Yes.

3        Q      And at other times as well?

4        A      At --  In the absence of the sheriff.

5        Q      Okay.  Well, for example, during the

6    STEM shooting, you were the PIO, essentially --

7        A      Yes.

8        Q      -- weren't you?

9        A      Yes.

10       Q      Okay.  And the sheriff was around at

11   that time?

12       A      Yeah.  He was at another location.

13       Q      All right.  But my point is, even

14   sometimes when the sheriff was in the county, you

15   were the face and/or voice of the sheriff's

16   office?

17       A      Sometimes.  Or if he asked me to speak,

18   such as at a public hearing or something.

19       Q      Do you agree that any sheriff has to

20   have 100 percent support in his or her

21   administration in order for the sheriff's office

22   to operate effectively?

23       A      For undersheriff?

24       Q      Well --

25       A      Could you repeat that, please.

```
1       A       Uh-huh.

2       Q       Okay.

3       A       Yeah.

4       Q       Yes?

5       A       Yes.  I'm sorry.

6       Q       So even if you disagreed with him on

7   certain things, he set the directives for the --

8       A       Yes.

9       Q       -- office?

10       A       Yes.

11       Q       And he expected you to carry out those

12   directives --

13       A       Yes.

14       Q       -- whether you agreed or not?

15       A       Yes.

16       Q       While you were undersheriff, do you

17   agree that trust among command staff was crucial?

18       A       Yes.

19       Q       While you were undersheriff, can you

20   describe for me or identify for me, let's say in

21   the last year you were undersheriff, who comprised

22   the command staff?

23       A       Myself, Chief Johnson, Chief Moore

24   Chief -- in the last year, let's see -- Chief

25   McMahan until he left, and then Chief Walcher took
```

```
 1    his place in August.  And there was some --
 2    Command staff sometimes would be referred to the
 3    captains as well, and then the chiefs and
 4    undersheriff and sheriff were considered executive
 5    staff.
 6         Q    Okay.
 7         A    I don't know if that's in policy, but
 8    that's -- that's the way it usually went.
 9         Q    So were captains considered command
10    staff?
11         A    I believe so, yeah.
12         Q    All right.  Then if I understand your
13    testimony, executive staff would be the sheriff,
14    the undersheriff and the two chiefs?
15         A    Three chiefs.
16         Q    Three chiefs.  I'm sorry.
17         A    Yes.
18         Q    Okay.  While you were undersheriff, do
19    you agree that collaboration and cooperation among
20    command staff was important?
21         A    Yes.
22         Q    While you were undersheriff, do you
23    agree that it was important that command staff
24    remain united?
25         A    Yes.
```

1  internal operations or the office or the citizens,

2  in your case, of Douglas County?

3     A    I think the citizens expect to see the

4  command staff on -- on the same page.

5     Q    Do you agree with the general

6  proposition that all officers and staff in a law

7  enforcement agency need to work in partnership?

8     A    Of course.

9     Q    Do you agree that an elected sheriff

10  has the right to appoint an executive staff that

11  he or she feels agrees with and supports his or

12  her vision?

13     A    Yes.

14     Q    Do you agree that an elected sheriff,

15  if he or she feels that he needs to make a change,

16  that that's perfectly acceptable?

17     A    Of executive staff?

18     Q    Correct.

19     A    Yes.

20     Q    I began the deposition, Ms. Kluth, with

21  asking you a few questions about the IA interview

22  with Lynn Johnson.

23     A    Uh-huh.

24     Q    Have you read Mr. Johnson's IA report

25  that's been produced --

SPURLOCK Motion for Summary Judgment, Exhibit A

1  A  I believe so --

2  Q  -- by my office?

3  A  -- yes.

4    By your office?

5  Q  Yeah.

6  A  Well --

7  Q  And, I'm sorry.  I think we're talking

8 over each other a little bit, and we're going to

9 draw the ire of my court reporter if we continue

10 to do that.

11    My office produced a copy of the IA

12 property during this litigation.

13  A  Yes.

14  Q  So whether it's that copy or another

15 copy, it doesn't matter.  Have you read a copy of

16 that report?

17  A  Yes.

18  Q  Okay.

19    MR. O'CONNELL:  We can mark this as

20 No. 1.

21    (Exhibit 1 marked.)

22  Q  (By Mr. O'Connell)  So I've handed you

23 what's been marked as Exhibit 1.  This is a copy

24 of Mr. Johnson's IA report.  And just for the

25 record, it's Bates-stamped DCSO -60 through -74.

