IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION DIVISION

CASE NO.: 1:21-CV-3417-NYW


HOLLY KLUTH,

       Plaintiff,

vs.

TONY SPURLOCK, individually and
in his official capacity as Douglas
County Sheriff,

       Defendant.
_____/


DEPOSITION OF TONY SPURLOCK




     DATE TAKEN:    August 31, 2022

     TIME:          9:06 a.m. to 6:07 p.m.
                 MOUNTAIN TIME


     LOCATION:     RATHOD MOHAMEDBAHAI, LLC
                 2701 Lawrence Street, Suite 100
                 Denver, Colorado 80205



Reported By:
Jessica Wharton, Reporter

SPURLOCK Motion for Summary Judgment, Exhibit C

1     A.   No.

2     Q.   Let's do a -- let's run though some

3   hypotheticals.  You're a Republican; is that right?

4     A.   Yes.

5     Q.   Are you still a Republican, or you were

6   elected as a Republican.  Are you still affiliated

7   with that party?

8     A.   Yes.

9     Q.   If a -- sorry.  Just give me a minute.  When

10  did you last run for office?

11    A.   2018.  The year 2018 I think it was.  It was

12  my second term.

13    Q.   Who did you run against in the general

14  election?

15    A.   No one.

16    Q.   Unopposed?

17    A.   Yes, sir.

18    Q.   Did you run against anyone in the primary?

19    A.   Yes.  No, no.  In the primary?

20    Q.   Yeah.

21    A.   No.

22    Q.   So you cakewalked all the way through?

23    A.   They love me.

24    Q.   What about your first election?

25    A.   I had a primary between two Republicans,

1  wasn't because of her demotion.  The allegations were

2  so obvious that that didn't come to my head, if you

3  will.

4       Q.   Did the incident with Detective Jensen,

5  where Ms. Kluth was verbally reprimanded by you, did

6  that factor into her termination?

7       A.   I would have to say that at the point of

8  termination, it was -- I've had enough issues of her

9  failing to follow the vision, mission, and values, and

10  I could no longer trust her decisions as a command

11  officer.  So obviously, at some point, it was in the

12  back of my mind.

13       Q.   Okay.  So it's just sort of a piece in the

14  puzzle?

15       A.   Yes.

16       Q.   You said that you had a phrase earlier that

17  for the first three years, it was a clean, pristine

18  cup.  What did you mean by that?

19       A.   I'm a, you know, fill-the-cup up, and not

20  good flies, don't fill up the cup up, and that was my

21  analogy there, probably not a very good one, but we

22  don't need to worry about the analogy because we could

23  talk about that all day.  The real point to this is,

24  is that the first three years of her employment, she

25  did an incredible job.

1  vague for a reason -- to allow real life to occur but

2  also to restrict no abuses.

3      Q.   Okay.  Is it fair to say members have more

4  latitude to engage in political activity while they

5  are off-duty as compared to on-duty?

6      A.   Yes, it is.

7      Q.   Is it also fair to say members have more

8  latitude to engage in political activity when they are

9  not in uniform as opposed to when they are?

10     A.   Well, unless their non-uniform is their work

11 time.  And they say they're plain clothes and they're

12 supposed to be at work --

13     Q.   Undercover and --

14     A.   Right.

15     Q.   Right.  But -- okay.  So whether -- whether

16 a member is on duty or off duty is a key factor in

17 assessing whether they've violated Section EE; is that

18 fair?

19     A.   I think that's a first step to it.  Yes,

20 that'd be fair.

21     Q.   Does it matter what candidate or party a

22 member supports when you assess whether there's been a

23 violation of Section EE, participation in election

24 campaigns?

25     A.   It does not.

SPURLOCK Motion for Summary Judgment, Exhibit C

1          Q.   So for example, you testified earlier that

2    you're a Republican, right?

3          A.   Yes.

4          Q.   If you are assessing a violation of Section

5    EE, it wouldn't matter whether the political activity

6    supported Republicans or Democrats; is that right?

7          A.   It would not.

8          Q.   What's the Hatch Act?

9          A.   The Hatch Act is a federal regulation,

10   originally designed before the Reform Act, to prevent

11   Congressman, Senators, Governors from using their

12   office to influence people for campaign preference.

13   The Reform Act adjusted it to all elected officials,

14   anywhere in the United States now.  So it -- it --

15   although it has many, many different requirements in

16   it, it's really designed to prohibit people from using

17   their position to influence people to support a

18   particular candidate or -- or some kind of position

19   and using that office, their paid position to do it,

20   to fulfill it.

