IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO.: 1:21-cv-3417-NYW

HOLLY KLUTH,

    Plaintiff,

vs.

TONY SPURLOCK, Individually and in his official capacity as Douglas County Sheriff,

    Defendant.
_____

DEPOSITION OF KEVIN DUFFY

DATE TAKEN: September 19, 2022

TIME: 9:35 a.m. - 6:33 p.m. MT

LOCATION:    RATHOD MOHAMEDBHAI, LLC
               2701 Lawrence Street, Suite 100
               Denver, Colorado 80205

Reported By:

Jessica Wharton, Court Reporter

1     Q.   Okay. So this is the kind of situation that happens
2 from time to time.
3     A.   It happens.
4     Q.   And this was the first time that had happened with
5 Ms. Kluth.
6     A.   Yep.
7     Q.   Sand that's why you put in here?
8     A.   Right.
9     Q.   Okay. Let's talk about your final entry here, which
10 begins on the first page of the exhibit, titled comment slash
11 demeanor. What is this entry?
12     A.   This entry was a -- was made based on what I consider
13 a very serious conflict between the captain and myself. When I
14 took over the division, one of the things that I told the
15 cap --the two captains, was that I was gonna meet privately with
16 all the lieutenants within the entire law enforcement bureau, so
17 not just patrol, but also investigations and Highlands Ranch
18 industrial, because I wanted to hear from the lieutenants. This
19 is an opportune time. Brand new law enforcement bureau chief,
20 new captains. I wanted to hear from the lieutenants on what
21 they felt were identifying some of the areas of concern they
22 might have, some of the areas that they think we need to work on
23 as a division.
24         So I told the captains that I was gonna meet with
25 lieutenants and I was gonna get their input. And once I got all

1 their input, then I was gonna sit down with the captains and go
2 through that, which was fine. But we had a problem with that.
3 Then, as the couple month --more months passed on Captain
4 Jensen's on administrative leave, most likely gonna get demoted
5 or fired. We're gonna have --we're gonna go back from two
6 captains to one captain. We're gonna be moving people around.
7 The office is in flux, right? So I wanted to meet again with
8 the lieutenants privately. Because one of the things that I'm a
9 firm believer on is core foundation of our department is the
10 leadership of our lieutenants. Chiefs and captains, we have our
11 roles, we have our duties and responsibilities. But the rubber
12 meets the road with our lieutenants of all divisions. They're
13 the ones that take our orders and our direction that we've
14 gotten from the sheriff and the undersheriff, and they make it
15 happy.
16 They're also what's crucial with lieutenants, they are
17 really the pulse of the agency. They can either be the ones
18 that cause morale to just drop or keep morale and keep spirits
19 up and keep people focused. And that's what I constantly
20 focused on, is reminding the lieutenants, you, ladies and
21 gentlemen, are the ones who keep this agency moving forward.
22 So I wanted to be lieutenants privately just to send
23 them a message from myself as the law enforcement chief was now
24 more than ever, with all the stuff that this department's going
25 through, stuff that we never gone through in my career. As I

1   said earlier, we've never demoted an undersheriff before.  We'd
2   never demoted chiefs like this before.  We've never had this
3   much change in command staff.
4              I wanted to meet with the lieutenants privately just
5   to tell them, keep your eye on the ball, keep morale up, tell
6   the troops, everything's gonna be okay.  Just keep doing what
7   you're supposed to be doing.  Right?  It was a real simple
8   concept.  When Captain Nicholson-Kluth found out that I wanted
9   to meet with the lieutenants privately, she emailed me and
10  wanted to know -- she felt it was wrong that I do that, that I
11  meet with the lieutenants privately.  She felt that was a
12  violation of the chain of command, which is not.
13             She also wanted to be there.  And I came back to her
14  and said, no.  I wanna meet with these lieutenants privately
15  because I knew the message that I wanted to send them.
16  Oftentimes, when you start bringing too many bars and stars into
17  the picture, people have a tendency not to speak freely.
18  Trusted my lieutenants.  They trusted me.  I felt they -- if
19  they had anything concerning or wanted to talk about, they would
20  bring it out.  And that wasn't a reflection against Captain
21  Nicholson-Kluth or any of the other captains.  I just had
22  that --I felt I had that rapport with the lieutenants, and I
23  wanted to meet with them privately.  I felt they deserved that.
24  But I also wanted to discuss with them how important I felt they
25  were in making sure that our morale, that our mission is

1  maintained.

