IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION DIVISION

CASE NO.: 1:21-CV-3417-NYW


HOLLY KLUTH,

        Plaintiff,

vs.

TONY SPURLOCK, individually and
in his official capacity as Douglas
County Sheriff,

        Defendant.
_____/


DEPOSITION OF TONY SPURLOCK




      DATE TAKEN:    August 31, 2022

      TIME:         9:06 a.m. to 6:07 p.m.
                  MOUNTAIN TIME


      LOCATION:     RATHOD MOHAMEDBAHAI, LLC
                  2701 Lawrence Street, Suite 100
                  Denver, Colorado 80205



Reported By:
Jessica Wharton, Reporter

Tony Spurlock
August 31, 2022

 1      A.   No.

 2      Q.   Let's do a -- let's run though some

 3  hypotheticals.  You're a Republican; is that right?

 4      A.   Yes.

 5      Q.   Are you still a Republican, or you were

 6  elected as a Republican.  Are you still affiliated

 7  with that party?

 8      A.   Yes.

 9      Q.   If a -- sorry.  Just give me a minute.  When

10  did you last run for office?

11      A.   2018.  The year 2018 I think it was.  It was

12  my second term.

13      Q.   Who did you run against in the general

14  election?

15      A.   No one.

16      Q.   Unopposed?

17      A.   Yes, sir.

18      Q.   Did you run against anyone in the primary?

19      A.   Yes.  No, no.  In the primary?

20      Q.   Yeah.

21      A.   No.

22      Q.   So you cakewalked all the way through?

23      A.   They love me.

24      Q.   What about your first election?

25      A.   I had a primary between two Republicans,

Tony Spurlock
August 31, 2022

1    county counsel and HR, that's how I've operated since

2    I've been elected.

3        Q.    I'm showing you a memo dated July 19th,

4    2019.  Does -- you have this document in front of you?

5        A.    Yes.

6        Q.    It's Kluth 1558 in the bottom right corner.

7    Do you see that?

8        A.    Yes.

9        Q.    This is your signature?

10       A.    Yes.

11       Q.    Is this the letter that -- or memo that you

12   wrote to Ms. Kluth that you were just referencing?

13       A.    Yes.

14       Q.    This is a very positive letter, correct?

15       A.    Yeah, I'm reading through it very quickly,

16   but I do not believe that I notated any performance

17   issues in this memo.

18       Q.    Yeah, and take your time to it.

19       A.    Okay.

20       A.    Okay.

21       Q.    Having read the memo, you would agree this

22   is a very positive letter?

23       A.    Yes, it is.

24       Q.    There's nothing negative in there?

25       A.    There is not.

Tony Spurlock
August 31, 2022

1    Ms. Kluth was performing well as your Undersheriff?

2        A.    Well, if I said '17 if I did say '17 it

3    should be '19.  Obviously.

4        Q.    No, you didn't say.  I was just doing the

5    the math because she had started --

6        A.    Oh the math, okay.

7        Q.    Because she had she had started in 2014,

8    right?

9        A.    Yes.

10       Q.    And then you said three years, which took us

11   to 2017-ish.

12       A.    Yeah, yeah.  Yes, I can say this -- this

13   letter, anything that preceded that from the date I

14   appointed her as the Undersheriff which was in 2014,

15   she did an incredible job.

16       Q.    Okay.  So for the first five years or so as

17   Undersheriff she did an incredible job?

18       A.    Yes.

19       Q.    Okay.  Just wanted to make sure I was

20   getting the math right.

21       A.    Sure, that's fine.

22       Q.    All right.  Ms. Kluth was demoted to the

23   rank of Captain on November 16th, 2020; is that

24   correct?

25       A.    Yes.

Tony Spurlock
August 31, 2022

1      Q.    What discipline do you think is appropriate

2   for a Hatch Act violation?

3      A.    I think it depends on the degree of the

4   behavior.  So I can't really give you parameters at

5   this point, but I think it would be dependent upon the

6   degree of the behavior.

7      Q.    Has the Office of Special Counsel ever found

8   that a Douglas County Sheriff's Office employee

9   violated the Hatch Act during your tenure at Sheriff?

