*AB Litigation Services*

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-CV-3417-NYW
_____

DEPOSITION OF HOLLY NICHOLSON-KLUTH
July 7, 2022
_____

HOLLY KLUTH,

Plaintiff,

vs.

TONY SPURLOCK, Individually and in
his official capacity as Douglas County
Sheriff,

Defendant.
_____


APPEARANCES:

     RATHOD|MOHAMEDBHAI, LLC
          By Matthew J. Cron, Esq.
             2701 Lawrence Street Suite 100
             Denver, Colorado  80205
               Appearing on behalf of Plaintiff

     WELLS, ANDERSON & RACE, LLC
          By William T. O'Connell, III, Esq.
             1700 Broadway, Suite 1020
             Denver, Colorado  80290
               Appearing on behalf of Defendant

Also Present: Tony Spurlock
```

```
 1   recipients.  Is that Darren Weekly?
 2        A     I'm assuming, yeah.
 3        Q     Okay.  Did you have any conversations
 4   with Darren Weekly about this e-mail?
 5        A     No.
 6        Q     Okay.  Did Moore, to your knowledge,
 7   ask --  And it could be referenced within one of
 8   the exhibits, so I'm not trying to trip you up.
 9   Did Moore, to your knowledge, solicit or inquire
10   of Weekly to provide a statement to Parker?
11        A     I believe he said something about
12   Weekly -- about talking to Weekly, but I don't
13   recall exactly what he said or -- or have any more
14   detail about it.
15        Q     Okay.  To your knowledge, did Weekly
16   ever submit anything to Parker?
17        A     I don't believe so.
18        Q     Okay.
19        A     I'm not sure.
20        Q     All right.  You can set that aside.
21   Thank you.
22              Now, you announced your candidacy for
23   sheriff on -- on or about February 13, 2021; is
24   that right?
25        A     That sounds about right.
```

AB Litigation Services

```
 1      Q     Did Sheriff Spurlock know before then
 2   that you were considering running for sheriff?
 3      A     Yes.
 4      Q     Had you apprised him prior to that date
 5   that you would be running?
 6      A     Yes.
 7      Q     When did you first talk to him about
 8   that?
 9      A     I think it was around February 6th.  I
10   remember thinking I wanted to do it -- give him a
11   week to know about it before I made the
12   announcement.
13      Q     Other than family members, did anybody
14   else at the -- anybody else know of your intent to
15   run --
16      A     I don't recall.
17      Q     -- excuse me -- prior to your formal
18   announcement?
19      A     I don't recall.  I don't recall.
20      Q     Is it your contention in this case that
21   your act of informing Sheriff Spurlock that you
22   would be announcing your candidacy caused you to
23   be demoted, as you claim, to captain of
24   detentions?
25      A     I don't know if it caused me to be
```

```
 1   then the captain of professional standards,
 2   Jason Kennedy; is that right?
 3        A    Yes.
 4        Q    I'm not looking for an exact time,
 5   obviously, but about how long did that meeting
 6   last?
 7        A    Less than 10 minutes.
 8        Q    Okay.  And describe for me, if you
 9   would, exactly what happened in that meeting.
10        A    So that's been a little over two years
11   ago --  Was it a year ago or two?  I guess it was
12   a year ago.
13        Q    It would have been a year ago this past
14   May, so 14 months ago.
15        A    Chief Johnson asked me to come by the
16   office.  I was out washing my car or something.
17   So I got there, and he -- I went in his office and
18   he said, "The sheriff wants to see you."  So I
19   walked into the conference room, and the sheriff
20   was sitting at the head of the table and Laura
21   Leary was sitting here (indicating), and then
22   Jason Kennedy was sitting there (indicating).
23             I sat down and he said --
24        Q    "He" being who?
25        A    The sheriff.
```

```
 1      Q     Okay.
 2      A     -- "Nothing has changed since last
 3   fall.  I want you to resign," or something to
 4   that --  I don't remember the exact chronology.
 5      Q     Uh-huh.
 6      A     These are the words that I remember.
 7   "I want you to resign.  I'll pay you six months'
 8   pay and benefits."
 9            And I asked him, "Is there something
10   I've done?  Or is there something I haven't done?"
11   He said, "You aren't meeting my mission, vision
12   and values."
13            And so I said, "Well, I don't want to
14   resign."  And he --  I said, "What happens if I
15   don't resign?"  He said, "This is your last day."
16            So I said, "I'm not resigning."  He got
17   up and walked out shortly after that, and I don't
18   remember if there was any other conversation.  I
19   think that's all I recall.
20            And Laura Leary passed the folder over
21   to me and said, "Do you want to look at this?"  I
22   said, "No.  I'm not interested."  So they walked
23   me down and I emptied my office.
24      Q     Do you recall Jason Kennedy saying
25   anything?
```

