Tony Spurlock
August 31, 2022

```
                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLORADO

                       CIVIL ACTION DIVISION

                    CASE NO.: 1:21-CV-3417-NYW
```

HOLLY KLUTH,

       Plaintiff,

vs.

TONY SPURLOCK, individually and
in his official capacity as Douglas
County Sheriff,

       Defendant.
_____/

              DEPOSITION OF TONY SPURLOCK

| | |
|---|---|
| DATE TAKEN: | August 31, 2022 |
| TIME: | 9:06 a.m. to 6:07 p.m. MOUNTAIN TIME |
| LOCATION: | RATHOD MOHAMEDBAHAI, LLC<br>2701 Lawrence Street, Suite 100<br>Denver, Colorado 80205 |

Reported By:
Jessica Wharton, Reporter

Tony Spurlock
August 31, 2022

1  A.  Yes. Excuse me. Most generally, probably
2  in our -- on our -- could be put in our Guardian
3  Tracker, could be put in the supervisor's
4  documentation book, however they choose to keep track
5  of it.
6  Q.  Okay. There'd be some sort of writing of
7  some sort --
8  A.  Yes.
9  Q.  What's Guardian Tracker?
10 A.  It's a program that contains, collates, and
11 keeps track of a variety of things, up to and not
12 limited to personnel files, personal action forms,
13 disciplinary -- some disciplinary action, could have
14 some supervisor notes in there. Their training
15 documents could be stored there, certificates.
16         It's kind of a -- it was designed to be a
17 one-stop shop for data for us to look at employee X
18 and be able to look at a variety of different
19 things -- personnel files, again pay, positions
20 they've held, assignments they were in, because you
21 just can't keep track of all of those with all the
22 number of employees we have. So it was designed for
23 that, and it's Guardian Tracker, so it's in the word
24 as well. It tracks information.
25 Q.  Do employees have access to their own

1    Q.  You wrote that you -- quote, "You continue
2    to exceed my expectations and gain the respect of the
3    other command staff members as someone who is fair and
4    supportive".  End quote.  Do you see that?
5    A.  Yes.
6    Q.  And that was true and accurate at the time
7    of the memo?
8    A.  Yes.
9    Q.  I think -- we can all agree that's high
10   praise.  Yes?
11   A.  Yes.
12   Q.  I think earlier you had testified that the
13   bucket referring to Ms. Kluth was pristine for the
14   first three years as Undersheriff?  Is that -- do you
15   recall that?
16   A.  It was a cup, but yes.
17   Q.  A cup.  Sorry, a smaller vessel.
18   A.  There you go.
19   Q.  And she became your Undersheriff in 2014?
20   A.  Yes.
21   Q.  Okay, so that's approximately 2014 to '17
22   that she had a pristine cup, right?
23   A.  Yes.
24   Q.  Okay.  Having read this memo, does this make
25   you reconsider at all the sort of the time frame that

1    Q.   And what statement would that be?

2    A.   Well, whatever their statement is.

3    Q.   When would that appropriate time have been?

4    A.   You know, that's for them to make that
5  determination, quite frankly.  I just say it's not a
6  good idea to get involved in politics as any member of
7  the office because it's had -- it has inherent risks,
8  and why would you risk your career over stuff like
9  that.

10         If you are -- you know, if you don't take
11 any kind of -- of action, you're less likely to find
12 yourself in -- in harm's way, you know, from a
13 political backlash.

14   Q.   Right.  So one of the risks, right, is that
15 the person who you oppose politically might retaliate
16 against you if you win, if they win, right?

17   A.   Yeah.  I was approached by the county
18 manager and told me, through other staff, but then
19 also told me, hey, this could jeopardize your standing
20 in the county when it comes to budget.  And I
21 immediately responded, I bet it doesn't because I knew
22 the pulse of the county.  And if an elected official
23 was going to impact public safety because I didn't
24 support a guy who personally attacked me and
25 personally attacked my wife, my guess is is when it

1  comes to the opinion of -- you know, public opinion,
2  I'm going to win that public opinion.
3           And so you know, I didn't -- not supporting
4  George Teal wasn't an issue for me.  And the reason
5  why I told Holly is I said, hey, listen, you know,
6  you're going to be running in four years.  Let this --
7  let this wave roll over you.
8      Q.   So did you expect her to endorse Ms. Neal-
9  Graves --
10     A.   No, I did not.  I did not.
11     Q.   And was your advice, then, actually that she
12 should kind of stay neutral or sit on the sidelines?
13 Is that --
14     A.   No, I didn't say you should do this, you
15 shouldn't do that.  I gave her information and let her
16 make her own decision.  I -- I informed my staff
17 because I knew that there was going to be a backlash
18 that was continuing on because of the Red Flag issue.
19 And I just didn't want them to feel like they, you
20 know, were -- were not in the loop of how I was going
21 to publicly make statements.
22     Q.   What was Ms. Kluth's response when you
23 informed her?
24     A.   You know, I think it was appropriate.  She
25 later, actually, met Lisa Neal-Graves because she was

