Tony Spurlock
August 31, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION DIVISION

CASE NO.: 1:21-CV-3417-NYW


HOLLY KLUTH,

    Plaintiff,

vs.

TONY SPURLOCK, individually and
in his official capacity as Douglas
County Sheriff,

    Defendant.
_____/


DEPOSITION OF TONY SPURLOCK


DATE TAKEN:   August 31, 2022

TIME:         9:06 a.m. to 6:07 p.m.
              MOUNTAIN TIME

LOCATION:     RATHOD MOHAMEDBAHAI, LLC
              2701 Lawrence Street, Suite 100
              Denver, Colorado 80205


Reported By:
Jessica Wharton, Reporter

```
 1   wasn't because of her demotion.  The allegations were
 2   so obvious that that didn't come to my head, if you
 3   will.
 4        Q.   Did the incident with Detective Jensen,
 5   where Ms. Kluth was verbally reprimanded by you, did
 6   that factor into her termination?
 7        A.   I would have to say that at the point of
 8   termination, it was -- I've had enough issues of her
 9   failing to follow the vision, mission, and values, and
10   I could no longer trust her decisions as a command
11   officer.  So obviously, at some point, it was in the
12   back of my mind.
13        Q.   Okay.  So it's just sort of a piece in the
14   puzzle?
15        A.   Yes.
16        Q.   You said that you had a phrase earlier that
17   for the first three years, it was a clean, pristine
18   cup.  What did you mean by that?
19        A.   I'm a, you know, fill-the-cup up, and not
20   good flies, don't fill up the cup up, and that was my
21   analogy there, probably not a very good one, but we
22   don't need to worry about the analogy because we could
23   talk about that all day.  The real point to this is,
24   is that the first three years of her employment, she
25   did an incredible job.
```

1    She was specifically picked because she
2    could do projects very well.  She's very well
3    organized.  She is very dedicated to the state of --
4    whatever the project is, so she did a very good job at
5    doing the things that a new sheriff comes in and wants
6    to make changes, and create new, quite frankly,
7    policies into move the office forward, and she did an
8    incredible job doing that.
9           I had no complaints of her performance or
10   her support or her -- any of those issues that would
11   fall within the side of that vision mission values for
12   those first three years.
13        Q.   Okay.  You said there was a second incident
14   that had come to mind last night.
15        A.   Yeah, and I'm kind of surprised that it
16   didn't come into my head earlier in this because it's
17   a serious situation, but it was really an opinion
18   difference or maybe the approach difference.
19           We got a number of employees that are LGBTQ
20   Plus, and quite frankly, Holly didn't like that.  She
21   was not a supporter of their lifestyle, if you want to
22   call it that, or at least she would call it that.  And
23   we had one particular employee who changed his name,
24   and that was very problematic and created a bunch of
25   hoo-ha, if you will, and I had to say, knock that off,

1   Q. Right. Right. What was your opinion of
2   Ms. Kluth during this time frame? Let's say, the time
3   that she first joined the Douglas County Sheriff's
4   Office through the time that you appointed her as
5   Undersheriff?
6   A. I think she was a very good employee. I
7   think that she had lots of attributes. She was very
8   meticulous when she worked in Investigations Division.
9   I think that she possessed skills to you know, be a
10  good cop. And I knew her as a person who did a really
11  good with projects because of her ability to be
12  meticulous.
13          And that was one of the main reasons why I
14  selected her as the Undersheriff because I lack in
15  that expertise, if you will. I had a number of people
16  that were on the short list, if you will, and she rose
17  to the top. She -- I mean, it just by her performance
18  she didn't -- she asked -- I mean, we talked about the
19  job, and she did everything appropriate to show me she
20  had the ability to be an undersheriff and so that's
21  how she was selected.
22  Q. Did you consider her a person of integrity?
23  A. I did.
24  Q. Were you personal friends with Ms. Kluth?
25  A. You know, it's it when you work with someone

