**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-3417-NYW-MEH

HOLLY KLUTH,

     Plaintiff,

v.

TONY SPURLOCK, individually, and
DARREN WEEKLY, in his official capacity as Douglas County Sheriff,

     Defendants.

_____

**Plaintiff's Response to Defendants' Motion for Summary Judgment [ECF No. 30]**
_____

Plaintiff Holly Kluth spent three decades working at the Douglas County Sheriff's Office ("DCSO") without incident until September 2020, when Sheriff Spurlock endorsed a Democratic candidate for County Commissioner. In response, Ms. Kluth, together with DCSO Chief Tim Moore, engaged in political activity and speech aimed at publicly supporting Douglas County GOP ("DCGOP") candidates, and distancing Ms. Kluth politically from Spurlock in preparation for her own candidacy for Sheriff. In response, Spurlock initiated an investigation into Ms. Kluth and Mr. Moore, and disciplined them for personnel policy violations, demoting Ms. Kluth to the rank of Captain. Despite this punishment, Ms. Kluth declared her candidacy in February 2021. Shortly thereafter Spurlock transferred her to a less public-facing role and then terminated her three months later. As described in her Motion for Partial Summary Judgment, ECF No. 33, deliberately violated DCSO policy and breached an implied contract established by state law. Ms. Kluth was told only "nothing has changed since the fall"—when she had engaged in political activity—and that she violated Spurlock's "mission, vision, and values." Only a rapist and a

murderer had been summarily terminated by the DCSO in this fashion. Tellingly, Spurlock also terminated Mr. Moore at the same time, in the same fashion.

In addition to breaching an implied contract, Ms. Kluth's termination was unlawfully motivated by her political affiliation (or disaffiliation with Spurlock) and speech, and thus violated her clearly established rights under the United States and Colorado Constitutions.

The central dispute on summary judgment is whether Ms. Kluth's termination was motivated by her political affiliation and speech. As detailed herein, a plethora of evidence creates a material dispute of fact on that issue, precluding summary judgment. Both of Ms. Kluth's direct supervisors testified that they were not consulted prior to her termination, that they did not recommend her termination, that she was not subject of any formal discipline, and that they had no significant performance concerns. Given this, it is no surprise that Defendants' entirely *post hoc* reasons for Ms. Kluth's termination are unworthy of credence—including reasons that Spurlock admitted he did not know about when he made his termination decision.

Defendants' various legal arguments regarding Ms. Kluth's free speech claim fare no better. Ms. Kluth's speech was core political speech and was entitled to First Amendment protection under clearly established law.

Defendants' motion should therefore be denied, except as to the due process claims, which Ms. Kluth concedes.

### RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS ("RSUMF")

1.      Admitted.

2.      Denied. Sheriff Spurlock terminated Ms. Kluth during the meeting, not at the end. (Ex. 22, Spurlock Dep. at 211:19-24.)[1]

---

[1] Ms. Kluth's exhibit numbering continues from her exhibits to her Motion for Partial Summary Judgment and her Reply thereto.

3.      Denied. The DCSO's Disciplinary Policy was an implied contract of employment. *See generally* Pl.'s Mot. for Partial Summary J., ECF No. 33.

4.      Denied. The entire policy manual comprises the mission, vision, and values. (Ex. 23, Duffy Dep. 30(b)(6) at 241:5-8.)

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted that Mr. Parker contacted Ms. Kluth to ask for a "positive statement" in response to Sheriff Spurlock's endorsement, and that he contacted Captain Timothy Moore, who was Plaintiff's superior in the DCGOP. (Ex. D at DCSO 71; Ex. 24, Moore Decl. ¶¶ 34-35.) But the cited evidence does not support that Mr. Parker contacted any other member of the DCSO.

9.      Admitted.

10.     Denied. Ms. Kluth did not speak to Mr. Moore to facilitate Mr. Parker's request, but to convey that she was not comfortable with the way that the DCGOP was planning to use her statement. (Ex. E, at 42; Ex. 25, Kluth Dep. 52:25-53:5; Ex. 24, Moore Decl. ¶ 36.)

11.     Admitted.

12.     Denied. When Ms. Kluth learned that Mr. Moore had contacted another member of the command staff member about providing a statement to the DCGOP, Plaintiff directed Mr. Moore to "make sure he knows this not related to work and is off duty; that it is not a supervisor/subordinate discussion." (Ex. 25, Kluth Dep. at 74:25-75:13.)

13.     Admitted that Ms. Kluth was aware that Mr. Moore was speaking to other members of the command staff as a DCGOP representative while off duty. (Ex. 25, Kluth Dep.73:6-74:24; Ex. 24, Moore Decl. ¶¶ 38-39.) But any implication that Mr. Moore used his

3

position to pressure other members is denied. (Ex. 26, Domenico Dep. 30(b)(6) 161:16-25.)

14.    Admitted. However, Ms. Kluth did not authorize Mr. Parker to use the statement and it was never published.

15.    Denied. The Facebook post does not begin by referencing Spurlock. (Ex. F.)

16.    Admitted.

17.    Denied. Defendant Spurlock also conducted the investigation. (Ex. 27, Spurlock IA Investigation Notes; Ex. 22, Spurlock Dep. at 177:3-8.) Based on his investigation, Defendant Spurlock personally concluded that Ms. Kluth had violated policy. (Ex. 27, at 4.) Moreover, Mr. Johnson was not asked to determine whether Ms. Kluth had violated policy, which was highly aberrational. (Ex. 26, Domenico 30(b)(6) Dep. at 84:17-85:12; 86:23-87:3.)

18.    Admitted.

19.    Admitted. *But see* RSUMF ¶ 17.

20.    Admitted that Spurlock determined that Ms. Kluth violated the first five policies as he was the only decision-maker. (Ex. M, at 145). Denied that it was determined that Ms. Kluth violated the Law Enforcement Code of Ethics. (*Id.*)

21.    Admitted.

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.    Admitted that Ms. Kluth did so because it was futile to dispute them and she was concerned about further upsetting Spurlock. (Ex. 25, Kluth Dep., 76:25-80:10; 83:17-84:1.)

