Tony Spurlock
August 31, 2022

1   and failed to provide proper training or guidance to

2   their subordinates.

3          So are we looking at the supervisor for

4   maybe violating the policy, and so I'd like look at it

5   from a 30,000-foot view.  Do we have an agency issue,

6   do we have a policy issue, or do we have a behavioral

7   issue?  So I hear those.  Some of them I look at, and

8   some of them I don't.

9      Q.   When you say that you -- for the Internal

10  Affairs investigations that you do look at, does that

11  include review of the factual reports, or are you

12  largely reviewing the commanding officer's assessment

13  of those reports?

14     A.   Again, it depends on what I am interested to

15  see what happened.  Sometimes I read the entire

16  investigation; sometimes I read the synopsis.

17  Sometimes I want to see what -- how the investigation

18  was conducted.  So it really depends on the

19  circumstance at hand, if I go to that level to read

20  those.

21         There are a lot of IAs and PCRs.  I think

22  you heard about a PCR.  It's a lower-level complaint

23  that could rise to an IA, and it would just be

24  impossible for me to read all of those.

25     Q.   What is a PCR?  Is that an acronym?

Tony Spurlock
August 31, 2022

1        A.   It is.  It is a personnel complaint action,

2   and it's basically a personnel complaint action.  So

3   if a citizen calls in about someone's driving -- Unit

4   1910 was speeding down the road -- that would come in

5   as a PCR, as a low level.  That sergeant might handle

6   it and say find out who 1910 was, and were you here,

7   we could check GPS.  Yeah, were you speeding?  Yeah, I

8   was going to this.  Okay.  And it would be done.  Or

9   maybe that car was never even on the lot, or was on

10  the lot the entire time, so it couldn't have been

11  1910.

12        That's kind of PCR, although PCRs do

13  sometimes, and that's -- sometimes I look at those.

14  They -- sometimes supervisors take care of their

15  staff, and they try to protect them.  And so they

16  don't move it up to IA form.  And I'll get wind of a

17  PCR, and I'll look it and say, well, that should be

18  looked at, you know, at an IA level.  So the start out

19  at low, and they can go up high.

20        Q.   Are PCRs -- actually, let's stick with

21  internal investigation for a second.  When an IA is

22  conducted, and you understand when I use IA, it's

23  shorthand for Internal Affairs.

24        A.   Yes.

25        Q.   Whenever an IA is conducted, it typically

Tony Spurlock
August 31, 2022

1    might take the evaluation cycle to get there.

2         Q.    But all the information that that supervisor

3    takes down or records about an employee should

4    ultimately make its way to the Guardian Tracker file;

5    is that right?

6         A.    Under the evaluation process, yes, although

7    the caveat to that is, is that we don't always

8    attach -- like if I'm keeping a notebook on employees

9    as the sergeant, I may use that to help refresh my

10   memory when I'm writing the evaluation.  I'm

11   transferring that information into the evaluation.  I

12   upload the evaluation and my notes, I can discard

13   them.

14          Some people like to put them in the file.

15   I've heard chatter back and forth in the

16   administration about, well, we don't like those in

17   there because of this, or we like those, and so we

18   never really resolved it.  As long as the information

19   is transferred into an evaluation, that's acceptable.

20        Q.    Significant performance issues, whether they

21   be positive or negative, should be documented

22   somewhere; is that correct?

23        A.    Should be, yes.

24        Q.    And if a supervisor is not documenting

25   performance issues, that would be a problem?

Tony Spurlock
August 31, 2022

1      A.    Yes.

2      Q.    What if a captain in your administration

3  supported, endorsed Mr. McCoy?  Would you have done

4  anything with that?

5      A.    Not likely.

6      Q.    You would have just left the person in the

7  captain position, right?

8      A.    Yes.

9      Q.    Is -- unlike the Undersheriff position,

10 doesn't require the same degree of political support;

11 is that fair?

12     A.    That's fair.

13     Q.    And just so we're clear, would you agree

14 that political loyalty or affiliation is not an

15 appropriate requirement for the effective performance

16 of a captain in the Douglas County Sheriff's Office?

17     A.    I would agree with that, yes.

18     Q.    But it is an appropriate requirement for the

19 Undersheriff position, right?

20     A.    I would believe any of the 62 sheriffs,

21 which I know all of them, would require their

22 Undersheriff to be politically aligned with them

23 because you don't get this job unless you're

24 politically aligned because you get elected.  So yes.

25     Q.    What about chiefs?  Do they have to be

Tony Spurlock
August 31, 2022

1      A.   Yes.

2      Q.   And then when she was transferred to

3  Detentions, who was her supervisor then?

4      A.   Steve Johnson.

5      Q.   Okay.  So when she was a Patrol Captain,

6  Captain or Chief Duffy would have been responsible for

7  conducting any employee evaluations if they occurred,

8  right?

9      A.   Yes.

10     Q.   Okay.  And when she was a Detentions

11  Captain, Chief Johnson would have been responsible for

12  conducting any employee evaluations, if they occurred,

13  right?

14     A.   If they would have occurred, yes.

15     Q.   Did Chief Duffey conduct any employee

16  evaluations of Ms. Kluth?

17     A.   I didn't see any, so . . .

18     Q.   And if he had, they would be found in

19  Guardian Tracker?

20     A.   Yes.

21     Q.   Did Chief Johnson conduct any employee

22  evaluations of Ms. Kluth?

23     A.   I didn't see any.

24     Q.   If he had conducted any employee

25  evaluations, they would be found in Guardian Tracker?

Tony Spurlock
August 31, 2022

1    A.   I -- I take it -- it's an important policy
2    to review for the severity.  I guess it depends on
3    the -- again, the circumstances that are at hand.
4    Q.   If you were informed or you learned that one
5    of your employees was found to have violated the Hatch
6    Act, what would your response be with respect to that
7    employee?
8    A.   So if we received a complaint from the
9    Office of Special Counsel, not just someone else --
10    Q.   Let's say not just a complaint but a
11    sustained finding.
12    A.   Okay.
13    Q.   A Hatch Act violation.  Say -- let's say one
14    of your captains, for example, was found by Special
15    Counsel to have committed a Hatch Act violation, how
16    would you respond to that notice?
17    A.   Well, we would take that notice, we would
18    consider that notice as a -- as a complaint.  And then
19    it would go to Internal Affairs, most likely I would
20    have it go to Internal Affairs because those are
21    complex investigation.  And then the Internal Affairs
22    investigator would take the complaint, get the
23    narrative from the Office of Special Counsel, compare
24    it to our policy, and then that policy, if there was a
25    violation of the policy, then they would be the fact

Tony Spurlock
August 31, 2022

1   finder, and then it would go back to that employee's

2   commander.

