Kevin Duffy
September 19, 2022

1      Q.    And has that been the case during your tenure as a

2   chief?

3      A.    Yes.

4      Q.    Okay.   I think we can go back to your individual

5   capacity now.   Is there any time that, as a chief, where you

6   were not in the discipline of one of your subordinates?

7           MR. O'CONNELL:   Objection to the form.

8           THE WITNESS:   I'm not really -- I'm not quite

9   understanding what you're asking.

10  BY MR. BOHNET-GOMEZ:

11     Q.    So has there ever been a time as chief where one of

12  your subordinates was disciplined that you were not part of

13  the -- the -- the process in terms of reviewing the discipline

14  and/or imposing it yourself?

15     A.    Yes.

16     Q.    Can you tell me about that time or those times?

17     A.    The termination of Ms. Kluth.

18     Q.    Any others?

19     A.    The termination of Captain Jensen.

20     Q.    Any others?

21     A.    No.

22     Q.    So you were not involved with the termination of

23  Captain Jensen?

24     A.    I was involved to the extent to where I submitted my

25  recommendations to the undersheriff on the final discipline.

Kevin Duffy
September 19, 2022

1      A.    No.

2      Q.    What about the investigation into Ms. Kluth?  Did you

3    discuss that with Undersheriff -- or Dave Walcher?

4      A.    Which investigation?

5      Q.    The -- into the political activity.

6      A.    Did I discuss it with the undersheriff?

7      Q.    Well not Undersheriff Kluth, but Dave Walcher.

8      A.    I don't believe so.

9      Q.    When did you learn that -- that, in fact, you would be

10   promoted to law enforcement bureau chief?

11     A.    It was either late October or early November.

12     Q.    So certainly, before -- well, what do you mean by

13   early November?  When -- when would be kind of the latest that

14   you would have learned about that?

15     A.    Again, I don't remember the exact date.  I just

16   remember the sheriff did -- after we had that initial

17   conversation, he did come down to me, I believe it was, like, a

18   week later.  He said he thought about it, and he decided he was

19   gonna make me law enforcement bureau chief.  I became the bureau

20   chief on November 19th.

21     Q.    And when did you learn that Ms. Kluth would be your

22   subordinate?

23     A.    Probably the very first meeting that weekend that --

24   that week of November 17th, 18th, in there.  We met -- we talked

25   about movements and that was when the sheriff notified me that

Kevin Duffy
September 19, 2022

1   you said, ding someone come evaluation time?

2        A.   That's my opinion.  And I've seen and I've called them

3   into question on officers under my command, the lieutenants or

4   captain, who -- and they've gotten much better at this, to

5   where, they don't need one thing against them to beat them up on

6   their evaluation.  But if they show a continuing pattern,

7   it --it substantiates why they ding the score in particular that

8   they did.

9        Q.   And -- and your -- your view and your pattern --

10  practice as a manager is to use Guardian Tracker to support

11  documenting patterns like that?

12       A.   Correct.

13       Q.   When would you have formally -- well, let me back up.

14  Did you ever formally evaluate Ms. Kluth?

15       A.   No.

16       Q.   Why not?

17       A.   I didn't have her long enough.  Again, her cycle was

18  October through March.  So at -- at March, I would've had to do

19  her first evaluation if she would have stayed under my command.

20  But because she was transferred, then per our policy, I would

21  then have had to fill out what they call a special evaluation

22  Chief Johnson on the transfer.  I never had time to do that

23  before she left the department.

24       Q.   Okay.  So if she had stayed in patrol, her evaluation

25  would have occurred in March?

Kevin Duffy
September 19, 2022

```
 1  days per policy to get that transfer evaluation done.
 2       Q.   Okay.  And do you know how long Ms. Kluth continued to
 3  work for the sheriff's office?
 4       A.   I don't.
 5       Q.   If I represented to you that her last day was May
 6  25th, 2021, do you have any reason to doubt that?
 7       A.   Again, I don't know the specific date when she left
 8  the department, so.
 9       Q.   If she left on May 25th, then she would have worked
10  for almost another three months after her transfer, correct?
11       A.   Yeah.
12       Q.   And you said you have 30 days under the policy to
13  complete a transfer evaluation?
14       A.   The policy says that they would like have a transfer
15  evaluation done within 30 of the transfer.  Does it always
16  happen?  No.
17       Q.   Okay.  And it didn't happen in Ms. Kluth's case?
18       A.   That's correct.
19       Q.   And why is that?
20       A.   I just didn't get it done.
21       Q.   Due to your other work commitments?
22       A.   Correct.
23       Q.   No one told you, don't evaluate her?
24       A.   Oh, no.  No.  That would be on me.
25       Q.   Okay.
```

Kevin Duffy
September 19, 2022

1  question is if I could make -- if I would -- can I make a doc --

2  a Guardian Tracker that encompasses a length of period even

3  though it's only maybe one day, I could talk about a week or two

4  or three in one narrative?  Is that what you're asking?

5      Q.   And can one of your narratives relate to a span of

6  time in an employee's performance?

7      A.   Yes.

8      Q.   And that's one that you do the entries?

9      A.   That's one way.

10     Q.   And in terms of what you can actually put into the

11  system, though, do you have to pick one date for when occurred,

12  or can you put in a date range?

13     A.   I think you can only pick one date.

14     Q.   Okay.  So looking at this entry here, the one where

15  you put in November 15th, 2020, did this actually occur all on

16  one date, or is this one of those entries relating to a span of

17  time?

18     A.   This is a span of time.

19     Q.   And is that span of time essentially the start of when

20  Ms. Kluth was your subordinate until February 22nd, 2021?

21     A.   Yes.  This one is from the time I took over as an law

22  enforcement bureau chief and she came down as patrol captain.

23  This -- this one here is a span of time that I captured a lot of

24  information.

25     Q.   I see.  So you were trying to capture her overall --

Kevin Duffy
September 19, 2022

1   your overall assessment of her from the time you took over as

2   law enforcement bureau chief until February 22nd?

