1   texts that are on -42, right?

2       A     Yes.

3       Q     Now, the second text to Moore, in which

4   you state, "And maybe he can put a little" -- then

5   there appears to be an asterisk -- "under the

6   pictures and say from Douglas County Sheriff's

7   website."

8             What exactly are you referencing there?

9       A     I was referencing the pictures.

10      Q     Okay.  And why were you asking --  Or

11  why were you thinking about perhaps him putting a

12  little asterisk under the pictures?

13      A     Because he made some comment that he

14  was going to get the pictures off of the website,

15  and I wasn't really comfortable with that.  This

16  was really just a brief discussion about this.  I

17  was off duty.  I was at home.  I was recovering

18  from wrist surgery, and this was some

19  back-and-forth that went on.  But I was not

20  comfortable with our pictures being in uniform.

21      Q     Uh-huh.  Now, it's hard for me to make

22  out who's identified in those pictures.  It's

23  yourself, Moore --  Is that Brad Heyden?

24      A     Heyden, Jensen and Weekly.

25      Q     Okay.  Heyden, Jensen and Weekly.  All

1      A      -- of the Monday, November 16th memo to

2   me.

3      Q      So Exhibit 5?

4      A      Yes.

5      Q      What do you mean by "the tone"?

6      A      Well, I'll have to go through that.

7      Q      If you would, please.

8      A      Uh-huh.  When it says, "You were

9   contacted by a representative from a third party

10  entity to use your position of the Douglas County

11  Sheriff's Office to influence your subordinates to

12  vote in a particular manner" -- or "influence your

13  subordinates to vote in a particular manner,

14  recruit others to do likewise, and publicly pledge

15  support in direct contradiction to my positions

16  and public statements," that was not my intention.

17            "While you were fully aware your

18  actions would have the effect of publicly

19  undermining my authority" --  I didn't consider

20  that it would undermine his authority.

21            "You secretly engaged" -- I think

22  that's stated here -- and I wasn't necessarily

23  secretly engaging.  I was trying to get ahold of

24  him to talk about it.  I didn't see it as publicly

25  discrediting him.  I didn't --  And I think that's

1   mentioned here, that I intentionally directed

2   Chief Moore -- I think that's in this one -- how

3   to communicate.  I "facilitated and assisted Moore

4   with acquiring 'quotes' from my command staff."  I

5   didn't facilitate or assist him acquiring quotes.

6           I don't believe I abused my authority by

7   asserting my position and influence over employees

8   under my direct command.  And then I think I talk

9   about the Hatch Act situation, that we didn't

10  discuss that.

11          That's it.

12     Q    All right.  So let's take those in

13  order.  You began by reading the first sentence

14  of the paragraph of Exhibit 5 which begins,

15  "While serving as my appointed Undersheriff,"

16  right?

17     A    Yes.

18     Q    Is your disagreement with that portion

19  of Exhibit 5 included in Exhibit 6?

20     A    I don't think so.  "From a third party

21  entity to use your position . . . to influence

22  subordinates" --  Maybe I did put that.  It states

23  it here, but it's --  I think this one

24  (indicating) is referring to this bullet on Page 2

25  of 5, where it kind of reiterates that same

1    Exhibit 5 that is not contained within your memo,

2    Exhibit 6, is that second -- is that first bullet

3    point on the second page, which begins, "You

4    intentionally withheld from me that you were not

5    only facilitating but supervising."

6              Do you see that?

7       A    Yes.

8       Q    All right.  Sheriff Spurlock had no

9    idea that you were in contact with Chief Moore

10   about providing these quotes to Stu Parker, right?

11      A    That's true.

12      Q    Why didn't you tell him?

13      A    Well, there was a couple reasons.  I --

14   This happened while I was home on light duty -- or

15   not light duty, but on leave.  It happened over a

16   period of 24 to 36 hours, maybe.  And as soon as I

17   started seeing what they were putting together and

18   had had the discussions with Chief Moore, I

19   started asking him to meet.  I needed to talk to

20   him.  I wanted to talk to him about it.

21             He was very busy during those two days

22   with media interviews, out of cell coverage at

23   Sprucewood Mountain and other things --  I believe

24   I contacted him two or three times asking to talk.

25   We finally didn't talk until Thursday morning.  So

1      Q      Well, what about the portion of the

2   clause that states "violations of Office Policy

3   and Procedures"?

4      A      At the time, I didn't feel that there

5   was an office policy and procedure violation.

6      Q      Despite the fact that you knew he was

7   speaking to other members of command staff about

8   providing quotes to Parker?

9      A      In their personal capacity.

10      Q      But you knew that Moore was doing that

11   while at least partially -- or at times on duty,

12   right?

