Philip Domenico  Non-Confidential
August 30, 2022

1      plaintiff, and the plaintiff is with us here today also.
2              MR. THAPA:  Saugat Thapa on behalf of the defendant.
3              THE REPORTER:  Thank you.  Will the witness please say
4      and spell your first name for the record.
5              THE WITNESS:  Philip Domenico, P-h-i-l-i-p.
6              THE REPORTER:  Would you spell your last name as well,
7      sir.
8              THE WITNESS:  D-o-m-e-n-i-c-o.
9              THE REPORTER:  Thank you.  Will the -- the witness has
10     presented his government-issued identification, State of
11     Colorado.
12             Will you please raise your right hand.  Do you
13     solemnly swear or affirm that the testimony that you are
14     about to give in this matter will be the truth, the whole
15     truth, and nothing but the truth?
16             THE WITNESS:  I do.
17             THE REPORTER:  Thank you.
18     You may proceed, Counsel.
19                           EXAMINATION
20  BY MR. CRON:
21     Q.   What is your current position, Mr. Domenico?
22     A.   I'm the captain of the Highlands Ranch Division of the
23  Douglas County Sheriff's Office.
24     Q.   When did you become the captain?
25     A.   I believe it's August 21st was my date of rank,

1   just -- just this past August 21st.
2        Q.   Oh, okay.  So just about two weeks ago or so?
3        A.   Yeah, yeah, very recently.
4        Q.   And what position were you before that?
5        A.   I was the lieutenant commander for the Internal
6   Affairs Division.
7        Q.   So is that a promotion to captain?
8        A.   Yes, it is.
9        Q.   Congratulations.
10       A.   Thank you.
11       Q.   How long were you the commander of the Internal
12  Affairs --
13       A.   As the lieutenant, I was there for right about two
14  years, but I was also there as a sergeant investigator for about
15  a year and a half before that.
16       Q.   Have you ever been deposed before?
17       A.   Yes, I have.
18       Q.   How many times have you been deposed?
19       A.   Twice that I can recall.
20       Q.   Can you tell me what those two occasions were?
21       A.   Once was when I was working at the Douglas County --
22  or excuse me, at the Jefferson County Sheriff's Office, and it
23  was in a use of force case.  I was a captain at the time, and
24  one of the guys who worked for me -- the office was being sued,
25  and as the captain of the division, I was -- I was deposed by

1    Q.   Okay.  The question that I had asked prior was, why
2  tell an employee what they need to do to improve their
3  performance?
4    A.   As I had stated, we all want people who do well in
5  their job as a professional organization, so they can't correct
6  it if we don't tell them that it needs to be corrected.
7    Q.   Would you agree that sometimes an employee might not
8  know what they're doing is not meeting expectations if they're
9  not told?
10   A.   In some circumstances, yes.
11   Q.   Let's go to Exhibit 37.  Exhibit 37 is personnel files
12 in reference to Guardian Tracker on KLUTH 561 to 563; do you see
13 that?
14   A.   Yes, sir, I'm sorry.
15   Q.   Okay.  Now I'm going to ask you some questions in your
16 30(b)(6) capacity, and this is -- relates to Topic 2H.
17        What's the purpose of this Guardian Tracker tracking
18 policy?
19   A.   We keep a lot of documents within this electronic
20 database, Guardian Tracking, so this policy would speak to some
21 of that.
22   Q.   What kind of documents would you place into Guardian
23 Tracker?
24   A.   Evaluations would go in there, the personnel file of
25 somebody, like their application would be in there.  If a

