# DECLARATION OF JAMES JENSEN

1. I, James Jensen, am over the age of 18 and am otherwise competent to testify. I make the following statements based upon my personal knowledge, and if called upon to testify as to them, I could and would do so truthfully and competently.

2. This declaration is made voluntarily. I understand that it may be used in a lawsuit. I have not been promised any benefit, coerced, or threatened in any way that would change my testimony.

3. I am currently employed as the Chief of Police for the Keenesburg Police Department.

4. Holly Kluth and I are not friends, and we never were. We were co-workers and nothing more. Sometimes there was some friction between us. But I respected her professionally and got along with her professionally.

5. Our working relationship during the time that we were both working together as captains on patrol was the best that it had ever been. We worked together well, and without conflict.

6. It's completely untrue that Holly and I were not getting along as Patrol Captains, or that there was some sort of problem between us. It would surprise me if anyone claimed that.

7. I am not aware of any conflicts or tension between Holly and myself during the time we were both Patrol Captains. As far as I know, Holly did not criticize my management style.

8. I am not aware of anything that would even remotely support the statement that Holly "instigated continuous conflicts with Captain Jensen, criticizing his management style in an adversarial nature, which resulted in tension and disruption within the Patrol division and hindered its operations."

9. Holly and I worked different sides of the week. So, there were days when she was there and I wasn't and vice versa. That structure can result in some of its own little conflicts built in, just because one of us isn't aware what the other one is doing, or there is some operational disruption because of the lack of continuity. But that is a structural problem inherent in having two Patrol Captains.

10. Holly and I met shortly after we were informed we would both be working together as Patrol Captains. I think we both felt like one or both of us were being set up by Sheriff Spurlock, because of the very unusual command structure.

11. In the entire history of the Douglas County Sheriff's Office—and in most police and sheriff's offices around the country—you have one person who's in charge of a division. You don't share that responsibility. It's awkward, and logistically and operationally atypical, to say the least. It may be impossible to effectively divide the

command of the Patrol Division like that. Based on my experience, it was a strange and obviously unwise decision to have co-captains in Patrol.

12.     So, at the outset Holly and I discussed the structural issues with having co-captains in Patrol, and how we would need to work together closely to make it work. And that's what we did. We worked together well.

13.     My working relationship with Kevin Duffy was tenuous. I had a history with him, including a time I had to discipline his son for a Title VII sex-related complaint. For almost two years after that, he wouldn't even talk to me. Duffy and I weren't getting along very well at all during the time Holly and I were Captains in Patrol.

14.     I only recall one instance where I received feedback that Holly and I were not communicating effectively, or were in conflict, or anything to that effect. It was an email from Kevin Duffy that claimed Holly and I were sending conflicting messages regarding some training that Holly was helping organize.

15.     Aside from that one instance, I do not remember anyone ever saying that Holly and I were in conflict or needed to communicate better.

16.     No one ever told me there was any issue with my tweets, or that I was in a "Twitter war" with Holly. I do not recall any coaching or feedback regarding tweets.

17.     I recall that Holly and I nominated Lt. Lori Bronner for a leadership training. Favoritism didn't have anything to do with it. It was just luck of the draw. Lt. Bronner happened to be the most available and the most deserving of that training.

18.     I didn't particularly like Holly personally but respected her professionally. From what I observed some of the command staff liked her personally, and some didn't. But Holly was generally professionally respected. I never saw an instance where she was unable to get along with someone such that it would impair anyone's job duties.

19.     Before signing this declaration, I was provided an opportunity to change and correct it. I have made all changes necessary to make this declaration a true statement describing my own experiences.

I, James Jensen, declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23 day of September 2022.

_____
James Jensen