1    I'm going to direct your attention, Ms. Kluth, to

2    specific pages in a moment, but is Exhibit 1

3    something that you've taken a look at before

4    today's date?

5          A     I believe so.  There's --  I believe

6    I've seen this whole thing.  I --  I am a little

7    confused, because I got a copy of a redacted one

8    when I did a CORA request.

9          Q     Right.

10         A     And so --  And there's a lot of pages,

11   so --

12         Q     Right.

13         A     -- I'm not positive I've read every

14   page of this.

15         Q     Understood.

16         A     I believe so, though.

17         Q     I'd like to direct your attention to --

18   In the bottom right corner there are Bates stamps.

19               Do you see those?

20         A     Uh-huh.

21         Q     Okay.  Go to DCSO -70.  And at the

22   bottom you'll see your name.  This is a summary --

23   or what purports to be a summary of your interview

24   with Mr. Johnson that continues over to Pages 71

25   and 72.

1      A      Uh-huh.

2      Q      So it may take you a few moments, and

3   that's fine, but could you just read this summary

4   to yourself and let me know when you're finished,

5   the summary of your interview with him.

6      A      Yes.

7      Q      All right.  So you've had an

8   opportunity to read the summary of your interview

9   with Mr. Johnson as contained in Exhibit 1.  Did

10   you notice any inaccuracies?

11      A      I didn't feel like there were any

12   inaccuracies, although some of the way he -- ways

13   he puts things may be a little in his kind of

14   opinion.

15      Q      For example . . .

16      A      Okay.  Well, let's start at the

17   beginning.  I think just the statement,

18   "Undersheriff Nicholson-Kluth did not have any

19   concerns about the political conversations taking

20   place."  I believe I did say something like I did

21   not think about that.  I'm not sure that I did not

22   have any concerns.  But I don't know exactly what

23   I said to him, so . . .

24      Q      That's fine.

25      A      That's one.  And I'm just a little

1    curious about the comment that "never advised

2    Chief Moore not to conduct any political business

3    on duty."  That's true that I didn't, "Stating

4    'I didn't think about that.'"  So I don't know

5    what his exact question was, but I'd be curious to

6    review that.

7        Q     And you're referencing the last

8    sentence --

9        A     Yes.

10       Q     -- in the -- in your interview summary

11   on DCSO -72?

12       A     Yes.

13       Q     Is that it?

14       A     Yes.

15       Q     At the time, you were aware that

16   Mr. Johnson was recording his interview?

17       A     Yes, I assumed.

18       Q     Have you listened to that audio?

19       A     I have.

20       Q     When's the last time you listened to

21   it?

22       A     Yesterday.

23       Q     As part of your preparation for today?

24       A     Yes.

25       Q     All right.  You can set that aside for

SPURLOCK Motion for Summary Judgment, Exhibit A

1    now.  Thank you.

2              Okay.  I asked you a couple of

3    questions at the beginning of the deposition about

4    the November 12, 2020 hearing -- pre-disciplinary

5    hearing with Sheriff Spurlock.  You were aware

6    that that hearing was being recorded, correct?

7         A    I'm not sure if I was.

8         Q    Okay.  Have you listened to the audio?

9         A    I didn't --  No, I have not seen that

10   audio.

11        Q    Are you aware that that audio has been

12   produced by my office in this case?

13        A    No.

14        Q    Well, I'll represent to you at

15   approximately the 24 minute and 15 second mark,

16   you state, "I didn't realize until I talked to you

17   how upset you were, and so I apologize."

18             What were you apologizing for during

19   that hearing with the sheriff?

20        A    Well, I'm guessing, based on --  I

21   don't know the whole context of the discussion,

22   but for upsetting him.

23        Q    What was your understanding at the time

24   as to why he was upset?

25        A    That he felt it showed a rift between

1    he and I --  That what happened showed a rift

2    between he and I.

3         Q     Okay.  Do you agree that that -- that

4    there was an appearance of a rift between you and

5    he as a result of what you did?

6         A     Probably, yeah.  Uh-huh.

7               MR. O'CONNELL:  This is Exhibit 2.

8               (Exhibit 2 marked.)

9         Q     (By Mr. O'Connell)  All right.  I just

10   handed you Exhibit 2, which is the "Notification

11   of Findings/20IA-025" from Sheriff Spurlock to

12   you --

13        A     Uh-huh.

14        Q     -- dated November 12, 2020 and

15   bates-stamped DCSO -163 through -167.