21           So you know, I can't -- you know, well -- I

22   wouldn't do this, but you wouldn't want someone doing

23   commercials in a uniform about a particular referendum

24   or something like that.  That would -- that could

25   violate the Hatch Act because they're using their

1     A.    Thank you.

2          MR. O'CONNELL:  Objection to form.

3          THE WITNESS:  No, they do not pose any

4     issue.

5     BY MR. CRON:

6     Q.    This is a personal Facebook post, sharing

7     her political, religious beliefs, right, essentially?

8     A.    Exactly.

9     Q.    And those beliefs are somewhat similar to

10    your beliefs, are they not?

11    A.    Very close, yes.

12    Q.    So what was the problem of this Facebook

13    post?

14    A.    There is no problem with it.  I mean, you

15    questioned me before, I think, maybe we were not in

16    sync.

17    Q.    Okay.

18    A.    This was part of the IA investigation,

19    obviously.  That's -- it's part of it because it was

20    something that was gathered.  I -- I don't think that

21    this document right here, in itself, is substantiated

22    in any policy violation because there's not any, in my

23    opinion, as this stands just by itself, isn't a

24    violation of policy.

25    Q.    Okay.  Did this Facebook post undermine your

SPURLOCK Motion for Summary Judgment, Exhibit C

1  authority as a Sheriff?

2       A.   I think the appearance of this post and the

3  appearance of the way that people might have perceived

4  the Undersheriff and myself were now in conflict.  And

5  Holly and I actually had that conversation about it,

6  and she even admitted, yes, I can see how that would

7  make us look like we were in conflict.  In itself,

8  it's her belief system, and that's -- that's fine.  I

9  think the way that it was done created the appearance

10  of a conflict between the Sheriff and Undersheriff.

11      Q.   Do you believe it was her intent to create

12  an appearance of conflict between you and her?

13      A.   I think her intent was to satisfy

14  Republicans pressuring her to step up is what I think

15  it was.

16      Q.   And this Facebook post, notably, does not

17  endorse George Teal by name, right?

18      A.   That's correct.

19      Q.   And would you agree with me that this is

20  political speech?

21      A.   Oh yeah, I think -- because she's saying

22  this is how I believe.  It's -- you know, although she

23  only makes one real statement about this is how I'll

24  vote, conservatively, the rest of it is really just

25  about who she is and what she's done in the past.  So

1    suggested they do it.

2         Q.   What's the basis for your testimony that she

3    ordered Chief Moore to orchestrate this plan?

4              MR. O'CONNELL:  Objection to form.

5              THE WITNESS:  She is the Undersheriff.  She

6    can hide behind the fact that she was off duty and

7    sick all day long.  But when she picked up the phone

8    to call anybody, she's the Undersheriff.  And you

9    don't get to hide from her position.  She is an -- she

10   is an executive officer, and so when she called Tim

11   Moore, her and Tim had the discussion, let's get the

12   captains, the police captains, to write letters.  That

13   was Holly Nicholson-Kluth and Tim Moore combined

14   together to do that.  And that's where the policy

15   violations come into it.

16   BY MR. CRON:

17        Q.   Now, you had been reported that Deputy Moore

18   had asked Captain Jensen to prepare letters supporting

19   the GOP candidates, right?

20        A.   Exactly.

21        Q.   And on that initial information, the report

22   was not that Ms. Kluth had ordered Captain Jensen to

23   write a letter or prepare a letter, right?

24        A.   Correct.

25        Q.   Okay.  Can you turn to Exhibit 1?  Do you

SPURLOCK Motion for Summary Judgment, Exhibit C

1    recognize what this document is?

2         A.   Yes, I do.

3         Q.   What is this document?

4         A.   This is the supplemental report done by a

5    private contractor, Lynn Johnson, that I had hired to

6    do the Internal Affairs investigation into the

7    Undersheriff's actions, the Chief Deputy's actions,

8    and the Captain's actions.

9         Q.   And you read through these interviews?

10        A.   Yes.

11        Q.   Or summaries of interviews?

12        A.   Yes.

13        Q.   Okay.  And these informed the significant

14   discipline that Ms. Kluth received, right?

15        A.   Yes.

16        Q.   And the -- which included -- which isn't

17   actually in a formal discipline, but it included a

18   loss of your political support, right?

19             MR. O'CONNELL:  Objection to form.

20   BY MR. CRON:

21        Q.   Or at least a diminishment of --

22        A.   Loss of my political support?

23        Q.   Yeah.

24        A.   From who?

25        Q.   From Ms. Kluth.  I mean, part of -- part of

SPURLOCK Motion for Summary Judgment, Exhibit C

1      Q.   And you sustained the disciplinary finding

2    regarding that Facebook post Ms. Kluth made?