2  So I did meet with the lieutenants. And then, she
3  sent an email to me basically accusing me of policy violations,
4  that I violated policy, which is a serious accusation that I
5  violated policy in this office. Plus she was upset that I asked
6  the administrative secretary to come to the meeting and not her.
7  Well, the only reason I asked the administrative secretary is I
8  need somebody to take the notes so I could have an open
9  dialogue. This person over here could take the notes for me,
10 full attention on the notes were gonna be taken, and that I was
11 gonna share that with the captains. There's no secrets here.  I
12 just wanted to have that meeting face-to-face with just the
13 lieutenants.

14 She came to me in an email accusing me of violating
15 policy. So I'm now an executive officer for this department
16 who's being accused of violating policy. What do I do with
17 that? Right? I'm not gonna turn myself into internal affairs
18 or go to internal affairs. So I went to my boss, the
19 undersheriff. I went to him, said, this is what's going on.
20 This is what I've been accused on. What do you want me to do
21 here? You replied back to me, I want you to send me that email.
22 I want look at it, and I'll handle it. I sent him the email.
23 And then the undersheriff sent a reply back to her basically
24 saying that having --that her allegation that I violated a
25 policy was unfounded and that actually he supported what I was

1  trying to do here.  And that, as a chief, I have the full right
2  to go talk to anybody I want to.  And that's something I talk
3  about all the time.
4         So one of the things that I made very, very clear,
5  have always made as a lieutenant and then as a captain, that
6  people have come to me, you know, supervisors saying, hey, Chief
7  Johnson, for example, it's down over here talking to a sergeant,
8  and he didn't come talk to me first.  And I would always look at
9  them, like, he's a chief.  He can go talk to anybody he wants.
10 Or the sheriff is down here talking to deputy, or the
11 undersheriff's down here talking to detective.  I've always had
12 the same attitude.  People above me, they can go talk to anybody
13 they want to about anything.  That's their -- that's -- they're
14 the boss.
15     Q.  So -- so other -- you've heard this kind of complaint
16 before from --
17     A.  I've heard it tro -- from troops upward, that, you
18 know, like a lieutenant who gets mad a chief that went down and
19 talked to a sergeant, right?  And I've always, like, made it
20 very, very clear they absolutely can do that.  The only thing
21 that I asked as a respect was absolutely we're open book here.
22 To answer any questions you want -- they ask of me.  Just do me
23 a favor, when you're done with the conversation, just let me
24 know what -- what they're -- what they need so that, again, I'm
25 not caught off guard.  I did the exact same thing.  That's why I

1  to me with a termination saying that someone is being
2  terminated, they don't have to give me a justification or a
3  reason.  I take them that they had full justification to take
4  the action that they did.
5      Q.   Did you ever recommend that Ms. Kluth be terminated
6  to --
7      A.   Me, personally?
8      Q.   Yeah.
9      A.   No.
10     Q.   And you mentioned your meetings with Undersheriff
11 Walcher about both Ms. Kluth and Captain Jensen, right?
12     A.   Correct.
13     Q.   How are those connected, in your mind, to her
14 termination?
15     A.   I don't know if they're connected.  I know that
16 the --there was conflict.  There was behavior by two executive
17 officers or captains that is not conducive to what the
18 undersheriff expects of men and women of that rank and the level
19 of experience.  We are placed in these positions for a reason.
20 But we have -- but we're held to a high standard of how we're
21 supposed to maintain ourselves and act.  And if we don't meet
22 them standards or we fail to meet those standards, the sheriff
23 undersheriff are full within the right to terminate us.
24     Q.   So you said that the captains, Captain Kluth and
25 Captain Jensen were not meeting the standard that Undersheriff

1  Walcher expected.  Is that -- my understanding correctly?
2     A.   They weren't meeting the expectations of myself, as
3  far as I was hoping the captains could do better in working
4  together.  I think in some areas, they tried.  But in a lot of
5  areas, they failed to work cohesively and to show leadership.
6  They started doing things that I thought was more self-serving
7  to their own styles.  Basically, they weren't in -- in lockstep
8  and consistency, like I talked about at the beginning of this is
9  the key.  And I don't think that the captains ever met that
10 consistent level.
11    Q.   In your assessment, is that due to the fact that there
12 are two captains or is it individual to their performance in
13 that?
14    A.   I think human nature would be --it'd be, at the
15 beginning I was expecting that two captains in the same -- same
16 role per se, there was gonna be some challenges.  But I also
17 have high expectations of men and women of their leadership and
18 their years of experience, that they'd be able to work this out
19 and work for the best interest of the department.
20    Q.   Ms. Kluth's Guardian Tracker file doesn't have
21 anything about conflicts with Captain Jensen, correct?
22    A.   Correct.
23    Q.   Did you make any entries in Captain Jensen's Guardian
24 Tracking file about it?
25    A.   No.