10     A.    Oh, not as my tenure as Sheriff.

11     Q.    I added that because I didn't want you going

12  back 40 years.

13     A.    Thank you.

14     Q.    Got limited time.  So back to -- back to

15  Section EE.  Violating this policy is one of the

16  reasons that Ms. Kluth was demoted, correct?

17     A.    This is one of the policies that she

18  violated, yes.

19     Q.    And she was demoted two ranks, right?

20     A.    That's correct.

21     Q.    Which is significant punishment, do you

22  agree?

23     A.    I would agree, yes.

24     Q.    You take Section EE fairly seriously, then,

25  I take it?

Tony Spurlock
August 31, 2022

1       Q.    And you sustained the disciplinary finding

2   regarding that Facebook post Ms. Kluth made?

3       A.    Yes, I did.

4       Q.    When did you inform Ms. Kluth that she was

5   being terminated?

6       A.    On the -- I apologize for the date, May 25,

7   is that -- if that's the date.  She was called into a

8   conference room, and there were some other people

9   present, Laura Leary and Jason Kennedy, Captain

10  Kennedy from my office, and myself, and I presented

11  her with a severance package and told her that she no

12  longer the vision, mission, values of my office.

13          And I was giving her an opportunity to take

14  the severance package and review it, and you know,

15  take the severance package, and she refused to and

16  slid it back across the table from me.  And I think

17  she asked me, why am I being terminated?

18          And I said, well, you have the -- this --

19  and that's not it, but I had a piece of paper in front

20  of me that -- the severance package, and I said, you

21  can take the severance package and review it.  And she

22  goes, and if I don't?  And I said, well, you're being

23  terminated today.  Today is your last day.  So you

24  have an option to either take the severance package or

25  not.

Tony Spurlock
August 31, 2022

1          Then, she asked me again, what am I being

2     terminated for, and I said you're being terminating

3     for violating -- or you no longer meet the vision,

4     mission, and values of this office.

5          Q.   The severance package that you offered her

6     would have characterized her exodus as a resignation,

7     right?

8          A.   Yes.

9          Q.   Did you -- did she ask you how she had

10    failed to meet the vision, mission, and values of the

11    Sheriff's Office?

12         A.   No, I don't recall she -- she goes, I

13    want -- can you give me -- can you be more specific,

14    she might have said.  She might have said that, yes.

15         Q.   And did you respond to that request?

16         A.   I did not.

17         Q.   Okay.  So you did not tell her how she had

18    failed to meet the vision, mission, and values of the

19    Sheriff's Office, right?

20         A.   That's right.  That in itself collectively

21    encompasses a variety of things.

22         Q.   When did you make the decision to term her?

23         A.   Maybe a week before that date.

24         Q.   Uh-huh.  Who did you consult with prior to

25    making the decision to terminate her?

Tony Spurlock
August 31, 2022

1      A.    County attorney, HR director.

2      Q.    Anyone else?

3      A.    No.

4      Q.    Did you consult with Undersheriff Walcher?

5      A.    I think I told him what I was doing.  I

6  might have -- I might have asked him.  I don't recall

7  if I asked him, like, what do you think or whatever.

8  I think I told him what I was doing.

9      Q.    Prior to this meeting, did Ms. Kluth have

10  any heads-up that she was about to be terminated?

11      A.    Not to my knowledge.

12      Q.    You didn't tell her that she might be

13  terminated at this meeting?

14      A.    I did not.

15      Q.    Yeah.  So when she was called into the

16  meeting, she presumably didn't know what the meeting

17  was about.

18      A.    Correct.

19      Q.    Why was Mr. Kennedy at this meeting?

20      A.    Well, I knew that Ms. Kluth was no longer

21  going to be an employee once we left that conference

22  room, and the Office of Professional Standards is

23  charged with exiting employees.  It's one of their

24  other tasks.

25            And so I needed a staff member to take her

Tony Spurlock
August 31, 2022

1   and escort her to wherever that was going to be, her

2   office to pick her essentials that might be necessary,

3   and then escort her out of the building.  So that was

4   his job.