```
 1        A     I don't recall him saying anything.
 2        Q     Okay.  And, I'm sorry.  Perhaps you
 3   referenced this earlier.  And I'm not trying to
 4   belabor or go over old ground, but when the
 5   sheriff said, "You're not living up to my vision,
 6   mission and values," what was your response to
 7   him?
 8        A     Something like, "Have I not done
 9   something" --  "Have I done something?  Have I not
10   done something?"  It was, "Have I either done
11   something or not done something you expected,"
12   basically.  And I think he repeated it twice,
13   "You're not meeting my mission, vision and
14   values."
15        Q     And at that point, then, is that --
16   And, I'm sorry.  I'm not trying to --
17        A     Yeah.
18        Q     -- trip you up.  At that point, did you
19   ask him or --  I'm just trying to get the
20   chronology straight in my mind.  After he said
21   that, what happened next?
22        A     I think I said something, like, "I'm
23   not resigning.  I don't want to resign," or "If I
24   haven't done something, I'm not resigning."
25        Q     And that's when he told you,
```

```
 1         Q     Okay.  Please turn to Page --  Well,
 2    bear with me for a second.  Before we get there,
 3    let me go back to your complaint.  At
 4    Paragraph 156 of your complaint, you allege that
 5    the sheriff failed to provide you with a letter
 6    containing the effective date of the demotion or
 7    termination, as well as a statement citing the
 8    reasons for the demotion or termination.
 9               Is that accurate?
10         A     For the termination, yes.
11         Q     Okay.  He provided you written
12    notification with respect to the demotion,
13    obviously, right?
14         A     Yes.
15         Q     Okay.  Did you ever request a letter
16    from the sheriff with respect to your termination?
17         A     No.
18         Q     Why not?
19         A     I didn't have an opportunity.  I was
20    terminated without any information or
21    documentation and was walked out that day.
22         Q     Could you have requested a letter after
23    the fact, to your knowledge?
24         A     I probably could have.
25         Q     Did you do so?
```

```
 1      A     No.
 2      Q     Why?
 3      A     I assumed I was being fired for
 4   political reasons.
 5      Q     Okay.  So what did --  Why does that --
 6   I don't understand how that relates to your
 7   failure to request a letter.
 8      A     I texted him asking him for my
 9   retirement -- retired -- retired officer permit,
10   my LEOSA permit, and he said --  I asked him if I
11   could have it.  He said, "No.  You can get a CCW."
12   I'm sorry.  So I just assumed he wasn't going to
13   do anything for me.
14      Q     What's a CCW?
15      A     A concealed handgun permit.
16      Q     But you never expressly requested --
17      A     No, I did not.
18      Q     -- the letter?
19            Okay.  Paragraph 159 of your
20   complaint --
21      A     Excuse me.
22      Q     That's all right.
23      A     Okay.  Go ahead.
24      Q     -- states that -- or alleges that the
25   sheriff failed to provide you with a right to
```

```
 1   to waive your appeal?
 2        A    The entire meeting violated policy and
 3   the termination violated policy.  And so,
 4   therefore, I didn't feel there would be any
 5   opportunity to appeal.
 6        Q    How did the meeting violate policy?
 7        A    Because there was no pre-disciplinary
 8   opportunity.  There was no findings of any IA.
 9   There was no letter of discharge.  There was no
10   notification that I had the right to appeal, which
11   is in our policy.  I have never experienced
12   something like that in my 32 years.
13        Q    Well, I thought you testified earlier
14   that if an action is deemed so egregious that
15   termination is deemed necessary, then the employee
16   could be terminated on the spot?
17        A    I would guess that they would be told
18   what their egregious action was.
19        Q    Well, you were told you weren't living
20   up to the sheriff's mission, vision and values,
21   right?
22        A    That was not egregious, in my opinion,
23   nor was it any information other than a vague
24   comment to apparently justify terminating me.
25        Q    Well, it was up to the sheriff
```