1    A.   Well, an Internal Affairs investigation was
2  immediately started.  Well, I shouldn't say
3  immediately, probably within a short period of time.
4  And then, we reached out to her for an opportunity to
5  be interviewed, and she declined.
6    Q.   If you wouldn't tell her what, specifically,
7  she had done wrong, how was she supposed to have a
8  discussion with you about her termination?
9    A.   You mean at that -- right at that moment?
10   Q.   At the May 25th meeting.
11   A.   She was very clear of the foundational
12 meaning and vision, mission, and values.  It is on
13 every evaluation.  The very first one is J, which is
14 judgment.  And she could have easily said, where -- if
15 I did this, did I, you know, no longer devotion to
16 duty?  Did I make a bad judgment?  That document
17 initially drives any reader to ask additional
18 questions.  And she knew that.  I mean, that
19 document -- she had used that document with other
20 people before.
21   Q.   And she did ask additional questions, right?
22 She asked how did I not live up to this values?
23   A.   Yes.
24   Q.   And you didn't tell her.
25   A.   On advice of counsel not to do that.

Tony Spurlock
August 31, 2022

```
 1   your knowledge?
 2       A.   I cannot answer that.  I don't know if the
 3   HR director or the captain did.
 4       Q.   Can you please look at your -- the complaint
 5   on Page 11.
 6       A.   Okay.
 7       Q.   The allegation in Paragraph 93 is Spurlock
 8   stated to Ms. Kluth --
 9       A.   Page 11?
10       Q.   Page 11, Paragraph 93.
11       A.   Sorry, my apologies.
12       Q.   It's no problem.
13       A.   Yes, that's true, and I forgot that, yes.
14       Q.   Okay.  So you --
15       A.   I'm sorry, my apologies.
16       Q.   And you told Ms. Kluth that nothing had
17   changed since last fall?
18       A.   Yes, this was -- this was -- this statement
19   was made after she had asked me, can you give me --
20   what have I done?  Tell me what I have done.  And I
21   said, you know, nothing has changed.  Your behavior
22   hasn't changed since last fall.
23       Q.   What had happened last fall?
24       A.   That's when she was demoted from
25   Undersheriff to Captain.
```

```
 1        Q.   So that comment kind of harkened back to the
 2   comment that she engaged in behavior that led to her
 3   demotion.
 4        A.   The policy --
 5             MR. O'CONNELL:  Objection to form.
 6             THE WITNESS:  The policy violations.
 7   BY MR. CRON:
 8        Q.   Okay.
 9        A.   And basic just behavior, trust.
10        Q.   Had she in the time between her demotion and
11   her termination, had she continued to instruct
12   subordinates to engage in political activity?
13        A.   No, but that wasn't the issue.
14        Q.   Had she continued to conspire with
15   subordinates behind your back?
16        A.   No.  She continued to not live up to the
17   vision, mission, and values.
18        Q.   Turning back to -- are you still on Exhibit
19   5?
20        A.   Yes, yes.
21        Q.   Still have that up?  Had she violated -- so
22   she was found sustained five specific policy
23   violations on November 16th, 2020?
24        A.   Yes.
25        Q.   Okay.  Had she continued to violate the
```

Defendant's Response to Plaintiff's Motion for Partial Summary Judgment Exhibit X

```
 1        A.    Not to my knowledge.
 2        Q.    Are there any major incidents that occurred
 3   while she was Captain of Detentions?
 4        A.    Not that rises -- not that anything that
 5   comes to mind.
 6        Q.    Were there any -- were there any issues with
 7   her performance as Captain in the Detentions Division
 8   that contributed to your decision to fire her?
 9        A.    I don't recall any right now.  She was there
10   for a very short period of time.
11        Q.    Almost three months, right?
12        A.    Yeah.
13        Q.    Did Chief Johnson ever communicate to you
14   any issues with Ms. Kluth's performance as she was
15   employed as the Detentions Captain?
16        A.    It was one thing that escapes me right now.
17   And I apologize for the -- for the long day.  But I
18   think there was one issue that he said -- that he had
19   mentioned.  But I apologize.  I don't recall,
20   specifically, what the details are.
21        Q.    Okay.  Not -- not -- may assume, from
22   your -- it's not a huge incident?
23        A.    No.  It -- it -- it -- it's not anything
24   that's like we've talked before.
25        Q.    Why was Ms. Kluth transferred to Detentions?
```