1  And I had doubts that she was going to overcome that.
2         And I -- I didn't -- I, again, like I say, I
3  wasn't out campaigning for anyone.  I had not gotten
4  behind anybody.  I didn't go to her and say, that's
5  it.  I'm not your -- I'm not going to help you in any
6  means.  But I just, in my mind, I worried that she
7  wasn't going to step up and make it.
8      Q.   So around the time, late February, early
9  March, when she was transferred to Detentions is when
10 you began to think, this might not work out with
11 Ms. Kluth as a captain?
12     A.   Yeah.  I hoped that she was going to be
13 successful.  But I was -- I was concerned at that
14 point.
15     Q.   And her performance as a captain in
16 Detentions reinforced your conviction that was not
17 going to work out as a captain.
18     A.   And again, it wasn't anything that was
19 negative, other than that thing that the Chief said,
20 you know, when she -- you just don't go do that.  She
21 wasn't rising to the occasion.  She had every
22 opportunity to rise to the occasion.  We had many,
23 many things going on in the jail.  And I -- I -- an
24 Undersheriff, and a Chief, and a Captain, and now a
25 Captain again, she possessed all of the skills to do

1     that, just chose not to.
2          Q.   How did she not rise to the occasion as a
3     Detentions Captain?
4          A.   Well, again, I'm just saying, in my
5     observation of the agency at the 30,000-foot, there
6     was a lot of captains that were doing a lot of things,
7     that were stepping up, and working together, and
8     trying to fulfill the mission of the Office.  And it
9     just seemed like she wasn't doing that.
10              You know, she wasn't -- she had every
11    opportunity to make herself known, and she wasn't
12    taking any opportunity just to do that.
13         Q.   And that was sort of the general sense that
14    you had, right?
15         A.   Yes.
16         Q.   Or -- we're not talking about specific
17    failings or --
18         A.   No.
19         Q.   Why did you decide to fire Ms. Kluth on May
20    25th, 2021, as opposed to June 25th or April 25th?  Is
21    there anything significant?
22         A.   I think there could have been something
23    that, you know, maybe I saw or heard or led me to
24    believe that this was not going to go any further.
25    And dragging it out was only going to harm the Office.

1  records?
2     A.  Yes.  Because they're not their files.
3  They're the files of the Sherriff.
4     Q.  And in this case, you had personally
5  requested to review Ms. Kluth's records pertaining to
6  a 1988 domestic violence incident, correct?
7     A.  I didn't personally ask to review that, no.
8  Someone asked for her personnel file, and it was in
9  the personnel file.  So I didn't ask to look at it.
10 You all asked for her personnel file.
11    Q.  So you didn't instruct -- who's Tommy
12 Barrella?
13    A.  So Tommy Barrella is the record custodian.
14 And if I recall correctly, what happened is, is that
15 he -- he would not have had access to those files
16 anyway.  The records custodian for personnel would be
17 the Office of Professional Standards.  But we run
18 everything through them, so they are properly
19 redacted.
20         So we don't -- so we follow the redaction
21 laws in the State of Colorado.  So Tommy Barrella
22 would have been the reciprocal person of all of the
23 documents in other divisions that he didn't have
24 control over but would've had -- had those.
25    Q.  Had you been aware of this 1988 domestic

```
 1   violence incident prior to receiving the records from
 2   us?
 3       A.   I was not aware of any report.  I knew that
 4   Holly had had an ex-husband.  And I knew that she had
 5   problems with him.  I did not know that that was in
 6   the personnel file.  I never looked into her personnel
 7   file until this incident -- until, you know -- even
 8   when I was selecting her as the Undersheriff, I didn't
 9   go and do a background check on her to see what her
10   personnel file was.
11       Q.   And so you never instructed Lieutenant
12   Barrella to inform you if he located this 1988 report,
13   right?  Because you didn't even know the report
14   existed?
15       A.   Right.  And -- and it wouldn't have been our
16   report, by the way, anyway.  It was a Park County's
17   report.  So I don't know why I would ask him to look
18   for a report.
19       Q.   So when Mr. McMahan testified yesterday that
20   he had discussed this domestic violence incident
21   report.  Is he also mistaken about that?
22       A.   No.
23       Q.   Didn't he testify yesterday that he had
24   discussed the 1988 domestic violence report with you?
25       A.   No.  Yeah.  We -- yes.  We had that
```