28.    Admitted.

29.    Admitted.

30.    Admitted.

31.    Denied.[2] Ex. N, Spurlock's interrogatory answer regarding why he terminated Ms. Kluth, was based on Ex. O, a memorandum written by Chief Kevin Duffy, who was Ms. Kluth's direct supervisor when she was a patrol captain. (Ex. 22, Spurlock Dep. at 234:22-235:13.) Ex. O was created well after the initiation of this lawsuit, and thus could not have been relied upon by Spurlock in deciding to terminate Ms. Kluth. (Ex. 22, Spurlock Dep. 232:9-234:1.) Ex. N is, at most, admissible as to Spurlock's motivation in terminating Ms. Kluth. But when offered, as here, to establish that Ms. Kluth actually engaged in particular conduct, it is not admissible because it consists nearly entirely of hearsay, since Spurlock did not directly supervise Ms. Kluth and learned of the alleged facts from others, if at all. *See Luster v. Illinois Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (movant's interrogatory answer cannot support summary where it "does not supply an admissible foundation from which to conclude that he even possessed personal knowledge"). Ex. O was not created in the ordinary course of business and is also inadmissible hearsay. As such, this asserted fact and its subparts are unsupported by admissible evidence to the extent they rely on Exs. N and O. *See* Fed. R. Civ. P. 56(c)(2).

   a.   Denied. Ms. Kluth did not object to or complain about the on-call command structure; rather, she asked to pick up an additional on-call shift to ease the burden on her co-captain. (Ex. 25, Kluth Dep. at 145:20-146:16.) Duffy testified that he shared Ms. Kluth's concerns about the on-call command structure and advised the command staff to get rid of it.

---

[2] This Court's Civil Practice Standards require each material fact to be "separately numbered and paragraphed." Civ. Practice Standard 7.1D(b)(1). Here, Defendant's Paragraph 31 provides seven subparts, which are all single-spaced in violation of Civ. Practice Standard 10.1(a).

(Ex. 23, Duffy Dep. at 188:17-189:4; 190:6-16.) Duffy also denied that Ms. Kluth told him that she did not want to be on call. (Ex. 23, Duffy Dep. at 189:5-23.) This purported incident was not investigated by the DCSO in any fashion and was not noted in Ms. Kluth's personnel file. (Ex. 22, Spurlock Dep. at 241:4-15.) In addition, Spurlock does not have personal knowledge of this alleged fact, therefore his testimony is inadmissible hearsay when offered as proof of the fact. (Ex. 22, Spurlock Dep. 240:1-9, 240:24-241:1.)

b.   Denied. Ms. Kluth's email shows that she did not assert that Duffy lacked authority to meet with her lieutenants, nor did she accuse him of acting disrespectfully. (Ex. P, at DCSO 952.) Instead, Ms. Kluth questioned why Duffy was meeting with her subordinates outside of her presence based on the DCSO's chain of command policy. (*Id.*) At the time, DCSO's policy stated that "[i]nformation and communication shall move up and down through channels, or horizontally with prior approval." (Ex. 28, P&P-A-100 Policy at XII; Ex. 23 Duffy Dep. at 134:4-24.) After Ms. Kluth asked about Chief Duffy's meetings, DCSO's chain of command policy was amended to add a sentence stating, "This section does not prevent Executive Command Staff from having discussions with any member of this Office…." (Ex. 29, Revised P&P-A-100 Policy at XII.) This revision occurred to eliminate the confusion inherent in the chain of command policy upon which Ms. Kluth had based her query. (Ex. 23, Duffy Dep. at 138:4-24.) This incident was not subject to an IA or a PCR investigation, she was not found to have violated any policies, and she did not receive any formal discipline. (Ex. 22, Spurlock Dep. at 248:5-14; Ex. 25, Kluth Dep. 140:21-141:15.)

c.   Denied. Ms. Kluth suggested a 4/10 schedule, but not for the purpose of being eligible for overtime. As an exempt employee, Ms. Kluth would not have been eligible for overtime even if she was classified as essential. (Ex. 25, Kluth Dep. 149:22-150:4; Ex. 30, Leary

Dep. 36:1-9.) In addition, Spurlock does not have personal knowledge of this alleged fact. (Ex.

22, Spurlock Dep. 238:17-241:1.)

      d.   Denied. There was no "Twitter war." Defendants have not identified a single

objectionable tweet by Ms. Kluth, nor could any of her tweets possibly be construed as being

part of a twitter war. Every witness denied any issues with Ms. Kluth's tweets. (Ex. 31, Jensen

Decl. ¶ 16; Ex. 25, Kluth Dep. at 152:2-16; Ex. 32, Johnson Dep. at 127:2-10; Ex. 33, Walcher

Dep. at 256:4-7; Ex. 22, Spurlock Dep. at 248:21-251:8; 252:17-21.). In addition, Spurlock does

not have personal knowledge of this alleged fact. (Ex. 22, Spurlock Dep. 249:9-24, 250:6-8,

250:22-251:5.)

      e.   Denied. Ms. Kluth and Captain Jensen had a positive working relationship as co-

captains, without significant conflict or communication issues. (Ex. 25, Kluth Dep. at 150:8-

151:13; Ex. 31, Jensen Decl. ¶¶ 5-8; Ex. 24, Moore Decl. ¶¶ 40, 42.) Ms. Kluth's alleged

communication issues with Captain Jensen were not noted in Guardian Tracking, were not

subject to any investigation, and Spurlock did not know whether any alleged concerns were ever

conveyed to Ms. Kluth. (Ex. 22, Spurlock Dep. at 254:25-255:14.) In addition, Spurlock does not

have personal knowledge of this alleged fact. (Ex. 22, Spurlock Dep. 254:16-24.)

      f.   Denied. Ms. Kluth complied with Chief Duffy's instructions about reviewing and

approving deputy pursuits. (Ex. 25, Kluth Dep. at 154:2-155:4.)

      g.   Denied. Defendants cite only to Exs. O and N which are inadmissible hearsay.