3       Q.   So you would expect that there would be IA

4   investigation undertaken if you received notice that a

5   Hatch Act --

6       A.   Yes.

7       Q.   -- violation was found.

8       A.   Yes, sir.

9       Q.   All right.  Let's talk about Ms. Kluth's

10  demotion from Undersheriff to captain, a very

11  significant punishment, as you -- as you stated.  To

12  lay a little historical context, the conduct that she

13  was disciplined for arose out of a primary -- or no,

14  sorry.  The conduct that she was disciplined for arose

15  out of the general election between George Teal and

16  Lisa Neal-Graves for a Commissioner seat; is that

17  right?

18           MR. O'CONNELL:  Objection to form.

19           THE WITNESS:  In part, yes.

20  BY MR. CRON:

21      Q.   Now, prior to that general election, there

22  had been a primary in the Republican party for that

23  Commissioner spot, right?

24      A.   For both Republican and Democrat, yes.

25      Q.   And I'm speaking specifically of the

Tony Spurlock
August 31, 2022

1        Q.    Okay.  Did she publicly support your

2   retention in office?

3        A.    I believe so, yes.

4        Q.    So she put aside, essentially, her personal

5   differences with -- or her personal political

6   differences to publicly support your position; is that

7   fair?

8        A.    That's fair.

9        Q.    Now, you discussed your intent to endorse

10  Ms. Neal-Graves with Ms. Kluth prior to your

11  endorsement, right?

12       A.    Yes.

13       Q.    What was her reaction when you informed her

14  of your plan?

15       A.    I have to reflect.  I remember having a

16  conversation in her office.  I think she was cautious

17  with the support of it because I -- she -- she did and

18  I knew and I supported intentions to run for Sheriff,

19  and Douglas County Sheriff's Office has a tendency to

20  have pretty, kind of strict rules about Republicans

21  and you know, those kinds of things.  So I think she

22  was concerned about her future for that.

23            But I -- I -- I made it very clear that I

24  would not nor could I, you know, by any stretch of the

25  means, support him.  And I wanted her just to be aware

Tony Spurlock
August 31, 2022

1  of that.  So as my undersheriff, just this is what I'm

2  going to be doing, so don't get shocked when I go do

3  something, when I go say something.  So it would be

4  fair for her to have that knowledge first.

5       Q.   Right.  You do understand that it might put

6  Ms. -- well, I'm sure you talked about historically

7  the strict rules of the Republican party in Douglas

8  County.  Douglas County hasn't -- has had a Republican

9  Sheriff for the last, what, 50, 60 years; is that

10  right?

11       A.   Yeah, I think Royal McKinster was actually a

12  Democrat.  He was the Sheriff when I first got hired.

13  And no Republican would come up, and he was pretty --

14  at that time, when you were a Democrat, you were

15  probably a Republican anyway.

16       Q.   That was like 40 years ago?

17       A.   Yeah, that was 40-some years ago, but I

18  believe he was actually a registered Democrat.  But

19  for the most part, you're right.

20       Q.   It's fair to say that the Republican

21  candidate for Sheriff has a pretty strong chance of

22  winning in the general election in Douglas County --

23       A.   Oh yeah.

24       Q.   -- agree with that?

25       A.   Without a doubt, yes.

Tony Spurlock
August 31, 2022

```
1        Q.   So I mean, it seems, from my vantage point,

2   that whoever wins the Republican primary is very

3   likely going to win the general election, right?

4        A.   That's -- that's correct.

5        Q.   At least that's historically been the case.

6        A.   Historically.

7        Q.   They haven't been particularly close general

8   elections when they've -- when the Democrats have even

9   fielded a candidate, right?

10       A.   That's correct.

11       Q.   So I -- and you recognize that Ms. Kluth had

12  aspirations to become the next Sheriff after you had

13  retired.

14       A.   Yes.

15       Q.   Did you recognize that endorsing Ms. Neal-

16  Graves might put Ms. Kluth in a tricky political

17  situation?

18       A.   She should have no tricky political position

19  as the Undersheriff.  She should support -- not

20  support anything.  She should do the rule of law,

21  support the Office of the Sheriff, do the job.  I do

22  realize that -- and that's why I went to her.  That's

23  why I said, this is to give you time to think.  This

24  is to give you time to pre-plan and -- and say things

25  that you need to say because I'm -- it's no -- there
```

Tony Spurlock
August 31, 2022

1  was no surprise she wanted to run for Sheriff, and I

2  wanted to support her.  That's why I went and told her

3  that this could be -- this -- this was happening, and

4  I just wanted her to be aware of it.

5       Q.   Right.

6       A.   Not to say you've got to be on my side or

7  that side.  Just I'm giving you something.  I hope you

8  take it and -- and do appropriate stuff with it.

9       Q.   And you did that because you recognized that

10 it could affect her campaign in the future; is that

11 right?

12      A.   No, I did that to provide her with

13 information that could help her.  I supported her to

14 be the Sheriff on the day that I went into her office

15 and told her that.  So I was, in essence, I'm giving

16 you some intelligence information here.

17      Q.   Right.

18      A.   Yeah.

19      Q.   What did you think that she should have done

20 with that intelligence?

21      A.   Well, I guess all I can say is what I would

22 have done with it is I would have held onto it and

23 then, you know, okay, done nothing in any campaign,

24 gone static.  That often works very well in Douglas

25 County.  And I didn't want her to be shocked at some

Tony Spurlock
August 31, 2022

1   uniform in her Facebook page, would you have any

2   reason to disbelieve that?

3        A.   I would not.

4        Q.   So let's assume for purposes of this line of

5   questioning that her Facebook profile picture was not

6   in uniform.  Okay?

7        A.   Okay.

8        Q.   Just asking for that assumption for these

9   questions.  Does paragraph -- does her statements in

10  Paragraph 1 in this Facebook pose present any problems

11  to you?

12            MR. O'CONNELL:  Objection to form.

13            THE WITNESS:  It doesn't, no.

14  BY MR. CRON:

15       Q.   How about Paragraph 2, does that pose any

16  problems?

17       A.   No.

18       Q.   Does Paragraph 3 pose any problems?

19       A.   No.

20       Q.   How about Paragraph 4?

21       A.   No.

22       Q.   And if you want to read --

23       A.   Sure, go on down --

24       Q.   -- 5 through 7, do any of those pose any

25  problems?

Tony Spurlock
August 31, 2022

1      A.    Thank you.

2            MR. O'CONNELL:  Objection to form.

3            THE WITNESS:  No, they do not pose any

4    issue.

5    BY MR. CRON:

6      Q.    This is a personal Facebook post, sharing

7    her political, religious beliefs, right, essentially?

8      A.    Exactly.

9      Q.    And those beliefs are somewhat similar to

10   your beliefs, are they not?

11     A.    Very close, yes.

12     Q.    So what was the problem of this Facebook

13   post?

14     A.    There is no problem with it.  I mean, you

15   questioned me before, I think, maybe we were not in

16   sync.