3       A.   From the time I took over as a law enforcement bureau

4   chief, I wouldn't say necessarily to February 22nd.  Again, when

5   I do these, the dates have occurred and entered, I don't really

6   pay a lot of attention to that.  The narrative is what I'm

7   trying to focus on and that's what I did here.

8       Q.   But in any case, the -- the date there that you put in

9   occurred is meant just to signal that that's kind of when

10  your -- your narrative begins.

11      A.   That's fair.

12      Q.   And that was an approximation because you weren't

13  actually chief until November 19th.

14      A.   Correct.

15      Q.   So tell me about this entry.  What is it?

16      A.   This is kind of an overall impression I had of her

17  that she was transferred to a patrol division as one of two

18  captains in the division documented here.  This was the first

19  time this office has ever had two captains in the patrol

20  division.  She was assigned to the A side, working Sunday

21  through Wednesday.  Since taking on this new and challenging

22  assign -- assignment, she had done a very good job in working to

23  familiar herself with the policies and the SOP's of the patrol

24  division.

25           While doing that, one of the things that she did is

Kevin Duffy
September 19, 2022

1  she --she went and started reading all the patrol SOP's just to

2  make sure that she was appraised of the standard operating

3  procedures of the division.  She recognized herself that several

4  of --many of the SOP's within the control division hadn't been

5  updated or revised properly.  And she took the initiative to

6  begin doing the revisions herself or to assign them to

7  appropriate team or unit.  And she took on some special

8  assignments as well as the captain of the division of that was,

9  the town of Larkspur, which is south of Castle Rock, that we

10 have a contract with, to provide patrol and law enforcement

11 functions to the town of Larkspur, which -- and act as the

12 liaison, meaning to meet elected officials in the town officials

13 in Larkspur.

14        She took that --she took the same initiative with the

15 City of Castle Pines contract, which is to the north of Castle

16 Rock, to -- to make sure that she was fully appraised on the

17 contract and what the contract held the sheriff's office to

18 (inaudible) liaison with the city of Castle Pines.  She also did

19 the same with the US Forest service.  We had a contract with

20 them where we have residents and deputies who live up in our

21 District 8 in the Pike National Forest.  And she took oversight

22 of those two deputies specifically.

23        She also took the department herself to be in charge

24 of the reserve officers working in patrol.  Those are

25 not --they're commissioned reserves.  They're not full time

Kevin Duffy
September 19, 2022

1  deputies, but they'll come out and work in a deputy capacity

2  when needed.  So she took that --oversight of that for the

3  patrol division.  She also took on the oversight of the

4  community safety volunteers, the CSV's that were assigned to the

5  patrol division.  She also did oversight for the explorer post,

6  which is our teen -- high school kids that are working,

7  volunteering in our explorer post.  That's something that's been

8  going on in the -- with the sheriff's office since I've been

9  with the sheriff's office.  I believe, if I remember right, when

10  Holly was in patrol, she was actually an explorer advisor and

11  possibly the led advisor.  So taking over the explorer post

12  force.

13         And then, she also began working with me helping me

14  with detailing tasks or assignments that were given to patrol

15  watch commanders to include the canine program, our FTO program,

16  our traffic unit.  For the short time that she was in patrol, I

17  thought she made tremendous strides in organizing a more

18  consistent and efficient method in the safety tell tips that

19  were coming in.  Especially those that come in after hours.

20  Most of the safety tell tips then we forward onto the school

21  resource officers, but we do get a lot of after hour tips that

22  need to be addressed.

23         She was working very hard to communicate the needs of

24  patrol and various trainings for Axon files, which is our

25  body-worn camera.  You know -- and the new world system, our

Kevin Duffy
September 19, 2022

1   Guardian Tracker, our power DMS.  She -- I noted in here that

2   she did get resistance from the other captain, which is Captain

3   Jensen.  But she -- and she also got a lot of push back from the

4   captain of professional standards or oversees these -- that

5   particular area.  So she was, in my opinion, she was doing --

6   she was trying to do the right thing.  She was just running

7   into, again, like we talked about earlier, the challenges and

8   conflicts of the other captains.

9          She -- she also identified that in those areas of

10  body-worn cameras, the use of the new world system, the power

11  DMS system, Guardian Tracker system, that it was her belief that

12  more direct training needed to be done with the frontline

13  supervisors, specifically the sergeants and the lieutenants.

14  She --she did a very good job also in --with our CALEA, which is

15  one of our three triple crown or triple crown (inaudible)

16  agency.  She was very, very strong in that when she was the

17  undersheriff.  She took on the duties, if you wanna call that,

18  making sure that patrol was maintaining our CALEA mandates,

19  which is critical to the office.

20          She worked hard to make sure that our reserve officers

21  and our CSV's officers were working in accordance with our

22  standards.  And she also identified priorities of the CF -- CSB

23  program could be working on to maybe improve their efficiency,

24  such as house watches, you know, where, maybe we were asking too

25  much of them in one area and then were not being able to focus

Kevin Duffy
September 19, 2022

1   on the other areas that fall within theirs.

2          So needless to say, what I was trying to

3   doc --document in here is that she was not afraid to take on

4   challenges when she came down as a captain of patrol.  And as a

5   as a brand new chief, this is something that I wanted to

6   document because I very, very much appreciated the dedication

7   and the diligence and her work effort.  And I wanted to make

8   sure that that was documented here.  And I also put in there

9   that I think that, in my opinion, that her coming into this new

10  assignment was both on a personal and professional level, very

11  challenging.  It's one of those things, put yourself in their

12  shoes.  You're the undersheriff for six years with the high

13  level of authority, and now you're a captain on patrol, right?

14          It takes a person with a tremendous amount of courage

15  to be able to come in and come into work every day and --and

16  meet the expectations, but also meet the expectations and go

17  above and beyond.  So she took the --she took the role of

18  captain on patrol very, very professionally and very diligently,

19  in wanting to do the work that --and the tasks that were

20  assigned to her, even tasks that I didn't even ask her to do.

21  She just raised her head and then took them on, which is

22  something for --as a brand chief, I was very much appreciative.