13      A      Yes.

14      Q      Okay.  But you don't believe that that

15   is an occasion of Moore demonstrating laxity in

16   the performance of his duty or that such conduct

17   violated office policies and procedures?

18      A      No.

19      Q      Sitting here today, almost two years

20   later, do you believe that Moore seeking or

21   inquiring about other command staff members

22   providing these statements is, in fact, violating

23   office policy and procedure?

24      A      Not from a personal perspective.

25   There --  And he also told me that he took

1   vacation time to do that.  If he was contacting

2   them as a captain of the DCGOP, then he was

3   contacting them from their perspective of DCGOP,

4   not as a subordinate.

5        Q    Well, to the extent he was contacting

6   any member of the sheriff's office, who either

7   directly or indirectly reported to him, while on

8   duty about providing a political statement, that's

9   a clear violation of policy and procedure, right?

10       A    Not necessarily.

11       Q    Why do you say that?

12       A    Because in the course of being an

13  exempt employee, conversations aren't --  Duty

14  isn't 8:00 to 5:00.  Duty is 24/7.  And do you

15  have --  You know, do you have conversations about

16  politics at work?  Yes.  We did for many, many

17  years with at least three of the sheriffs that I

18  worked with, as well as Tim.

19            The fact that he told me he took

20  vacation time to have those conversations and he

21  was doing it as a representative of the DCGOP, I

22  didn't feel, at that time, that that was a

23  violation of policy.  And I didn't feel that --  I

24  did not think I needed to stop him from that.

25       Q    Then why did you tell him to make sure

1    that Captain Jensen knew --

2        A    Because --

3        Q    -- he wasn't -- hold on.  Let me

4    finish, ma'am -- that he wasn't doing it --  And I

5    can't remember exactly what your concern was with

6    Jensen.  Can you just refresh my memory there?

7        A    Sure.  Captain Jensen had had some

8    disciplinary issues, and his wife had, that Tim

9    was involved in.  I wanted to make sure that he

10   knew --  After he told me that he had been talking

11   to him, I told him, "Make sure he knows this is

12   not related to work and is off duty; that it is

13   not a supervisor/subordinate discussion."

14       Q    Right.  Thank you.  Why did you tell

15   him that, then?

16       A    What do you mean?

17       Q    If you weren't concerned at all with

18   Moore's conduct, why did you make sure to tell

19   Moore that?

20       A    I wanted to make sure that Jim didn't

21   claim that.

22       Q    Okay.  All right.  Let's --  We'll take

23   a break here in a moment, but let's just wrap this

24   up first.

25            So the last policy that you admitted to

1    violating in Exhibit 6 was the "Internet Social

2    Networking and Personal Websites" policy.  Do you

3    believe that your conduct violated that policy?

4         A    I think the --  I really didn't feel it

5    was against policy.  I took it down because the

6    sheriff was upset about it.

7         Q    Well, let me direct your attention to

8    DCSO -164, because that --

9         A    Which one?  Okay.

10        Q    I'm just pointing it out here

11   (indicating)?

12        A    -164?

13        Q    Yeah.  It begins, "The Sheriff's Office

14   expects employees to use common sense when posting

15   on any social media site."

16        A    Uh-huh.

17        Q    So do you believe that your post to

18   your Facebook account was an exercise of

19   commonsense?

20        A    It was a personal statement of

21   political feeling.

22        Q    So the answer is yes, you do believe

23   you were exercising commonsense?

24        A    Yes.

25        Q    Okay.  So the bottom line here is that

1    despite admitting in Exhibit 6 --

2        A      Uh-huh.

3        Q      -- to violating all five of the

4    policies we just went through, at the time you

5    made such an admission, you didn't actually

6    believe it?

7        A      That's true.

8        Q      Okay.  And as you sit here today, it

9    sounds like maybe the only policy that you believe

10   you may have violated was the Exercising

11   Discretion policy?

12               MR. CRON:  Objection, form

13       A      Can you ask the question again?

14       Q      (By Mr. O'Connell)  Yeah.  As you sit

15   here today -- and feel free to correct me -- I've

16   understood your testimony to be that you believe

17   perhaps your conduct violated -- may have violated

18   the Exercising Discretion policy; is that right?

19               MR. CRON:  Same objection to form.

20       A      I wish I would have known that it would

21   upset the sheriff.

22       Q      (By Mr. O'Connell)  Okay.  So is that a

23   yes or a no?

24       A      Can you ask the question again?

25       Q      Yeah.  We went through, over the past

1   15 minutes, you know, all of these various

2   policies you admitted to violating, but now you're

3   walking that back.  I asked you specifically about

4   the Exercising Discretion policy and the fact that

5   it requires all members of the office to rely on

6   good judgment.