Philip Domenico  Non-Confidential
August 30, 2022

1  supervisor makes some kind of a log entry, whether that be
2  positive or negative, that would be in there.  I think we would
3  put in their personnel action forms; you know, whenever there
4  was a pay adjustment, it gets put into Guardian Tracking.  I
5  guess I could look at it and tell you more things.
6      Q.   Well, let me ask you a couple of questions about what
7  you've already said.
8           What's a supervisor log entry?
9      A.   So if somebody does something that's either noteworthy
10 or -- or if you want to -- if they did something that you want
11 to bring to their attention as an expectation for improvement,
12 you can go into the Guardian Tracking and put a narrative in
13 there, and then they get a chance to see that and respond to it,
14 and then people within that individual's chain of command can
15 also see that entry and respond to it as well.
16     Q.   So if an entry is in Guardian Tracker, does that
17 suggest that it is noteworthy in some manner?
18     A.   Yes.
19     Q.   Do -- are most -- are noteworthy performance issues
20 supposed to be documented via a supervisor log entry?
21          MR. THAPA:  Object to form.  You may answer.
22          THE WITNESS:  So your question as it states is, are
23      they supposed to be in there?  So the answer is, no, that's
24      up to the individual supervisor, what they would put in
25      there.

```
 1  than a Guardian Tracking entry.
 2       Q.   What process would that trigger?
 3       A.   Whether it would be a personnel comment report, so a
 4  minor investigation, a minor administrative investigation, or
 5  whether it would necessitate an Internal Affairs investigation.
 6       Q.   Is a minor performance investigation, is that the
 7  P--PCR?
 8       A.   PCR, yes, sir.
 9       Q.   Okay.  What's a PCR investigation?
10       A.   For something that is of more of a minor nature,
11  something where the potential administrative sanction would be
12  within the purview of a sergeant or a lieutenant.  A major would
13  be beyond that, so the administrative sanction would be more
14  severe.
15       Q.   So other than a criminal matter or a policy violation
16  that results in an Internal Affairs investigation or a PCR
17  investigation, it'd be the custom and the practice of the
18  Sheriff's Office to document noteworthy performance issues in
19  Guardian Tracking?
20       A.   Yes, that's correct.
21            MR. CRON:  Would you please mark this, I believe,
22       Exhibit 45.
23            THE REPORTER:  Yes.
24            (Plaintiff's Exhibit 45 was marked for
25       identification.)
```

1  A.   He presented a set of facts, and those decisions were
2  reserved for -- for the sheriff, as is the construct -- and I
3  know that because of the documents that he later tendered.
4  Q.   So the sheriff made the decision that the conduct --
5  A.   Based upon Lynn's report, he made a decision of what
6  the conduct en -- entailed; in this case, that policies were
7  violated.
8  Q.   And hadn't that decision already been made prior to
9  this investigation?
10 A.   I don't know.  I -- you'd have to ask the sheriff.  I
11 don't know.
12 Q.   Well, I'm asking you in your capacity as the Sheriff's
13 Office.
14 A.   No.
15 Q.   The decision had not been made that Ms. Kluth had
16 violated policy?
17 A.   Not until the investigation gets done.
18 Q.   You testified earlier that under Sheriff's Office
19 policy and practice, the investigator determines whether a
20 policy has been violated, right?
21 A.   Correct.
22 Q.   So why was that process not followed in this case?
23 A.   This was an extraordinary circumstance; I hadn't seen
24 it in my tenure in there, and, quite frankly, I don't know when
25 the last time something like that actually did happen at the

1  Sheriff's Office, that you brought in an outside investigator to
2  conduct an investigation.  So to answer your question of why it
3  didn't follow our normal construct, it was an abnormal
4  situation; it involved the second highest ranking person in the
5  office so...
6     Q.   You -- the Sheriff's Office provided Mr. Johnson with
7  copies of its policies, right?
8     A.   There -- yes, yes, he would have looked at those; I'm
9  sure he did.
10    Q.   So why was he not asked to make the determination as
11 to whether policy had actually been violated?
12    A.   I don't know.
13    Q.   The reason that you-- did the Sheriff's Office pay Mr.
14 Johnson for his services?
15    A.   I don't know; I would have to assume they did.
16    Q.   Okay.  So the reason that, you know, the Sheriff's
17 Office would hire Mr. Johnson or retain Mr. Johnson to perform
18 this service is to conduct a fair, thorough, and --
19    A.   Impartial investigation.
20    Q.   -- impartial investigation, right?
21    A.   Correct.
22    Q.   And to also avoid the appearance of impropriety,
23 right?
24    A.   Correct.
25    Q.   Or the appearance of impartialness, correct?