16              You've seen this before, obviously,

17   correct?

18        A     Yes.

19        Q     Okay.  Were you provided this document

20   at the beginning of the hearing or meeting,

21   however you want to describe what you had with

22   Sheriff Spurlock on that date?

23        A     I believe so, yeah.

24        Q     Okay.

25        A     Uh-huh.

1    Mr. Parker in which you provided this quote been

2    produced in this case?

3         A    I don't think so.

4         Q    Okay.  Do you have that --  And I don't

5    mean on your person today.  Do you still have --

6    Do you still have that text on your phone?

7         A    I believe so.

8              MR. O'CONNELL:  So, Counsel, I'm going

9    to request that that text be provided, please, as

10   responsive to Sheriff Spurlock's RFPs.

11        Q    (By Mr. O'Connell)  Do you recall what

12   you said in that text to Mr. Parker?

13        A    It --  It was almost the same thing

14   that was shown on the text message when he showed

15   the graphic of what he wanted to do, and it said

16   something about "I've lived in Douglas County so

17   many years.  I've been involved in the GOP.  I

18   think we're a better county because of our

19   conservative leadership," et cetera.

20        Q    Now, this sentence also references a

21   posting you made to your personal Facebook page.

22        A    Uh-huh.

23        Q    Now, that posting has been produced by

24   your lawyers in this case.

25        A    I believe so, yeah.

1    I understand your testimony.  Had you been

2    provided Exhibit 2 prior to the pre-disciplinary

3    hearing, if I'm understanding your testimony --

4         A     This --  Right.

5         Q     -- you would have essentially been able

6    to tell Sheriff Spurlock in the hearing what's

7    captured in Exhibit 3; is that right?

8         A     This and maybe more, but I don't know.

9         Q     Okay.

10        A     I can't put myself in that position.

11        Q     The second paragraph of Exhibit 3

12   states --  Actually, the first sentence says,

13   "First of all, I take full responsibility for my

14   actions and inactions in this situation."

15             What inactions are you referring to?

16        A     I think to some of the --  You know,

17   the fact that I could have told Tim, "Hey, don't

18   reach out to the captains.  Don't reach out to

19   them, you know, while you're working."  So that

20   would be one inaction I probably could have done

21   differently.

22        Q     Can you think of any other inactions

23   that you're referencing in this Exhibit 3?

24        A     I'm going to have to look through this.

25        Q     Go ahead, please.  And "Tim," just for

1   the record, is Tim Moore?

2       A       Tim Moore, uh-huh.  And I think the

3   only other thing would be to not mention the

4   sheriff in my Facebook post, because I mentioned

5   him at the very beginning.

6       Q       Okay.  I just want to make sure I

7   understand the hierarchy at that time.  So Tim

8   Moore, at the time this was going on in

9   October/November 2020, was he a bureau chief?

10      A       Yes.

11      Q       Okay.  Was he one of your direct

12  reports?

13      A       Yes.

14      Q       In that same paragraph, the second

15  paragraph on Exhibit 3 there, the first page, you

16  reference that -- well, you reference mitigating

17  factors.

18              Do you see that?

19      A       Which paragraph?

20      Q       It is the second paragraph --

21      A       Okay.

22      Q       -- the third sentence.

23      A       "I would like to note however, not for

24  the purpose of" --  Okay.  Uh-huh.

25      Q       What are --  What are mitigating

1    It's the first page.

2        A    Oh, sorry.

3        Q    The second paragraph begins, "First of

4    all, I take full responsibility."

5             Do you see that?

6        A    Yeah.

7        Q    The next sentence begins, "I apologize

8    for betraying your trust."

9        A    Uh-huh.

10       Q    Do you see that?

11       A    Uh-huh.

12       Q    Why did you apologize for betraying

13   Sheriff Spurlock's trust?

14       A    I felt like he -- he was mad --  I

15   didn't feel like I had betrayed his trust, but he

16   was mad when I -- when I asked him what he thought

17   about my Facebook post when I talked to him on the

18   25th.  He said it appeared that it created a rift

19   between us, or something to that effect.

20             And so, therefore, I felt that maybe he

21   didn't trust me anymore or something to that

22   effect, I guess.  I don't know.