3      A.   Yes, I did.

4      Q.   When did you inform Ms. Kluth that she was

5    being terminated?

6      A.   On the -- I apologize for the date, May 25,

7    is that -- if that's the date.  She was called into a

8    conference room, and there were some other people

9    present, Laura Leary and Jason Kennedy, Captain

10   Kennedy from my office, and myself, and I presented

11   her with a severance package and told her that she no

12   longer the vision, mission, values of my office.

13           And I was giving her an opportunity to take

14   the severance package and review it, and you know,

15   take the severance package, and she refused to and

16   slid it back across the table from me.  And I think

17   she asked me, why am I being terminated?

18           And I said, well, you have the -- this --

19   and that's not it, but I had a piece of paper in front

20   of me that -- the severance package, and I said, you

21   can take the severance package and review it.  And she

22   goes, and if I don't?  And I said, well, you're being

23   terminated today.  Today is your last day.  So you

24   have an option to either take the severance package or

25   not.

SPURLOCK Motion for Summary Judgment, Exhibit C

1          Then, she asked me again, what am I being

2   terminated for, and I said you're being terminating

3   for violating -- or you no longer meet the vision,

4   mission, and values of this office.

5      Q.   The severance package that you offered her

6   would have characterized her exodus as a resignation,

7   right?

8      A.   Yes.

9      Q.   Did you -- did she ask you how she had

10  failed to meet the vision, mission, and values of the

11  Sheriff's Office?

12     A.   No, I don't recall she -- she goes, I

13  want -- can you give me -- can you be more specific,

14  she might have said.  She might have said that, yes.

15     Q.   And did you respond to that request?

16     A.   I did not.

17     Q.   Okay.  So you did not tell her how she had

18  failed to meet the vision, mission, and values of the

19  Sheriff's Office, right?

20     A.   That's right.  That in itself collectively

21  encompasses a variety of things.

22     Q.   When did you make the decision to term her?

23     A.   Maybe a week before that date.

24     Q.   Uh-huh.  Who did you consult with prior to

25  making the decision to terminate her?

1  performance, but I didn't tell him what I was thinking

2  about doing, no.

3      Q.  Did --

4      A.  I mean, I didn't ask for his advice.

5      Q.  Yeah.  You didn't ask his opinion as to

6  whether he thought Ms. Kluth should be terminated?

7      A.  No.

8      Q.  Was there any chance or opportunity for

9  Ms. Kluth to change your mind at the May 25th meeting?

10      A.  Yeah, she could have -- she could have --

11  she could have taken the severance package illustrated

12  right here.  She could have taken the severance

13  package and said, I would like to take this and read

14  this.  And then obviously, that -- is in there some

15  instructions for her to get back to us, and then, we

16  could have had dialogue.  She could have easily done

17  that.

18      Or she could have said I would like to -- I

19  would like to talk to you about the termination.  I

20  would like to have a conversation with you about it.

21  She never did that.  She just demanded that I give her

22  the reason, and I said, I've given you the reason.

23  You no longer meet the vision, and the mission, and

24  the values of this office.  And that is -- that's

25  enough.

SPURLOCK Motion for Summary Judgment, Exhibit C

1          And so you know, she never asked, hey, can

2     we have a private conversation?  Do these people need

3     to be here?  Can you and I talk?

4          Q.   You didn't tell her any of the conduct that

5     she had engaged in that didn't meet the vision,

6     mission, and values, did you?

7          A.   Specifically?

8          Q.   Yeah.

9          A.   On the judgment?

10          Q.   Yeah.

11          A.   And the justice?  No.

12          Q.   Why didn't you tell her what she had done

13     wrong?

14               MR. O'CONNELL:  Objection to form.

15               THE WITNESS:  On advice of counsel.

16     BY MR. CRON:

17          Q.   Did you give Ms. Kluth the termination

18     letter?

19          A.   No, I did not.

20          Q.   Prior to this lawsuit, did you ever expound

21     on your reasons for terminating Ms. Kluth?

22          A.   Expound on them?

23          Q.   Expound.

24          A.   To who?

25          Q.   To Ms. Kluth?

SPURLOCK Motion for Summary Judgment, Exhibit C

1      A.   Well, an Internal Affairs investigation was

2   immediately started.  Well, I shouldn't say

3   immediately, probably within a short period of time.