1  identified and that she was trying to rectify.  That I think she
2  was on the right path.  It's just the manner in which the
3  messages relayed, was causing conflict.  I just -- I didn't see
4  those two ever coming together in a unified way.  That's one of
5  the reasons why when I had an opportunity to talk to the sheriff
6  and the undersheriff about the idea of two captains on patrol, I
7  didn't think it was a good idea.
8       Q.   As between Ms. Kluth and Jensen, in your assessment,
9  who is more at fault for -- for that situation you described
10 where the captains are in conflict?
11      A.   Well, you know, when you deal with captains, you're
12 dealing officers, command officers at that level, I wouldn't lay
13 blame on one or the other.  I'd lay blame equally on both.  I
14 expected them to do better.  And I was disappointed that they
15 didn't.
16      Q.   In -- in terms of meeting with them about it, you
17 described sort of an initial meeting you had with them to
18 emphasize the importance of their communication and working
19 together; is that right?
20      A.   Think I emphasized the importance of all three of us
21 working together.
22      Q.   Yeah.
23      A.   I'm brand new as the law enforcement bureau chief,
24 Captain Nicholson-Kluth was coming in brand new as a captain in
25 patrol.  We've ever done this before with two.  Now, they have a

1     A.   Well, he -- that's not why he terminated.  That's what
2 started the investigation.  It had more to do with his failure
3 to take any responsibility for his actions, his failure to
4 adhere to the policy that was clearly written where he was out
5 of policy.  And that for an officer at a captain's level to
6 blatantly disregard a policy, one of the most dangerous policies
7 we have because a pursuit that ends badly can bring more
8 liability under this office than anything other than deadly use
9 of force.  Pursuits are dangerous.  Pursuits have to be looked
10 at very, very closely.  We have to adhere to our policy in order
11 for us to maintain the trust and the confidence in our public.
12 Captain Jensen clearly showed that he didn't adhere to the
13 policy, he didn't respect the policy, he felt that he was right,
14 the policy was wrong, and he was gonna do it his way.  His
15 eventual lack of taking responsibility for his actions, and
16 adhering to the policy of accepting the policy changes that were
17 being made, eventually led his termination.
18     Q.   So is it fair to say that when Ms. Kluth was appointed
19 captain of patrol, she brought some of these issues to your
20 attention and that helped resolve some of these?
21     A.   It's fair to say that she brought some of the issues
22 to my attention.  I think the biggest conflict I had with
23 Captain Nicholson-Kluth is she didn't want to make the decision
24 either.  She didn't want to say the pursuit was in policy or out
25 of policy.  More likely if it was not in policy.  In fact, I did

1 have to talk to her about, she would send responses back to me
2 saying this, you know, this one here is close.  I think she used
3 the term this one's on the bubble.  And I did have to talk to
4 her and say, as a captain, there is no on the bubble.  You
5 either are within policy or you're not.  You have to make a
6 decision.  Don't make me make the decision.  So if you're saying
7 it's within policy, stand up and say it's within policy.  Send
8 them to me.  If I disagree, right, which is my right to do as a
9 chief, then I can go back to her and explain to her why I
10 disagree and open up, and do more with that.  If she thinks it's
11 not within policy and she says, I don't believe this is policy
12 and sends it up to me and I agree with her, then that's gonna go
13 to internal affairs where we'll work it.  If I disagree with her
14 and say, no, I think we were within policy, that's why we have
15 that review.

16        But the conflict was having with this captain was
17 every pursuit was justified, no ifs ands or buts.  The conflict
18 was having over here with this captain was we had pursuits on
19 the bubble.  There is no such thing as being on the bubble.  You
20 are either in policy or not policy.  Make a decision.  And if I
21 needed to clear up the language of the policy, that's what we
22 need to do.  And, in that one instance, we did had to clear up
23 some of the language because it was being interpreted in a -- in
24 a way that I think it was being misinterpreted.  But we cleared
25 up the -- the language of the policy to make it as clear as we