5        Q.    Was there -- and her termination was

6   effective immediately?

7        A.    Yes, it was.

8        Q.    And she was escorted off the premises?

9        A.    I believe the captain took her to her office

10  to collect, you know, some things that she might need,

11  eyeglasses or, you know, medication or anything else

12  that she might have needed.  And then, an agreement

13  was made for her to come later, after hours, so she

14  could clean out her office, so there wasn't a lot of

15  looky-loos standing around.

16       Q.    Was Ms. Kluth upset when she learned that

17  she had been terminated?

18       A.    She didn't cry, you know, she wasn't crying.

19  But I think that she was surprised.

20       Q.    And as you stated, she didn't have any sort

21  of advanced warning she was going to be on the

22  chopping block?

23       A.    Not from me.

24       Q.    And the only person that you spoke with in

25  the office about this termination decision was

Tony Spurlock
August 31, 2022

1  performance, but I didn't tell him what I was thinking

2  about doing, no.

3      Q.   Did --

4      A.   I mean, I didn't ask for his advice.

5      Q.   Yeah.  You didn't ask his opinion as to

6  whether he thought Ms. Kluth should be terminated?

7      A.   No.

8      Q.   Was there any chance or opportunity for

9  Ms. Kluth to change your mind at the May 25th meeting?

10     A.   Yeah, she could have -- she could have --

11 she could have taken the severance package illustrated

12 right here.  She could have taken the severance

13 package and said, I would like to take this and read

14 this.  And then obviously, that -- is in there some

15 instructions for her to get back to us, and then, we

16 could have had dialogue.  She could have easily done

17 that.

18          Or she could have said I would like to -- I

19 would like to talk to you about the termination.  I

20 would like to have a conversation with you about it.

21 She never did that.  She just demanded that I give her

22 the reason, and I said, I've given you the reason.

23 You no longer meet the vision, and the mission, and

24 the values of this office.  And that is -- that's

25 enough.

Tony Spurlock
August 31, 2022

1          And so you know, she never asked, hey, can

2   we have a private conversation?  Do these people need

3   to be here?  Can you and I talk?

4      Q.   You didn't tell her any of the conduct that

5   she had engaged in that didn't meet the vision,

6   mission, and values, did you?

7      A.   Specifically?

8      Q.   Yeah.

9      A.   On the judgment?

10     Q.   Yeah.

11     A.   And the justice?  No.

12     Q.   Why didn't you tell her what she had done

13  wrong?

14          MR. O'CONNELL:  Objection to form.

15          THE WITNESS:  On advice of counsel.

16  BY MR. CRON:

17     Q.   Did you give Ms. Kluth the termination

18  letter?

19     A.   No, I did not.

20     Q.   Prior to this lawsuit, did you ever expound

21  on your reasons for terminating Ms. Kluth?

22     A.   Expound on them?

23     Q.   Expound.

24     A.   To who?

25     Q.   To Ms. Kluth?

Tony Spurlock
August 31, 2022

1    Q.   So how was she supposed to discuss how she

2    had failed to live up to vision, mission, and values

3    if you, on advice of counsel, wouldn't tell her how

4    she had failed?

5    A.   Well, she -- I mean, what-ifs here again.

6    She could have said, can we at least talk?  Can you

7    and I have a conversation?  I would like to talk to

8    you about what I've done, where I'm at, what I'm

9    doing.  She was no rookie to the fact of being able to

10   come into my office and have those kinds of difficult

11   conversations.

12   Q.   After you had told her that today was going

13   to be her last day, right?  That's how you started the

14   meeting.

15   A.   No, that's not how I started.

16        MR. O'CONNELL:  Objection to form.

17        THE WITNESS:  That's not how I started.

18   BY MR. CRON:

19   Q.   Okay.  How did you start it?

20   A.   She sat down, what's going on, and I said,

21   listen, I would like to give you an opportunity to

22   take this severance packet because you no longer meet

23   the vision, mission, and values of this office.  So

24   I'd like to give you the opportunity to take this.

25   Q.   Okay.

Tony Spurlock
August 31, 2022

1    your knowledge?