1   A.   We, obviously, had to make some changes.
2   Captain Jensen was terminated.  And of course, that
3   created a -- a number of issues for us.  We made some
4   changes at the academy.  And the Arapahoe County
5   Sheriff's Office stepped away from the academy which
6   left a void of leadership.  So I made the decision to
7   move Captain Moore out there, you know.  And then we
8   decided to move people -- you know, essentially, we
9   ended up having to move captains around because we
10  ended having to promote a captain.  And --
11       Q.   So it's just a domino.
12       A.   So it's just a domino effect of people.
13       Q.   Who -- was her transfer to Detentions a
14  punitive measure?
15       A.   Oh, no.  The Detentions Division is a --
16  it's the largest division.  It has the large budget.
17  It's not punitive by any means.
18       Q.   So to -- it appears the, you know, the
19  issues that Chief Duffey documented, those were not
20  the reasons that she was moved to Detention?
21       A.   No.
22       Q.   You said Captain Jensen had been fired by
23  the Office?
24       A.   Yes.
25       Q.   Okay.  And when was he fired?

1    A.   I don't know the date.  But it was -- I'm
2  going to say somewhere around, maybe, February of
3  2021, maybe.
4    Q.   Okay.  So before Ms. Kluth and Mr. Moore
5  were fired?
6    A.   Yes.
7    Q.   It Brad Heyden still employed?
8    A.   Yes.  He is.
9         MR. CRON:  Let's just take a five-minute
10  break to collect my thoughts.
11         THE REPORTER:  Okay.  5:14.  Off the record.
12         (OFF THE RECORD)
13         (ON THE RECORD)
14         THE REPORTER:  Okay.  5:25.  We're back on
15  the record.
16  BY MR. CRON:
17    Q.   All right.  So from March 1st through May
18  25th, Ms. Kluth had served as the Captain of
19  Detention -- Detentions.  And there were no major
20  incidents that occurred during that time involving her
21  performance; is that correct?
22    A.   Yeah.  No major incidents.  I -- I was
23  looking at the interrogatories here, and I know that
24  there was one incident that was documented by me
25  regarding an incident where Ms. Kluth was -- was upset

1    and interfering with a transfer done by Chief Johnson
2    and the Undersheriff.
3            And if I recall correctly, I was briefed on
4    that.  If I recall correctly, they were transferring
5    a -- an employee from one place to the next.  And she
6    wanted to have -- she wanted to either have input on
7    that or say no, or you know, kind of interfered with
8    the Chief's decision that we're moving personnel.
9    That was brought up to me by the Chief, at one point,
10   when it occurred.  Apparently, she was huffing in his
11   office and as he described it, unprofessional.
12       Q.   Was that documented anywhere?
13       A.   Not that I know of, other than in this
14   document here.
15       Q.   Okay.  But referenced --
16       A.   Referenced Exhibit 40.
17       Q.   Yes.  In your interrogatory response.
18       A.   Yes.
19       Q.   But otherwise, this was all verbal
20   communication?
21       A.   Yes.
22       Q.   Chief Johnson didn't any document anywhere,
23   to your knowledge, the issues that he had with
24   Ms. Kluth with argument transferring of this deputy.
25       A.   Not to my knowledge.

1    And I had doubts that she was going to overcome that.
2             And I -- I didn't -- I, again, like I say, I
3    wasn't out campaigning for anyone.  I had not gotten
4    behind anybody.  I didn't go to her and say, that's
5    it.  I'm not your -- I'm not going to help you in any
6    means.  But I just, in my mind, I worried that she
7    wasn't going to step up and make it.
8        Q.   So around the time, late February, early
9    March, when she was transferred to Detentions is when
10   you began to think, this might not work out with
11   Ms. Kluth as a captain?
12       A.   Yeah.  I hoped that she was going to be
13   successful.  But I was -- I was concerned at that
14   point.
15       Q.   And her performance as a captain in
16   Detentions reinforced your conviction that was not
17   going to work out as a captain.
18       A.   And again, it wasn't anything that was
19   negative, other than that thing that the Chief said,
20   you know, when she -- you just don't go do that.  She
21   wasn't rising to the occasion.  She had every
22   opportunity to rise to the occasion.  We had many,
23   many things going on in the jail.  And I -- I -- an
24   Undersheriff, and a Chief, and a Captain, and now a
25   Captain again, she possessed all of the skills to do

1  that, just chose not to.
2      Q.   How did she not rise to the occasion as a
3  Detentions Captain?
4      A.   Well, again, I'm just saying, in my
5  observation of the agency at the 30,000-foot, there
6  was a lot of captains that were doing a lot of things,
7  that were stepping up, and working together, and
8  trying to fulfill the mission of the Office.  And it
9  just seemed like she wasn't doing that.
10          You know, she wasn't -- she had every
11  opportunity to make herself known, and she wasn't
12  taking any opportunity just to do that.
13     Q.   And that was sort of the general sense that
14  you had, right?
15     A.   Yes.
16     Q.   Or -- we're not talking about specific
17  failings or --
18     A.   No.
19     Q.   Why did you decide to fire Ms. Kluth on May
20  25th, 2021, as opposed to June 25th or April 25th?  Is
21  there anything significant?
22     A.   I think there could have been something
23  that, you know, maybe I saw or heard or led me to
24  believe that this was not going to go any further.
25  And dragging it out was only going to harm the Office.