Substantively, Ms. Kluth did not demonstrate divisive behavior, a lack of leadership, or poor

professional judgment. (Ex. 31, Jensen Decl. ¶ 18; Ex. 24, Moore Decl. ¶¶ 29, 45, Ex. 34,

Guardian Tracker File, at DCSO 952-954 (commendations for Ms. Kluth); *see also* SADF ¶ 36.)

      32.   Admitted.

33.     It is admitted that Spurlock made these statements, but it is denied that "nothing has changed since the fall" generically referred to her behavior. (SADF ¶¶ 26.)

34.     Admitted.

35.     Admitted.

### STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")[3]

1.     Prior to his endorsement of a Democratic candidate for Douglas County Commissioner, Sheriff Spurlock gave Ms. Kluth advance notice. Ms. Kluth and Sheriff Spurlock discussed her need to distance herself from the endorsement because she was planning on running for Sheriff. (Ex. 25, Kluth Dep. 44:10-20; 103:23-104:5; 104:21-105:19; Ex. 22, Spurlock Dep. 146:9-149:4.)

2.     At the time that Mr. Parker contacted Ms. Kluth, she was on medical leave and off-duty. DCSO members are allowed to engage in political activity off duty if they are not in uniform. (Ex. 22, Spurlock Dep. 175:5-13; Ex. 25, Kluth Dep. 44:10-20; 61:8-16; Ex. 26, Domenico 30(b)(6) Dep. 100:9-19.)

3.     While on medical leave, Ms. Kluth posted on Facebook that she would support and vote for conservative candidates that shared her beliefs "about public safety, government, rights, the law, the Constitution, and our Country." (Ex. F.)

4.     Ms. Kluth's Facebook post was protected speech or political activity under the First Amendment and did not violate any DCSO policies. (Ex. 35, Defs' Resp. to Pl.'s Second Set of Requests for Admission, at 1 (No. 3 ); Ex. 22, Spurlock Dep. 162:8-163:14.)

5.     Nevertheless, the DSCO sustained personnel policy violations against Ms. Kluth because of her Facebook post. (Ex. 26, Domenico 30(b)(6) Dep. 95:8-96:25; 152:19-153:6; Ex.

---

[3] Plaintiff incorporates by reference the material facts identified in her Motion for Partial Summary Judgment, ECF No. 33.

22, Spurlock Dep. 202:14-203:3.)

6.      As a result of Ms. Kluth's demotion, then-Captain of Investigations Kevin Duffy, who publicly supported Spurlock's chosen candidate for Commissioner, was promoted to Law Enforcement Bureau Chief. (Ex. 25, Kluth Dep. 119:21-25; Ex. 23, Duffy Dep. 56:9-11.)

7.      As a captain, Plaintiff did not owe a duty of political loyalty to Sheriff Spurlock. Political loyalty or affiliation is not an appropriate requirement for the effective performance of a DCSO captain. (Ex. 36, Defs' Resp. to Pl.'s First Set of Requests for Admission at 1 (No. 1)); Ex. 22, Spurlock Dep. 59:13-17.)

8.      During her time as Captain, Plaintiff did not receive any formal performance evaluations. (Ex. 23, Duffy Dep. at 90:9-12; 92:5-18; Ex. 22, Spurlock Dep. 118:5-20; Ex. 32, Johnson Dep. at 97:6-7.)

9.      During her time as Captain, Ms. Kluth was not subject to any IA investigations or PCR[4] investigations. (Ex. 22, Spurlock Dep. at 220:23-221:18.)

10.     It was the custom and practice of the DCSO to document noteworthy performance issues in Guardian Tracking other than major instances of misconduct, such as a criminal matter, or a policy violation that results in an Internal Affairs Investigation. (Ex. 26, Domenico 30(b)(6) Dep. 27:15-28:18; 32:15-20; Ex. 22, Spurlock Dep. 41:2-23.)

11.     As Captain, Ms. Kluth received multiple commendations in her Guardian Tracking file for Unity, Ingenuity, and twice for Leadership Demonstrated. (Ex. 34, Guardian Tracking File, at DCSO 952-954. Ex. 23, Duffy Dep. 101:14-107:4.)

12.     Plaintiff also received two negative entries in her Guardian Tracking file for

---

[4] PCR refers to a personnel complaint action, which is less serious than an IA investigation. (Ex. 22, Spurlock Dep. 28:25-29:19.)

Conduct/Demeanor and Accountability. Neither of these incidents rose to the level of deserving formal discipline or investigation. (Ex. 34, Guardian Tracking File, at 951-952; Ex. 25, Kluth Dep. at 138:16-140:5; Ex. 23, Duffy Dep. 119:8-10; 120:17-121:21; RSUMF ¶ 31(b).)

13.     Plaintiff did not receive any formal or informal discipline during her tenure as Captain. (Ex. 34, Guardian Tracking File.)

14.     Chief Duffy's six Guardian Tracking entries captured everything that was significant about Ms. Kluth's performance and were comprehensive to his assessment of her performance. (Ex. 23, Duffy Dep. 132:14-133:1; Ex. 34, Guardian Tracking File.)

15.     Ms. Kluth performed well as Captain of Patrol and went above and beyond Chief Duffy's expectations. (Ex. 23, Duffy Dep. 102:15-107:4, 106:14-17.)

16.     By transferring Ms. Kluth to Detentions, Spurlock placed her in a position with a less public-facing role. (Ex. 25, Kluth Dep. 257:6-258:7; 273:25-275:2.)