17     Q.    Okay.

18     A.    This was part of the IA investigation,

19   obviously.  That's -- it's part of it because it was

20   something that was gathered.  I -- I don't think that

21   this document right here, in itself, is substantiated

22   in any policy violation because there's not any, in my

23   opinion, as this stands just by itself, isn't a

24   violation of policy.

25     Q.    Okay.  Did this Facebook post undermine your

Tony Spurlock
August 31, 2022

1    working, and I got a phone call from Andrea Bradbury,

2    and I'm sitting at my home office, and that's when I

3    learned about this.

4        Q.   Ms. Kluth was on medical leave during this

5    period, was she not?

6        A.   Yes, I think she had some -- she was on sick

7    leave.  She wasn't on FMLA, I don't believe.

8        Q.   Okay.  And if you're on sick leave or

9    medical leave, that's considered off duty, right?

10       A.   Yes.

11       Q.   So while this whole thing was going on,

12   Ms. Kluth was off duty, right?

13       A.   Yes.

14       Q.   Okay.  I believe you testified that

15   Ms. Kluth had -- or did you testify that she had

16   orchestrated this whole plan?

17           MR. O'CONNELL:  Objection to form.

18           THE WITNESS:  No, I didn't testify that she

19   orchestrated.

20   BY MR. CRON:

21       Q.   Ordered -- she ordered subordinates to write

22   letters?

23       A.   So she directed Tim Moore, two of them, if

24   you will, orchestrated with, probably with one or two

25   of the other people in the -- in the GOP that

Tony Spurlock
August 31, 2022

1   recognize what this document is?

2        A.   Yes, I do.

3        Q.   What is this document?

4        A.   This is the supplemental report done by a

5   private contractor, Lynn Johnson, that I had hired to

6   do the Internal Affairs investigation into the

7   Undersheriff's actions, the Chief Deputy's actions,

8   and the Captain's actions.

9        Q.   And you read through these interviews?

10       A.   Yes.

11       Q.   Or summaries of interviews?

12       A.   Yes.

13       Q.   Okay.  And these informed the significant

14   discipline that Ms. Kluth received, right?

15       A.   Yes.

16       Q.   And the -- which included -- which isn't

17   actually in a formal discipline, but it included a

18   loss of your political support, right?

19            MR. O'CONNELL:  Objection to form.

20   BY MR. CRON:

21       Q.   Or at least a diminishment of --

22       A.   Loss of my political support?

23       Q.   Yeah.

24       A.   From who?

25       Q.   From Ms. Kluth.  I mean, part of -- part of

Tony Spurlock
August 31, 2022

1  have violated the internet, social networking, and

2  personal website policy?

3      A.   I need to see the investigation to see what

4  the supporting and refuting -- without

5      Q.   Sure.

6      A.   Can I have that?

7      Q.   Can you turn to Exhibit 2?

8      A.   Yes.

9      Q.   This is what you're referring to that you

10  would need to see?

11      A.   Yes.

12      Q.   Okay.  Did you refresh your memory?

13      A.   Yes, I did.

14      Q.   How did Ms. Kluth violate the internet and

15  social networking policy?

16      A.   So it appears in this policy, it would be

17  relative to, I guess, the posts she made that it

18  should be considered -- or employees should consider

19  the possibility of adverse consequences of the

20  internet posting.

21      Q.   Her Facebook post?

22      A.   Yeah, I'm assuming that's what that is for.

23  I didn't -- I guess I should have turned to the next

24  page to see if there something else in there.  Yes.  I

25  think that's what the investigator's referring to.

Tony Spurlock
August 31, 2022

1    Q.    And you sustained the disciplinary finding

2    regarding that Facebook post Ms. Kluth made?

3    A.    Yes, I did.

4    Q.    When did you inform Ms. Kluth that she was

5    being terminated?

6    A.    On the -- I apologize for the date, May 25,

7    is that -- if that's the date.  She was called into a

8    conference room, and there were some other people

9    present, Laura Leary and Jason Kennedy, Captain

10   Kennedy from my office, and myself, and I presented

11   her with a severance package and told her that she no

12   longer the vision, mission, values of my office.

13        And I was giving her an opportunity to take

14   the severance package and review it, and you know,

15   take the severance package, and she refused to and

16   slid it back across the table from me.  And I think

17   she asked me, why am I being terminated?

18        And I said, well, you have the -- this --

19   and that's not it, but I had a piece of paper in front

20   of me that -- the severance package, and I said, you

21   can take the severance package and review it.  And she

22   goes, and if I don't?  And I said, well, you're being

23   terminated today.  Today is your last day.  So you

24   have an option to either take the severance package or

25   not.

Tony Spurlock
August 31, 2022

1           Then, she asked me again, what am I being

2    terminated for, and I said you're being terminating

3    for violating -- or you no longer meet the vision,

4    mission, and values of this office.

5        Q.   The severance package that you offered her

6    would have characterized her exodus as a resignation,

7    right?

8        A.   Yes.

9        Q.   Did you -- did she ask you how she had

10   failed to meet the vision, mission, and values of the

11   Sheriff's Office?

12       A.   No, I don't recall she -- she goes, I

13   want -- can you give me -- can you be more specific,

14   she might have said.  She might have said that, yes.

15       Q.   And did you respond to that request?

16       A.   I did not.

17       Q.   Okay.  So you did not tell her how she had

18   failed to meet the vision, mission, and values of the

19   Sheriff's Office, right?

20       A.   That's right.  That in itself collectively

21   encompasses a variety of things.

22       Q.   When did you make the decision to term her?

23       A.   Maybe a week before that date.

24       Q.   Uh-huh.  Who did you consult with prior to

25   making the decision to terminate her?

Tony Spurlock
August 31, 2022

1      A.   County attorney, HR director.

2      Q.   Anyone else?

3      A.   No.

4      Q.   Did you consult with Undersheriff Walcher?

5      A.   I think I told him what I was doing.  I

6   might have -- I might have asked him.  I don't recall

7   if I asked him, like, what do you think or whatever.

8   I think I told him what I was doing.

9      Q.   Prior to this meeting, did Ms. Kluth have

10   any heads-up that she was about to be terminated?

11      A.   Not to my knowledge.

12      Q.   You didn't tell her that she might be

13   terminated at this meeting?

14      A.   I did not.

15      Q.   Yeah.  So when she was called into the

16   meeting, she presumably didn't know what the meeting

17   was about.

18      A.   Correct.

19      Q.   Why was Mr. Kennedy at this meeting?

20      A.   Well, I knew that Ms. Kluth was no longer

21   going to be an employee once we left that conference

22   room, and the Office of Professional Standards is

23   charged with exiting employees.  It's one of their

24   other tasks.

25              And so I needed a staff member to take her

Tony Spurlock
August 31, 2022

1    Q.   So how was she supposed to discuss how she

2    had failed to live up to vision, mission, and values

3    if you, on advice of counsel, wouldn't tell her how

4    she had failed?