23  So I wanted to commend her for what I felt was her bravery in

24  the way she faced this adversity and her commitment to this

25  office.

Kevin Duffy
September 19, 2022

1      Q.   So fair to say that on February 22nd, 2021, when you

2   sat down, you wanted to capture a number of -- of -- of reasons

3   you were very pleased with her performance up to that date?

4      A.   Yep.

5      Q.   So just a couple of questions on that.  So these

6   special assignments that she took on, are those kind of

7   assignments that, like with the radio board, that are not really

8   part of her duties that are on top of that?

9      A.   No, all of these duties that are listed in here, fall

10  smack dab in patrol division.

11     Q.   I see.

12     A.   Being done by then, one --one captain.  And it kind of

13  goes into the understanding the reasoning behind Sheriff

14  Spurlock and in my opinion, that's a lot.  Right?  But there's

15  still more that needs to be done that the other captain had to

16  pick up.  Right?

17     Q.   I see.

18     A.   So two captains for that big division.  This is just a

19  partial list of what goes on in the patrol division.  It's a

20  fast moving, high paced division with a lot of duties and

21  responsibilities.

22     Q.   I see.  So on the last paragraph there, you wrote that

23  Ms. Kluth was working very hard to communicate with you daily.

24  You see that?

25     A.   I do.

Kevin Duffy
September 19, 2022

1   clerk and recorder, she was looking for solutions.  So I thought

2   that was important that she was looking out for the best

3   interest of that deputy.

4       Q.    And the date of January 28th, 2021, did you mean that

5   to approximate kind of when that was occurred.

6       A.    Yeah.  Either that's when it occurred or that's when

7   it was brought to my attention, approximately thereof.

8       Q.    Okay.  Let's do the next entry also on page DSCO 952,

9   titled accountability.  Do you see that?

10      A.    I do.

11      Q.    What is this entry?

12      A.    This entry was a concerning one because for --for I

13  think we -- I think in my estimation, I think she got out of her

14  lane on this one.  She -- she emailed -- she sent an email

15  directly to the sheriff requesting for changes in the SOP

16  involving how the CSV -- the CSV schedule and the program was

17  gonna work and how they were gonna do the house watches.  She

18  sent that email before talking to me as a law enforcement bureau

19  chief.  And so she caught me and the undersheriff off guard

20  because she sent an email directly to the sheriff.

21          So it went to him, went to the undersheriff, then back

22  to me.  Through that, both me and the undersheriff had no idea

23  about this, right?  So he was caught off guard.  He wasn't happy

24  that --that people were going directly to the sheriff asking him

25  about SOP changes as it relates to patrol division.  Obviously,

Kevin Duffy
September 19, 2022

```
1   I wasn't happy with it.  These are the type of things to where
2   you work up through the chain of command.  You don't go to the
3   top and then work down.  So I just made a documentation in here,
4   said she had come to patrol that -- that I just wanted to advise
5   her in writing that, basically, I didn't think that she was
6   following the chain of command with something like this to where
7   she's wanting changes in the, SOP, that this needed to go
8   through the chain.  It's one of those things that would've been
9   real simple.  If she would've come to me and said, hey, I wanna
10  go talk to the sheriff because the sheriff is the final say over
11  things like this, I would've most likely said, absolutely.  Or I
12  would have said, send me what you got, let me go talk to the
13  undersheriff.  And then, if the sheriff -- undersheriff is good
14  with it, then by all means, go -- go to the sheriff.  It's just
15  in my opinion, she got ahead of herself and went straight to the
16  sheriff, and that's not how it's supposed to be done.
17       Q.   So essentially, what she could have done was just give
18  you a heads up before sending that email?
19       A.   Could have.
20       Q.   And that would've been one appropriate course of
21  action?
22       A.   That's the appropriate course of action, especially
23  when it comes to SOP changes.
24       Q.   And why did you feel this was -- needed to be in the
25  Guardian Tracking?
```

Kevin Duffy
September 19, 2022

1    A.    I think this -- what -- the reason why I documented

2  this is this was the first real example of delineating herself

3  from, for six years, as the undersheriff, she was used to going

4  straight to the sheriff, which I totally understood that was her

5  she's the undersheriff, that's who she would go to.  This was

6  more of a reminder of, you're in a different role now, you have

7  to follow the chain of command.

8    Q.    So if I understand you correctly, you documented this

9  because you thought it was important for her to understand how

10 to go about these communications because this was a change from

11 her prior situation?

12   A.    Correct.

13   Q.    Any other reason for documenting this?

14   A.    Nope.

15   Q.    So I've heard these entries sometimes referred to as

16 coaching notes --

17   A.    Yep.

18   Q.    -- have you heard that before?

19   A.    Yeah.

20   Q.    Is this a coaching note?

21   A.    Coaching note, a reminder.  It's one -- this is an

22 example of what we discussed about earlier.  This is one of

23 those documentations to where happens one time, let's say this

24 one instance.  And then, when it comes time for her evaluation,

25 it never happened again, wouldn't reflect in her evaluation.

Kevin Duffy
September 19, 2022

```
 1      A.    Reprimand.

 2      Q.    Okay.  And is this the most serious entry in terms of

 3 Ms. Kluth's performance in the Guardian Tracking file?

 4      A.    For the entries I made, yes.

 5      Q.    And this is the last entry that you made, correct?

 6      A.    Correct.

 7      Q.    And you continued to supervise her for some time after

 8 February 22nd?

 9            MR. O'CONNELL:  Objection to form.

10            THE WITNESS:  She was, as I -- we said earlier,

11 February 23rd, the decision was made that she was gonna be

12 transferred to detentions as the division commander on March

13 1st.

14      Q.    So you supervised her until March 1st, approximately?

15      A.    Approximately.

16      Q.    And you would have had an opportunity to make

17 additional Guardian Tracking entries if you felt they were

18 necessary?

19      A.    Correct.

20      Q.    So is it fair to say that these six entries that you

21 made in Mrs. Kluth's Guardian Tracking file capture everything

22 you felt was significant about her performance?

23      A.    Yes.

24      Q.    And are comprehensive as to your assessment of her

25 performance?
```

Kevin Duffy
September 19, 2022

1    A.   Yes.

2    Q.   Let me point your attention to Exhibit 20, or excuse

3    me, Exhibit 30, in the binder in front of you.  Before we got

4    into this, circling back to the issue that you put in Guardian

5    Tracking about Ms. Kluth's saying you weren't following chain of

6    command, did that continue to a problem after Undersheriff

7    Walcher weighed in?

8    A.   I don't have any documentation to show that it

9    continued to be an issue.