7        A    Uh-huh.

8        Q    And I --  And I believe your testimony

9   was that you're not sure if your conduct violated

10  that policy -- is that right? -- as you sit here

11  today?

12       A    I don't remember if that's what I said,

13  but I believe that the post, because it upset the

14  sheriff, that I would have done it differently.

15            MR. CRON:  I didn't get the chance to

16  put my objection in, but I would, again, object to

17  the question on the same grounds.

18       Q    (By Mr. O'Connell)  All right.  So the

19  answer is you don't know -- that as you sit here

20  today, you don't know whether your conduct

21  violated that policy or not?

22            And I'm not trying to be difficult.  I

23  just want to make sure I understand.

24       A    I don't believe that it did, but I can

25  see where it would be --  I'll just say that

1    policies, in general, they're not black and white.

2    It's not exactly what the policy says that

3    happens, and you can make things fit if you want.

4    I just want to clarify that although I made a

5    comment that I admit to all the policy violations,

6    there was -- in my opinion, there was no point in

7    appealing them and nitpicking through this and

8    saying, "I didn't think this would upset you.  I

9    didn't think this was the way it was."  And so

10   that's why I put that I admit those.

11            At this point, looking through them and

12   looking through the actual verbiage of them, I

13   felt like I didn't violate the policies, but I

14   felt it was futile to -- to dispute them.

15   Q    Well, you could have denied violating

16   the policies and still not appealed, right?

17   A    I could have, but maybe that would have

18   made him madder.  And that is --  And that

19   happened to Captain Jensen, to my understanding,

20   is that he appealed his discipline where he was

21   going to be demoted, and he appealed it to the

22   undersheriff, and the undersheriff fired him.

23            So that was my experience in -- and

24   that's happened before.  It's happened before in

25   the sheriff's office that people have been -- have

1    appealed a discipline and then gotten worse

2    discipline.  I didn't want to upset the sheriff

3    anymore.

4        Q    So is it your testimony that you were

5    fearful that had you appealed the discipline to

6    the sheriff, he may have been so upset because you

7    appealed it that he may have converted your

8    demotion to termination?

9        A    I don't know.  I'm just saying I didn't

10   want to make him madder.

11       Q    Did you have any role in drafting

12   and/or revising the five policies that you

13   admitted to violating in Exhibit 6?

14       A    I'm not sure.  Let me look.

15           MR. CRON:  I'm going to object to form.

16       Q    (By Mr. O'Connell)  And after the

17   break, Ms. Kluth, I can show you each of the

18   policies if that would assist you in answering.

19       A    Sure.  Yeah.  I may have had some --  I

20   can't recall, to be honest with you.

21           MR. O'CONNELL:  Okay.  All right.

22   Let's take a 10-minute break.

23           (Recess from 11:03 a.m. to 11:24 a.m.)

24       Q    (By Mr. O'Connell)  Are you ready to

25   start again, Ms. Kluth?

1          Is that fair?

2          MR. CRON:  Objection to form.

3     A     That question doesn't make sense.  My

4     conduct, obviously, resulted in consequences.

5     Q     (By Mr. O'Connell)  Okay.  Well, maybe

6     it didn't make sense.  That wouldn't be the first

7     time a lawyer's question didn't make sense; that's

8     for sure.

9          The only -- Again, just to reiterate

10    so that I'm perfectly clear where you stand, the

11    only thing you think you did wrong with respect to

12    this whole Stu Parker quote, this whole Facebook

13    statement, was making him upset.  You'll own the

14    fact that those actions made Sheriff Spurlock

15    upset; is that right?

16    A     Absolutely.

17    Q     Okay.  But, again, just to reiterate,

18    you don't believe your conduct violated any

19    specific DCSO policies and procedures, right?

20    A     I believe that the policies can be -- a

21    lot of things could fit into those policies, and

22    there's really a lot of discretion as to whether

23    or not someone's found sustained on a policy.  And

24    when I look at the detail of the specific wording

25    of the policy, I don't honestly feel like I

```
 1   violated the policies.

 2        Q      Okay.  Any of the policies?

 3        A      Yeah.

 4               (Exhibit 8 marked.)

 5        Q      (By Mr. O'Connell)  You've been handed

 6   Exhibit 8 --

 7        A      Uh-huh.

 8        Q      -- DCSO -144, a memo from Sheriff

 9   Spurlock to you dated December 10, 2020.  And

10   you've obviously seen this before, correct?

11        A      Uh-huh.

12        Q      Is that a yes?

13        A      Yes.

14        Q      Okay.  Did you respond to this

15   memorandum in writing?

16        A      No.

17        Q      Did you respond orally in any sense?

18   In other words, did you --

19        A      I don't believe so.

20        Q      -- respond in a conversation with the

21   sheriff?

22        A      I don't believe so.

23        Q      Are there any inaccuracies in this

24   memorandum?  And if there are, please point them

25   out.
```

1    demoted or not.  I just know the timing of it.