1  A. Correct.
2  Q. And yet, do you have any explanation as to why the
3 Sheriff's Office did not task Mr. Johnson with making a
4 determination as to whether a policy violation occurred to
5 further that impart -- appearance of impartiality?
6  A. I don't know; I don't know what conversations may have
7 been had with that. I would not have been party to that.
8  Q. Do you think that would have been wise?
9  A. That I was party to that?
10  Q. No, sorry.
11  A. Oh.
12  Q. In your personal capacity, do you think it would have
13 been wise for Mr. Johnson to have made a determination as to
14 whether policy violations occurred?
15  A. There's a part of me that can understand that --
16 that that would have been reserved for the sheriff. I think
17 that Lynn could have certainly have done that. To the extent
18 that there was a conversation there, I don't know, I don't know.
19 I don't know if he was asked not to do that or if there was some
20 kind of an agreement or conversation about that. I don't know.
21  Q. You weren't party to any conversation --
22  A. Not about that stuff, no.
23  Q. Can you think of any other IA investigation where the
24 investigator did not make a determination regarding whether a
25 policy violation had occurred?

1    A.   Within the office, we have always done that.  This
2  was, like I said, an extraordinary event, and I hadn't been
3  party to something like this in the past.
4    Q.   Can you think of any IA investigation that has
5  occurred where the sheriff had made a decision that a policy
6  violation had occurred prior to the commence-- commencement of
7  the investigation?
8         MR. THAPA:  Object to form.  You may answer.
9         THE WITNESS:  No.
10 BY MR. CRON:
11   Q.   Can you think of any situation where IA has begin an
12 investigation after a member's superior has already determined
13 that a policy violation occurred?
14   A.   I don't -- it's just -- the way the question is
15 stated, I -- we always start an investigation because there is
16 something that is going on where there may be a policy
17 violation; that's why we start it.  So, yes, people -- a chief
18 deputy will be informed by a captain that somebody did
19 something, and it's like, oh, that's a problem, that's against
20 our policy.  So IA's role is to vet that out, what exactly
21 happened, did that happen the way that we -- that it's being
22 initially reported.  Because sometimes we'll have a case that
23 it's reported to us, and as we start to get in it, it didn't
24 even happen that way, like the information that came back isn't
25 even accurate.

1  policy violations were sustained, right?
2    A.   Well, they-- they were sustained by the sheriff on a
3  51% preponderance of the evidence, so his opinion is that it did
4  do that.
5    Q.   So his opinion is that Ms. Kluth's Facebook post did
6  bring discredit on the office?
7    A.   Right.
8    Q.   And as far as the Sheriff's Office is aware, the
9  internet, social networking policy violation is based solely on
10 Ms. Kluth's Facebook post, right?
11    A.   I'm trying to remember the investigation -- I believe
12 that's it, because I don't believe that other thing ever got
13 posted.
14    Q.   And by virtue of the sustained policy violation, the
15 Sheriff's Office's position is that Ms. Kluth's Facebook post
16 did bring discredit on the office?
17    A.   Correct.
18    Q.   Did her Facebook post violate the Sheriff's Office
19 policy in any other way?
20    A.   Back to these policy violations, it could fall under
21 exercising discretion or on an off-duty conduct as well.
22    Q.   And I'm -- I'm talking specifically about how did
23 it -- did Ms. Kluth's Facebook post, which formed the -- which
24 was the only internet or social media activity that violated
25 this policy, internet, social networking, and personal websites,

1  did her Facebook post violate this policy in any other way than
2  bringing discredit to the office?
3      A.   Well, I'd have to look real quick because I don't--
4  you'll have to forgive me, but I don't know the policy that well
5  to be able to know all the intricate parts of it.  No, I don't
6  think -- I don't believe so.
7      Q.   And the internet, social networking policy violation
8  formed part of the basis for the discipline that Ms. Kluth
9  received in Exhibit 5, right?
10     A.   I mean, that's a better question for the undersheriff;
11 if he decided what the discipline was going to be.  I don't -- I
12 don't know.  I don't -- you're asking me to make a determination
13 on his discipline being all of this, one of this, none of this;
14 I don't --
15     Q.   You said the undersheriff; you mean the sheriff,
16 right?
17     A.   Oh, I'm sorry, did I say --
18     Q.   I think you said the undersheriff, yeah.
19     A.   Then I misspoke, it was -- it's the sheriff.
20     Q.   As the designee of the Sheriff's Office on this topic,
21 you can't tell me whether the internet, social networking,
22 personal websites sustained policy violation played a part in
23 the discipline Ms. Kluth received?
24     A.   It does, because he says in here, after reviewing all
25 information, so it does.