23       Q    Do you believe you betrayed his trust?

24       A    I don't know.  I --  I --  I felt like

25   we had a different relationship and we had a

1    different --  We had a discussion about me putting

2    something out.  We didn't sit down and go through

3    it, and I put something out.  He told me it was --

4    or he felt like it showed a rift between us, so --

5    And at that point, I thought, "Okay.  I have done

6    something that he's upset about."  The way I

7    worded this, it's possible that I felt that he

8    felt that he couldn't trust me.

9         Q     Could you understand why

10   Sheriff Spurlock believed that what you had

11   done appeared to have created a rift between you

12   and he?

13        A     Can I understand that?  Yes.  Uh-huh.

14        Q     Okay.  Did you have any concerns that

15   Stu Parker would do something that could possibly

16   get you and Tim Moore in trouble?

17        A     Yeah.  And I texted that to Tim and

18   said, "I hope he doesn't do something to get us in

19   trouble."

20        Q     Okay.

21        A     I also felt like I could --  That had

22   not been decided what to do at that point.  It was

23   just discussions, which is why I went to talk to

24   the sheriff about it.

25        Q     What could Stu Parker possibly do that

1  would have gotten you in trouble?

2      A      Putting something out like that with

3  the pictures on it of us in uniform, I felt like

4  that was going too far.

5      Q      Uh-huh.  At the time you provided the

6  quote to Mr. Parker, you knew that he was

7  contemplating posting that with your picture from

8  the website, right?

9      A      I knew he was planning something, yes.

10     Q      Okay.

11     A      Excuse me.  Could I get some water for

12 this (indicating)?

13     Q      Sure.

14            MR. O'CONNELL:  Off the record.

15            (Discussion off the record.)

16            MR. O'CONNELL:  This is No. 4.

17            (Exhibit 4 marked.)

18     Q      (By Mr. O'Connell)  I've handed you

19 what's been marked Exhibit 4.

20     A      Uh-huh.

21     Q      It's DCSO -42 and -53.  And -53, the

22 second page of the exhibit, is simply a blown-up

23 version --

24     A      Okay.

25     Q      -- of a couple of texts that are on the

SPURLOCK Motion for Summary Judgment, Exhibit A

1   first page of the Exhibit, which is DCSO -42, all

2   right?

3        A      Uh-huh.

4        Q      So let me direct your attention to the

5   first page of the exhibit, DCSO -42.  You'll see

6   at the bottom there are some what appear to be

7   text messages to Tim Moore.

8        A      Uh-huh.

9        Q      Are those your texts to Mr. Moore?

10       A      I think the blue are.

11       Q      Okay.  All right.  So the texts --

12  Just to make sure the record is clear, the texts

13  that begin "Not really comfortable with" and then

14  "And maybe he can put a little star under the

15  picture" and then "Can we trust Stu," those are

16  from you to Moore?

17       A      Yes.

18       Q      Understood.  The last text on the first

19  page of Exhibit 4 states, "I'm gonna call him

20  about 830," that's from Moore to you?

21       A      Yes.

22       Q      All right.  And then just confirm that

23  the second page of the exhibit, those are --

24  confirm, if you would, that those are simply

25  expanded or blown-up versions of a couple of the

SPURLOCK Motion for Summary Judgment, Exhibit A

1   texts that are on -42, right?

2       A    Yes.

3       Q    Now, the second text to Moore, in which

4   you state, "And maybe he can put a little" -- then

5   there appears to be an asterisk -- "under the

6   pictures and say from Douglas County Sheriff's

7   website."

8           What exactly are you referencing there?

9       A    I was referencing the pictures.

10      Q    Okay.  And why were you asking --  Or

11  why were you thinking about perhaps him putting a

12  little asterisk under the pictures?

13      A    Because he made some comment that he

14  was going to get the pictures off of the website,

15  and I wasn't really comfortable with that.  This

16  was really just a brief discussion about this.  I

17  was off duty.  I was at home.  I was recovering

18  from wrist surgery, and this was some

19  back-and-forth that went on.  But I was not

20  comfortable with our pictures being in uniform.

21      Q    Uh-huh.  Now, it's hard for me to make

22  out who's identified in those pictures.  It's

23  yourself, Moore --  Is that Brad Heyden?