4   And then, we reached out to her for an opportunity to

5   be interviewed, and she declined.

6      Q.   If you wouldn't tell her what, specifically,

7   she had done wrong, how was she supposed to have a

8   discussion with you about her termination?

9      A.   You mean at that -- right at that moment?

10      Q.   At the May 25th meeting.

11      A.   She was very clear of the foundational

12   meaning and vision, mission, and values.  It is on

13   every evaluation.  The very first one is J, which is

14   judgment.  And she could have easily said, where -- if

15   I did this, did I, you know, no longer devotion to

16   duty?  Did I make a bad judgment?  That document

17   initially drives any reader to ask additional

18   questions.  And she knew that.  I mean, that

19   document -- she had used that document with other

20   people before.

21      Q.   And she did ask additional questions, right?

22   She asked how did I not live up to this values?

23      A.   Yes.

24      Q.   And you didn't tell her.

25      A.   On advice of counsel not to do that.

1     Q.   So how was she supposed to discuss how she

2   had failed to live up to vision, mission, and values

3   if you, on advice of counsel, wouldn't tell her how

4   she had failed?

5     A.   Well, she -- I mean, what-ifs here again.

6   She could have said, can we at least talk?  Can you

7   and I have a conversation?  I would like to talk to

8   you about what I've done, where I'm at, what I'm

9   doing.  She was no rookie to the fact of being able to

10  come into my office and have those kinds of difficult

11  conversations.

12    Q.   After you had told her that today was going

13  to be her last day, right?  That's how you started the

14  meeting.

15    A.   No, that's not how I started.

16         MR. O'CONNELL:  Objection to form.

17         THE WITNESS:  That's not how I started.

18  BY MR. CRON:

19    Q.   Okay.  How did you start it?

20    A.   She sat down, what's going on, and I said,

21  listen, I would like to give you an opportunity to

22  take this severance packet because you no longer meet

23  the vision, mission, and values of this office.  So

24  I'd like to give you the opportunity to take this.

25    Q.   Okay.

SPURLOCK Motion for Summary Judgment, Exhibit C

1      A.    And at that point, she could have had more

2  conversation with me.  She had the opportunity to call

3  me the next day.  She was in the office to collect her

4  goods.  She could have easily reached out to me to

5  say, I'd like to talk to you, even if -- at the

6  expense of saying, could I have that severance package

7  to take a look at it, Tony?  And I'd done it, and I

8  would have had that conversation with her.

9      Q.    Did you record the meeting?

10      A.    Did not.  At least I didn't.

11      Q.    Did you instruct other people to record the

12  meeting?

13      A.    No.

14      Q.    Do you know whether Ms. Kluth recorded the

15  meeting?

16      A.    I do not.

17      Q.    All right.  Could she have recorded the

18  meeting?

19      A.    It would have been secretly.  She -- because

20  if she would have asked to record it, my guess is the

21  HR and Professional Standards Captain would have said

22  no.

23      Q.    Did you take notes at the meeting?

24      A.    No, I didn't.

25      Q.    Did anyone take notes at the meeting, to

1  your knowledge?

2      A.   I cannot answer that.  I don't know if the

3  HR director or the captain did.

4      Q.   Can you please look at your -- the complaint

5  on Page 11.

6      A.   Okay.

7      Q.   The allegation in Paragraph 93 is Spurlock

8  stated to Ms. Kluth --

9      A.   Page 11?

10     Q.   Page 11, Paragraph 93.

11     A.   Sorry, my apologies.

12     Q.   It's no problem.

13     A.   Yes, that's true, and I forgot that, yes.

14     Q.   Okay.  So you --

15     A.   I'm sorry, my apologies.

16     Q.   And you told Ms. Kluth that nothing had

17  changed since last fall?

18     A.   Yes, this was -- this was -- this statement

19  was made after she had asked me, can you give me --

20  what have I done?  Tell me what I have done.  And I

21  said, you know, nothing has changed.  Your behavior

22  hasn't changed since last fall.

23     Q.   What had happened last fall?

24     A.   That's when she was demoted from

25  Undersheriff to Captain.

1      Q.   So that comment kind of harkened back to the

2  comment that she engaged in behavior that led to her

3  demotion.

4      A.   The policy --

5           MR. O'CONNELL:  Objection to form.

6           THE WITNESS:  The policy violations.

7  BY MR. CRON:

8      Q.   Okay.

9      A.   And basic just behavior, trust.

10      Q.   Had she in the time between her demotion and

11  her termination, had she continued to instruct

12  subordinates to engage in political activity?