1 could possibly make it.
2     Q. And at some point, you instructed Ms. Kluth that she
3 needed to come out one side or the other when she's reviewing --
4     A. Make a decision.
5     Q. -- pursuits, correct?
6     A. Correct.
7     Q. And after you told her that, was that an issue with
8 her going forward?
9     A. I -- I think that was an issue still. I can't
10 remember any specifics. I believe there was two pursuits. In
11 fact, I know there was one pursuit that -- where she ruled it as
12 it was clearly out of policy, but it -- because it only lasted a
13 very short amount of time, like a minute and 30 seconds. She
14 thought it was okay. We're talking about an officer who was
15 engaged in the pursuit that his car wasn't even working properly
16 His lights weren't working, the siren wasn't working, his
17 body-worn camera wasn't working, knew that it wasn't working.
18 That officer had no business chasing a car. But because he only
19 did it for a minute and 30 seconds, she was gonna say that it
20 was okay. And I was like, nope. That's not okay. He should've
21 known that and we're gonna do -- we're gonna take some steps.
22     Q. And so you disagreed on the application of the policy
23 to that pursuit?
24     A. Yeah. Yeah. He was clearly out of policy. He had no
25 business pursuing a car even if it was only for a minute and 30

1  seconds.
2      Q.   Okay.  And at the time that you instructed Ms. Kluth
3  to come out one side or the other when reviewing pursuits, were
4  you already rewriting the pursuit policy at that time?
5      A.   It had already been rewritten.  I think it had been
6  revised by that time.
7      Q.   Okay.  And then other than pursuits, what are the
8  other obvious examples of conflict in the patrol division?
9      A.   Conflicts being, I think the one thing that kind of
10 challenged me the most was Captain Nicholson-Kluth coming to the
11 patrol division as a captain and immediately gonna work finding
12 all the faults and wrongs with the patrol division.  I think
13 what flustered me the most was how -- 'cause I wasn't in the
14 patrol division.  Two years prior to that, I was a captain in
15 investigations.  Four years prior to that, I was a captain of
16 the detentions division.  Prior to that, I was a lieutenant up
17 at Highlands Ranch substation.  I was not involved with patrol
18 and the operations of patrol.  I think what dumbfounded me the
19 most was immediately coming from --as the undersheriff to a
20 patrol captain and then going immediately to work to find
21 everything that was wrong with the patrol division, mistakes
22 that were being made, SOP's that hadn't been up -- upgraded and
23 revised in a timely manner, policies that were confusing, all of
24 these type of things that she was finding.  Training that needed
25 to be done with Axon, different types of things.  All valid.

```
1                    CERTIFICATE OF REPORTER
2
3         STATE OF COLORADO                  )
                                             )
4         COUNTY OF DENVER                   )
5
6       I, Jessica Wharton, Court Reporter, do hereby certify that
7   I was authorized to and did electronically report the deposition
8   of KEVIN DUFFY; that KEVIN DUFFY was duly sworn on the date
9   indicated; that the questions and answers thereto were reduced
10  to typewriting under my direction; that a review of the
11  transcript was requested; and that the foregoing is a true and
12  accurate electronic recording of the proceedings.
13      I FURTHER CERTIFY that I am not a relative, employee, or
14  attorney, or counsel of any of the parties, nor am I a relative
15  or employee of any of the parties' attorneys or counsel
16  connected with the action, nor am I financially interested in
17  the action.
                DATED this 4th day of October 2022.

19
20             _____
               Jessica Wharton, Court Reporter
21
22
23
24
25
```

1   CERTIFICATE OF TRANSCRIPTIONIST

2

3   I, Monica Walters, do hereby certify that I transcribed the
4   electronic recording produced by Jessica Wharton, court reporter
5   of the Deposition of KEVIN DUFFY; and that the foregoing
6   transcript is a true transcript of said electronic recording.
7   I FURTHER CERTIFY that I am not a relative, employee,
8   attorney, or counsel of any of the parties, nor am I a relative
9   or employee of any of the parties' attorneys or counsel
10  connected with the action, nor am I financially interested in
11  the action.
12  DATED this 4th day of October 2022.
13
14
15  _____
    Monica Walters
16
17
18
19
20
21
22
23
24
25

1  E R R A T A   S H E E T

2  Witness: KEVIN DUFFY
   RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
3  official capacity as Douglas County Sheriff
   Date of Proceeding: September 19, 2022
4  U.S. Legal Support Reference No.: 6192843

5      PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
          REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
6

7      Page / Line /    Change      / Reason.

8   7 / 20 / I do to I Am /  I Am correct Response

9   11 / 21 / him to her / It was a female I took home

10  17 / 6 / Delete "or deputy" / duplication

11  20 / 22 / Detections - Detentions / Miss spelling

12  22 / 7 / Network to work / work is correct

13  28 / 25 / Impartial / correct word

14  31 / 17 / Chief Johnson / Miss spelling

15  46 / 17 / Tony to Troy / Correct name

16  54 / 20 / inaudible / Moore

17  54 / 22 / inaudible / Law Enforcement Bureau Chief

18  Under penalties of perjury, I declare that I have
    read the foregoing transcript and that the facts stated in it
19  are true.
    _____ 89-05  10/11/2022
20  KEVIN DUFFY                    Date

21

22  (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
    Sworn and subscribed to before me this 11th day of
23  October         , 20 22.