2         A.   I cannot answer that.  I don't know if the

3    HR director or the captain did.

4         Q.   Can you please look at your -- the complaint

5    on Page 11.

6         A.   Okay.

7         Q.   The allegation in Paragraph 93 is Spurlock

8    stated to Ms. Kluth --

9         A.   Page 11?

10        Q.   Page 11, Paragraph 93.

11        A.   Sorry, my apologies.

12        Q.   It's no problem.

13        A.   Yes, that's true, and I forgot that, yes.

14        Q.   Okay.  So you --

15        A.   I'm sorry, my apologies.

16        Q.   And you told Ms. Kluth that nothing had

17   changed since last fall?

18        A.   Yes, this was -- this was -- this statement

19   was made after she had asked me, can you give me --

20   what have I done?  Tell me what I have done.  And I

21   said, you know, nothing has changed.  Your behavior

22   hasn't changed since last fall.

23        Q.   What had happened last fall?

24        A.   That's when she was demoted from

25   Undersheriff to Captain.

Tony Spurlock
August 31, 2022

1    meant when I said, you have not changed your behavior

2    since last fall.  You're still violating policies.

3    They're just different policies.

4        Q.   Did she violate the Law Enforcement Code of

5    Ethics after her demotion?

6        A.   I suppose you could fine-tooth comb it and

7    say yes, but I'm not going to go there.  I'm not going

8    to say -- I didn't -- that -- I didn't make a decision

9    based upon that.

10       Q.   Okay.

11       A.   Yes.

12       Q.   So I mean, she was demoted for specific

13   actions in November of 2020, right, in that she had

14   planned with a subordinate to get other command staff

15   members to write letters for the DC GOP, right?

16   That's the gist of what she did?

17       A.   Yeah.  She violated policies that were

18   surrounding each one of those five policy behaviors.

19       Q.   And just to be clear, she wasn't engaging in

20   that sort of specific type of conduct after she was

21   demoted to captain, right?

22       A.   Not that specific conduct, no.

23       Q.   All right.  So okay, did you -- so you told

24   Ms. Kluth that nothing had changed since last fall,

25   and that she was not living up to your mission,

Tony Spurlock
August 31, 2022

1  vision, and values at the May 25th, 2021, meeting,

2  right?

3       A.   Correct.

4       Q.   Did you tell her any other explanation as to

5  why she was being terminated?

6       A.   I did not.

7       Q.   All right.  Let's go to Exhibit 35, which

8  are your response to the interrogatories.  Or no, it's

9  Exhibit 40, sorry.

10       A.   I think you might have them.  I only have

11  39.  Thank you.

12       Q.   But are you aware of the State statute

13  requiring the Sheriff to inform employees of the

14  reason for a termination?

15       A.   Yes.

16       Q.   Okay.  And you're also aware of the

17  statutory requirement that the Sheriff must give the

18  employee an opportunity to be heard?

19       A.   Yes.

20       Q.   Okay.  And you believe that telling

21  Ms. Kluth that she was not living up to the mission,

22  vision, and values of the office satisfied that

23  requirement?

24       A.   That's a clear satisfaction to that

25  requirement.

Tony Spurlock
August 31, 2022

```
 1   she was fired, was she?
 2        A.   No.
 3        Q.   Okay.  So she would have been eligible to
 4   receive LEOSA at that juncture, right?
 5        A.   No, because the statute is for good
 6   standing, and she had an option to either accept the
 7   severance package and resign or be terminated.  And so
 8   that, in itself, doesn't make you in good standing in
 9   our office because -- it just doesn't.
10        Q.   Did Tim Moore request a LEOSA permit?
11        A.   He did not.
12        Q.   He did not?
13        A.   I don't recall he did.  The only one I
14   recall -- asking was Holly.
15        Q.   Okay.  Would he have been -- would Mr. Moore
16   have been eligible to receive one?
17        A.   He would not have been, no.
18        Q.   All right.  So sorry to jump around, but can
19   you look at Exhibit 16, actually.
20        A.   Okay.
21        Q.   This is the disciplinary corrective action
22   policy.
23        A.   I have it.
24        Q.   Okay.  It's KLUTH 621 through KLUTH 626.
25   Okay.  This policy sets forth the procedures to
```

Tony Spurlock
August 31, 2022

1   discipline employees, right?