1    of time the inability to unite with other members of
2    the agency, or you had someone who had not made good
3    judgments and wasn't still making good judgments, that
4    is a dangerous recipe, particularly for someone who is
5    in charge of the Detentions Division.
6         Q.   Did she have an opportunity to appeal her
7    termination?
8         A.   Yeah.  She did.
9         Q.   Who would she have appealed the termination
10   to?
11        A.   To me.
12        Q.   Would you have changed your mind had she
13   appealed?
14        A.   I don't know.  I -- she never appealed.  So
15   I don't know.
16        Q.   You've been in law enforcement for 47 years.
17   I assume you've been trained to run investigations?
18        A.   Yes.
19        Q.   Including criminal investigations?
20        A.   Yes.
21        Q.   What's witness tampering?
22        A.   If you -- an example would be, if you were a
23   witness to something and I either threatened you not
24   to say something, or I encouraged you to say
25   something, or maybe you had something in your

CERTIFICATE OF OATH FOR WITNESS

STATE OF COLORADO

COUNTY OF DENVER

I, Jessica Wharton, Reporter, certify that on August 31, 2022, TONY SPURLOCK appeared before me at 9:06 a.m. via video conference; that photo identification was presented and verified via Colorado driver's license; and that TONY SPURLOCK was duly sworn on August 31, 2022.

SIGNED this 16th day of September 2022.

_____
Jessica Wharton

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF COLORADO

4    COUNTY OF DENVER

5

6         I, Jessica Wharton, Reporter, do hereby certify

7    that I was authorized to and did electronically report

8    the deposition of TONY SPURLOCK; that TONY SPURLOCK

9    was duly sworn on the date indicated; that the

10   questions and answers thereto were reduced to

11   typewriting under my direction; that a review of the

12   transcript was requested; and that the foregoing is a

13   true and accurate electronic recording of the

14   proceedings.

15        I FURTHER CERTIFY that I am not a relative,

16   employee, or attorney, or counsel of any of the

17   parties, nor am I a relative or employee of any of the

18   parties' attorneys or counsel connected with the

19   action, nor am I financially interested in the action.

20        DATED this 16th day of September, 2022.

21

22              [signature]

23        _____
          Jessica Wharton, Reporter

24

25
```

Tony Spurlock
August 31, 2022

1             CERTIFICATE OF TRANSCRIPTIONIST

2

3     I, WENDY K. SAWYER, do hereby certify that I

4 transcribed the electronic recording produced by

5 Jessica Wharton, Reporter, of the deposition of TONY

6 SPURLOCK; and that the foregoing transcript is a true

7 transcript of said electronic recording.

8

9     I FURTHER CERTIFY that I am not a relative,

10 employee, attorney, or counsel of any of the parties,

11 nor am I a relative or employee of any of the parties'

12 attorneys or counsel connected with the action, nor am

13 I financially interested in the action.

14

15         DATED this 16th day of September, 2022.

16

17

18     _____
        WENDY K. SAWYER, CDLT

19

20

21

22

23

24

25

```
 1              E R R A T A   S H E E T
 2    Witness: TONY SPURLOCK
      RE: Holly Kluth vs. Tony Spurlock
 3    Date of Proceeding: August 31, 2022
      U.S. Legal Support Reference No.: 6192337
 4
 5      PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
           REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
 6
 7    Page  /  Line  /    Change      /  Reason
 8    88    /  22    / TUI to TDY     / Correction
 9    155   /  16    / obligation to obvious / wrong word typed
10    169   /  13    / endors to encourage / wrong word typed
11    173   /  4     / Puppit         / Inaudable Correction
12    203   /  12    / met            / Missing word
13    ___   /  ___   / _____        / _____
14    ___   /  ___   / _____        / _____
15    ___   /  ___   / _____        / _____
16    ___   /  ___   / _____        / _____
17    ___   /  ___   / _____        / _____
18    ___   /  ___   / _____        / _____

      Under penalties of perjury, I declare that I have
19    read the foregoing transcript and that the facts
      stated in it are true.
20
      [signature]                    10/10/2022
21    TONY SPURLOCK                  Date

22    (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
      Sworn and subscribed to before me this 10th day of
23    October           , 20 22.

24    [signature Julie Browne]       [signature]
25    NOTARY PUBLIC                  TONY SPURLOCK
```

JULIE F. BROWNE
Notary Public
State of Colorado
Notary ID # 20214019458
My Commission Expires 05-18-2025