17.     Chief of Administrative Services Steve Johnson was Ms. Kluth's direct supervisor when she was Captain of the Detentions Division. (Ex. 32, Johnson Dep. 16:3-13; 56:11-57:4.)

18.     Ms. Kluth did not have any significant performance issues or incidents during her three-month tenure as Captain of the Detentions Division, which was her last position prior to termination. (Ex. 22, Spurlock Dep. 265:6-24; Ex. 32, Johnson Dep. 103:3-25.)

19.     All of Chief Johnson's communications to Spurlock or other command staff about Ms. Kluth's job performance were positive. (Ex. 32, Johnson Dep. 106:20-107:13.)

20.     Chief Johnson's practice was to enter any significant performance issues by subordinates into the Guardian Tracking system. (Ex. 32, Johnson Dep. 90:5-91:24.)

21.     During her time as Captain of Detentions, Ms. Kluth did not receive any negative performance notices on Guardian Tracking by Chief Johnson or anyone else. (Ex. 34.)

22.     Spurlock was the sole decision-maker regarding Ms. Kluth's termination. He did not consult with anyone else prior to her termination. (Ex. 22, Spurlock Dep. 204:24-205:3.)

23.     Chief Duffy was not involved in the decision to terminate Ms. Kluth, did not recommend her termination, and was saddened to learn of her termination. (Ex. 23, Duffy Dep. 34:11-17; 140:21-141:3; 143:5-9.)

24.     Chief Johnson did not recommend that Ms. Kluth be terminated, disciplined, or transferred out of detentions, and believed that Ms. Kluth was meeting the mission, vision, and values of the DCSO during the time that he directly supervised her. (Ex. 32, Johnson Dep. 109:24-110:7; 177:25-17.)

25.     Spurlock shunned both Ms. Kluth and Moore after their November 2020 demotions (Ex. 24, Moore Decl. ¶ 26.)

26.     Spurlock's statement to Ms. Kluth at her termination that "nothing had changed since last fall," referred to Ms. Kluth's political activities and alleged policy violations that led to her demotion. Spurlock admitted that Ms. Kluth did not engage in the same sort of specific conduct, or violate the same policies, that caused her fall 2020 demotion, and nothing else occurred in the fall of 2020 that Spurlock could have been referring to. (Ex. 22, Spurlock Dep. 213:16-214:6, 214:10-216:22; Ex. 25, Kluth Dep. 283:23-285:3.)

27.     During the 2022 Republican primary, Spurlock publicly endorsed Ms. Kluth's election opponent, Darren Weekly, to be the next Sheriff. (Ex. 22, Spurlock Dep. 269:21-270:5.)

28.     Tim Moore, who was the other DCSO command staff member demoted in November 2020, was also terminated on May 25, 2021. (Ex. 24, Moore Decl. ¶ 3.)

29.     Like the murderer, the rapist, and Ms. Kluth, Mr. Moore's termination did not follow the process set forth in the DCSO disciplinary policy. (Ex. 24, Moore Decl. ¶¶ 3-7; Ex.

22, Spurlock Dep. 228:24-229:2; ECF No. 35, Defs' RSOMF ¶ 44.)

30.     At the time of Ms. Kluth's termination, there were no pending internal affairs or other investigations into Ms. Kluth, and she was not on a performance improvement plan. Ex. 26, Domenico Dep. 168:8-17; Ex. 33, Walcher Dep. 125:7-11; Ex. 32, Johnson Dep. 99:12-17.

31.     Philip Domenico, the lieutenant commander of internal affairs at the time of Ms. Kluth's termination, was unaware of any other DCSO employee who had been terminated without an internal affairs investigation. (Ex. 26, Domenico Dep. 6:21-7:15; 168:13-170:1.)

32.     In response to an interrogatory seeking each and every material reason Defendants had for terminating Ms. Kluth's employment, Defendants listed approximately fifteen purported incidents or examples of Ms. Kluth's misconduct. (Ex. N at 2-6.)

33.     Defendants' interrogatory response was based off a memorandum written by Chief Duffy. (Ex. 22, Spurlock Dep. at 234:22-235:13.)

34.     Chief Duffy prepared the memorandum at the request of DCSO Captain Domenico on or about May 10, 2022, almost one year after Ms. Kluth's termination. (Ex. 23, Duffy Dep. 164:19-165:18; 167:3-168:3, 170:1-13.)

35.     Chief Duffy understood that he was supposed to provide examples of conflict with Ms. Kluth. Thus, the focus of the memorandum was to identify conflicts and challenges with Ms. Kluth and not meant to be an overall assessment of her performance. (Ex. 23, Duffy Dep. 171:1-7; 186:6-12.)

36.     Spurlock did not actually know about some of the purported incidents set forth in Duffy's memorandum—and which were then included in Defendants' interrogatory response— when he terminated Ms. Kluth. (Ex. 22, Spurlock Dep. 255:15-258:7; Ex. N, at 5.)

37.     Defendants claimed to terminate Ms. Kluth because of an incident involving

"setting meetings with IT supervisors." (Ex. N, at 5.)

38.    Ms. Kluth's setting meetings with IT was an example of "good communication" and "keeping everybody in the loop." (Ex. 23, Duffy Dep. at 203:5-204:25.)

39.    Defendants claimed to terminate Ms. Kluth because she "argued against Chief Johnson and Undersheriff Walcher's decision to transfer a deputy to another shift, despite verbal admonishments to cease interrupting and interfering with the transfer." (Ex. N, at 5.)

40.    Ms. Kluth did not interfere with a transfer. (Ex. 32, Johnson Dep. 130:23-133:2.)

41.    Defendants claimed to terminate Ms. Kluth because she "objected to her superiors' decision to allow uniformed deputies to wear facial hair…." (Ex. N, at 5.)