5    A.   Well, she -- I mean, what-ifs here again.

6    She could have said, can we at least talk?  Can you

7    and I have a conversation?  I would like to talk to

8    you about what I've done, where I'm at, what I'm

9    doing.  She was no rookie to the fact of being able to

10   come into my office and have those kinds of difficult

11   conversations.

12   Q.   After you had told her that today was going

13   to be her last day, right?  That's how you started the

14   meeting.

15   A.   No, that's not how I started.

16        MR. O'CONNELL:  Objection to form.

17        THE WITNESS:  That's not how I started.

18   BY MR. CRON:

19   Q.   Okay.  How did you start it?

20   A.   She sat down, what's going on, and I said,

21   listen, I would like to give you an opportunity to

22   take this severance packet because you no longer meet

23   the vision, mission, and values of this office.  So

24   I'd like to give you the opportunity to take this.

25   Q.   Okay.

Tony Spurlock
August 31, 2022

1  your knowledge?

2      A.   I cannot answer that.  I don't know if the

3  HR director or the captain did.

4      Q.   Can you please look at your -- the complaint

5  on Page 11.

6      A.   Okay.

7      Q.   The allegation in Paragraph 93 is Spurlock

8  stated to Ms. Kluth --

9      A.   Page 11?

10     Q.   Page 11, Paragraph 93.

11     A.   Sorry, my apologies.

12     Q.   It's no problem.

13     A.   Yes, that's true, and I forgot that, yes.

14     Q.   Okay.  So you --

15     A.   I'm sorry, my apologies.

16     Q.   And you told Ms. Kluth that nothing had

17 changed since last fall?

18     A.   Yes, this was -- this was -- this statement

19 was made after she had asked me, can you give me --

20 what have I done?  Tell me what I have done.  And I

21 said, you know, nothing has changed.  Your behavior

22 hasn't changed since last fall.

23     Q.   What had happened last fall?

24     A.   That's when she was demoted from

25 Undersheriff to Captain.

Tony Spurlock
August 31, 2022

1        Q.   So that comment kind of harkened back to the

2   comment that she engaged in behavior that led to her

3   demotion.

4        A.   The policy --

5             MR. O'CONNELL:  Objection to form.

6             THE WITNESS:  The policy violations.

7   BY MR. CRON:

8        Q.   Okay.

9        A.   And basic just behavior, trust.

10       Q.   Had she in the time between her demotion and

11  her termination, had she continued to instruct

12  subordinates to engage in political activity?

13       A.   No, but that wasn't the issue.

14       Q.   Had she continued to conspire with

15  subordinates behind your back?

16       A.   No.  She continued to not live up to the

17  vision, mission, and values.

18       Q.   Turning back to -- are you still on Exhibit

19  5?

20       A.   Yes, yes.

21       Q.   Still have that up?  Had she violated -- so

22  she was found sustained five specific policy

23  violations on November 16th, 2020?

24       A.   Yes.

25       Q.   Okay.  Had she continued to violate the

Tony Spurlock
August 31, 2022

1    first one, C-101-2-EE, participating in election

2    campaigns?

3         A.   No.

4         Q.   Had she continued to violate Section 2U, on

5    or off-duty conduct?

6         A.   Potentially, yes.

7         Q.   Okay.  We'll get to that.  Had she continued

8    to violate exercise and expression?

9         A.   Yes.

10        Q.   Had she continued to violate responsibility

11   for conduct.

12        A.   The specifics of that policy is has kind of

13   driven away, so I would say no, I didn't consider

14   that.

15        Q.   Had she continued to violate internet,

16   social networking, and personal websites policy?

17        A.   No.

18        Q.   So the second and third policies are the

19   ones that she continued to violate in your opinion.

20        A.    Well, and I want to make it clear, I'm not

21   saying that she continued to do that.  She failed the

22   vision, mission, and values which are part of bad

23   judgment, trust, unity.

24             And those are maybe not these specific, but

25   they are policies of this office, and that's what was

Tony Spurlock
August 31, 2022

1    meant when I said, you have not changed your behavior

2    since last fall.  You're still violating policies.

3    They're just different policies.

4         Q.   Did she violate the Law Enforcement Code of

5    Ethics after her demotion?

6         A.   I suppose you could fine-tooth comb it and

7    say yes, but I'm not going to go there.  I'm not going

8    to say -- I didn't -- that -- I didn't make a decision

9    based upon that.

10        Q.   Okay.

11        A.   Yes.

12        Q.   So I mean, she was demoted for specific

13   actions in November of 2020, right, in that she had

14   planned with a subordinate to get other command staff

15   members to write letters for the DC GOP, right?

16   That's the gist of what she did?

17        A.   Yeah.  She violated policies that were

18   surrounding each one of those five policy behaviors.

19        Q.   And just to be clear, she wasn't engaging in

20   that sort of specific type of conduct after she was

21   demoted to captain, right?

22        A.   Not that specific conduct, no.

23        Q.   All right.  So okay, did you -- so you told

24   Ms. Kluth that nothing had changed since last fall,

25   and that she was not living up to your mission,

Tony Spurlock
August 31, 2022

1   discipline employees, right?

2        A.   Yes.

3        Q.   And this policy applies to all employees

4   except for yourself?

5        A.   Yes.

6        Q.   And this policy lays out specific procedures

7   for discipline or corrective action, right?

8        A.   Yes.

9        Q.   Okay.  And Ms. Kluth's demotion from

10   Undersheriff to Captain followed these procedures,

11   correct?

12        A.   Yes.

13        Q.   There was an IA investigation, right?

14        A.   Yes.

15        Q.   And a notice of complaint.  There was a

16   pre-disciplinary hearing, right?

17        A.   Yes.

18        Q.   That was recorded?

19        A.   Yes.

20        Q.   And there was a written notice of

21   discipline?

22        A.   Yes.

23        Q.   Okay.  Now, prior to her termination,

24   Ms. Kluth did not receive any formal discipline as a

25   captain, had she?

Tony Spurlock
August 31, 2022

```
 1        A.    No.
 2        Q.    She had never -- she was not subject to any
 3   IAs when she was a captain, right?
 4        A.    No.
 5        Q.    She was not subject to any PCRs when she was
 6   a captain, right?
 7        A.    Not to my knowledge, no.
 8        Q.    Is that something you would have knowledge
 9   of?
10        A.    You would think that I would have looked at
11   it, given this circumstance.  I probably would never
12   have known it if it wasn't in the circumstance we're
13   in --
14        Q.    You had contemplated firing her so you,
15   presumably, would have looked to see if there was
16   anything.
17        A.    I would have looked to see if somebody had
18   documented something.
19        Q.    Okay.  So why do these policies for imposing
20   disciplines exist?
21        A.    To give guidance to the agency on a variety
22   of different things.  Discipline is a very --
23   unfortunately, it's a fluid, and no one discipline is
24   the same as the other.  So it gives the staff some
25   guidance, so we don't have people going off
```

Tony Spurlock
August 31, 2022

1    you -- you have told your boss that you committed a

2    murder, and you -- I got your application right here.