10   Q.   So that was the end of it, once she was told that it

11   wasn't an issue by Undersheriff Walcher?

12   A.   For that particular incident, I believe it was.

13   Q.   So you've got Exhibit 30 in front of you.  Could I

14   turn your attention to page DCSO 2510.  So this is the start of

15   a six-page span of this exhibit that contains Douglas County

16   Sheriff's Office policy.  Do you see that?

17   A.   I do.

18   Q.   Are you familiar with this policy?

19   A.   I am.

20   Q.   And this was -- well, let me have you turn to page

21   three of that policy which is page DCSO 2512.  Are you with me?

22   A.   I am.

23   Q.   And Roman numeral 12 there.  It says chain of command.

24   A.   Correct.

25   Q.   Is this the chain of command policy that was in place

Kevin Duffy
September 19, 2022

1  when the issue we were discussing with Ms. Kluth and the

2  lieutenant's meeting arose?

3      A.   It is.

4      Q.   And the --according to the letter of this policy

5  applies to all matters correct?

6      A.   The chain of command shall be respected in all

7  matters.

8      Q.   So that it -- it applies to all matters at the

9  sheriff's office, according to your understanding of that

10  policy?

11      A.   I'm just reading what it says, that the chain of

12  command shall be respected in all matters.

13      Q.   And information and communication shall move up and

14  down through channels, right?

15      A.   Correct.

16      Q.   And that is the chain of command?

17      A.   That's the chain of command.

18      Q.   And the policy also says it's the responsibility of

19  each level to forward information in communications to the next

20  higher or lower level, right?

21      A.   Correct.

22      Q.   So that means the chain of command policy goes up and

23  down the chain, right?

24      A.   Correct.

25      Q.   And it applies unless indicated otherwise by office

Kevin Duffy
September 19, 2022

1  marked as Exhibit 54 has Bates number DCSO 1714 through 1720.

2  Chief Duffy, is the current version of the office structure

3  policy that we just looked at?

4       A.   They're not the same.

5       Q.   Right.  So this version in Exhibit 54, it's the same,

6  you know, it's --they're both numbered, policy and procedure

7  A100, office structure, correct?

8       A.   Correct.  The difference is the one that you have in

9  Exhibit 29, is that this one.

10      Q.   Uh-huh.

11      A.   This one went in effect of December 8th of 2019.  This

12  one that you handed me as Exhibit 54 one supersedes the 12/8 of

13  2019, put into effect April 27th of 2021.

14      Q.   Right.  So this one, Exhibit 54 is the updated

15  version?

16      A.   Correct.

17      Q.   Okay.  Can I have you flip to Roman numeral 12, chain

18  of an on page DCSO 1717?  And this has been amended or updated

19  since the version that we looked at in Exhibit 30, correct?

20      A.   Appears to be.

21      Q.   And in particular, the last sentence of that section

22  in Exhibit 4 is new, correct?

23      A.   Correct.

24      Q.   That sentence reads, this section does not prevent

25  executive command staff from having discussions with any member

Kevin Duffy
September 19, 2022

1  Duffy, when did you first learn Mis Kluth was gonna be

2  terminated?

3      A.   You know, I couldn't tell you.  I don't know that

4  wasn't a decision that was made by me and wasn't -- didn't

5  involve me.

6      Q.   Did you learn about it only after it happened?

7      A.   I would say no, I don't have any dates or times.  But

8  in the -- in my -- it's been my experience that the sheriff and

9  the undersheriff, they usually keep their executive officers

10 informed when a major decision like that is gonna be made prior

11 to it being published to the entire department.

12     Q.   So I was asking you about it earlier, and you didn't

13 know the date that she was terminated; is that right?

14     A.   That's right.

15     Q.   But do you know how far in advance you learned of the

16 termination before it happened?

17     A.   I don't recall.

18     Q.   Do you have a --a sense of how long that time period

19 was?

20     A.   I don't recall.

21     Q.   What was your reaction when you learned Ms. Kluth was

22 gonna be terminated?

23     A.   I've known -- I've Holly for 34 years.  Worked with

24 her, worked for her.  Anytime someone is terminated from the

25 office, it's a sad -- it's sad.  It saddens me that career would

Kevin Duffy
September 19, 2022

```
 1   end.  So I'd say personally, I was saddened.  But again, these
 2   are the decisions that were made for the best interest of the
 3   department.
 4        Q.   Do you know why that decision was made?
 5        A.   I know that it, again, I don't have direct knowledge.
 6   I know that there was several things that were being
 7   investigated as far as her conduct and behavior that had come to
 8   light that the sheriff and the undersheriff made the decision
 9   that she no longer can be a member of the office and she was
10   terminated.
11        Q.   What sort of issues with her conduct were being
12   investigated as far as you know?
13        A.   As far as I know, there was falsified records within
14   her file.  Orders that she gave to subordinate officers to
15   destroy records within her file that she was being -- had -- had
16   been reported to the district attorney's office under her
17   Brady -- under the Brady Law, she was gonna be receiving a Brady
18   Letter, very serious.  All of that.  Led to her eventual
19   dismissal from the office.
20        Q.   Okay.  Any other conduct that, as far as you know, was
21   the reason she was fired?
22        A.   Conduct?  Other than, as anyone in those positions,
23   captain and above, myself included, we worked at the pleasure of
24   the sheriff.  And, quite frankly, it was made very, very clear
25   to me the day I was offered the job as a captain, that I could
```

Kevin Duffy
September 19, 2022

1  to me with a termination saying that someone is being

2  terminated, they don't have to give me a justification or a

3  reason.  I take them that they had full justification to take

4  the action that they did.