2         Q     Okay.  So you don't have any evidence

3    that there's any type of causal connection?

4         A     I don't have any evidence.

5         Q     When you were assigned to captain of --

6    Well, strike that.

7               Who was in the position of captain of

8    detentions immediately prior to you assuming that

9    position?

10        A     Tim Moore.

11        Q     When you were moved -- or assigned

12   captain of detentions, where was Moore moved or

13   assigned to?

14        A     To the Foundation training Academy, the

15   Foundation building.

16        Q     Okay.  The training academy, is that

17   otherwise known as Highlands Ranch Law Enforcement

18   Training Academy?

19        A     Yes.

20        Q     Was that a new captain's position at

21   the training academy?

22        A     Yes.

23        Q     Now, I believe you've referenced here a

24   couple times this morning that you and Sheriff

25   Spurlock had some conversations about you having

1    to make a statement, as you refer to it in the

2    complaint, about distancing yourself from his

3    endorsement of Lisa Neal-Graves.

4              Is that accurate?

5       A    Yeah.

6       Q    How many conversations did you have

7    with the sheriff about that?

8       A    Maybe one or two.

9       Q    When was the first, if you recall?

10      A    I don't recall.

11      Q    Were there any witnesses to that

12   conversation other than the two of you?

13      A    I don't think so.

14      Q    Where did that conversation take place?

15      A    I believe one of them was in his

16   office, but I don't have a lot of recollection of

17   it.  I just remember us discussing it.

18      Q    What specifically do you recall the

19   sheriff stating?

20      A    What I told him?

21      Q    Well, yeah.  Let's just --  Let's take

22   it from the top, then.  What you told him.  What

23   he told you.  Let's start with what you told him.

24      A    Over the month or two before he made

25   it --  Sometime during the summer, maybe up until

*AB Litigation Services*

1    the time he made the endorsement, he told me a

2    couple times that he was thinking about doing it.

3    And I just remember saying, "You know I can't have

4    anything to do with that.  I'm thinking about

5    running for sheriff," or something along those

6    lines.  I --  And I don't really recall the words,

7    but something to the effect of "I would have to

8    make a statement personally that I didn't agree

9    with that."

10        Q     Okay.  What was the sheriff's reaction?

11        A     I felt like he understood.

12        Q     Well, how did you arrive at that

13   feeling?

14        A     I don't remember his words, but it

15   wasn't negative.

16        Q     Okay.  Well, was it positive?

17        A     It was --  It --  To me --  From what I

18   recollect, it was more of just, "Yeah, right.  I

19   understand," or something to that effect.

20        Q     Did he actually say that?

21        A     I don't remember the words.

22        Q     Okay.  Did you memorialize that

23   conversation at any time?

24        A     No.

25        Q     Now, that conversation or those

1     Q      -- because he publicly endorsed

2  Sheriff Spurlock's chosen candidate for

3  commissioner?

4     A      Yes.

5            MR. CRON:  Objection to form.

6     Q      (By Mr. O'Connell)  Okay.  Do you have

7  any evidence to support that belief?

8     A      Other than the timing of the post and

9  Duffy and his wife's agreement to do a public

10 post, I don't have any proof of that, no.

11    Q      Uh-huh.  And what relevance

12 specifically does the fact that the Tweet that was

13 liked by Mrs. Spurlock have?

14    A      It appeared to be a group kind of

15 feeling about, "Hey, we're supporting Lisa

16 Neal-Graves" Stacy, Tony, Chris Duffy and Kevin

17 Duffy.

18    Q      Who's Chris Duffy?

19    A      Kevin's wife.

20    Q      Okay.

21    A      And I get demoted --  So Tim and I get

22 demoted after talking with the Republican Party

23 and wanting to support conservative candidates,

24 and Kevin gets promoted after endorsing and being

25 pictured with his Lisa Neal-Graves endorsement.

1   exhibit, does this accurately capture your

2   conversations with Chief Duffy about this

3   incident?

4        A     I think it does.  I'll have to read it.

5        Q     Go ahead, please.

6        A     I would have to actually look at my

7   e-mails -- and I do have them, and I think they've

8   been turned over, actually -- to say if every word

9   here was accurate.

10       Q     Okay.

11       A     It's pretty accurate.

12       Q     There's been a lot of paper produced in

13  this case.  I may have that e-mail.  If I do, I'll

14  show it to you later.

15       A     Uh-huh.

16       Q     Okay.  So as you sit here today, is it

17  your belief that Chief Duffy somehow violated DCSO

18  policy and procedure by holding this meeting

19  without you being present?