1	A.	It's that people don't use their position in the
2	Sheriff's Office to -- to prop up somebody else's, you know --
3	to prop up a candidate while they're on duty or while they're
4	wearing their uniform.
5	Q.	When you said prop up, are you speaking about to other
6	members of the Sheriff's Office or members of the civilian
7	population?
8	A.	Both.
9	Q.	Members are allowed to engage in political activity
10	off duty if they're not in uniform, correct?
11	A.	Correct?
12	Q.	Let's talk about -- well, can members belong to
13	political parties?
14	A.	Yes.
15	Q.	Can members engage in political activity off duty with
16	other members?
17	A.	Correct.
18	Q.	They can?
19	A.	Yes, they can.
20	Q.	Can members talk about politics while on duty with
21	each other?
22	A.	To the extent that it doesn't interfere with what
23	they're doing.  You know, if two people are talking about they
24	saw the union of the -- or the state of the union address the
25	night before and they're talking about it, I don't see that as a

1 against Ms. Kluth in the recent primarily for sheriff, right?

2      A.   Correct.

3      Q.   If Mr. McCarty had expressed his support in that
4 LinkedIn post for Ms. Kluth, would that have posed any problems?

5      A.   In its construct that you showed me, no.

6      Q.   Wouldn't that have exposed a rift between Mr. McCarty
7 and the sheriff?

8      A.   Not in that construct, no.

9      Q.   Why not?

10     A.   This is somebody who is engaging in conduct with
11 people on duty as it pertains to some political things, but at
12 the same time, taking people away from what they're doing at
13 work, that is somebody who puts something on a LinkedIn page;
14 it's two separate and completely different circumstances.

15     Q.   You and I talked about Ms. Kluth talking with people
16 on duty at work, but I believe that we were talking about the
17 Facebook post specifically.

18     A.   Okay.

19     Q.   And maybe I got confused; did the Facebook post itself
20 violate this exercising discretion clause?

21     A.   You could make an argument that -- that it could.

22     Q.   Well, I'm not making the argument, the Douglas County
23 Sheriff's Office sustained a policy violation under exercise and
24 discretion, and as the 30(b)(6) representative of the Sheriff's
25 Office, I'm asking the office what Ms. Kluth did to earn a

1  sustained exercising discretion policy violation.
2     A.  It serves to show the community that she is not in
3  lockstep with the sheriff.  Regardless of who she's supporting,
4  in doing it in the manner that she does it shows that there's a
5  rift there.
6     Q.  And that was because of the Facebook, correct?
7     A.  Yes.
8     Q.  Okay.  Other than -- because the discussions between
9  Mr. Moore and Ms. Kluth, those were never public, right?
10    A.  I don't believe so.
11        MR. THAPA:  Object to form.
12        MR. CRON:
13    Q.  And that pamphlet that was in the works was never
14  publicly disseminated, right?
15    A.  Beyond the DC GOP, I don't believe so.
16    Q.  And is it your understanding that the entire DC GOP
17  observed that pamphlet?
18    A.  I don't know, I don't know.
19    Q.  Who made the pamphlet?
20    A.  I'm not sure.
21    Q.  Is it your understanding -- is it the office's
22  understanding that Ms. Kluth and/or Mr. Moor made the pamphlet?
23    A.  I don't believe so, I think it was made under their
24  consultation by the DC GOP.  They had --  they had --
25    Q.  So the DC GOP made the pamphlet, correct?