24      A    Heyden, Jensen and Weekly.

25      Q    Okay.  Heyden, Jensen and Weekly.  All

1   right.  These texts were sent to Moore on

2   September 22, 2020, correct?

3       A     Uh-huh.

4       Q     Is that a yes?

5       A     Yes.

6       Q     All right.  I asked you earlier this

7   morning whether the text to Parker was made before

8   or after the Facebook post.  Does this help you

9   kind of pinpoint exactly when the Facebook post

10   happened in relation to the text to Parker?

11       A     No, it doesn't help.  I believe --  My

12   recollection is that it may have been that morning

13   that I gave him a statement.  You can see on here

14   the statement is there, and that's in the

15   afternoon --

16       Q     I see that.

17       A     -- 4:17.

18       Q     Okay.

19       A     And I believe the post went up in the

20   morning, but I'm not positive.

21       Q     So did --  To your knowledge, did

22   Parker edit any of the quote that you provided to

23   him via text?

24       A     There was something about saying --  At

25   first he said something to me about putting that I

1      A      I don't remember a specific statement.

2      Q      Okay.  When you read this memo on or

3  about November 16, 2020, did you understand what

4  he meant with that sentence?

5      A      Of course, yes.

6      Q      Okay.  Do you agree with the

7  proposition that all command staff members should

8  be in agreement with the sheriff's vision, mission

9  and values?

10      A      Yes.

11      Q      You would agree it's not unusual for

12  any sheriff to have a vision or mission, correct?

13      A      Right.

14      Q      When you were running for Douglas

15  County Sheriff, you actually had a vision/mission

16  statement on your website, right?

17      A      Yes.  Uh-huh.

18      Q      The last sentence of that same

19  paragraph there on DCSO -146 --

20      A      Uh-huh.

21      Q      -- states, "As Undersheriff," you're --

22  "you are the 2nd in command and I expect complete

23  compliance with all state and federal laws, as

24  well as all DCSO Policies and Procedures."

25              Do you see that?

1   Exhibit 5 that is not contained within your memo,

2   Exhibit 6, is that second -- is that first bullet

3   point on the second page, which begins, "You

4   intentionally withheld from me that you were not

5   only facilitating but supervising."

6           Do you see that?

7   A     Yes.

8   Q     All right.  Sheriff Spurlock had no

9   idea that you were in contact with Chief Moore

10  about providing these quotes to Stu Parker, right?

11  A     That's true.

12  Q     Why didn't you tell him?

13  A     Well, there was a couple reasons.  I --

14  This happened while I was home on light duty -- or

15  not light duty, but on leave.  It happened over a

16  period of 24 to 36 hours, maybe.  And as soon as I

17  started seeing what they were putting together and

18  had had the discussions with Chief Moore, I

19  started asking him to meet.  I needed to talk to

20  him.  I wanted to talk to him about it.

21          He was very busy during those two days

22  with media interviews, out of cell coverage at

23  Sprucewood Mountain and other things --  I believe

24  I contacted him two or three times asking to talk.

25  We finally didn't talk until Thursday morning.  So

SPURLOCK Motion for Summary Judgment, Exhibit A

1     Q     Okay.  Documents provided by your

2   counsel?

3     A     Yes --

4     Q     Okay.

5     A     -- or obtained by me through the CORA

6   request.

7     Q     Okay.  Let's go back to Exhibit 1,

8   please, which was the -- the IA report from

9   Lynn Johnson.

10    A     Okay.

11    Q     Directing your attention to DCSO -67,

12  you'll see towards the bottom there is a summary

13  of Tim Moore's interview with Johnson, which

14  continues over to Pages -68, -69 and -70.  And

15  since you're a fairly quick reader, Ms. Kluth,

16  I'll ask you to read this summary to yourself and

17  then let me know when you're finished, starting on

18  Page -67, if you would.

19    A     I did.

20    Q     Okay.

21          MR. CRON:  And take your time, because

22  I'm not as quick as you.

23          THE DEPONENT:  Okay.

24          MR. O'CONNELL:  Off the record.

25          (Discussion off the record.)

SPURLOCK Motion for Summary Judgment, Exhibit A

1      Q      (By Mr. O'Connell)  All right.  You've

2    now had a chance to read the summary of Tim

3    Moore's interview with Lynn Johnson contained in

4    Exhibit 1, correct?

5      A      Yes.

6      Q      And there's a lot to unpack there, I

7    realize.  As it relates to Mr. Moore's contacts

8    with you, as he told Mr. Johnson about, did you

9    notice any inaccuracies?