13      A.   No, but that wasn't the issue.

14      Q.   Had she continued to conspire with

15  subordinates behind your back?

16      A.    No.  She continued to not live up to the

17  vision, mission, and values.

18      Q.   Turning back to -- are you still on Exhibit

19  5?

20      A.   Yes, yes.

21      Q.   Still have that up?  Had she violated -- so

22  she was found sustained five specific policy

23  violations on November 16th, 2020?

24      A.   Yes.

25      Q.   Okay.  Had she continued to violate the

SPURLOCK Motion for Summary Judgment, Exhibit C

1  office, which involved very important, particular

2  issues, like judgment, and trust, and unity.

3      Q.   These reasons, these specific incidents,

4  contributed to your assessment that Ms. Kluth no

5  longer satisfied the vision, mission, and values of

6  your office; is that right?

7      A.   Yes.

8      Q.   Okay.  In other words, if you hadn't engaged

9  in any of these behaviors, then there might not have

10 been a -- as much of a problem with her employment; is

11 that fair?

12     A.   And these and others that I'm aware of -- if

13 she had not engaged in those -- if she had gone to her

14 job and done what she had done when she was an

15 Undersheriff the first three, four, five years as an

16 Undersheriff, she wouldn't -- we wouldn't be here

17 today.

18     Q.   Okay.  This -- this question asks you to

19 describe each and every material reason you had for

20 terminating Plaintiff's employment; do you see that?

21     A.   Yes.

22     Q.   So can we assume that these reasons in here

23 are material reasons?  Are they -- do -- do you know

24 what I mean by material reasons?

25     A.   Like, I -- I used those to solidify my

SPURLOCK Motion for Summary Judgment, Exhibit C

1    decision?

2         Q.    They're -- they're the key reasons --

3         A.    Yeah.

4         Q.    -- essentially.

5         A.    Yeah.

6         Q.    Are there any material reasons -- you've

7    already given us, you know, over three pages of

8    answers here; are there any other material reasons

9    that you terminated her employment?

10        A.    Like I said earlier today, there -- there's

11   some things that come into my mind that caused me to

12   realize that she was not, you know, fulfilling her

13   job.  These reasons right here -- quite frankly, I

14   only need one reason.  She's a captain of a very

15   important division.  When I no longer could trust her

16   because of her inability to follow with inside the

17   vision, mission, and values, she's a detriment to the

18   people of Douglas County, and to the Sheriff's Office,

19   and that's why I terminated her.

20        Q.    So you have a -- you didn't just have that

21   one reason, you have lots of reasons, right?

22        A.    Yes.

23        Q.    And the specific incidents informed your

24   decision to terminate her employment?

25        A.    Yes.

SPURLOCK Motion for Summary Judgment, Exhibit C

1    Q.    And by material, I think (inaudible) the big

2    reason, right, like, you know, had she, for example,

3    you know, committed a murder, that would be a material

4    reason you would have for terminating her, right?  Do

5    you understand that?

6    A.    Yeah. And I guess that's a -- I would say,

7    if I'm, you know, maybe correct me if I'm wrong, but

8    your interpretation of the material reason of big --

9    mine is, you can't get any bigger than not having

10   trust, and making good judgment, or unity as a -- as a

11   commander.  You can't get any bigger than that.

12   Q.    And -- and I understand that.  And I'm just

13   asking if there's any other big reasons that are not

14   in this document, in sum.

15   A.    And at this point, I do not recall any.

16   I -- I don't -- I can't think of any.

17   Q.    All right.  So bottom of Page 3, as a

18   captain, Plaintiff consistently objected to, and

19   complained about the on-call command structure

20   established by Chief Duffey, her superior and direct

21   supervisor, and that fact that she is not exempt from

22   the on-call requirement, which generally applied to

23   all captains.

24   A.    Yes.

25   Q.    Do you see that?

SPURLOCK Motion for Summary Judgment, Exhibit C

1    A.   Yes.

2    Q.   Okay.  And this is a reason that informed

3  your decision to terminate Ms. Kluth?

4    A.   Yes.  It, again, goes right to her inability

5  to function in unity.  Poor judgment on her part as an

6  Undersheriff.  She denied captains overtime and

7  on-call all the time.  And so I was put back on the

8  fact that that's what she wanted to do now that she's

9  a captain.

10    Q.   That seems to correlate to sort of Paragraph

11  1 of Exhibit 31; would you agree with that?  That's

12  Mr. Duffey's memo.

13    A.   Oh.

14    Q.   If you have it.

15    A.   Yes, it does.  I'm -- I'm familiar.

16    Q.   It's on the first page.

17    A.   I'm familiar reading that here.  Yes.

18    Q.   Okay.  That's a -- the same issue we're

19  talking about, right?