24  _____    _____ 8905
    Notary Public              KEVIN DUFFY

25

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023

U.S. Legal Support | www.uslegalsupport.com          259

SPURLOCK Motion for Summary Judgment, Exhibit Q

1       E R R A T A   S H E E T

2  Witness: KEVIN DUFFY
   RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
3  official capacity as Douglas County Sheriff
   Date of Proceeding: September 19, 2022
4  U.S. Legal Support Reference No.: 6192843

5       PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
            REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
6

7       Page / Line /      Change       / Reason.

8  55 / 6 / inaudible / Law Enforcement Bureau
9  57 / 1 / Patrols / drop the S
10 61 / 23 / Control / Patrol
11 75 / 1 / a / drop the a
12 105 / 15 / inaudible / acredited
13 105 / 22 / CF--CSB / to CSV
14 122 / 16 / give toget / proper wording
15 122 / 21 / save to solve / Proper wording
16 123 / 18 / industrial to division / Proper word
17 154 / 11 / gonna to going to / Proper wording

18 Under penalties of perjury, I declare that I have
   read the foregoing transcript and that the facts stated in it
19 are true.  _KB Duffy 89-05_  _10/11/2022_
20 KEVIN DUFFY                    Date

21

22 (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
   Sworn and subscribed to before me this 11th day of
23 _October_, 20_22_.

24 _Julie Ware_                   _KB Duffy 89-05_
   Notary Public                  KEVIN DUFFY
25

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023

E R R A T A   S H E E T

Witness: KEVIN DUFFY
RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his official capacity as Douglas County Sheriff
Date of Proceeding: September 19, 2022
U.S. Legal Support Reference No.: 6192843

PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM

Page / Line / Change / Reason.

| Page | Line | Change | Reason |
|---|---|---|---|
| 164 | 12 | drop "a--as a very" | Proper wording |
| 165 | 2 | drop other to on | Proper wording |
| 185 | 6 | Would not be | correct statement |
| 185 | 6 | Change there to either | Proper wording |
| 187 | 16 | going to be | Proper wording |
| 210 | 6 | Brawner to Bronner | Miss Spelling |
| 210 | 12 | " | " | " | " | " |
| 210 | 19 | " | " | " | " | " |
| 211 | 5 | " | " | " | " | " |
| 211 | 6 | " | " | " | " | " |

Under penalties of perjury, I declare that I have read the foregoing transcript and that the facts stated in it are true.

_KEVIN DUFFY_ _10/11/2022_
KEVIN DUFFY                Date

(RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
Sworn and subscribed to before me this 11th day of October, 2022.

_Julie Ware_                _Kevin Duffy 89-05_
Notary Public              KEVIN DUFFY

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023

U.S. Legal Support | www.uslegalsupport.com          259

SPURLOCK Motion for Summary Judgment, Exhibit Q

```
 1                E R R A T A   S H E E T
 2    Witness: KEVIN DUFFY
      RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
 3    official capacity as Douglas County Sheriff
      Date of Proceeding: September 19, 2022
 4    U.S. Legal Support Reference No.: 6192843
 5         PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
                REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
 6
 7         Page / Line /     Change     / Reason.
 8    212 / 10 / Brawner to Bronner   Miss Spelling
 9    212 / 18 /   "       "    /"      "      "
10    213 /  2 /   "       "    /"      "      "
11    213 / 13 / Lon Bronner   Miss Spelling
12    214 /  9 /   "       "    /   "   "  "
13    214 / 10 / Jensen to Kennedy  Proper Person
14    236 /  8 / Darrin to Darren   Miss Spelling
15    236 / 15 /   "       "  "     "      "
16    236 / 19 /   "       "  "/    "      "
17    237 /  2 /   "       "  "/    "      "
18    Under penalties of perjury, I declare that I have
      read the foregoing transcript and that the facts stated in it
19    are true.
                  [signature] 8905      10/11/2022
20    KEVIN DUFFY                       Date
21
22    (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
      Sworn and subscribed to before me this 11th day of
23    October        , 2022
24    [signature]                  [signature] 89-05
      Notary Public                KEVIN DUFFY
25
```

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023

SPURLOCK Motion for Summary Judgment, Exhibit Q