2        A.   Yes.

3        Q.   And this policy applies to all employees

4   except for yourself?

5        A.   Yes.

6        Q.   And this policy lays out specific procedures

7   for discipline or corrective action, right?

8        A.   Yes.

9        Q.   Okay.  And Ms. Kluth's demotion from

10  Undersheriff to Captain followed these procedures,

11  correct?

12       A.   Yes.

13       Q.   There was an IA investigation, right?

14       A.   Yes.

15       Q.   And a notice of complaint.  There was a

16  pre-disciplinary hearing, right?

17       A.   Yes.

18       Q.   That was recorded?

19       A.   Yes.

20       Q.   And there was a written notice of

21  discipline?

22       A.   Yes.

23       Q.   Okay.  Now, prior to her termination,

24  Ms. Kluth did not receive any formal discipline as a

25  captain, had she?

Tony Spurlock
August 31, 2022

1   willy-nilly, and you know, one person doing this, and

2   another person, you know, not doing that or whatever.

3       Q.   Is it a measure of fairness that discipline

4   follows regular procedures?

5       A.   Yeah, I think you could call it that, yeah.

6       Q.   Now, you did not give Ms. Kluth a written or

7   verbal notice prior to the May 25th meeting, did you?

8       A.   Well, I mean, I guess it's a matter of

9   semantics.  I did give her verbal notice because I

10  called her in and said, this is what we're doing.

11      Q.   Okay.  She never received any previous

12  disciplinary hearing, did she?

13      A.   No, she did not.

14      Q.   Okay.  On Page -- or Paragraph 148 of the

15  complaint, Plaintiff alleged Defendant failed to

16  provide Ms. Kluth a pre-disciplinary notice, including

17  the charges against her prior to her termination; do

18  you see that?

19      A.   Yes.

20      Q.   Why did you deny that in your answer?

21      A.   Why did I deny that in my answer?  What do

22  you mean?  I'm not following your question.

23      Q.   You can read your answer in Paragraph 148.

24      A.   I have 148?

25           MR. O'CONNELL:  You (inaudible) answer.

Tony Spurlock
August 31, 2022

```
 1            THE WITNESS:  Oh.

 2   BY MR. CRON:

 3       Q.   Okay.  Okay.  Why did you deny that -- do

 4   you want me to repeat the question?

 5       A.   No, no.  I -- I -- I'm sorry.  I was

 6   confused on where you were going with that.  So I --

 7   in my opinion, she was given a notice.  I -- I brought

 8   her in, and told her what was happening.  She was

 9   given an option, so -- so she was given options to --

10   what was about to happen.

11       Q.   So the May 25th meeting itself constituted a

12   pre-disciplinary hearing?

13       A.   No.

14       Q.   Okay.  So --

15       A.   So I mean it -- it's, again --

16       Q.   -- do -- do you think that your answer to

17   Paragraph 148 is inaccurate?

18       A.   No, I think it's still accurate.  I think

19   it -- I think it's still accurate that, in my opinion,

20   she was given not a pre-disciplinary notice, but she

21   was given notice.

22       Q.   Okay.  But this says --

23       A.   Not a written one.

24       Q.   -- this specific allegation is that you

25   failed to provide her with pre-disciplinary notice,
```

Tony Spurlock
August 31, 2022

1    including the charges against her prior to the

2    termination, right?

3        A.   I mean, I -- I guess, again, we'll go into

4    semantics because before she was terminated, she was

5    told what was happening.

6        Q.   Is that the pre-disciplinary hearing that is

7    discussed in the -- the policy in Exhibit 16?

8            MR. O'CONNELL:  Objection to form.

9            THE WITNESS:  It is not.

10   BY MR. CRON:

11       Q.   Okay.  Was the notice you contended you

12   provided her given after you made the decision to

13   terminate her?

14       A.   Repeat that question, please.

15       Q.   Okay.  The notice that you gave her at the

16   May 25th meeting, was that the -- was that, like,

17   given to her after you had already made a decision to

18   terminate her?