42.    The purported objection regarding facial hair was a triviality, not a genuine performance issue. (Ex. 23, Duffy Dep. 208:12-209:7; Ex. 33, Walcher Dep. 257:2-8.)

43.    Defendants claimed to terminate Ms. Kluth because she objected to Chief Duffy's assignment to the crime lab board. (Ex. N, at 4; Ex. 22, Spurlock Dep. 241:21-243:11.)

44.    There were no issues in transitioning the crime lab role from Ms. Kluth to Chief Duffy. (Ex. 23, Duffy Dep. 191:16-194:2.)

45.    Defendants claimed to terminate Ms. Kluth because she "refused to vacate her office" upon her transfer to Detentions. (Ex. N, at 5.)

46.    Ms. Kluth never refused to move offices; she could not move until another office became available. (Ex. 24, Moore Decl. ¶¶ 48-53; Ex. 32, Johnson Dep. at 73:15-75:5.)

### STANDARD OF REVIEW

In reviewing Defendants' motion for summary judgment, the Court must "view the facts in the light most favorable to [Ms. Kluth] and resolve all factual disputes and reasonable inferences in [her] favor." *Duda v. Elder*, 7 F.4th 899, 905 (10th Cir. 2021). Summary judgment is "[n]ot a replacement for the trial as the preferred means for resolving disputes." *Walton v.*

*Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016). "It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext . . . the case should go to trial." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

**ARGUMENT**

**I.     Defendants are not entitled to summary judgment on Ms. Kluth's First Amendment political association and free speech claims.**

Defendants' motion does not squarely address Ms. Kluth's First Amendment claims. Her claims are not, as Spurlock characterizes them (at 9), based primarily on her demotion from Undersheriff to Captain in November 2020. Rather, the crux of this case is that Ms. Kluth's subsequent termination from the Captain position in May 2021 was unlawfully motivated by political retaliation—both for the September 2020 political activity that Spurlock investigated and demoted her for, and for her subsequent political campaign for sheriff, which began in February 2021. (Compl. ¶¶ 41-57, 86, 165.) The distinction is significant not only because of the different factual context, but because her position as a Captain was two ranks below Undersheriff, and undisputedly did not require political loyalty or affiliation with Spurlock. (SADF ¶ 7). In particular, Ms. Kluth's political association claim is premised on her political affiliation with the DCGOP and her perceived political disloyalty to Spurlock. Ms. Kluth's free speech is premised on three categories or instances of political speech: (1) her September 2020 speech responding to Spurlock's political endorsement, (2) her September 2020 Facebook post, and (3) speech relating to her February 2021 campaign for sheriff.

"*Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), govern political affiliation (or association) claims." *Duda*, 7 F.4th at 912 n.8 (citations shortened). The *Garcetti/Pickering* test applies to claims "[w]here a government employer takes adverse action

14

because of an employee's exercise of his or her right of free speech." *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999); *see also Duda*, 7 F.4th at 910. The two analyses are "distinct and separate." *Barker v. City of Del City*, 215 F.3d 1134, 1139 (10th Cir. 2000). Ms. Kluth's First Amendment retaliation claim survives summary judgment under both analyses.

### A. Disputes of material fact preclude summary judgment on Ms. Kluth's political association claim.

Because it is undisputed that Ms. Kluth's position as Captain did not require political allegiance, (SADF ¶ 7), her political association claims turn solely on whether political affiliation was a substantial or motivating factor in her termination. *See Gann v. Cline*, 519 F.3d 1090, 1093 (10th Cir. 2008) (political affiliation "need not be the sole reason"). On this element the record is genuinely disputed and contains more than enough evidence upon which a reasonable jury could find in Ms. Kluth's favor, making summary judgment inappropriate.[5]

First, while temporal proximity "alone" may not be enough to create a genuine dispute of material fact, temporal proximity "plus the employer's knowledge of the protected conduct" is sufficient for a jury to infer causation. *Tice v. Dougherty*, 846 F. App'x 705, 708 (10th Cir. 2021) (citing *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005)). This kind of causation may be shown by a "pattern of retaliatory conduct [that] begins soon after the [protected activity] and only culminates later in actual discharge." *Marx v. Schnuck Mkts.*, 76 F.3d 324, 329 (10th Cir. 1996). Thus, "when evaluating temporal proximity . . . the relevant time frame is not when the . . . discharge occurred, but when the [retaliatory] conduct leading up to the discharge began." *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1137 (10th Cir. 2013).

---

[5] To the extent Spurlock invokes qualified immunity with respect to the political association claim, Ms. Kluth's right not to be terminated for her political association or affiliation was clearly established by *Gann v. Cline*, 519 F.3d 1090 (10th Cir. 2008), among others.

Here, Spurlock was aware of Ms. Kluth's protected activity and political affiliation, immediately commenced an internal affairs investigation into Ms. Kluth (and Mr. Moore), and demoted Ms. Kluth.[6] (RSUMF ¶¶ 8-16; SADF ¶¶ 1-5.) Undeterred by this punishment, Ms. Kluth forged ahead and announced her candidacy for Sheriff in February 2021. (ECF No. 33 ¶¶ 24-25). Less than three weeks after Ms. Kluth announced her campaign, Spurlock transferred her to a less public-facing position in the detentions division and then terminated her less than three months later. (ECF No. 33 ¶¶ 27, 30; SADF ¶ 16.) Based on these facts, a reasonable fact-finder could infer that Spurlock's conduct constituted a pattern of retaliation culminating in termination. *See Piercy v. Maketa*, 480 F.3d 1192, 1199 (10th Cir. 2007) (sheriff's office's "[internal] investigation based on [plaintiff's] violation of personnel policies" related to her protected activity was sufficient temporal "link" to establish "prima facie cases for purposes of summary judgment"). And because this pattern of retaliatory conduct began shortly after Ms. Kluth attempted to distance herself politically from Spurlock, it supports a "reasonable inference that Plaintiff's political association was a substantial factor in her discharge," making summary judgment inappropriate. *Tice*, 846 F. App'x at 709.