3    And so we had dialogue back and forth, and I fired him

4    right there.

5         Q.   Okay.  Any --

6         A.   Without an investigation.  It was just me

7    having a conversation.

8         Q.   Any other situations?

9         A.   Well, there was Mr. Outlar, but that --

10   that's an extreme one.  He committed a crime in the

11   jail -- a deputy.

12        Q.   Is that where he raped an inmate?

13        A.   Yes.  And so I -- I fired him soon as --

14   soon as the complaint came in, I fired him without

15   even looking into the complaint.

16        Q.   What about with respect to Tim Moore?

17        A.   What -- what do you mean?

18        Q.   He was -- you would -- you gave him the --

19   you offered him the same deal as Ms. Kluth, right?

20   Resignation or --

21        A.   Yes.

22        Q.   -- it's your last day of employment?

23        A.   Right.

24        Q.   Did you follow the procedures of Exhibit 16

25   with the disciplinary correct action policy with

Tony Spurlock
August 31, 2022

```
 1   respect to Mr. Moore's employment?

 2        A.   I did not.

 3        Q.   So other than Mr. Moore, Ms. Kluth, the

 4   murderer, Mr. Burton?

 5        A.   No.  Outlar is a murderer --

 6        Q.   Outlar.

 7        A.   -- Butler is the other one.

 8        Q.   Okay.  So outside of Ms. Kluth, Mr. Moore,

 9   the murderer, and the rapist, are there any other

10   situations where you deviated from this disciplinary

11   corrective action?

12        A.   I'm -- I'm trying to think if there was

13   someone else that didn't follow it completely through.

14   I know -- no, I -- to the best of my knowledge right

15   now, nothing is popping up to my head.  There could

16   possibly be someone later if I went and did a bunch of

17   research, but I -- top of my head right now, I -- I

18   can't think of any more.  That's kind of impactful

19   stuff, so you remember it.

20        Q.   Right.  Can you turn to Exhibit 31, please?

21        A.   I don't have 31.

22             THE WITNESS:  I need 31, please.

23             MR. CRON:  It's in the packet.

24             MR. O'CONNELL:  This one --

25             THE WITNESS:  27.
```

Tony Spurlock
August 31, 2022

1    I -- I -- I can't recall because we had a lot more

2    conversation than I had with Holly because he had

3    conversation about separation, and was inquiring a lot

4    about his life, and his job, and just those things.

5        Q.   But in terms of reason, you would have given

6    him a pretty similar explanation as Ms. Kluth; is that

7    accurate?

8        A.   Yes, on advice of counsel.

9        Q.   So turning our attention to Exhibit 31,

10   please; have you seen this document before?

11       A.   Yes, I have.

12       Q.   Okay.  What is this document?

13       A.   This is a -- I -- I think it is a

14   combination of the number of entries that Chief Deputy

15   Kevin Duffey had in his personal note file, if you

16   will.  His calendar.  And some of these I'm familiar

17   with because obviously, I had talked to him about

18   them.  But this looks like kind of a summary, if you

19   will, of that.

20       Q.   Those are his initials at the top?

21       A.   Those are.

22       Q.   And what's 89-05?

23       A.   That's his badge number.

24       Q.   Do you know when this document was created?

25       A.   I do not.

Tony Spurlock
August 31, 2022

1      Q.   When did you first see this document?

2      A.   I don't recall.

3      Q.   Do you know how you came to see this

4   document?

5      A.   I believe it was prepared because of this

6   lawsuit.  So I -- I don't -- I'm trying to recall

7   if -- if -- I know I had a conversation with him, but

8   I'm not sure if someone else didn't say do you have

9   any documentation.  I think it might have been from a

10  summons that -- from the lawsuit.  Do you have any

11  documentation on employees listed here.  And so he

12  might have got it -- gotten it from that.  Might have

13  gotten it from me.  I -- I don't know which came

14  first.

15     Q.   Is -- do you know when he prepared this

16  document?

17     A.   I do not.  And again, I don't know if this

18  is cut and paste, or what, so I -- I couldn't tell you

19  that.

20     Q.   But this -- this is not the document that

21  you saw prior to Ms. Kluth's termination, is it?

22     A.   No.

23     Q.   Then it -- it sounds like it's a -- a

24  document that you saw only after the lawsuit was

25  filed; is that right?

Tony Spurlock
August 31, 2022

1      A.   Yes.   Yeah.   Um-hum.

2      Q.   Let's turn to Question 2 of Exhibit 40,

3   which is your interrogatory responses.

4      A.   Okay.

5      Q.   Starting halfway down Page 3, and actually

6   the -- Question Number 2 asks you to describe each and

7   every material reason you had for terminating

8   Plaintiff's employment at the time you made the

9   decision; do you see that?

10      A.   Yes.

11      Q.   And your substantive response begins on Page

12   3 and continues through halfway up Page 6; is that

13   correct?

14      A.   Yes.   Yes.

15      Q.   All right.   That first paragraph appears to

16   be -- starting with Subject 2, without waiving the

17   foregoing objection, so --

18      A.   Yes.

19      Q.   -- that paragraph seems to be fairly broad

20   critiques; would you agree with that?

21      A.   I would not.

22      Q.   Okay.   Would you agree that the following

23   paragraphs are -- provide more specific examples of

24   problematic conduct?

25      A.   Yes.   Some of those other paragraphs are

Tony Spurlock
August 31, 2022

1   specific issues that were in that memo, or -- I'm

2   going to call it a memo from Chief Duffey.  I think

3   they were excerpts from that into this response.

4        Q.   Okay.

5        A.   Some of those -- those other paragraphs.

6        Q.   But -- so Captain Duffey's memo, which lists

7   many issues with Ms. Kluth, was -- many of those

8   issues are imported into this interrogatory response;

9   is that right?

10        A.   That is correct.

11        Q.   And these are the reasons that you fired

12   Ms. Kluth, right?

13        A.   Yes.

14        Q.   Let's go through some of them.  We see at

15   the bottom of Page 3 --

16        A.   I'm there.

17        Q.   Well, actually, let me ask you a few more

18   questions.  Sorry, I'm jumping all over, but these are

19   the reasons that were important to your decision to

20   fire Ms. Kluth?

21        A.   These the substantive reasons that were

22   shared with me.  They were not inclusive to the

23   reasons why I terminated her.  Again, the Number 1

24   reason that I terminated her was because she no longer

25   fulfilled the vision, mission, and values of my

Tony Spurlock
August 31, 2022

1    Q.   And by material, I think (inaudible) the big

2   reason, right, like, you know, had she, for example,

3   you know, committed a murder, that would be a material

4   reason you would have for terminating her, right?  Do

5   you understand that?