5       Q.   Did you ever recommend that Ms. Kluth be terminated

6  to --

7       A.   Me, personally?

8       Q.   Yeah.

9       A.   No.

10      Q.   And you mentioned your meetings with Undersheriff

11 Walcher about both Ms. Kluth and Captain Jensen, right?

12      A.   Correct.

13      Q.   How are those connected, in your mind, to her

14 termination?

15      A.   I don't know if they're connected.  I know that

16 the --there was conflict.  There was behavior by two executive

17 officers or captains that is not conducive to what the

18 undersheriff expects of men and women of that rank and the level

19 of experience.  We are placed in these positions for a reason.

20 But we have -- but we're held to a high standard of how we're

21 supposed to maintain ourselves and act.  And if we don't meet

22 them standards or we fail to meet those standards, the sheriff

23 undersheriff are full within the right to terminate us.

24      Q.   So you said that the captains, Captain Kluth and

25 Captain Jensen were not meeting the standard that Undersheriff

Kevin Duffy
September 19, 2022

1    Q.   So you didn't bring up any concerns?

2    A.   I don't know how many times I can answer this.  I

3    don't recall bringing up any specific concerns other than the

4    concerns that I had as far as her limited experience on patrol,

5    which I'm -- I knew that the sheriff and the undersheriff as --

6    were aware of as well.

7    Q.   And other than the concern about her limited

8    experience, did you have any concerns about her staying on as

9    the sole captain in patrol?

10   A.   I think for myself, my only concern was her ability to

11   be accepted by the patrol officers, by the patrol lieutenants as

12   a -- as a very commanding officer.

13   Q.   Any other concerns?

14   A.   Lack of experience within the patrol division, lack of

15   trust and --and acceptance by the people that she's in command

16   of.  That is enough.

17   Q.   Any other concerns?

18   A.   Not that I can recall.

19   Q.   Let's look at Exhibit 31, if you would turn to that,

20   please?  This document has been previously marked as Exhibit 31

21   has Bates numbers is DCSO 2374, 2379.  Do you recognize this?

22   A.   I do.

23   Q.   You wrote this?

24   A.   I did.

25   Q.   What is it?

Kevin Duffy
September 19, 2022

1     A.   Basically, when Captain Domenico came to me and told

2  me that it had come up in a deposition that I had notes and logs

3  on Captain Nicholson-Kluth and that I needed to turn those over,

4  that was the first time that it ever came to my attention.  I

5  didn't have daily logs, as it was expressed to

6  Captain Domenico's email to me that I had daily logs.  I didn't

7  have daily logs.  I don't think anybody keeps daily logs other

8  people.  So what I did was I went through the period of time

9  when Captain Nicholson-Kluth was the captain of patrol under my

10 command and went back through my -- all my emails, went back

11 through all my calendars and pulled up various -- all my -- not

12 every email, but just emails that I thought pertained to what

13 was presented as far as performance issues.  And -- so once I

14 put all those together, then I drafted what I call a synopsis of

15 what I was giving to Captain Domenico.  This was -- this was

16 more when I wrote this, I wrote this fairly quickly, kind of an

17 overall synopsis of the time that Captain Nicholson-Kluth was

18 patrol captain for me.

19     Q.   So -- so -- so you were approached by Captain Domenico

20 to turn over documents you had on Ms. Kluth?

21     A.   He sent an email saying that it come up in a

22 deposition that I kept daily logs and that I needed sign these

23 daily logs and turn them over.

24     Q.   And what's your -- why do you think someone would have

25 thought that you have daily logs on Captain Kluth?

Kevin Duffy
September 19, 2022

```
 1              (Exhibit No. 55 marked for identification)
 2   BY MR. BOHNET-GOMEZ:
 3        Q.   You've been handed a document labeled Exhibit 55.
 4   I'll represent to you that this is a screenshot of the actual
 5   Word version of Exhibit 31 that we were provided.  And it
 6   contains some of the metadata imbedded in the file.  Do you see
 7   that?
 8        A.   Yeah.  I -- this -- this (inaudible).  I don't know
 9   what this is, but.
10        Q.   So you see sort of at the top, it has DCSO 2796,
11   examples of conflict with Captain Nicholson-Kluth.  Is that the
12   file name that you chose for the document that is Exhibit 31?
13        A.   It could be.
14        Q.   Okay.  And do you see on the right-hand side of the
15   page in Exhibit 55, there is a -- a kind of a section titled
16   properties with a number of -- of information there?
17        A.   Okay.
18        Q.   And do you see at the bottom there, you are the
19   author, Kevin D. Duffy.  That's you, right?
20        A.   Yes.
21        Q.   And then, sort of in the middle of that column,
22   there's a date and time for created --
23        A.   Okay.
24        Q.   Of May 10th, 2022 at 11:38 a.m.?
25        A.   Yes.
```

Kevin Duffy
September 19, 2022

1        Q.    is that when you began working on the document that is

2   Exhibit 31?

3        A.    I believe that's about the time frame.

4        Q.    And then you see there's a field it says last printed,

5   and it has a date and time of May 10th, 2022 at 4:46 p.m.?

6        A.    Okay.

7        Q.    And it also has a total editing time for this document

8   of 314 minutes.  Does that sort of comport with your

9   recollection of when you stopped working on the document and --

10  and how long you worked on it?

11       A.    On the original?

12       Q.    Yes.

13       A.    I think so.

14       Q.    In other words, you worked on it for a little over

15  five hours that day and finished it also on May 10th, 2022?

16       A.    I don't know if I worked on it for five hours.  It

17  was --I would say it could've been opened on my computer for

18  that time.  I don't think that this (inaudible) document took me

19  five hours.  But, again, this was done, I thought for Captain

20  Domenico, to kinda put a perspective of the pile of emails and

21  calendar events that I was giving him to just kinda highlight in

22  there some of the areas that we're concerning for me.