20       A     This particular type of situation, I've

21  never seen happen before, where a supervisor of

22  another -- of a person would specifically exclude

23  them from a meeting of their subordinates.  I've

24  never seen that happen.  And so when he did that,

25  I said, you know, really, policy says chain of

1   command, unless it's urgent or an IA, you

2   should --  If it's information going up or down

3   the chain, it should be -- should be carried out

4   through the chain of command.

5           And I thought it was just extremely --

6   It was embarrassing, because he didn't even tell

7   me about the meeting.  He said --  He told my

8   subordinates, and then my subordinates were

9   telling me, "We're having a meeting with the

10  chief."  And I said, "I didn't know about it."  So

11  I asked him, "Can I be there?"  He said, "I'm

12  meeting with them privately."

13          "What are you meeting with my

14  subordinates privately about?  Is it about me?

15  Why can't I be there?"  I replied to him, and I

16  have the e-mail, "Respectfully, you know, I would

17  like to be there."

18          And he said he didn't need my approval

19  and -- and then said I was insubordinate.

20     Q     Did he need your approval --

21     A     I felt --

22     Q     -- according to policy?

23     A     I felt from the --  First of all, I

24  thought that it was just extremely unusual,

25  extremely detrimental to my ability to supervise

1    people if they thought that I should not be at a

2    meeting with them and the chief.  It was

3    disrespectful, I felt.  And I felt like it

4    violated chain of command for him to exclude me

5    from the meeting, but he had the secretary there.

6         Q     Okay.  And according to this entry, at

7    least he wanted the secretary to take notes.  And

8    according to this, Duffy instructed the secretary

9    to send you a copy of the notes as soon as the

10   meeting was over.

11            Was that done?

12        A     Yeah.

13        Q     What was the meeting about?

14        A     I don't have a copy of it anymore,

15   unfortunately, but it was very generic.  I --  I

16   don't know exactly.  I can't remember exactly what

17   was discussed, but it wasn't anything in

18   particular where I shouldn't be there.  It think

19   it was the point that he specifically excluded

20   me and I don't know why.

21        Q     So with respect to this sending an

22   e-mail directly to Spurlock or this encounter with

23   Chief Duffy about this meeting, were you formally

24   disciplined as a result of either?

25        A     This --  This is just supervisor notes.

*AB Litigation Services*

1      Q      Okay.  So you didn't receive a

2  reprimand, letter of counseling or anything of

3  such?

4      A      This is a written --  Not a formal

5  letter of reprimand.  This is more like a letter

6  of counseling.  It's --  It's --  It's a

7  discussion, a documentation.  Once we came up with

8  Guardian Tracker and we started putting these

9  types of things in there, it became more of a --

10  just a less formal form of letter of counseling.

11      Q      Okay.

12      A      It's just documenting it.

13      Q      So there was no tangible action as a

14  result of this?

15      A      No.

16      Q      In other words, your pay wasn't

17  affected or anything like that.

18      A      No.

19      Q      Okay.

20          MR. O'CONNELL:  Let's take a lunch

21  break.  Thank you.

22          (The deposition recessed at 12:49 p.m.,

23           to be reconvened at 1:30 p.m.)

24

25

```
 1        A      That's about right, yeah.

 2        Q      While you were reporting to Chief Duffy

 3   as a co-captain in patrol, did he establish an

 4   on-call command structure?

 5        A      Yes.

 6        Q      Did that generally apply to all

 7   captains?

 8        A      I don't know what the other captains

 9   were doing.  It was --  Things had changed.  We

10   normally rotated --  All the captains and chiefs

11   rotated and took a week at a time, but then

12   shortly before that, the sheriff decided that he

13   wanted people responsible for their own divisions

14   to be on-call for them.  I don't know what the

15   other captains were doing, but I believe our

16   on-call was Jim and I splitting the week.  So I

17   think I was on-call, like, Sunday through

18   Wednesday, and then he was on-call Wednesday night

19   through Sunday morning.

20        Q      What was your reaction to this

21   establishment of an on-call command structure?

22        A      It was what it was.

23        Q      Did you object or complain in any way

24   to --

25        A      I don't remember complaining about it.
```

1        Q      Let me just finish my question,

2    Ms. Kluth.

3        A      Sure.

4        Q      Did you object or complain to anybody

5    within the chain of command about that?

6        A      The only thing I asked for was Jim --

7    It appeared Jim was getting more --  He had the

8    on-call from Wednesday when he got off through

9    Sunday morning when I came on at 6:00 a.m.  I had

10   it Sunday morning when I came on until Wednesday

11   when I left.  It seemed he was getting more time

12   on-call, so I agreed to --  I think I was going to

13   take every other Wednesday for him.