1     A.   That specifically, no.
2     Q.   Why does that -- why is Mr. Moore's actions of
3  coordinating with or asking other members to write letters
4  different than coordinating what items to bring to a public
5  lunch?
6     A.   Because it is specifically geared for political
7  activity, which is against the policy.
8     Q.   Isn't attending -- isn't, you know, talking about what
9  items to bring to a lunch also political activity in a sense?
10    A.   No.
11    Q.   Why not?
12    A.   Because on one hand, we're talking about what side
13 dish to bring, and on the other hand, we're talking about
14 writing letters on duty for political activity; it's two
15 separate things.
16    Q.   Were the -- is it your -- did Mr. Moore order any
17 person to write a letter on behalf of the DC GOP?
18    A.   To my knowledge, no, but I -- I wasn't there when he's
19 having the conversations; I don't know.
20    Q.   No-- to your knowledge, no member said that they felt
21 unduly pressured to write a letter?
22    A.   To my knowledge, no.
23    Q.   Is there any evidence in the record that any member
24 was unduly pressured to write letters?
25    A.   To my knowledge no.

1      Q.    And what's your understanding as to why she was
2  terminated?
3      A.    At the time, I did not know why.
4      Q.    Did you have any speculation at the time?
5      A.    She must have done something that got her terminated.
6      Q.    Something big?
7      A.    Most probably.
8      Q.    Why -- why did you assume that she had done something
9  big to be terminated?
10     A.    Because she got terminated, so it's reasonable to
11 assume that if somebody gets fired, that they did something
12 which precipitated that.
13     Q.    You were still in IA at the time, right?
14     A.    I was.
15     Q.    At that time, were there any pending IA investigations
16 into Ms. Kluth?
17     A.    No.
18     Q.    Were you surprised that she was -- had been terminated
19 when there was no IA complaints or investigations into Ms.
20 Kluth?
21     A.    It was interesting to me because I -- because there
22 was nothing going on in IA as it pertains to Ms. Kluth, so yes,
23 I -- I was surprised by it.
24     Q.    Do most Sheriff's Office employees who get terminated
25 have an IA issue?

1    A.    In most cases, yes.

2    Q.    Other than Ms. Kluth, can you think of any Sheriff's
3 employees Office -- Sheriff's Office employees who have been
4 terminated when there's no IA investigation on --

5    A.    Not--not that I'm aware.

6    Q.    That's part of the reason you were surprised to --

7    A.    Yes, sir.

8    Q.    You stated that you didn't now the basis for her
9 termination at the time; what's your understanding of the reason
10 she was fired sitting here today?

11   A.    As a result of being involved in gathering stuff for
12 this litigation, the sheriff is -- I've seen written down that
13 she wasn't supporting his mission and values.

14   Q.    What does that mean to you?

15   A.    That she was not in concert with his vision for the
16 office in what she was doing with her actions.  That's more for
17 him to give you all the details about that.

18   Q.    As an employee of the Sheriff's Office, does learning
19 that Ms. Kluth was fired for not supporting his vision, mission,
20 and values provide you with that any information as to what
21 conduct she engaged in?

22   A.    No.

23   Q.    Are you aware of any other investigation into Ms.
24 Kluth other than an IA such as a PCR?

25   A.    Prior to --

1     Q.   Prior to her termination.

2     A.   No.

3          MR. CRON:  Okay.  Let's take a short break.

4          (Off the record at 3:55 p.m.)

5          (On the record at 4:12 p.m.)

6          (Plaintiff's Exhibit 50 was marked for

7  identification.)

8  BY MR. CRON:

9     Q.   All right.  Captain Domenico, I'm showing a document

10 that's Bates stamped 863 to 898; do you recognize this document?

11    A.   Yes, sir.

12    Q.   This is the -- your investigation report for the

13 21IA024, correct?

14    A.   Yes, sir.

15    Q.   All right.  What's the deal with the dates on the

16 front page?

17    A.   So the April 17th is the -- is the date of when the

18 record deletion -- when she would have first looked at the file,

19 at her Guardian Tracker file for the record deletion, and then

20 July 31st is the second time that she looked at her file.  So

21 the audit trail, those are the dates off that audit trail.

22    Q.   I had assumed that the dates of the investigation

23 were-- so it should really be the date of the incident then,

24 right?

25    A.   You could say that.  I always why use the dates of