10     A      Just some of the way he put something

11   about how I then went to talk to the sheriff and

12   stuff like that.  I mean, I called the sheriff, so

13   I didn't really go and talk to him.  So it's stuff

14   like that, but nothing -- nothing -- nothing that

15   I saw really stood out.

16     Q      Okay.  All right.  Let me direct your

17   attention to DCSO -68.  The very last sentence on

18   this page, which begins "Undersheriff

19   Nicholson-Kluth told him she was likely going to

20   have to take a personal position" --  Do you see

21   that?

22     A      Uh-huh.

23     Q      Okay.  And that's a yes?  I just want

24   to --

25     A      Yes.

1       A       I don't believe that arguing with him
2    about this would have done me any good.  I can't
3    imagine saying, "But you told me I could," you
4    know, or "You agreed to me making a statement" or
5    "You didn't tell me you had a problem with me
6    making a statement."
7              So it just didn't come up.  I was
8    pretty -- what's the word? -- deflated by all of
9    this, and so I wasn't about to argue with him.
10      Q       Well, did you consider just pointing
11   that fact out to --
12      A       No, I didn't consider --
13      Q       -- to be arguing?
14      A       -- it, no.
15      Q       Okay.  Just do me a favor, Ms. Kluth,
16   and let me finish.  Otherwise, we're going to get
17   in trouble here.
18             So at the time the IA revved up in the
19   fall of 2020, you had been undersheriff for over
20   six years?
21      A       Yeah.
22      Q       You had been in law enforcement for how
23   long?
24      A       32-1/2.
25      Q       32-1/2 years.  You were the subject --

SPURLOCK Motion for Summary Judgment, Exhibit A

1    Tracker by Chief Duffy; is that right?

2          A     That's what it appears, yeah.

3          Q     Okay.  And would you --  Is it fair to

4    describe these entries as commendations?  Or how

5    would you describe them?

6          A     Positive supervisor notes.

7          Q     Okay.  All right.  That's all I have

8    with that.  You can set that aside.  Thank you.

9                Is it your contention in this case that

10   you were terminated on May 25, 2021 or that the

11   termination --  Strike that.  Let me rephrase.

12               Is it your contention in this case that

13   your May 25, 2021 termination was motivated by

14   your political affiliation and political speech?

15         A     Yes.

16         Q     Why do you contend that?

17         A     A comment that the sheriff made when I

18   first walked in was, "Nothing has changed since

19   last fall," and there was no other reason given

20   or -- other than mission, vision, values, which to

21   me didn't make any sense.  Nothing was formal.

22   Nothing was given to me, and so that was my

23   feeling, my assumption.

24         Q     All right.  We'll drill a little deeper

25   into that here later.  Anything else, though, as

SPURLOCK Motion for Summary Judgment, Exhibit A

1   far as why you believe your termination was

2   motivated by political affiliation and political

3   speech?

4       A    Other than it was just --  There was no

5   reason given.  And the comment about "last

6   fall" -- that "nothing had changed since last

7   fall," as well as the fact that I felt I had

8   worked very hard during that time period and had

9   no other reason to be terminated.

10      Q    While you were --  How long did you

11  report to Chief Duffy as a co-captain of patrol

12  for, give or take?

13      A    About three months.

14      Q    Okay.  So until --

15      A    Two to three months.

16      Q    -- late February or the early March

17  time frame; somewhere along there?

18      A    Mid to late February.

19      Q    All right.  And then you were

20  reassigned to detentions.  Who did you report to

21  when you were captain of detentions?

22      A    Chief Steve Johnson.

23      Q    So you reported to Johnson for about

24  another two or three months before your

25  termination?

SPURLOCK Motion for Summary Judgment, Exhibit A

1    A    It was just uncomfortable.  He --  I

2    tried my best to make sure he knew I respected him

3    and that I was going to do anything he asked me to

4    do, but we had had a somewhat strained

5    relationship due to just some discipline that --

6    I had insisted he do a 360 evaluation with his

7    subordinates and co-captains, because he had a lot

8    of complaints about his demeanor, and so it was

9    uncomfortable.  But we got along fine.  I

10   respected him and I -- I told him so.

11   Q    How about while you were reporting to

12   Johnson?  Was that difficult for you, in that he

13   was one of your direct reports while as

14   undersheriff?

15   A    It was probably easier with him.  His

16   demeanor is a -- was a little bit different and a

17   little more collaborative, but it was still

18   awkward.  It seemed that the relationship had

19   changed, obviously, from a team member to a

20   subordinate, so it was awkward, yeah.  But we got

21   along.