20    A.   Yes.

21    Q.   This states you raised the issue right after

22  her transfer on November 23rd, 2022; do you see that?

23    A.   Yes.

24    Q.   Did she raise the issue more than one time?

25    A.   No, because I think she was told no.

SPURLOCK Motion for Summary Judgment, Exhibit C

1      A.    I don't know.

2      Q.    Okay.  Do you know whether anyone conveyed

3  to Ms. Kluth that her ask -- request for this change

4  was problematic?

5      A.    I -- I don't know.

6      Q.    Do you know whether Ms. Kluth was told that

7  she needed to improve on this issue?

8      A.    Well, I -- I -- I don't know if anyone's

9  told her to improve on that issue.  Again, she just

10  could not grasp the vision, mission, and values, one

11  being unity.  And judgment.

12      Q.    Plaintiff alleged that Chief Duffey lacked

13  authority to meet with lieutenants outside of her

14  presence, accused him of acting disrespectful in

15  soliciting information or ideas from her subordinates

16  outside of her presence.  Do you see that on the

17  interrogatory response?

18      A.    Yes, I do.

19      Q.    All right.  And this was also one of the

20  reasons that informed your termination of Ms. Kluth?

21      A.    Yes.

22      Q.    All right.  And the -- this, I believe,

23  correlates to sort of an email chain that is on Page

24  2377 and 78 of Exhibit 31.  Check that out real quick.

25  It's like the bottom.

SPURLOCK Motion for Summary Judgment, Exhibit C

1        A.    (Inaudible).

2        Q.    Yeah, we're going to be largely using your

3   interrogatory responses and Mr. -- Captain Duffey's

4   memo here.

5        A.    I'm going to get these -- I'm going to get

6   them all messed up here.  It's in this book here?

7        Q.    Do you want to --

8              MR. CRON:  Let's go off the record for a

9   moment.

10             THE REPORTER:  4:41.  We're off the record.

11             (OFF THE RECORD)

12             (ON THE RECORD)

13             THE REPORTER:

14   BY MR. CRON:

15       Q.    Okay.  So I had asked you about the

16   allegation that Plaintiff had alleged that Chief

17   Duffey lacked authority to meet with lieutenants.

18       A.    Yes.

19       Q.    And I believe that correlates to emails

20   on -- starting on the bottom of Page 2377 and

21   continuing onto 2378?

22       A.    Yes.

23       Q.    Okay.  Those emails are -- that email is

24   dated February 18th, 2021?

25       A.    I don't have that document, but I'm familiar

1  with it.  It's not in this --

2      Q.   If you look at the bottom of 2377.

3      A.   Okay.  I'm sorry.

4      Q.   Do you see where the memo states on February

5  18th, 2021, I received an email --

6      A.   Yes, I see it.  My apologies.

7      Q.   Okay.  We can assume that the email --

8  Ms. Kluth sent an email on that date?

9      A.   Yes.

10      Q.   And the gist of this was that she took issue

11  with Captain Duffey meeting with lieutenants beneath

12  her, under her command, right?

13      A.   Yes.

14      Q.   And she was excluded from that meeting; is

15  that correct?

16      A.   Yes.

17      Q.   Okay.  Now, doesn't the chain of command go

18  both ways?

19      A.   It does not.

20      Q.   It does not.  It only goes down?

21      A.   Yes.

22      Q.   Okay.  Now --

23      A.   I'm sorry.

24      Q.   Yeah, I'm not sure which way is down.

25      A.   Yes.

1      Q.    Okay.  Now, do you have any reason -- can

2    you speculate as to why Chief Duffey would have noted

3    this incident in the Guardian Tracker?

4      A.    Insubordinate is a serious violation for

5    supervisors, particularly at a captain's level.  It is

6    incredibly serious.

7      Q.    This was a big deal.

8      A.    This was a big deal.

9      Q.    Yeah.  And that's, presumably, why he noted

10    it in his Guardian Tracker?

11      A.    Yes.

12      Q.    Okay.  Now, if he did not note something in

13    his Guardian Tracker, could we presume it was less big

14    of a deal?

15      A.    No.  Again, the -- whether it's in Guardian

16    Tracker or not doesn't dictate its severity.  I think

17    each situation must stand on its own.  And so

18    obviously, some things you might think, well, that's

19    not very serious at all and other things, you might.