19       A.   Oh, well, yes.  Of course.  Because I

20   already knew what was going to happen that day.  It

21   was going to go one or two ways.

22       Q.   She was going to resign or be terminated?

23       A.   She was no longer going to be an employee

24   after that day.

25       Q.   So it's going to go one way?

Tony Spurlock
August 31, 2022

1      A.   Well, yes.   I guess, in regards to

2  employment, yes.

3      Q.   Okay.   Did Ms. Kluth have the opportunity to

4  reply to the charges and present mitigating

5  information?

6      A.   Again, she was given an opportunity there.

7  She could have -- not to this policy.   As the Sheriff,

8  I made the decision that she was going to be

9  terminated.   She could have, again as I said, asked,

10 hey, can you and talk.   And I -- I'm -- I'm likely to

11 have given her that option.   I've given lots of people

12 opportunities to -- to talk to me.   And she could have

13 had the opportunity if she so chose to do that.

14         Part of the reason why she was terminated

15 was part of the way that she handled this -- is that

16 she was incredibly defiant, and -- and argumentative

17 to the administration.   And if she had just stopped

18 being argumentative to the administration, and

19 accepted the position she was in, and worked hard to

20 be a good captain, we -- we might not be here, and she

21 could be the candidate for Sheriff.

22     Q.   Did you prepare and provide to Ms. Kluth

23 written notice, stating a final disciplinary decision

24 concerning her termination?

25     A.   Not written notice.   No.

Tony Spurlock
August 31, 2022

1    Q.   Oh, so in Paragraph 154 of the complaint,

2    Plaintiff alleged Defendant failed to provide

3    Ms. Kluth with a written notice of the final

4    disciplinary decision concerning her termination.  Do

5    you see that?

6    A.   150 --

7    Q.   Four.

8    A.   Okay.  Yes.

9    Q.   Your answer states that Sheriff Spurlock

10   denies the allegations in Paragraph 154.  What's the

11   basis for your -- that denial?

12   A.   Well, I -- I didn't give her -- I can tell

13   you right now, I didn't give her written notice of the

14   final disciplinary action.  She -- she could have the

15   -- the separation agreement, but she chose not to take

16   it, so I can only assume that's why that answer is

17   relevant to this question.  It's not very clear, I

18   agree to -- I agree with you.  It's not very clear.

19   Q.   Your answer doesn't seem to be correct in

20   Document 13; is that fair?

21   A.   Yeah.  Just -- this answer -- this answer

22   would require an example or more expansion, yes.

23   Q.   And yet, the only document that could be

24   construed as any sort of written notice was the

25   severance agreement that was offered -- offered to

Tony Spurlock
August 31, 2022

1   her?

2        A.   That -- that is correct.

3        Q.   Would you agree that the termination of

4   Ms. Kluth did not directly follow the procedures of

5   the policy set forth in Exhibit 16?

6        A.   I would agree, yes.

7        Q.   What other employees have been terminated

8   without following the procedures of Exhibit 16?

9             MR. O'CONNELL:  Since he became Sheriff, I

10  assume.

11            MR. CRON:  Since he became Sheriff.

12            THE WITNESS:  Okay.  So --

13  BY MR. CRON:

14       Q.   Let's start there.

15       A.   Okay.  So Gary Butler, who was mentioned

16  before in another deposition.  Gary Butler was a

17  sergeant with our office.  He confessed to an employee

18  that he committed a murder, and I brought him in,

19  personally.  I went to Internal Affairs section

20  personally, and sat across the table from him, and

21  said what did you tell the lieutenant.  And he goes,

22  well, it's been weighing on my mind.  This is what

23  happened.  I committed a murder X amount of years ago,

24  and then -- and I got it expunged because of his

25  connection with the Mormon Church in Utah.  And I said

Tony Spurlock
August 31, 2022

1   respect to Mr. Moore's employment?

2        A.   I did not.

3        Q.   So other than Mr. Moore, Ms. Kluth, the

4   murderer, Mr. Burton?