Second, a reasonable factfinder could infer a political motivation based on Spurlock's statement at Ms. Kluth's termination meeting that "nothing has changed since the fall." (SADF ¶ 26.) Ms. Kluth, of course, had engaged in political activity in the fall, which became the subject of an internal affairs investigation into her purported violation of personnel policies. But, as Spurlock admitted, Ms. Kluth did not again violate those policies thereafter. (SADF ¶ 26. As

---

[6] Spurlock's decision to investigate Ms. Kluth and Mr. Moore can also fairly be construed as "*opposition to the employee's speech*," *Maestas*, 416 F.3d at 1189, from which causation can be inferred, as can Spurlock's assertion (at 16) that Ms. Kluth's activity caused a "rift." In any case, Ms. Kluth was disciplined for her Facebook post, which Spurlock later conceded was protected First Amendment activity that did not violate any policy. (SADF ¶¶ 4-5.)

such, a reasonable jury could infer that Spurlock's statement at the termination meeting referred to Ms. Kluth's underlying political affiliation and activity—and thus that they were a substantial factor motivating her termination.

Third, Mr. Moore's contemporaneous termination from the DCSO reinforces the conclusion that Ms. Kluth's termination was connected to her September 2020 political activity and affiliation. Mr. Moore and Ms. Kluth were both affiliated with the Douglas County GOP and held official positions in the party. (RSUMF ¶ 8). After Spurlock endorsed a Democratic Candidate for County Commissioner, Ms. Kluth and Mr. Moore communicated regarding a public statement responding to Spurlock's endorsement. (RSUMF ¶¶ 8-14). Spurlock then investigated and disciplined them both for violating personnel policies. (Defs' SOMF ¶ 16). Then, on May 25, 2021, after having shunned them for months, Spurlock unilaterally terminated them both without notice, and without following policy. (ECF No. 33 ¶¶ 30-34; SADF ¶¶ 22-23, 25.) Only two other DCSO deputies had ever been terminated in such manner: a rapist and a murderer. (ECF No. 33 ¶ 44; SADF ¶¶ 28-29). A reasonable fact finder could infer that Mr. Moore's and Ms. Kluth's sudden terminations that contravened written policy were connected— and that Ms. Kluth's (and Mr. Moore's) political affiliation and activity is what connected them.

Last, but not least, there is abundant evidence of pretext, from which a fact-finder could alone infer Ms. Kluth's termination was politically motivated. *Ware v. Unified Sch. Dist. No. 492, Butler Cnty., State of Kan.*, 881 F.2d 906, 911 (10th Cir. 1989), *modified in part*, 902 F.2d 815 (10th Cir. 1990) ("[a] plaintiff may create a reasonable inference of improper motivation by presenting evidence tending to show that the reasons proffered for the adverse action are without factual support"); *see also Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1157-58

(10th Cir. 2015) ("a jury could infer an improper [political] motive for the revocation of Plaintiff's commission because the explanations given by Defendants . . . are dubious").

To begin with, Ms. Kluth was provided with an "entirely subjective" explanation for her termination, *Jones v. Barnhart*, 349 F.3d 1260, 1267–68 (10th Cir. 2003), namely failure to meet Spurlock's "mission, vision, and values." (ECF No. 33 ¶ 37). Even though this provided Ms. Kluth with no information how she had fallen short, Spurlock repeatedly refused to provide any explanation whatsoever. (ECF No. 33 ¶¶ 38-39.) The substantive explanation (or lack thereof) given to Ms. Kluth at her termination thus supports a finding of pretext. In addition, the procedural irregularity of Ms. Kluth's (and Mr. Moore's) termination—which was not preceded by any investigation, (SADF ¶ 31), and deliberately violated the DCSO's Disciplinary Policy, in breach of an implied contract—is itself strong "evidence that improper purposes are playing a role." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977); *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002) ("[D]eviations from normal [agency] procedure . . . provide support for [Plaintiffs'] pretext argument.").[7]

During litigation, Defendants asserted a variety of more specific reasons for Ms. Kluth's termination, none of which were ever conveyed to Ms. Kluth at the time, (SADF ¶ 32). Nearly all of the incidents underlying Defendants' asserted reasons were not documented in any form prior to this litigation—and none were documented as the basis for the termination. (SADF ¶¶ 8-14, 21, 30); *see Copp v. Unified Sch. Dist.*, 882 F.2d 1547, 1554 (10th Cir. 1989) (pretext shown by "the total absence of documentation corroborating the alleged problem"). Moreover, the record evidence shows that Spurlock's asserted reasons were generated only during this

---

[7] Spurlock's failure to follow the Disciplinary Policy and Ms. Kluth's breach of implied contract claim are discussed at length in her motion for partial summary judgment, ECN No. 33.

litigation, based on a memorandum Chief Duffy was asked to prepare in response to Ms. Kluth's discovery requests—a memorandum that was explicitly intended to be critical of Ms. Kluth, not convey Chief Duffy's full experience working with her. (SADF ¶¶ 23, 33-35.). A jury could reasonably infer that Spurlock only came up with these reasons after the fact, to justify his unlawful termination. *Tyler v. Re/Max Mtn. States, Inc.*, 232 F.3d 808, 813 (10th Cir. 2000) (jury could reasonably disbelieve reasons provided for the first time "months after the decision is made"). Indeed, when cross-examined at his deposition, Spurlock admitted that at least some of his asserted reasons for terminating Ms. Kluth were things he did not even know about at the time he terminated Ms. Kluth. (SADF ¶ 36).