6    A.   Yeah. And I guess that's a -- I would say,

7   if I'm, you know, maybe correct me if I'm wrong, but

8   your interpretation of the material reason of big --

9   mine is, you can't get any bigger than not having

10   trust, and making good judgment, or unity as a -- as a

11   commander.  You can't get any bigger than that.

12    Q.   And -- and I understand that.  And I'm just

13   asking if there's any other big reasons that are not

14   in this document, in sum.

15    A.   And at this point, I do not recall any.

16   I -- I don't -- I can't think of any.

17    Q.   All right.  So bottom of Page 3, as a

18   captain, Plaintiff consistently objected to, and

19   complained about the on-call command structure

20   established by Chief Duffey, her superior and direct

21   supervisor, and that fact that she is not exempt from

22   the on-call requirement, which generally applied to

23   all captains.

24    A.   Yes.

25    Q.   Do you see that?

Tony Spurlock
August 31, 2022

1       A.   Yes.

2       Q.   Okay.  And this is a reason that informed

3   your decision to terminate Ms. Kluth?

4       A.   Yes.  It, again, goes right to her inability

5   to function in unity.  Poor judgment on her part as an

6   Undersheriff.  She denied captains overtime and

7   on-call all the time.  And so I was put back on the

8   fact that that's what she wanted to do now that she's

9   a captain.

10      Q.   That seems to correlate to sort of Paragraph

11  1 of Exhibit 31; would you agree with that?  That's

12  Mr. Duffey's memo.

13      A.   Oh.

14      Q.   If you have it.

15      A.   Yes, it does.  I'm -- I'm familiar.

16      Q.   It's on the first page.

17      A.   I'm familiar reading that here.  Yes.

18      Q.   Okay.  That's a -- the same issue we're

19  talking about, right?

20      A.   Yes.

21      Q.   This states you raised the issue right after

22  her transfer on November 23rd, 2022; do you see that?

23      A.   Yes.

24      Q.   Did she raise the issue more than one time?

25      A.   No, because I think she was told no.

Tony Spurlock
August 31, 2022

1    Q.   So she asked for something, and she was

2    told, no, and then she did not ask again; is that

3    right?

4        A.   To the best of my knowledge.  She didn't ask

5    me.

6        Q.   Is it -- and is there any -- do you have any

7    basic reason to think that she asked Captain Duffey

8    again?

9        A.   I doubt it.

10       Q.   Okay.  Is it problematic for a subordinate

11   to suggest a change or ask for a change?

12       A.   It's problematic that a person who was just

13   demoted from Undersheriff, who denied those types of

14   things to captains for subordinates below her at the

15   time.  Now, she's a captain, and now she's immediately

16   asserting, oh, we need to have this.  That, in my

17   opinion, was, again, conflict to her ability and unity

18   to try to work with the whole department.

19       Q.   Where do you -- where do you see that she

20   asserted that they needed to have it?

21       A.   Or she asked for it.

22       Q.   Okay.

23       A.   Yeah.

24       Q.    When did you learn about this issue?

25       A.   I -- I don't -- I don't recall.  Probably,

Tony Spurlock
August 31, 2022

1   obviously, sometime after it, but I don't know when.

2       Q.   Prior to terminating Ms. Kluth?

3       A.   Oh, yeah.

4       Q.   Is there any investigation into this issue?

5       A.   No.

6       Q.   Not a -- not even a PCR investigation?

7       A.   Nope.

8       Q.   Was this issue noted in her Guardian

9   Tracker?

10      A.   That, I don't know.  It was noted in the --

11  in the Chief's notes, so other than that, I don't

12  know.

13      Q.   Was it conveyed to Ms. Kluth that it was

14  problematic for her to ask for this change?

15      A.   I don't know.

16      Q.   Was this behavior so egregious that it would

17  demand termination without following the processes of

18  the corrective action policy?

19      A.   It's one of the collective reasons that I

20  made the decision.

21      Q.   Let's go to the -- another -- the next one.

22  Plaintiff objected to Duffey's assignment to serve as

23  a Sheriff's representative for UNFCL and coordinated

24  UNFCL's board meetings.  That's from your

25  interrogatory response; do you see that?

Tony Spurlock
August 31, 2022

1     A.    Yes, I do.

2     Q.    Okay.  And this is another reason that

3   informs your termination decision?

4     A.    Again, this another reason she clearly knew

5   that that was not her place as a Captain, and Patrol

6   Division, was no place for the crime lab.  And, again,

7   unity.  Anyone with a -- a captain with her

8   experience, and time, and grade would know that

9   that's, quite frankly, an inappropriate request to

10  make.

11    Q.    This correlates to Paragraph 2 of Captain

12  Duffey's memo?

13    A.    Yes, it does.

14    Q.    When did you learn about this issue?

15    A.    When we made the change because I sat as the

16  chair -- well, I don't -- not the chair anymore.  I'm

17  the secretary now.  But I sat, as an officer on the

18  board for the crime lab, and when she was demoted,

19  obviously, we were going to make a change on the

20  liaison that would sit on that board.  And that -- I

21  wasn't going to have her do it anymore because she was

22  demoted and moved to a position that had nothing to do

23  with the crime lab.  So it came up around that time.

24    Q.    And was this issue noted in her Guardian

25  Tracker?

Tony Spurlock
August 31, 2022

1       A.    I don't know.

2       Q.    Okay.  Do you know whether anyone conveyed

3   to Ms. Kluth that her ask -- request for this change

4   was problematic?

5       A.    I -- I don't know.

6       Q.    Do you know whether Ms. Kluth was told that

7   she needed to improve on this issue?

8       A.    Well, I -- I -- I don't know if anyone's

9   told her to improve on that issue.  Again, she just

10  could not grasp the vision, mission, and values, one

11  being unity.  And judgment.

12      Q.    Plaintiff alleged that Chief Duffey lacked

13  authority to meet with lieutenants outside of her

14  presence, accused him of acting disrespectful in

15  soliciting information or ideas from her subordinates

16  outside of her presence.  Do you see that on the

17  interrogatory response?

18      A.    Yes, I do.

19      Q.    All right.  And this was also one of the

20  reasons that informed your termination of Ms. Kluth?

21      A.    Yes.

22      Q.    All right.  And the -- this, I believe,

23  correlates to sort of an email chain that is on Page

24  2377 and 78 of Exhibit 31.  Check that out real quick.

25  It's like the bottom.

Tony Spurlock
August 31, 2022

1    A.    I learned about it, like, right when it

2    happened, I think, or very close proximity to that.  I

3    don't know the date of it that's on the Guardian

4    Tracker, but within close proximity of that time.

5         Q.    Was there an IA investigation into this

6    insubordination?

7         A.    I don't believe so, no.

8         Q.    Okay.  PCR investigation?

9         A.    No.

10        Q.    Okay.  Was Ms. Kluth found to have violated

11   any policies?