23       Q.    Okay.  But in --in any case, May 10th, 2022 is also

24  around when you finished the work on the document that is

25  Exhibit 31?

Kevin Duffy
September 19, 2022

1      Q.    So his request was just for the daily log, as you put

2  it, correct?

3      A.    Correct.

4      Q.    Why did you decide to write a synopsis?

5      A.    'Cause there was -- 'cause when I went back and

6  confirmed daily logs, he was -- he was confused as well, and I

7  explained, I don't have daily logs.  I said, I have meeting

8  notes and I have emails and such, and so he just, he said, yeah,

9  both of those.  Put them all togeth -- get it all and send them

10  to me.  I'm like, okay.  So I did.  And then, with a fairly

11  large stack of both, I then decided to kind of write a synopsis

12  for Captain Domenico of what I was given him, of some of the

13  things that I felt were more in line of what he was asking for.

14      Q.    The file name that we were provided is there in

15  Exhibit 54, and it's examples of conflict with Captain

16  Nicholson-Kluth.

17      A.    Exhibit 55, you mean?

18      Q.    Exhibit 55.  Excuse me.  So is that your understanding

19  of what you were being asked for, is to find examples of

20  conflict with Captain Kluth?

21      A.    No.  That was my word.  That was my interpretation of

22  what I was giving him.  That was -- I had to -- when you save a

23  file, you've gotta name it something.  So I just clicked in

24  examples of conflict.  I don't know.  That's just the words I

25  chose.

Kevin Duffy
September 19, 2022

1    Q.    And then Exhibit 31, so at the top you write about a

2    third of the way down the page, I've outlined some examples of

3    my supervision challenges and conflicts with Captain

4    Nicholson-Kluth and Captain Jensen.  Is that your understanding

5    of --of what you were being asked to do?

6    A.    That was my understanding of what I was providing them

7    was conflicts that I had with both captains.

8    Q.    And other than Captain Domenico, did you speak to

9    anyone else about this request or your process in providing

10   these documents?

11   A.    I did.

12   Q.    Who?

13   A.    Sheriff.

14   Q.    And when did you talk to him about that?

15   A.    Pretty much right after Captain Domenico sent me the

16   email.  I was confused.  Captain Domenico said he thought that

17   it was something that the sheriff might have, that I'd kept

18   daily logs.  So I went to the sheriff just to clarify that I

19   didn't have daily logs.  And that was pretty much it.  I

20   explained to him, I said, I have emails and I have meeting

21   notes.  And he looked at me 'cause he, again, knows me and has

22   been to, you know, hundreds of meetings with me.  I think that's

23   what he meant by daily logs.  And I think we clarified that.  So

24   I just wanted to make sure I was on the right page of meeting

25   notes and emails.

Kevin Duffy
September 19, 2022

```
 1              MR. O'CONNELL:  Objection to form.

 2              THE WITNESS:  There's dates in here with certain

 3  incidences or certain discussions or meetings that were had that

 4  I highlighted for Captain Domenico to review.

 5  BY MR. BOHNET-GOMEZ:

 6      Q.   Is it fair to say, though, that the -- the focus of

 7  Exhibit 31 is just identifying conflicts and challenges with

 8  Captain Kluth?

 9      A.   Yes.

10      Q.   It was not meant to be an overall assessment of her

11  performance?

12      A.   That's correct.

13      Q.   Did you ever discuss with Chief Johnson who was also

14  asked to put together a similar set of documents?

15      A.   No.

16      Q.   Let's go through some of the specifics here.  If I

17  could have you turn to Exhibit 29.  Page 2386.  And these are

18  your meeting notes of a Nove -- November 23rd, 2020 meeting with

19  Ms. Kluth?

20      A.   It was a meeting she -- I believe she sat with me.

21  This was a meeting with Chief Duffy.  But yeah, she's the

22  organizer of the meeting.

23      Q.   And then it has some notes that I presume are your

24  notes?

25      A.   Yeah.  She had these three basic questions.
```

Kevin Duffy
September 19, 2022

1   investigations would be notified as well.  It's kinda doubled up

2   my workload because I end up getting called twice.

3          The captain on patrol will call me first and say, hey,

4   we got a death of a 30-year-old, patrol's doing this and this.

5   We're calling out the investigations division.  And then 15

6   minutes later, I get another call from the captain of

7   investigations saying, hey, we're calling out investigators.

8   I'm okay with that, because in the course of that time, I learn

9   information.  But -- so she wanted to know if we were going

10  to -- if she was gonna have to be on call as we did it in the

11  past, which means she was gonna have to take calls for things

12  that would normally be handled by investigations.  So I wrote it

13  down 'cause I wanted to bring this up again to the executive

14  officers.  She also wanted to know about --

15      Q.   Well, let me -- let me stop you --

16      A.   Okay.

17      Q.   -- before we get on a different topic.  So -- so do I

18  understand you correctly that you also had questions about

19  whether the on-call command system was gonna continue to be

20  used?

21      A.   I had questions of whether or not it was the most

22  efficient way to do things, and whether or not we really needed

23  to do to do because we had a whole rotating cal -- of on ca --

24  of who the on-call commander was, and it was confusing at times.

25  So she brought it up.  I wrote, you know, my perception was she

Kevin Duffy
September 19, 2022

1  certainly didn't want to be on call 'cause she was coming from

2  that undersheriff, she wasn't on-call.  As the undersheriff, you

3  would get called on major things, but she would not get called

4  nearly as much as a captain.  So I --

5      Q.   Did she say to you that she didn't want to be on call?

6      A.   I didn't -- I -- I don't recall her saying she didn't

7  want to be on call, but I could tell she didn't want -- she

8  wasn't excited about the idea.  Nobody wants to have to give up

9  a whole week.

10     Q.   And that was an assumption you made is that she didn't

11 wanna be on call?

12     A.   Yeah.

13     Q.   Did -- did you communicate that on to anyone else?

14     A.   I did.

15     Q.   Who?

16     A.   The executive officers.

17     Q.   Okay.

18     A.   Not onto her specific, but just to talk about the

19 on-call command system, and my belief that we needed to change

20 it.