14            Other than that, I don't recall any

15   conversations about the on-call schedule or

16   complaining about it.

17       Q      Okay.  Did you ever serve as the

18   sheriff's office representative for that -- for

19   the crime lab?

20       A      I was the --  I wasn't on the board,

21   but I was the coordinator of the agenda --  I'm

22   trying to think.  Was I the alternate for the

23   sheriff?  I don't --  I think I was --  I don't

24   remember if I was the alternate for the sheriff,

25   but I was the coordinator of the agenda and

1        Q       -- and your captains?

2                Did you ever speak to either the

3    sheriff or Duffy about scheduling matters for you

4    or other captains.

5        A       When I --  When the sheriff told me I

6    was going to patrol, I -- and we were going to do

7    A side B/side responsibilities, I asked him if I

8    could do A side.  At that time, we didn't know for

9    sure that it was going to be a Sunday through

10   Wednesday.  It was just that I would handle the

11   A side teams.

12       Q       Okay.  Is that the only conversation

13   you recall having with the sheriff or Chief Duffy

14   about scheduling?

15       A       Other than the changes that came after

16   that, yes, I believe so.

17       Q       Are --  While you were serving as a

18   captain in patrol -- co-captain in patrol, was it

19   your understanding that captain positions are

20   generally exempt from overtime?

21       A       Yes.

22       Q       Okay.  Could essential employees,

23   though --  Could an employee deemed essential

24   receive overtime even if otherwise exempt?

25       A       I don't think so.  I think it had --

1  You had to be --  Okay.  The way you worded that

2  may be confusing.  I was exempt.  Even if I was

3  essential, I would -- if I was exempt, I still

4  would not get overtime.

5      Q     So you were co-captain in control with

6  Jensen for two or three months, right?

7      A     Yeah.

8      Q     Describe, if you would, your working

9  relationship with Captain Jensen while you and he

10 had responsibility over patrol?

11     A     I actually felt like we had a better

12 relationship than we had for a long time.  I

13 specifically went in when I first went down there

14 and sat down with him.  I said, "I know we haven't

15 always agreed on things in the past."  And he knew

16 that we had had disagreements and I had, you know,

17 noted some supervisor notes on him and so forth.

18 So it was awkward, very awkward.

19         But I sat down with him and said,

20 "I know we haven't always agreed and we haven't

21 always, you know, been on the same page in the

22 past, but I want to make sure that we are here and

23 that we work well together."  And I --  We had a

24 good conversation about sharing information.  If

25 we were going to supervise this team and that

1   team, we all had to be on the same page -- we had

2   to be on the same page, he and I.

3              And so we had a good working

4   relationship.  I don't recall ever having any

5   major disagreements with him.  If we did, we

6   talked about it.  We agreed to copy each other on

7   e-mails; if one of us put out an e-mail to their

8   team, we'd copy the other one so we'd know what

9   was going on, so each side --  Because we only saw

10  each other one day a week when we were on Sunday

11  through Wednesday, and so there was one day to

12  catch up on stuff.  So I thought we had a good

13  working relationship.

14     Q     Do you and he share the same type of

15  management style?

16     A     I don't think so.  He's very black and

17  white, very non-emotional, non-personable.  I'm

18  more of a -- kind of an amiable type that likes

19  communication and likes to get on a personal level

20  with people.  But other than that, we agreed on

21  how to manage the patrol division.

22     Q     So you described Jensen as black and

23  white.  Is your management style more along the

24  lines of there are shades of gray within that

25  black and white?

1        A      There could be, yeah.

2        Q      While you were a co-captain in patrol,

3    did you have a Twitter account?

4        A      I did.

5        Q      Okay.  Did you actively post on Twitter

6    while you were co-captain in patrol?

7        A      Yes.

8        Q      If certain folks within the sheriff's

9    office have described you as engaging in a Twitter

10   war with Jensen while you were co-captains in

11   patrol, would you agree with that?

12       A      No.

13       Q      Why --  Why wouldn't you agree --

14       A      I have no --

15       Q      -- with that?

16       A      -- idea what that means.

17       Q      While you and Jensen were co-captains

18   in patrol, to your knowledge, was there any

19   tension within -- within the ranks of the patrol

20   deputies --

21       A      I don't --

22       Q      -- because of your management styles?

23       A      I wasn't aware of any.

24       Q      While you were a co-captain with Jensen

25   in patrol, did you ever express any criticisms of

1       A       No.

2       Q       While you were reporting to Chief Duffy

3   as a co-captain in patrol, did he task you with

4   reviewing and approving deputy pursuits?

5       A       Yes.  That was part of the captain's

6   job.