22   Q    All right.  So in the termination

23   meeting that you had with the sheriff on May 25,

24   2021, according to your complaint, two other folks

25   were in attendance, HR Director Laura Leary, and

SPURLOCK Motion for Summary Judgment, Exhibit A

1    then the captain of professional standards,

2    Jason Kennedy; is that right?

3        A    Yes.

4        Q    I'm not looking for an exact time,

5    obviously, but about how long did that meeting

6    last?

7        A    Less than 10 minutes.

8        Q    Okay.  And describe for me, if you

9    would, exactly what happened in that meeting.

10       A    So that's been a little over two years

11   ago --  Was it a year ago or two?  I guess it was

12   a year ago.

13       Q    It would have been a year ago this past

14   May, so 14 months ago.

15       A    Chief Johnson asked me to come by the

16   office.  I was out washing my car or something.

17   So I got there, and he -- I went in his office and

18   he said, "The sheriff wants to see you."  So I

19   walked into the conference room, and the sheriff

20   was sitting at the head of the table and Laura

21   Leary was sitting here (indicating), and then

22   Jason Kennedy was sitting there (indicating).

23            I sat down and he said --

24       Q    "He" being who?

25       A    The sheriff.

1       Q     Okay.

2       A     -- "Nothing has changed since last

3   fall.  I want you to resign," or something to

4   that --  I don't remember the exact chronology.

5       Q     Uh-huh.

6       A     These are the words that I remember.

7   "I want you to resign.  I'll pay you six months'

8   pay and benefits."

9           And I asked him, "Is there something

10  I've done?  Or is there something I haven't done?"

11  He said, "You aren't meeting my mission, vision

12  and values."

13         And so I said, "Well, I don't want to

14  resign."  And he --  I said, "What happens if I

15  don't resign?"  He said, "This is your last day."

16         So I said, "I'm not resigning."  He got

17  up and walked out shortly after that, and I don't

18  remember if there was any other conversation.  I

19  think that's all I recall.

20         And Laura Leary passed the folder over

21  to me and said, "Do you want to look at this?"  I

22  said, "No.  I'm not interested."  So they walked

23  me down and I emptied my office.

24      Q    Do you recall Jason Kennedy saying

25  anything?

SPURLOCK Motion for Summary Judgment, Exhibit A

1      A      I don't recall him saying anything.

2      Q      Okay.  And, I'm sorry.  Perhaps you

3   referenced this earlier.  And I'm not trying to

4   belabor or go over old ground, but when the

5   sheriff said, "You're not living up to my vision,

6   mission and values," what was your response to

7   him?

8      A      Something like, "Have I not done

9   something" --  "Have I done something?  Have I not

10   done something?"  It was, "Have I either done

11   something or not done something you expected,"

12   basically.  And I think he repeated it twice,

13   "You're not meeting my mission, vision and

14   values."

15      Q      And at that point, then, is that --

16   And, I'm sorry.  I'm not trying to --

17      A      Yeah.

18      Q      -- trip you up.  At that point, did you

19   ask him or --  I'm just trying to get the

20   chronology straight in my mind.  After he said

21   that, what happened next?

22      A      I think I said something, like, "I'm

23   not resigning.  I don't want to resign," or "If I

24   haven't done something, I'm not resigning."

25      Q      And that's when he told you,

SPURLOCK Motion for Summary Judgment, Exhibit A

1    "Today's your last day," or something to that

2    effect?

3         A    I said something to the effect of,

4    "If I don't resign, what happens?"  And he said,

5    "This is your last day."

6         Q    Okay.  So during that meeting, when the

7    sheriff referenced twice, if I understand your

8    testimony, that you weren't living up to his

9    mission, vision and values, did you know what he

10   was specifically referring to?

11        A    No.

12        Q    Did you seek any clarification from him

13   after that meeting as to what he was referring to?

14        A    I didn't really have an opportunity.

15        Q    Were you familiar with what the

16   sheriff's mission, vision and values were?

17        A    Yes, but I couldn't quote them.

18        Q    Okay.

19             MR. O'CONNELL:  And, Matt, I don't have

20   a copy of this for you, but I'll note for the

21   record that it's Kluth -1.