20    So I don't want to characterize the Guardian Trackers

21    only serve for serious things because, as we said

22    earlier, it's also for good things.  And those could

23    be considered, you know, good serious things.

24      Q.    Okay.  Did you -- when did you learn about

25    this issue?

SPURLOCK Motion for Summary Judgment, Exhibit C

1      A.   I learned about it, like, right when it

2  happened, I think, or very close proximity to that.  I

3  don't know the date of it that's on the Guardian

4  Tracker, but within close proximity of that time.

5      Q.   Was there an IA investigation into this

6  insubordination?

7      A.   I don't believe so, no.

8      Q.   Okay.  PCR investigation?

9      A.   No.

10      Q.   Okay.  Was Ms. Kluth found to have violated

11  any policies?

12      A.   Well, given that specific time and space,

13  there was no -- there was no investigation or PCR.  So

14  there's no findings.

15      Q.   Okay.  Are you aware of any other Guardian

16  Tracker entries regarding insubordinate by Ms. Kluth?

17      A.   No.

18      Q.   And she was not terminated immediately after

19  this issue, was she?

20      A.   She was not.

21      Q.   Okay.  Okay.  Let's go to -- on Page 4,

22  bottom of Page 4.  Plaintiff using her DCSO Twitter

23  account engaged in a Twitter war with a colleague,

24  Captain Jensen, violating DCSO's policy prohibiting

25  activities that bring discredit to the DCSO.  Do you

1    see that?

2         A.   Yes.

3         Q.   This is one of the reasons informing the

4    decision to terminate Ms. Kluth?

5         A.   Yes.

6         Q.   Okay.   This -- this correlates to the bottom

7    of 2374?

8         A.   Yes.

9         Q.   What tweets did Plaintiff send out that were

10   objectionable?

11        A.   I don't recall what the tweets were.   I

12   recall the scenario or scenarios around them that both

13   Jensen and herself were tweeting things back and forth

14   that were not -- one would tweet one thing, and the

15   other would tweet another, and they -- the messages

16   weren't the same, you know, for a social media

17   messaging to go out.   And it became problematic with

18   our social media as, hey, they have Twitter accounts,

19   but they couldn't get together to have the same

20   messaging.   And so it became a -- the -- the -- again,

21   the urban legend, it became a Twitter war between the

22   two of them because to see whoever could tweet the

23   most and whoever could tweet the -- you know,

24   whatever.

25             And we had to put a stop to it because it

SPURLOCK Motion for Summary Judgment, Exhibit C

1    office, document any problematic tweets from either

2    Plaintiff or Captain Jensen?

3         A.   Not to my knowledge.

4         Q.   And you believe that Ms. Kluth was told to

5    work with Captain Jensen on this tweeting issue?

6         A.   Well, they were to -- they were co-captains

7    of Patrol Division, so they should have communicated

8    with each other on a lot of things to make sure that

9    there was a unity between the two -- two units.

10        Q.   Do you know whether this issue was brought

11   to their attention?

12        A.   I was told it was.

13        Q.   By who?

14        A.   By the chief.

15        Q.   Chief Duffey?

16        A.   Duffey, yes.

17        Q.   Was there an IA investigation into this

18   issue?

19        A.   There was not.

20        Q.   PCR investigation?

21        A.   There was not.

22        Q.   Okay.  Plaintiff instigated continuous

23   conflicts with Captain Jensen, criticizing his

24   management style, adversarial nature.  Do you see

25   that?

SPURLOCK Motion for Summary Judgment, Exhibit C

1      A.   Yes.

2      Q.   Okay.  This is another reason that informed

3  your decision to terminate Ms. Kluth?

4      A.   It was.

5      Q.   Okay.  Captain Jensen had communication

6  issue with others, did he not?

7      A.   Yes.

8      Q.   Okay.  In fact, Chief Duffey noted that

9  Captain Jensen need to dramatically improve his

10  communication to the chief.  Are you aware of that?

11      A.   Yes.

12      Q.   Was Jensen ever counseled on his

13  communication issues?

14      A.   Not by me.

15      Q.   Okay.  By the Chief Duffey?

16      A.   Could have been.

17      Q.   Was Chief Duffey reprimanded for not

18  communicating well with Captain Jensen?

19      A.   Chief Duffey?

20      Q.   Yeah.

21      A.   He never -- he didn't not communicate well.

22      Q.   Well --

23      A.   The allegation is that Jensen didn't

24  communicate well.