5        A.   No.  Outlar is a murderer --

6        Q.   Outlar.

7        A.   -- Butler is the other one.

8        Q.   Okay.  So outside of Ms. Kluth, Mr. Moore,

9   the murderer, and the rapist, are there any other

10  situations where you deviated from this disciplinary

11  corrective action?

12       A.   I'm -- I'm trying to think if there was

13  someone else that didn't follow it completely through.

14  I know -- no, I -- to the best of my knowledge right

15  now, nothing is popping up to my head.  There could

16  possibly be someone later if I went and did a bunch of

17  research, but I -- top of my head right now, I -- I

18  can't think of any more.  That's kind of impactful

19  stuff, so you remember it.

20       Q.   Right.  Can you turn to Exhibit 31, please?

21       A.   I don't have 31.

22            THE WITNESS:  I need 31, please.

23            MR. CRON:  It's in the packet.

24            MR. O'CONNELL:  This one --

25            THE WITNESS:  27.

Tony Spurlock
August 31, 2022

1      A.    Not to my knowledge.

2      Q.    Are there any major incidents that occurred

3  while she was Captain of Detentions?

4      A.    Not that rises -- not that anything that

5  comes to mind.

6      Q.    Were there any -- were there any issues with

7  her performance as Captain in the Detentions Division

8  that contributed to your decision to fire her?

9      A.    I don't recall any right now.  She was there

10 for a very short period of time.

11     Q.    Almost three months, right?

12     A.    Yeah.

13     Q.    Did Chief Johnson ever communicate to you

14 any issues with Ms. Kluth's performance as she was

15 employed as the Detentions Captain?

16     A.    It was one thing that escapes me right now.

17 And I apologize for the -- for the long day.  But I

18 think there was one issue that he said -- that he had

19 mentioned.  But I apologize.  I don't recall,

20 specifically, what the details are.

21     Q.    Okay.  Not -- not -- may assume, from

22 your -- it's not a huge incident?

23     A.    No.  It -- it -- it -- it's not anything

24 that's like we've talked before.

25     Q.    Why was Ms. Kluth transferred to Detentions?

Tony Spurlock
August 31, 2022

1   I felt uncomfortable that I couldn't trust where she

2   was at, what she was doing.

3          I felt uncomfortable with -- that she wasn't

4   going to live up to the vision and the mission and

5   values.  And I had -- I had concerns of -- of the many

6   issues that were going on in the Office.  And so I

7   started to have the conversation, as I said before,

8   with the county attorney, the HR director.  Talked

9   about options and what -- what were my options.

10  And -- and then I made -- I made the decision and went

11  there.

12      Q.  As you sit here today, there's not a

13  specific catalyst that caused you to fire Ms. Kluth on

14  that particular date or --

15      A.  Yeah.  I just didn't -- it was a collective

16  issues of my concern about her failing to fill the

17  vision, mission, and values.

18      Q.  Did you -- and you decided that she needed

19  to be terminated without going through the procedures

20  of the corrective action policy in Exhibit 16, right?

21      A.  Yeah.  I thought it was best for the agency

22  to separate immediately.

23      Q.  All right.  Why?

24      A.  If you have someone that you don't feel like

25  you can trust, and who has demonstrated over a period

Tony Spurlock
August 31, 2022

```
 1        A.    No.

 2        Q.    Completely coincidental that they were

 3   fired --

 4        A.    Two separate employees, two separate issues.

 5        Q.    They engage in different conduct that led to

 6   their termination.

 7        A.    Well, the -- the -- they both failed to meet

 8   the vision, mission, and values of the office.  So, to

 9   that degree, yes.  But they were individual

10   terminations that were not linked.

11        Q.    How many employees have you fired during

12   your tenure as Sheriff?

13        A.    How many employees?

14        Q.    Yes.

15        A.    Maybe 20.

16        Q.    Of those 20, were there any that did not

17   fail to meet the vision, mission, and values of your

18   office?

19        A.    No.  They all failed to meet that.

20        Q.    It sounds, really, if you're terminated, you

21   almost, by definition, have failed to meet the vision,

22   mission, and values of the office; is that accurate?

23        A.    That would be fair.  Yes.  Because that

24   document is the foundation of our policy.

25        Q.    Right.
```