Many of the other purportedly material reasons for Ms. Kluth's termination are at best implausible or trivial, if not outright false. For example, Ms. Kluth's purported "Twitter war" that no witness could explain or provide evidence for. (RSUMF ¶ 31(d).) Ms. Kluth's setting of meetings with IT staff—which her supervisor praised at his deposition. (SADF ¶¶ 37-38.) A supposed argument about an unnamed deputy's transfer that no relevant witness could corroborate. (SADF ¶¶ 39-40). Ms. Kluth's purported "opposition" to a facial hair policy, which multiple witnesses admitted was not a genuine issue. (SADF ¶¶ 41-42). Ms. Kluth's supposed "objection" to Chief Duffy's serving on the crime lab board, which Duffy testified was not an issue. (SADF ¶¶ 43-44.) And Ms. Kluth's alleged "refusal" to move offices, which the evidence showed was because the office she was moving into was not yet available. (SADF ¶¶ 45-46.).

In addition, substantially all the reasons Spurlock asserted for Ms. Kluth's termination occurred prior to her transfer to Detentions—a transfer that Chief Duffy, DCSO's 30(b)(6) designee on the topic, testified was based on Ms. Kluth's good performance. (ECF No. 33 ¶¶ 28-29; SADF ¶ 15, 18). And Chief Johnson, Ms. Kluth's supervisor in Detentions had no

performance complaints about Ms. Kluth. (SADF ¶¶ 17, 19-20, 24). Despite the lack of any evidence Ms. Spurlock was performing poorly, Spurlock nonetheless claims it was necessary to immediately terminate Ms. Kluth without adhering to the DCSO's Disciplinary policy—and to terminate Ms. Moore at the same time. (ECF No. 33 ¶¶ 33-34.) A reasonable fact-finder could conclude that Spurlock's assertions are inconsistent and implausible.

Under these circumstances, Ms. Kluth has gathered more than enough evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Spurlock's explanations that a reasonable jury could "find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Tyler*, 232 F.3d at 814 ("[W]hen the Plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility.").

When considered together, the record evidence gives rise to a genuine dispute of fact about Spurlock's motivation, and to permit a reasonable jury to conclude that Ms. Kluth's political affiliation or activity was a substantial or motivating factor in her termination. *See Randle*, 69 F.3d at 451 ("a showing of pretext *is* evidence which allows a jury to infer discriminatory intent") (emphasis in original); s*ee also EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1200 (10th Cir. 2000) (evidence that is insufficient "standing alone" can create genuine dispute of fact when "considered in the aggregate").

### B.  Summary Judgment is not warranted on Ms. Kluth's free speech claim

Defendants argue (at 10) they are entitled to summary judgment on Ms. Kluth's free speech claim because her claim "fails under the second, third, and fourth steps" of the

*Garcetti/Pickering* test, and because (at 22) the law was not clearly established.[8] Defendants are wrong for three reasons: First her speech was a matter of public concern under clearly established law, satisfying the second *Garcetti/Pickering* step. Second, under clearly established law Ms. Kluth prevails on the third step—the balance-of-interests analysis—because Defendants are required to show actual disruption from Ms. Kluth's speech, which they have not done. Third, the material facts relevant to the fourth step—whether Ms. Kluth's speech motivated her termination—are genuinely disputed and must be resolved by a jury.

1. **It was clearly established that Ms. Kluth's political speech was a matter of public concern.**

Under clearly established law, the political speech Ms. Kluth engaged in is a matter of public concern. The Tenth Circuit has repeatedly "held that political speech regarding a public election is undoubtedly a matter of public concern" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007). "Speech about political elections," like Ms. Kluth's speech here, "is at the core of protected speech." *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002); *Jantzen*, 188 F.3d at 1257 ("[plaintiff's] political speech – his candidacy for office - undoubtedly relates to matters of public concern."). As Defendants concede (at 12), Ms. Kluth's September 2020 speech was made "in response to" his endorsement of a candidate for County Commissioner in the upcoming election, and to "support the DCGOP and Republican candidates." And even under Spurlock's characterization (at 12), Ms. Kluth's speech was "intended to demonstrate to voters" that she and others did not support Spurlock's candidate. As such Ms. Kluth's speech squarely "relates to [her] assessment of the viability of a potential

---

[8] Although Defendants assert in a footnote (at 10 n.3) that Ms. Kluth's "claim still fails at the fifth step," they present no argument on this step, on which they have the burden of proof, and it is therefore waived. *See Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019).

candidate's campaign and [her] belief about the relative merits of two potential candidates for public office," which "is at the core of protected speech." *Bass*, 308 F.3d at 1089.

To the extent that Defendants argue that Ms. Kluth's speech was motivated by her own political ambitions, it was also clearly established that "[m]erely because speech concerns an issue of personal importance does not preclude its treatment as a public matter." *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1182 (10th Cir. 2018); *Deutsch v. Jordan*, 618 F.3d 1093, 1101 (10th Cir. 2010); *see also Jantzen*, 188 F.3d at 1257 (plaintiff's own candidacy was matter of public concern). And, significantly, none of the cases cited by Defendants holds that **political** speech is unprotected due to the speaker's motive. *Cf. Brommer-Hoelter*, 492 F.3d at 1206 (finding that plaintiff's "political speech" was "undoubtedly protected" even if most of plaintiff's speech was "personal complaints and [was] not a matter of public concern"). In any case, given the clarity of the established law protecting political speech, Defendants' alleged belief that Ms. Kluth's speech was unprotected because it was "primarily motivated by [Ms. Kluth's] personal interests and concerns" was not "reasonable under the circumstances." ECF No. 30 at 13.