12        A.    Well, given that specific time and space,

13   there was no -- there was no investigation or PCR.  So

14   there's no findings.

15        Q.    Okay.  Are you aware of any other Guardian

16   Tracker entries regarding insubordinate by Ms. Kluth?

17        A.    No.

18        Q.    And she was not terminated immediately after

19   this issue, was she?

20        A.    She was not.

21        Q.    Okay.  Okay.  Let's go to -- on Page 4,

22   bottom of Page 4.  Plaintiff using her DCSO Twitter

23   account engaged in a Twitter war with a colleague,

24   Captain Jensen, violating DCSO's policy prohibiting

25   activities that bring discredit to the DCSO.  Do you

Tony Spurlock
August 31, 2022

1    see that?

2         A.    Yes.

3         Q.    This is one of the reasons informing the

4    decision to terminate Ms. Kluth?

5         A.    Yes.

6         Q.    Okay.  This -- this correlates to the bottom

7    of 2374?

8         A.    Yes.

9         Q.    What tweets did Plaintiff send out that were

10   objectionable?

11        A.    I don't recall what the tweets were.  I

12   recall the scenario or scenarios around them that both

13   Jensen and herself were tweeting things back and forth

14   that were not -- one would tweet one thing, and the

15   other would tweet another, and they -- the messages

16   weren't the same, you know, for a social media

17   messaging to go out.  And it became problematic with

18   our social media as, hey, they have Twitter accounts,

19   but they couldn't get together to have the same

20   messaging.  And so it became a -- the -- the -- again,

21   the urban legend, it became a Twitter war between the

22   two of them because to see whoever could tweet the

23   most and whoever could tweet the -- you know,

24   whatever.

25              And we had to put a stop to it because it

Tony Spurlock
August 31, 2022

```
 1   was -- it -- and if you understand social media
 2   through law enforcement, people take those things as,
 3   you know, that's the -- that -- that is the position
 4   of the agency.  And so we had to get control over,
 5   quite frankly, both of them.
 6         Q.   Did you review any of the -- these tweets in
 7   question?
 8         A.   I did not.
 9         Q.   Okay.  Did you -- do you know whether you've
10   produced any of the problematic tweets in discovery in
11   this case?
12         A.   I do not.
13         Q.   Now, was Ms. Kluth ordered to stop tweeting?
14         A.   No, not ordered to stop tweeting.  Ordered
15   to work together, again, in unity with her fellow
16   captain.
17         Q.   And was that a verbal order?
18         A.   I'm sure it was.  And it wasn't from me.  It
19   was from the Chief, I'm sure.
20         Q.   Was this issue noted in Guardian Tracker?
21         A.   Not to my knowledge.
22         Q.   Okay.  He used the term urban legend that it
23   was a Twitter war.  Does that mean that it's -- might
24   not actually have been the case?
25         A.   I used the wrong term.  I was trying
```

Tony Spurlock
August 31, 2022

1    describe that it was kind of the talk of the office

2    that these two would get into a Twitter war to see who

3    could tweet the most or tweet whatever.  And so it was

4    other captains and just conversation around the office

5    that these two were doing that.

6         Q.   Did Ms. -- did Ms. Kluth's tweets violate

7    DSCO policy?

8         A.   I do not believe so, no.

9         Q.   Okay.  Now, your interrogatory response

10   states that Plaintiff violated DSCO policy.  Do you

11   see that?

12        A.   Yes.

13        Q.   Okay.

14        A.   Um-hum.

15        Q.   But you don't believe that's, actually, the

16   case?

17        A.   Well, it -- the policy is they violated the

18   -- the unity policy but not -- or by vision, mission,

19   value by not working together because the messaging

20   that's going out was -- and I think if we were to look

21   at the social media policy, there's a -- there's a

22   statement in there that it has to be -- it can't

23   discredit the agency, or it can't make the agency look

24   like we're a bunch of buffoons.

25        Q.   To your knowledge, did the agency, your

Tony Spurlock
August 31, 2022

```
 1   office, document any problematic tweets from either

 2   Plaintiff or Captain Jensen?

 3        A.   Not to my knowledge.

 4        Q.   And you believe that Ms. Kluth was told to

 5   work with Captain Jensen on this tweeting issue?

 6        A.   Well, they were to -- they were co-captains

 7   of Patrol Division, so they should have communicated

 8   with each other on a lot of things to make sure that

 9   there was a unity between the two -- two units.

10        Q.   Do you know whether this issue was brought

11   to their attention?

12        A.   I was told it was.

13        Q.   By who?

14        A.   By the chief.

15        Q.   Chief Duffey?

16        A.   Duffey, yes.

17        Q.   Was there an IA investigation into this

18   issue?

19        A.   There was not.

20        Q.   PCR investigation?

21        A.   There was not.

22        Q.   Okay.  Plaintiff instigated continuous

23   conflicts with Captain Jensen, criticizing his

24   management style, adversarial nature.  Do you see

25   that?
```

Tony Spurlock
August 31, 2022

1      A.   So that's a one-way street, one that's

2   accused, so --

3      Q.   Well --

4      A.   -- it wasn't that he was -- that the chief

5   did anything wrong.

6      Q.   According to the chief.

7      A.   Exactly.

8      Q.   All right.  And if the communication issues

9   involved the chief, there'd be -- well, there is no

10  one to sort of object to that, right?

11         MR. O'CONNELL:  Objection to form.

12         THE WITNESS:  Well, I -- I'm -- I suppose

13  that Jim Jensen could have made a complaint to the

14  Undersheriff.

15  BY MR. CRON:

16     Q.   When did you learn about the issue of

17  Plaintiff having communication issues with Captain

18  Jensen?

19     A.   Well, obviously, after she was down there

20  for some time.  I don't know when.  I was -- you know,

21  either I heard information about the two of them not

22  getting along or -- or the two units doing things

23  opposite of each other and not in unity.  I don't have

24  a particular date.

25     Q.   Is this issue not in Guardian Tracker?

Tony Spurlock
August 31, 2022

```
1        A.    Not to my knowledge.

2        Q.    IA investigation?

3        A.    No.

4        Q.    PCR investigation?

5        A.    No.

6        Q.    Conveyed to Ms. Kluth that she needed to

7    communicate better with Captain Jensen?

8        A.    Not by me, but it could have been by the

9    chief.

10        Q.    Do you know whether she heeded that advise?

11        A.    I don't know.  I can't answer that question.

12        Q.    Do you know for a fact that Duffey

13    communicated this to her?

14        A.    I do not.

15        Q.    Okay.  Let's see.  (Inaudible) on Page 5,

16    Plaintiff demonstrated preferential treatment to

17    friends with special assignments and violated standard

18    operating procedures while assigned as a captain to

19    the Patrol Division.  Do you see that?

20        A.    Yes.

21        Q.    This is, also, one of the reasons that

22    informed your termination decision; is that right?

23        A.    That's correct.

24        Q.    Okay.  And this correlates to Exhibit 31,

25    Page 2376, on January 26th, 2021, as notified by
```

Tony Spurlock
August 31, 2022

1    Captain Nicholson-Kluth that she and Captain Jensen

2    had chosen Lieutenant Lorie Brawner to attend the DU

3    Leadership Command School.  Do you see that?

4         A.   Yes.

5         Q.   And so this occurred on January 26th of

6    2021.  What -- what is wrong with Ms. Kluth's actions

7    here?