21     Q.   I see.  So you never told the executive officers that

22 Ms. Kluth was asking to not be on call?

23     A.   No.

24     Q.   Okay.  You just raised some general questions and

25 concerns about the on-call --

Kevin Duffy
September 19, 2022

1      A.   I believe I brought it back to the executive team that

2 it's come up.  The question's been asked again.  I've asked it

3 myself when I was a captain, and now I'm chief.  I can ask it

4 again.  And this being the chief, I thought they'd listen to me

5 more, and they did.  And we changed.

6      Q.   Okay.  So you brought up -- what you brought up to the

7 executive team relating to the on-call command system was the

8 same concern that you had had?

9      A.   Yeah.  Let's just get rid of it.

10      Q.   And --

11      A.   Just call the -- just call the captains direct.

12      Q.   And that was what went into effect?

13      A.   That's what happened.

14      Q.   And that was the only thing about this that you

15 brought up to the executive, correct?

16      A.   Correct.

17      Q.   Okay.  Well, we've been going for a little while and,

18 frankly, we'll be going for a while, so why don't we take a

19 break.

20           THE REPORTER:  Okay.  Time is 4:16 --

21           (Off the record at 4:16 p.m.)

22           (On the record at 4:34 p.m.)

23           THE REPORTER:  It's 4:34, and you're back on record.

24 //

25 BY MR. BOHNET-GOMEZ:

Kevin Duffy
September 19, 2022

1    Q.   Okay, Chief Duffy, we took a break just now.  Before

2  that, we were talking about questions that Ms. Kluth and -- and

3  you had about the on-call command system.  Do you recall that?

4    A.   I do.

5    Q.   And I asked you if you had reported and what you had

6  reported to the sheriff's office executive team.  Do you recall

7  that?

8    A.   I do.

9    Q.   Just wanna kind of define who that executive team is.

10    A.   That'd be the sheriff, the undersheriff, myself, and

11  Chief Johnson.

12    Q.   Okay.  So I'm gonna ask you, you know, going forward

13  about the executive team.  So when I say the executive team,

14  understand that I'm referring to any of those individuals.

15    A.   Okay.

16    Q.   So turning back to Exhibit 29, I believe you still

17  have in front of you on page DCSO 2386.  Do you see that?

18    A.   I do.

19    Q.   So -- so we talked about -- there's three bullet

20  points there.  We talked about the on-call command one just now,

21  right?  And the second one is UMFCL.  That's also referred to as

22  the crime lab, correct?

23    A.   Correct.

24    Q.   So this meeting note says she will send me everything

25  that she has so I can take over her spot on the UMFCL Board as

Kevin Duffy
September 19, 2022

1   the sheriff's designee, right?

2       A.   Correct.

3       Q.   So as of November 23rd, 2020, Ms. Kluth was going to

4   send you all that she had on the crime lab board so that you

5   could take over; is that a fair summary?

6       A.   Correct.

7       Q.   And any issues with respect to your assuming that

8   position?

9       A.   No issues.  The only concern I had that I needed to

10  clarify what the sheriff is, prior to her demotion, she was the

11  designee for the sheriff on the board for the crime lab, and I

12  was a member of the consortium.  There's three command officers,

13  one from each of the major departments.

14          So I would go to a consortium meetings once a month,

15  the board would meet once a quarter.  I'd go to that as well,

16  but I wouldn't sit with the board.  I sit in -- in the cheap

17  seats.  Holly was the designee.  She set up on the board

18  meetings.  She set up the agenda.  She worked with the board to

19  put the board meetings together every quarter.  So with her

20  movement to patrol as a captain, I was to take over as now as

21  the law enforcement bureau chief as the designee for the sheriff

22  on the board.  So I took over her duties, putting the board

23  together and that kind of stuff.

24          So I had to get all that from her.  And then the only

25  thing I need to clarify with the sheriff is that he want me to

Kevin Duffy
September 19, 2022

```
 1    so continue on as my role as a consortium for up until about a
 2    week ago, I did both.
 3        Q.    Okay.  And did -- did Ms. Kluth provide you with
 4    everything you needed for that?
 5        A.    She did.
 6        Q.    And there weren't any issues with -- with you moving
 7    into that role, as far as you recall?
 8        A.    No.
 9        Q.    And you would have reported any issues or conflicts to
10    the executive team about the crime lab board?
11        A.    Issues with the board?
12        Q.    Issues with your moving into the role?
13        A.    No.  Just let them know that I was taking over as the
14    designee for the sheriff on the board (inaudible).
15        Q.    Okay.  So -- so other than informing the executive
16    team that you're moving into the new role, you wouldn't have
17    reported anything else about it --
18        A.    No.
19        Q.    -- to them?  And you did not report to them that
20    Ms. Kluth objected to your assignment on the board?
21        A.    No.
22        Q.    And you did not report to the executive team that
23    Ms. Kluth insisted that she should continue to coordinate to the
24    crime lab board meetings?
25        A.    No.
```

Kevin Duffy
September 19, 2022

```
 1      Q.   Is that -- would not have been accurate?

 2      A.   Yeah.  I don't recall her ever objecting.

 3      Q.   Okay.  Let me have you turn back to -- well, let me

 4  just ask you, are you familiar with the term nonexempt and

 5  exempt as it relates to employees?

 6      A.   Nonexempt or exempt or essential and nonessential,

 7  yeah.

 8      Q.   Are those all same, or do they have distinctions?

 9      A.   I think they're the same.

10      Q.   Okay.  What do you recall -- well, let me have you

11  turn first to page 2390 of Exhibit 29.  You see the second entry

12  on the bottom, says captains on patrol being reclassified as

13  essential.  Sheriff said no.  See that?

14      A.   I do.

15      Q.   What do you recall about this discussion?

16      A.   I recall -- can we go back to 29?

17      Q.   Yep.

18      A.   Page 2386.  The last bullet you forgot to mention

19  here.  Captain Nicholson-Kluth asked if the two captains on

20  patrol could be moved to a 4/10 schedule working an A side and a

21  B side and also we reclassified essential.  That was the

22  quest -- the question made to me.  That's not the decision I can

23  make.  I could make a decision on A side, B side and time.  But

24  as far as essential and nonessential, that's a decision only the

25  sheriff can make.  A nonessential employee, which is what
```

Kevin Duffy
September 19, 2022

1          A.    Correct.

2          Q.    So you were on board with -- with her idea to -- to do

3     this training?