7       Q       Okay.  Did he give you specific

8   instructions related to that task?

9       A       I don't recall specific instructions to

10  that.

11      Q       To your knowledge, did you comply with

12  any instructions Duffy did give you about

13  reviewing and approving deputy pursuits while you

14  were co-captain in patrol?

15      A       To my knowledge I did.

16      Q       Do you recall any conversation with him

17  where he was critical of your review and approval?

18      A       There was one pursuit that was sent

19  through -- and I think it was Lieutenant Bronner,

20  and I approved it.  He came back with some

21  questions.  I sent it back to her.  There was some

22  time period before she actually got to it.  It had

23  actually --  Some of those get in the queue and it

24  takes a while to get them through all the

25  supervisors and then back again if there's

1    questions.  I don't recall there being any issue

2    afterwards.  I think her explanation of why she

3    made the decision she made was sufficient, and I

4    never heard anything more about it.

5         Q     Who's Lieutenant Bronner?

6         A     Lieutenant Bronner is a Lori Bronner.

7    She's a lieutenant in the office.

8         Q     How do you spell her last name?

9         A     B-r-o-n-n-e-r.

10        Q     So she --  At the time you were

11   co-captain in patrol, she was a lieutenant in

12   patrol?

13        A     Yes.

14        Q     Are you personal friends with

15   Lieutenant Bronner?

16        A     I am.

17        Q     Have you ever social- --  While you

18   were at the sheriff's office, did you ever

19   socialize with Lieutenant Bronner outside the

20   office?

21        A     Yes.

22        Q     What type of social activities did you

23   do?

24        A     Let's see here.  I'm trying to think

25   what we did.  We'd go to lunch, go to dinner.

1   they hadn't been done.  And I, at that time,

2   wondered what my bureau chief over law enforcement

3   had been doing all those years in not assuring

4   that these things were up to date.  So I felt like

5   I was really making a difference.

6            I was in this community meetings with

7   the mayor of Larkspur, with the city manager of

8   Castle Pines, going to their council meetings or

9   attending them on Zoom, and I just felt like I was

10  doing a really good job and making difference in

11  getting out there and representing the sheriff's

12  office well.  I was working on things with

13  reserves that they had complaints about, this and

14  that.  These were volunteers that were coming and

15  giving sometimes 40 hours a week of their time to

16  the sheriff's office, and in some ways they were

17  being ignored, and they were told they had to be

18  at training during hours they couldn't possibly be

19  at training because they worked.

20           And so I felt like I was making a

21  difference for them, for the citizens, for the

22  deputies, for the commanders.  And I felt like

23  that maybe I was -- that maybe the sheriff didn't

24  want me out in the community after I announced my

25  candidacy because that brought attention to me, I

1    was able to see people and so forth; that maybe he

2    wanted to bury me in the jail where I really

3    didn't have those outside meetings with cities and

4    towns and other quasi-government agencies; that I

5    was uncovering things that hadn't been done.

6              So that was just kind of my impression

7    when I got transferred to the jail.

8        Q     That's what your assumption was?

9        A     Yes.

10       Q     Did you ever acquire any independent

11   evidence to support that assumption?

12       A     No.

13       Q     On Kluth -1445, you identify a Bob

14   Sexton.  Who's Bob Sexton?

15       A     He's a district captain, I believe, in

16   Castle Pines.

17       Q     -1447 through -1471 are text between

18   you and Kevin Duffy, according to the disclosure

19   that accompanied these.  Take a look very quickly

20   at Kluth -1455.

21             MR. CRON:  Did you say -55?

22             MR. O'CONNELL:  Yes

23       Q     (By Mr. O'Connell)  Now, your texts are

24   on the right-hand side, correct?

25       A     I think so, yeah.

1    evaluations; that type of thing.

2         Q    Johnson never brought any of that to --

3         A    No.

4         Q    -- your attention when you were

5    undersheriff?

6         A    No.

7         Q    Now, when you moved over to detentions,

8    did you have to clean up any stuff in detentions?

9         A    Not as much, no.  I mean, I don't think

10   I had to clean up anything necessarily.

11        Q    All right.  And that's my terminology.

12   I mean, did you find detention as much of a mess

13   as it sounds like you found patrol?

14        A    I don't think patrol was a mess, but

15   there were definitely policy issues and some

16   evaluations -- or at least one evaluation --

17        Q    Okay.

18        A    -- and things like that.  It wasn't a

19   mess.  Patrol was running well, but there were

20   issues that should have been found by the captain.

21        Q    Understood.  You didn't find as many

22   issues with detentions -- in detentions when you

23   got there?