22        Q    (By Mr. O'Connell)  I'm just showing

23   this to you.  This is part of your production,

24   Ms. Kluth.

25             MR. O'CONNELL:  Matt, maybe at a break

1    I'll make a copy.

2              MR. CRON:  Okay.  Yeah, whatever you

3    like

4        Q    (By Mr. O'Connell)  But this says,

5    "Douglas County Sheriff's Office, Sheriff Tony G.

6    Spurlock Vision:" then something, "Mission:" then

7    something, and then "Values:" then something.

8        A    Uh-huh.  Uh-huh.  Uh-huh.

9        Q    So it seems self-explanatory, but is it

10   your understanding that this was, while you were

11   serving as undersheriff and captain, this was a

12   synopsis of Sheriff Spurlock's mission, vision and

13   values?

14       A    Yes.

15       Q    Okay.  Was it your understanding at the

16   time of your termination that you somehow failed

17   to live up to one of the three of these things or

18   all three, vision, mission and values?

19       A    I'm --  When he --  He just said,

20   "You aren't meeting my mission, vision and

21   values."  Obviously, at that time, I was not

22   staring at them, but I had no idea what he

23   meant --

24       Q    Okay.

25       A    -- or any reason within that.

SPURLOCK Motion for Summary Judgment, Exhibit A

1      Q    Do you know if that last sentence, as I

2  just read it to you, "Employees may leave

3  employment with Douglas County at any time," if

4  that essentially defines what at-will employment

5  is?

6      A    I assume.  I guess so.

7      Q    Okay.  You certainly didn't work to --

8  with the sheriff's office or work at the sheriff's

9  office pursuant to any contract, did you?

10      A    I didn't fill out any contract.

11      Q    Did you have any role in revising or --

12  excuse me -- drafting or revising or approving

13  this policy, Exhibit 17?

14      A    I probably approved it as it came

15  through.  Maybe not.  The --  Because of the

16  "Effective Date 3-1-21," I was no longer an

17  undersheriff.  So I don't know how it's been

18  revised between the time I approved it and this

19  date.

20      Q    Uh-huh.  You would have had some

21  involvement with the predecessor policy to this;

22  is that right?

23      A    Yes.  Uh-huh.

24      Q    Okay.  So was it your understanding

25  while you were undersheriff that employees of the

1    A    I think personal loyalty.  I don't

2   ever --  I didn't feel that anything we did was --

3   or that I did was in direct disloyalty to him when

4   I did it, and I didn't realize that he would be so

5   upset about it or feel that way about it.

6    Q    As Sheriff Spurlock's undersheriff, did

7   you owe him a duty of loyalty?

8    A    I guess that's kind of a complicated

9   question.  I felt like he needed to be able to

10  rely on me to carry out his duties and his desires

11  and his mission, vision and values.  How I felt

12  about him personally were my own feelings, but I

13  would be -- or I wouldn't want someone to think

14  that I was disloyal to him.

15   Q    So as -- as the Douglas County sheriff,

16  I don't mean as the man Tony -- or as the

17  individual Tony Spurlock --

18   A    Yeah.

19   Q    -- but as Sheriff Tony Spurlock, did

20  you owe him a duty of loyalty as his undersheriff?

21   A    I believe so, yeah.

22   Q    Okay.  Do you believe what you did, as

23  far as texting the quote to Parker, posting the

24  statement on Facebook, speaking to Moore about

25  statements for the Douglas County GOP, did -- do

1   STATE OF COLORADO)

2                    )ss.   REPORTER'S CERTIFICATE

3   COUNTY OF DENVER )

4        I, Tracy L. Harris, do hereby certify that I

5   am a Certified Realtime Reporter, Registered Merit

6   Reporter, within the State of Colorado; that

7   previous to the commencement of the examination,

8   the deponent was duly sworn to testify to the

9   truth.

10       I further certify that this deposition was

11  taken in shorthand by me at the time and place

12  herein set forth, that it was thereafter reduced

13  to typewritten form, and that the foregoing

14  constitutes a true and correct transcript.

15       I further certify that I am not related to,

16  employed by, nor of counsel for any of the parties

17  or attorneys herein, nor otherwise interested in

18  the result of the within action.

19       In witness whereof, I have affixed my

20  signature this 18th day of July, 2022.

21

22

23
                         _____
24                       Tracy L. Harris, CRR, RMR, RPR
                         216 - 16th Street, Suite 600
25                       Denver, Colorado 80202

SPURLOCK Motion for Summary Judgment, Exhibit A