25      Q.   Right.

SPURLOCK Motion for Summary Judgment, Exhibit C

1        A.   Well, was Ms. Kluth's termination motivated,

2   in part, by her political activities that she

3   undertook in the fall on behalf of the Douglas County

4   GOP?

5        Q.   No, it wasn't.

6        A.   What about Mr. Moore's termination?

7        Q.   Same question?

8        A.   Same.

9        Q.   No.  It wasn't.

10            MR. CRON:  Let me just confer with my

11   colleague.  We can go off the record for a moment.

12            (OFF THE RECORD)

13            (ON THE RECORD)

14            THE REPORTER:  Okay.  6:05.  We're back on

15   the record.

16            MR. CRON:  All right.  Exhibit 40, which was

17   your interrogatory responses.  I just don't have that

18   handy.

19            MR. O'CONNELL:  He can use mine.  I don't

20   think there's anymore --

21            MR. CRON:  Well, then I -- I'll just read it

22   to you.

23            THE WITNESS:  Thank you.

24   BY MR. CRON:

25        Q.   In your answer as to why you terminated

SPURLOCK Motion for Summary Judgment, Exhibit C

1　　　CERTIFICATE OF OATH FOR WITNESS

2

3

4　STATE OF COLORADO

5　COUNTY OF DENVER

6

7　　　　　I, Jessica Wharton, Reporter, certify that

8　on August 31, 2022, TONY SPURLOCK appeared before me

9　at 9:06 a.m. via video conference; that photo

10　identification was presented and verified via Colorado

11　driver's license; and that TONY SPURLOCK was duly

12　sworn on August 31, 2022.

13

14

15　　　　　SIGNED this 16th day of September 2022.

16

17

18　　　　　_____

19　　　　　Jessica Wharton

20

21

22

23

24

25

SPURLOCK Motion for Summary Judgment, Exhibit C

1          CERTIFICATE OF REPORTER

2

3  STATE OF COLORADO

4  COUNTY OF DENVER

5

6      I, Jessica Wharton, Reporter, do hereby certify

7  that I was authorized to and did electronically report

8  the deposition of TONY SPURLOCK; that TONY SPURLOCK

9  was duly sworn on the date indicated; that the

10 questions and answers thereto were reduced to

11 typewriting under my direction; that a review of the

12 transcript was requested; and that the foregoing is a

13 true and accurate electronic recording of the

14 proceedings.

15      I FURTHER CERTIFY that I am not a relative,

16 employee, or attorney, or counsel of any of the

17 parties, nor am I a relative or employee of any of the

18 parties' attorneys or counsel connected with the

19 action, nor am I financially interested in the action.

20      DATED this 16th day of September, 2022.

21

22

      _____

23      Jessica Wharton, Reporter

24

25

SPURLOCK Motion for Summary Judgment, Exhibit C

1                CERTIFICATE OF TRANSCRIPTIONIST

2

3         I, WENDY K. SAWYER, do hereby certify that I

4    transcribed the electronic recording produced by

5    Jessica Wharton, Reporter, of the deposition of TONY

6    SPURLOCK; and that the foregoing transcript is a true

7    transcript of said electronic recording.

8

9         I FURTHER CERTIFY that I am not a relative,

10   employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am

13   I financially interested in the action.

14

15            DATED this 16th day of September, 2022.

16

17

18   _____

19            WENDY K. SAWYER, CDLT

20

21

22

23

24

25

E R R A T A    S H E E T

Witness: TONY SPURLOCK
RE: Holly Kluth vs. Tony Spurlock
Date of Proceeding: August 31, 2022
U.S. Legal Support Reference No.: 6192337

PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM

Page / Line /      Change      / Reason

88 / 22 / TUI to TDY / Correction

155 / 16 / obligation to obvious / wrong word typed

169 / 13 / endors to encourage / wrong word typed

173 / 4 / Puppit / Inaudable Correction

203 / 12 / Met / Missing word

___ / ___ / _____ / _____

___ / ___ / _____ / _____

___ / ___ / _____ / _____

___ / ___ / _____ / _____

___ / ___ / _____ / _____

___ / ___ / _____ / _____

Under penalties of perjury, I declare that I have
read the foregoing transcript and that the facts
stated in it are true.

_____        10/19/2022
TONY SPURLOCK                           Date

(RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
Sworn and subscribed to before me this 10th day of
October , 20 22 .

_____        _____
NOTARY PUBLIC                          TONY SPURLOCK

JULIE F. BROWNE
Notary Public
State of Colorado
Notary ID # 20214019458
My Commission Expires 05-18-2025

SPURLOCK Motion for Summary Judgment, Exhibit C