### 2. Ms. Kluth satisfies the third Garcetti/Pickering step as a matter of clearly established law.

With respect to Ms. Kluth's September 2020 political speech, it is Defendants' burden to prove that it caused "actual disruption" in the workplace, since Ms. Kluth was terminated in May 2021. *Duda*, 7 F.4th at 912-13 ("we require the employer to prove "actual disruption" when the adverse employment action took place 'long after' the employee spoke on a matter of public concern."); *Kent v. Martin*, 252 F.3d 1141, 1144 (10th Cir. 2001) ("defendants must show actual disruption in order to articulate an interest in regulating [plaintiff's] speech six months after the fact"). Yet Defendants have neither argued nor presented undisputed evidence of actual disruption and rely (at 15-16) solely on "the potential for disruption" from a purported

"appearance of a rift in the office between" Ms. Kluth and Spurlock.[9] Defendants also do not address Ms. Kluth's campaign-related speech beginning in February 2021 and provide no argument or evidence that it caused any disruption, whether actual or potential.

Defendants' argument (at 15-16) that the balance of interests favors them because Ms. Kluth's speech does not expose "misconduct" misses the mark. A court "may consider . . . whether the speech is calculated to expose misconduct" in determining if it is a matter of public concern at the second *Garcetti/Pickering* step (which is then balanced against the employer's interests at the third step), but Defendants do not cite any precedent applying such a standard to political speech. *Brammer-Hoelter*, 492 F.3d at 1205. Indeed, applying such a standard would impermissibly burden political speech, which in many cases does not involve allegations of misconduct. Finally, Defendants' argument (at 14) that Ms. Kluth's "high rank" should be considered also falls flat. Again, Ms. Kluth's claims challenge her unlawful termination—not her demotion. Ms. Kluth was a captain at the time of her termination, a position that did not require political loyalty or affiliation. (SADF ¶ 7.)  As such, Ms. Kluth prevails as a matter of clearly established law at the third *Garcetti/Pickering* step.

### i. Because Spurlock's motivation is genuinely disputed, summary judgment is not appropriate at the fourth *Garcetti/Pickering* step.

The analysis on the fourth step is substantially the same as the analysis of whether Ms. Kluth's political affiliation was a substantial or motivating factor in her termination. As such, as described in Part I.A above, genuine disputes of fact preclude summary judgment on this step.

---

[9] There is also no evidence that, at the time of Ms. Kluth's termination, there was the potential for disruption to the DCSO's operations. Defendant's suggestion that the appearance of a conflict between Ms. Kluth and Spurlock could have been disruptive is the kind of "purely speculative allegation[]" that is insufficient to meet their burden on summary judgment. *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995) (noting that a defendant's "concerns about the impact of speech must be reasonable and formed in good faith").

Therefore, because Ms. Kluth prevails under clearly-established law on the second and third *Garcetti/Pickering* steps, and because there is a triable issue on the fourth step, Defendants are not entitled to summary judgment on Ms. Kluth's free speech claim.

**II.      Ms. Kluth's official-capacity claim is a *Monell* claim for which qualified immunity is not available.**

Ms. Kluth's official-capacity claims—now against Darren Weakly in his official capacity, *see* Fed. R. Civ. P. 25(d)—are municipal liability claims against the DCSO and county. Official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55 (1978). And "a municipality can be liable under § 1983 if the 'final policymaker' takes the unconstitutional action." *Moss v. Kopp*, 559 F.3d 1155, 1168–69 (10th Cir. 2009). It is undisputed that Spurlock was the final policymaker with respect to personnel matters at the DCSO. See ECF No. 33 ¶ 6; ECF No. 35 ¶ 6]. As such, Spurlock's "decision to fire" Plaintiffs is "chargeable as an official act," subjecting the county to "potential Section 1983 liability on *Monell* grounds." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1286 (10th Cir. 2007).

Because "[a] qualified immunity defense is only available to parties sued in their individual capacity," it does not apply to Ms. Kluth's official-capacity claims. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Defendants' sole argument (at 23 n.5) regarding Ms. Kluth's official-capacity claims is that "there is no evidence of an underlying constitutional violation." As such, summary judgment is not warranted on Ms. Kluth's official-capacity claims because, as described above in Part I, there is a triable issue on whether her First Amendment rights were violated, and Ms. Kluth need not show that the law was clearly established.

**III.      Summary judgment should be denied on the C.R.S. § 13-21-131 claim.**

Summary judgment should be denied on Ms. Kluth's C.R.S. § 13-21-131 claim based on violation of article II, § 10 of the Colorado Constitution for the same reasons it should be denied on her § 1983 First Amendment claims.[10] Additionally, article II, § 10 "provides broader protection for freedom of speech in the context of political speech. . . than does the First Amendment to the United States Constitution." *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 93 P.3d 633, 638 (Colo. App. 2004). As such, it is not appropriate to apply the same analysis as under the § 1983 claims, particularly the second and third steps of the *Garcetti/Pickering* test.

**IV.      Ms. Kluth is entitled to judgment in her favor on the implied contract claim.**

Summary judgment is appropriate on the breach of implied contract claim—but it should be in Ms. Kluth's favor, for the reasons articulated in her Motion for Partial Summary judgment, ECF No. 33, and her Reply thereto, ECF No. 37.

**V.       Spurlock's disputed state of mind precludes summary judgment on punitive damages.**

Spurlock's request for judgment as a matter of law on punitive damages should be denied. As explained above, the facts regarding Spurlock's motivation for terminating Ms. Kluth are heavily disputed. Based on the evidence, a jury could reasonably determine that Spurlock's decision was motivated by unlawful retaliation. And since Spurlock has claimed otherwise, the jury could reasonably find that he was dishonest. As such, it is for the jury to decide whether his state of mind merits punitive damages.

CONCLUSION

For the foregoing reasons, Ms. Kluth respectfully requests that the Court deny Defendants' motion for summary judgment on her First Amendment, breach of implied contract, and pendent state law claims.

---

[10] Ms. Kluth also concedes her § 13-21-131 claim based on a due process theory.

Respectfully Submitted,

RATHOD | MOHAMEDBHAI LLC

/s Felipe Bohnet-Gomez
Felipe Bohnet-Gomez
Matthew J. Cron
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400
fbg@rmlawyers.com
mc@rmlawyers.com

*Attorneys for Plaintiff*