8         A.   Well, we can -- from this statement right

9    here, it looks like he was -- both Jensen and Kluth

10   were directed by the chief to give him names of

11   lieutenants -- they have seven lieutenants -- to

12   attend this class, and apparently, Ms. Kluth and Jim

13   Jensen picked Lorie Brawner.

14        Q.   And what's wrong -- what's -- what's bad

15   about Lieutenant Brawner?

16        A.   What's bad about --

17             MR. O'CONNELL:  Objection to form.

18   BY MR. CRON:

19        Q.   Is Lieutenant Brawner still employed?

20        A.   Yes, she is.

21        Q.   What rank is she?

22        A.   She's a lieutenant.

23        Q.   Is she a good lieutenant?

24        A.   She's an average lieutenant.

25        Q.   Okay.  Is there anything wrong with her

Tony Spurlock
August 31, 2022

1    attending leadership school?

2         A.    There is not.

3         Q.    Do you know her to be a close friend of

4    Ms. Kluth's?

5         A.    Yes, I do.

6         Q.    Okay.  Is she a close friend of Ms. --

7    Captain Jensen's?

8         A.    That, I don't know.

9         Q.    Okay.  Was this a reason to terminate

10   Ms. Kluth?

11        A.    I think this is a cumulative issue.  I don't

12   know of -- I guess I would like to have seen more

13   names brought up.  They have a lot of other

14   lieutenants that were suggested, so Ms. Kluth had the

15   habit of putting Lorie Brawner up front a lot in a lot

16   of other circumstances.  I think that's why this

17   probably rose to the occasion.

18        Q.    Okay.  And this is one of the reasons that

19   informed your termination decision?

20        A.    Yes, it is.

21        Q.    Do you know whether Lieutenant Brawner

22   attended the Leadership Command School?

23        A.    I do not.

24        Q.    Okay.  Do you know whether any other

25   lieutenant wanted to attend the command school?

Tony Spurlock
August 31, 2022

1    A.   I do not.

2    Q.   Okay.  Was this issue noted in Guardian

3  Tracker?

4    A.   Not to my knowledge.

5    Q.   Was this something that you knew about prior

6  to the termination?

7    A.   No, I did not.

8    Q.   Okay.  Did anyone convey to Ms. Kluth that

9  she had done anything wrong?

10   A.   Not to my knowledge.

11   Q.   No opportunity to correct the issue, then?

12   A.   I didn't -- I didn't talk to her about it.

13   Q.   We've talked about a bunch of incidents that

14 are listed in Captain Duffey's memo, not everything,

15 and we haven't gone through your entire interrogatory

16 response.  But from my review, all the incidents

17 listed in Captain Duffey's memo occurred between

18 November 2020 and February 18th of 2021; is that

19 right?  Or sorry, no, in -- all of them began --

20 occurred between November 23rd, 2022 (sic), and March

21 2nd, 2021; is that right?

22   A.   That's correct.

23   Q.   Okay.  And she was -- Ms. Kluth was not

24 fired until three -- no, Ms. Kluth was not fired for

25 almost three months after the incidents set forth in

Tony Spurlock
August 31, 2022

1      A.   Not to my knowledge.

2      Q.   Are there any major incidents that occurred

3  while she was Captain of Detentions?

4      A.   Not that rises -- not that anything that

5  comes to mind.

6      Q.   Were there any -- were there any issues with

7  her performance as Captain in the Detentions Division

8  that contributed to your decision to fire her?

9      A.   I don't recall any right now.  She was there

10  for a very short period of time.

11      Q.   Almost three months, right?

12      A.   Yeah.

13      Q.   Did Chief Johnson ever communicate to you

14  any issues with Ms. Kluth's performance as she was

15  employed as the Detentions Captain?

16      A.   It was one thing that escapes me right now.

17  And I apologize for the -- for the long day.  But I

18  think there was one issue that he said -- that he had

19  mentioned.  But I apologize.  I don't recall,

20  specifically, what the details are.

21      Q.   Okay.  Not -- not -- may assume, from

22  your -- it's not a huge incident?

23      A.   No.  It -- it -- it -- it's not anything

24  that's like we've talked before.

25      Q.   Why was Ms. Kluth transferred to Detentions?

Tony Spurlock
August 31, 2022

1        Q.    No IA investigation?

2        A.    No.

3        Q.    No PCR investigation?

4        A.    No.

5        Q.    Do you have any knowledge as to whether

6   Chief Johnson expressed his displeasure with Ms. Kluth

7   to her?

8        A.    I have no knowledge of that, what he said to

9   her.

10       Q.    But do you know whether Ms. Kluth had any

11  knowledge as to this performance issue?

12       A.    I don't know what they shared with her.  I

13  just shared nothing with her.

14       Q.    Is that one of the reasons that informed

15  your termination decision?

16       A.    Yes.

17       Q.    Other than that one incident, was there any

18  other specific incidents that occurred between March

19  1st and May 25th?

20       A.    Not that I call -- recall at this point.

21       Q.    In -- in this last election, you supported

22  Captain Darrin Weekly; is that correct?

23       A.    Eventually, I did.  Yes.  Not right off the

24  bat, no.

25       Q.    Okay.  Well, he announced his candidacy in

Tony Spurlock
August 31, 2022

1   November of 2021; does that sound right?

2       A.   Yeah.  I think it was -- yeah.  Yes.

3       Q.   And you attended his kickoff campaign event,

4   right?

5       A.   Yes, I did.

6       Q.   Isn't that supporting him right off the bat?

7       A.   Yeah.  I guess I should have said that -- he

8   was talking about running well before then.

9       Q.   Okay.

10      A.   I never really stood up until that day.

11      Q.   I understand.

12      A.   Yeah.

13      Q.   When -- when was he talking about -- when

14  did you first hear him talking about running for sure?

15      A.   Well, I think after Ms. Kluth was

16  terminated, and I believe there was some discussion

17  about, maybe, one -- one, the commissioner and this

18  other person, they might be dropping out, or

19  something.  I don't recall, but that never occurred.

20  And I know there was some conversation about it.

21           Darrin had come to me and said, I'm thinking

22  about running because none of the other candidates

23  qualify for the job.  And so we -- obviously, we had

24  some discussion about that.  And I don't recall any of

25  that -- was a -- but it was, obviously, after