4          A.    Yes.

5          Q.    Was there any sort of issue in how she put together

6     the -- the training or anything else related to the training?

7          A.    With this particular email, this is when she brought

8     it to my attention.  She went -- she was asking my approval to

9     coordinate training for the supervisors for the various programs

10    such as Axon, Guardian Trainer (sic), Blueteam, et cetera, the

11    different types of formats we use, and that she bel -- she

12    believed and from what she was hearing, that a lot of people

13    didn't understand the -- the software and she didn't believe

14    that they were using the software to its full potential and

15    either due to absent or, excuse me, ina -- inadequate training.

16    And so she had already talked to several supervisors about this,

17    and she had ways of -- or ideas where they could save a lot of

18    time and stuff.

19          So she was forwarding me this email basically asking

20    if she could coordinate training for the supervisors on this

21    program, she cc'd Captain Jensen, which is a good communication.

22    She's keeping everybody in the loop.  And I on 100 percent

23    agreed with her what she was asking to do.  I thought it was a

24    great idea.

25          Q.    So it says in there she wants to have a group session

Kevin Duffy
September 19, 2022

 1  with patrol supervisors and IT and professional standard folks.

 2  Do you see that?

 3      A.   Yep.

 4      Q.   And she's coordinating with Captain Jensen --

 5      A.   Yep.

 6      Q.   -- it looks like.  So this -- this to you is an

 7  example of good communication and looping everyone in?

 8      A.   Yes.

 9      Q.   So it would not be accurate to say that she refused to

10  include other captains in the meetings about the training?

11      A.   On this one?

12      Q.   Yeah.

13      A.   That would be accurate.  She was -- she was including

14  Captain Jensen in this.

15      Q.   So it would be inaccurate to say that she refused to

16  include?

17      A.   Yes.

18      Q.   Or any of the other captains?

19      A.   Well, she only was including Captain Jensen.  I can't

20  speak for she didn't include Captain McCarty or Captain Weekly

21  or -- so two other captains within the law enforcement bureau.

22  But I took this as she was focusing more on patrol.

23      Q.   So you would not have reported to the executive team

24  any issues with this?

25      A.   This?  No.

Kevin Duffy
September 19, 2022

1  the executive staff, or at least with the three of us about if

2  we could go back to normal policy.  We were all in agreement

3  that we could.  So it was really a nonissue from -- from my

4  standpoint.  But I think Captain Nicholson-Cook -- Kluth took

5  exception to it that she wasn't involved in the decision-making

6  on this one.

7       Q.   Other than these emails we have here, do you recall

8  any discussion with anyone on the executive team about it?

9       A.   I don't know if it was the executive team.  But like I

10 said, it was just the sheriff, the undersheriff, and I talked

11 about it since this was affecting the patrol division.

12      Q.   Do you recall talking about it with the undersheriff

13 and sheriff?

14      A.   I do.

15      Q.   What did you talk about?

16      A.   Whether or not we should go back to allowing officers

17 to wear their beards.  And both the sheriff, the undersheriff,

18 and I all agreed that we didn't see a problem with it and they

19 could go back to wearing beards now.

20      Q.   Any other discussion with them about the beard policy?

21      A.   No.

22      Q.   Did you to discuss with them Ms. Kluth's January 24th

23 email about whether she should've been the one -- or she and

24 Captain Jensen, should've been the one to send out the decision

25 of the policy?

Kevin Duffy
September 19, 2022

1    A.   I think the undersheriff addressed it and I didn't

2  need to.

3    Q.   So you didn't discuss it with anyone?

4    A.   No.

5    Q.   And -- and then you said from your perspective, it was

6  a non-issue?

7    A.   Non-issue.

8    Q.   Okay.  Go ahead and turn to page DCSO 2476 of this

9  exhibit.  Do you have that in front of you?

10    A.   I do.

11    Q.   So this is a email chain with you and Ms. Kluth and

12  Undersheriff Walcher about a DU leadership training; is that

13  right?

14    A.   It is.

15    Q.   And the -- the January 25th email at the bottom of

16  this page reflects that Captain Jensen and Ms. Kluth chose

17  Lieutenant Lorie Brawner to attend that training?

18    A.   Yes.

19    Q.   Did you discuss this with anyone on the leadership

20  team?

21    A.   I did.

22    Q.   What was that discussion?

23    A.   The undersheriff is a big believer in higher education

24  of going to things like these types of leadership trainings.  So

25  he wanted it put out to all the captains to go and select a

Kevin Duffy
September 19, 2022

1  value mean?

2       A.   Written guidance of what they mean?  No.  Not guidance

3  for what they mean.  I think our entire policy manual is written

4  in a manner to strive to meet our mission, vision, and values.

5       Q.   So the entire policy manual --

6       A.   Supports our mission.

7       Q.   -- is content to what the mission, vision, values are?

8       A.   That -- I'd say yes.

9       Q.   So if someone says to an employee, you failed to

10  support the mission, vision, and values, that could refer to any

11  number of sheriff's policies?

12      A.   It can -- it can refer to a content of behaviors that

13  brought discredit to that employee.

14      Q.   So it's kind of fair to say that mission, vision, and

15  values is the -- the -- the highest level, most broad expression

16  of the sheriff's office policies?

17      A.   I wouldn't say it's the highest level.  I'd say it's

18  the foundation.  If I ever had a supervisor or someone above me

19  or even a colleague of mine believe that I wasn't meeting the

20  mission, vision, and values of this office, that would be

21  devastating.  That would mean I'm failing.

22      Q.   Would you know how you failed if someone told you

23  that?

24      A.   It would most likely be documented in my supervisor

25  documentation of my evaluations.