24        A    Right.

25        Q    Okay.  Now, I think before the break,

1   you testified that it's your subjective belief

2   that perhaps Sheriff Spurlock reassigned you from

3   patrol to detentions as a way of hiding you,

4   essentially, from the public, because he knew

5   you'd be running for sheriff; is that right?

6        A    I was running for sheriff.

7        Q    Okay.  And I understand that as

8   co-captain of patrol, you had a lot of -- you had

9   a fairly high public profile or you could make

10  yourself to have a fairly high public profile?

11       A    It was more than detentions, yes.

12       Q    All right.  Doesn't detentions, though,

13  have a lot of public-type programs that you could

14  have advised the public of?

15       A    I'm not sure what you're --

16       Q    Well, were there opportunities while

17  you were captain -- while you were a captain in

18  detentions to get out and inform the public about

19  what was going on?

20       A    Not necessarily about its detentions.

21  That wasn't really something you were out at

22  public meetings about.  I went to a couple --  I

23  think there were maybe two Douglas County

24  Republican Women meetings, but I believe those

25  were strictly as a candidate.  Yeah, I was going

1    as a candidate, so I wasn't representing the

2    sheriff's office.

3         Q    As detentions division captain, do you

4    have more interaction with the public -- with the

5    public than the support services division captain?

6         A    It's probably pretty similar.  There's

7    little -- little public contact.

8         Q    All right.  What is --  I'm looking at

9    an old org chart here.  What is RMRCFL?

10        A    Rocky Mountain Regional Computer

11   Laboratory.

12        Q    Okay.  And there was a captain assigned

13   to that, apparently, while you were a co-captain

14   in patrol?

15        A    Yes.

16        Q    Was that your understanding?

17        A    Yes.

18        Q    Okay.  Does the captain assigned to

19   RMRCFL have as much interaction or potential

20   interaction as the detentions division captain?

21        A    Probably about the same.  Very little

22   with the public.

23        Q    Okay.  I asked you some questions

24   earlier today about your failure to appeal your

25   termination.  The fact that you didn't get a

1   perfect?

2        A     As far as I knew --

3              MR. CRON:  Objection to form.

4        A     -- it was.

5              MR. O'CONNELL:  Okay.  I appreciate

6   your time today.  That's all I have.  Thank you

7   very much

8              THE DEPONENT:  Thank you.

9                     EXAMINATION

10  BY MR. CRON:

11       Q     I just have some brief follow-up.  When

12  you met with Sheriff Spurlock on May 25, 2021, did

13  you know what that meeting was to be about?

14       A     No.

15       Q     Did you have any inclination that you

16  were about to be terminated?

17       A     No.

18       Q     Had you received any warnings that you

19  might be terminated?

20       A     No.

21       Q     Did you receive --  Never mind.

22  Scratch that.

23              You testified earlier that

24  Sheriff Spurlock told you that nothing had

25  changed since the fall; is that correct?

1       A      Yes.

2       Q      And what did you interpret that

3    statement to mean?

4       A      That I was communicating with, hanging

5    around the Republican Party, pursuing conservative

6    interests.

7       Q      Why did you reach that conclusion?

8       A      Because I felt that's what got me in

9    trouble in the fall, was communicating with the

10   Republican Party and hanging out with them and

11   trying to make peace with them and . . .

12      Q      Did you interpret "the fall" being --

13   the "taking place in the fall" comment to relate

14   to your demotion and that IA investigation?

15      A      What do you mean?

16      Q      You said that you were talking

17   about your activities in the fall and talking with

18   the Republican Party.  Was that the same nucleus

19   of facts that led to your demotion from

20   undersheriff?

21      A      Yes.  I --  I was furthering my

22   community stance for conservative issues and

23   Republican Party values to the public, and that's

24   what I had been doing in the fall.

25      Q      Was there anything else that occurred

1   in the fall of 2020 that Sheriff Spurlock could

2   have been referring to?

3        A     I'm not aware of anything else.

4             MR. CRON:  Okay.  I've got no other

5   questions.

6             MR. O'CONNELL:  Hold on.  I may have a

7    couple follow-ups based on counsel's questions.

8                      EXAMINATION

9   BY MR. O'CONNELL:

10       Q     Counsel asked you a couple of

11  questions about, you know, what did you believe

12  Sheriff Spurlock was referring to when he

13  referenced "Nothing's changed from last fall."  I

14  asked you some questions about that, and you've

15  testified today as to what you believed he was

16  referring to, which was your subjective beliefs,

17  right?

18       A     (Deponent nodded head.)

19       Q     Within Exhibit 5 --  I'm sorry.  I

20  don't mean to --  This will be quick.  This is the

21  memo from Spurlock to you dated November 16, 2020.

22             THE REPORTER:  And they should be in

23  order.

24       Q     (By Mr. O'Connell)  There it is.  It's

25  the second page.