Steve Johnson
September 23, 2022

1           The sheriff asked me if I would come onboard

2     as a chief deputy, and I did.

3           Q.   And you remained in the position of chief of

4     the law enforcement bureau until November 2020; is

5     that right?

6           A.   Yes.

7           Q.   And then you were transferred to the

8     Administrative Services division as the chief of that

9     division?

10          A.   Yes.

11          Q.   And that was your final position with the

12    agency?

13          A.   Yes.

14          Q.   So as chief deputy for the law enforcement

15    bureau, who did you report to?

16          A.   My direct report was to Undersheriff

17    Nicholson-Kluth.

18          Q.   And then after you transfer to the

19    Administrative Services division, who did you report

20    to?

21          A.   Undersheriff Walcher.

22          Q.   You mentioned that you had known Sheriff

23    Spurlock your entire career essentially; is that

24    right?

25          A.   Yes, sir.

Steve Johnson
September 23, 2022

1      A.   Yes.

2      Q.   Do you know why the change was made to go

3   back to one patrol captain?

4      A.   No.

5      Q.   It's fair to say that when you were chief of

6   the detentions division, you did not concern yourself

7   with what was going on any more than the law

8   enforcement bureau here at Douglas?

9      A.   Unless it impacted with the detention

10  services bureau, no.

11     Q.   And we talked a bit about the time that

12  Ms. Kluth was transferred from patrol division to the

13  detentions division.  Do you recall that?

14     A.   Yes.

15     Q.   And again, as far as you know, that occurred

16  in late February or early March 2021?

17     A.   Yes.

18     Q.   When did you first learn about the transfer?

19     A.   As an executive command, we sat down and

20  went through at the sheriff's direction some changes

21  that were going to be made, that he was going to be

22  making and asked for our input as to who should go

23  where.

24     Q.   And what input did you provide relating to

25  who should be captain at the detentions division?

Steve Johnson
September 23, 2022

1       A.   I didn't have any input other than the fact

2   that, you know, I told the sheriff and the

3   undersheriff at the time that I would welcome

4   Captain -- then Captain Kluth to my division.  I had

5   given a little bit more input as to who I felt should

6   go to a newly created position and that was captain of

7   the academy.

8       Q.   And that position was filled eventually by

9   Tim Moore?

10      A.   Correct.

11      Q.   What was your input about that transfer?

12      A.   Tim Moore had done a lot of work and -- in

13  his position as the chief, he was working directly and

14  had responsibility for the academy.

15           And certainly, with respect to Ms. Kluth, I

16  thought that at the time since it was a new position

17  that the sheriff wanted a captain out there at the

18  academy that Tim -- Tim Moore could assimilate into

19  that position quicker than Ms. Kluth.

20           Again, I say that respectfully to her.  But

21  it was just his direct dealings as a chief with the

22  academy, the academy staff, the law enforcement

23  training academy board.

24      Q.   So fair to say you felt that his experience

25  and skills made him particularly well suited for the

Steve Johnson
September 23, 2022

1        A.    I don't.

2        Q.    And Joel would be referring to Joel White?

3        A.    Yes.

4        Q.    And is it your understanding that after

5    this, he was promoted to lieutenant?

6        A.    Yes.

7        Q.    Okay.  So fair to say that unauthorized

8    credit card purchase, that issue did not prevent him

9    from being promoted?

10        A.    Not that I know of.

11        Q.    If I could have you turn to page Kluth 1613.

12    Do you see the text messages dated March 4th, 2021 on

13    this page?

14        A.    I do.

15        Q.    You're communicating with Ms. Kluth about

16    moving her office; is that right?

17        A.    Yes.

18        Q.    What do you recall that -- what this was

19    about?

20        A.    Captain Moore moving out of his office,

21    moving to the academy and giving Captain Kluth the

22    opportunity to move into her office which was the

23    captain's office in detentions.

24        Q.    So at this point, Ms. Kluth was not able to

25    move?

Steve Johnson
September 23, 2022

1    A.    No, she was not.

2    Q.    And that's because Captain Moore was still

3  occupying that office?

4    A.    That's correct.

5    Q.    And that's why she wrote here, no problem,

6  I'll move into his office as soon as he gets out?

7    A.    That's correct.

8    Q.    And then you reply, okay, I asked him to get

9  started with it as soon as possible.

10         Does that reflect that you spoke with

11  Captain Moore about the move?

12   A.    Yes.

13   Q.    What did you say to him?

14   A.    He needed to get moved.

15   Q.    Do you recall what he said?

16   A.    No.

17   Q.    Do you recall when he moved?

18   A.    I don't.

19   Q.    Did Ms. Kluth -- was she able to eventually

20  move into that office once he moved out?

21   A.    Yes.

22   Q.    Do you know how long after Captain Moore

23  moved out that she moved in?

24   A.    No.

25   Q.    It would not be accurate to say that

Steve Johnson
September 23, 2022

1    Ms. Kluth refused to move offices, would it?

2         A.   She never refused to do that with me.

3         Q.   She had to wait until Tim Moore moved, was

4    what she said?

5         A.   According to these text messages, yes.

6         Q.   And do you have an independent recollection

7    of the situation about moving offices?

8         A.   No.

9         Q.   It was not something that you were focused

10   on as chief?

11        A.   It was brought to my attention, and like any

12   other daily situational problem, I tried to say, you

13   know, hey, you got to get moved, to Tim Moore.  And

14   then, you know, and I don't know why I did it by text

15   with Ms. Kluth other than to maybe she wasn't there

16   and before I forgot, I wanted to make sure I sent her

17   something.  And I appreciate she sent a response.

18        Q.   Do you recall any verbal conversations with

19   Ms. Kluth about the office move?

20        A.   No.  There may have been, but I don't

21   recall.

22        Q.   And you specify you were being asked about

23   it and write here in your text that you were getting

24   requests about it.  Do you recall what those requests

25   were?

Steve Johnson
September 23, 2022

1   that it's been a formal approach.

2        Q.   So it depends on the individual supervisor's

3   practice?

4        A.   Yes.

5        Q.   What was your practice for entering

6   information into Guardian Tracking for your

7   subordinates?

8        A.   I would enter quite a bit, I felt, both in

9   the positive, you know, hopefully more in the positive

10  as to what they did and then also things that needed

11  to be documented.

12       Q.   So when you say you entered quite a bit,

13  what do you mean by that?

14       A.   I feel that over my eight-year tenure in the

15  Douglas County Sheriff's Office as a chief deputy, I

16  entered quite a bit into Guardian Tracker for

17  individuals.

18       Q.   So you would regularly document the

19  performance in Guardian Tracking?

20       A.   It wasn't just only performance.  It was if

21  there was something that they did that was in the

22  positive light, it would be my position that it needed

23  to be in Guardian Tracker.  If there was something

24  that people did collectively as a group, I would put

25  that whole group in there.

Steve Johnson
September 23, 2022

1          While I have the Administrative Services

2    Bureau, I instituted a -- a comments section for our

3    record clerk where you could scan a code, and you were

4    asked five questions.  And I received a response on

5    those five questions.  And every single one of those

6    responses that I got resulted in a Guardian Tracker

7    entry for the employee.

8          Q.   So you mentioned positive Guardian Tracking

9    documentation.  What frequency did you document any

10   negative issues for your subordinates in Guardian

11   Tracking?

12         A.   I wouldn't be able to give you a -- a

13   numeric value to that.  But if it was significant, I

14   would enter it into Guardian Tracker, and they would

15   receive Guardian Tracker or other documentation

16   discipline.

17         Q.   Contemporaneous with the underlying issues?

18         A.   Yes.

19         Q.   You didn't wait until the time when you had

20   to complete an annual evaluation, for example?

21         A.   No.

22         Q.   So it was your practice to try and keep

23   Guardian Tracking up to date, positives or negatives?

24         A.   Yes.

25         Q.   And how do you describe the threshold that

Steve Johnson
September 23, 2022

1    example, you do August 4th or around then?

2         A.   Yes.

3         Q.   And you're not sure when Ms. Kluth's would

4    have been?

5         A.   Not off the top of my head, no.

6         Q.   Did you ever evaluate Ms. Kluth?

7         A.   No.

8         Q.   So is it fair to assume that her evaluation

9    date did not fall during a period of time when you

10   were her supervisor?

11        A.   Yes.

12        Q.   Because otherwise, you would have completed

13   the evaluation; there was no reason not to?

14        A.   Yes.  Unless I missed it.

15        Q.   When someone at the sheriff's office is

16   transferred from one assignment to another, is a

17   transfer evaluation performed at that point?

18        A.    No.  Unless it is a promotion, and then they

19   survey a period of time where they receive a quarterly

20   evaluation, or they should receive a quarterly

21   evaluation based on that promotion.

22        Q.   Is that the same as a probationary status?

23        A.   I don't think that it is.  The quarterly

24   evaluation is more to give the employee feedback as to

25   the core areas and how they're doing and, you know,

Steve Johnson
September 23, 2022

1    Q.   So in one of those ways, the evaluation

2    would be -- are joined together by the supervisors?

3    A.   It should.

4    Q.   Did any steps to doing that ever take place

5    with respect to an evaluation for Ms. Kluth?

6    A.   No.

7    Q.   And I think you said that's how it would

8    usually work unless there was a performance

9    improvement plan or any other unusual circumstance.

10   Did I understand that correctly?

11   A.   Yes.

12   Q.   Did any performance improvement plan or

13   other circumstance apply to Ms. Kluth?

14   A.   Not that I was made aware of.

15   Q.   You were not aware that she was on a PIP or

16   probation?

17   A.   No.

18   Q.   Okay.  What's your practice in terms of

19   preparing your subordinates' evaluations?  Do you keep

20   notes throughout the period and refer to them later?

21   Or do you start fresh?  Or how do you put it together?

22   A.   Well, in a perfect world, what I like to be

23   able to do is set forth the expectations that are

24   going to occur and have the employee moving forward

25   hear also the expectations that I have of you, you

Steve Johnson
September 23, 2022

1    someone apparently?

2        A.    Correct.  Yes.

3        Q.    Did you take any of those steps above

4    sitting down and having a discussion with respect to

5    Ms. Kluth's job performance?

6        A.    No.

7        Q.    And did you have -- did you sit down and

8    have discussions with Ms. Kluth about job performance

9    issues?

10       A.    In the short period of time that I had her,

11   no.

12       Q.    So you didn't do any steps at all to address

13   any performance issues with Ms. Kluth?

14       A.    For me, again, in the short period of time

15   that she worked for me, there weren't any that I

16   really identified.

17       Q.    Okay.  So you didn't identify any

18   performance issues with Ms. Kluth during her tenure as

19   captain at detentions?

20       A.    Correct.

21       Q.    And therefore, you didn't do anything to

22   address any performance issues with respect to

23   Ms. Kluth?

24       A.    I didn't have anything to address with her

25   at the time.

Steve Johnson
September 23, 2022

1  something and I didn't put it in there, then that's on

2  me.

3        Q.   But there's nothing you recall that you

4  intended to put in here, but didn't; is that right?

5        A    That's right.

6        Q.   So there's no entries during the time that

7  you supervised Ms. Kluth.  Is it fair to say that's

8  because as you said earlier that you didn't identify

9  any performance issues?

10        A.   Yes.

11              MR. O'CONNELL:  Objection to form.

12              THE WITNESS:  Yes.  And on the flipside of

13  that is too, you know, obviously, I didn't identify

14  anything that was positive that I should put in there.

15  BY MR. BOHNET-GOMEZ:

16        Q.   It was a short period of time and there was

17  nothing notable one way or the other.  Is that a fair

18  summary?

19        A.   Yes.

20        Q.   During the time Ms. Kluth was captain of the

21  detentions division, did you ever discuss Ms. Kluth's

22  job performance with anyone?

23        A.   To what degree?

24        Q.   Well, tell me generally what kind of

25  discussions you had about her job performance?

Steve Johnson
September 23, 2022

1          A.   With her or with --

2          Q.   Well, did you discuss her job performance

3     with her?

4          A.   We probably discussed things, but I don't

5     necessarily remember any of those being negative or

6     counterproductive.

7          Q.   Okay.  Yeah, you did testify earlier that

8     you never sat down and had a discussion about any

9     negative job performance issue, correct?

10         A.   That's correct.

11         Q.   Did you have any discussions about positive

12    job performance with Ms. Kluth?

13         A.   I would hope so.

14         Q.   You don't recall one way or the other?

15         A.   No.

16         Q.   Did you ever discuss Ms. Kluth's job

17    performance with Chief Duffy?

18         A.   No.

19         Q.   Did you ever discuss Ms. Kluth's job

20    performance with Undersheriff Walcher?

21         A.   I may have.

22         Q.   What do you recall about those discussions?

23         A.   I don't know that there was anything glaring

24    or glowing in the very short period of time.

25         Q.   By glaring or glowing, do you mean positive

Steve Johnson
September 23, 2022

1       A.   I don't know about a complaint per se.  You

2  have to define a complaint.

3       Q.   Is there anything that you communicated to

4  Chief Duffy that you believe could be characterized as

5  a complaint, depending on the definition?

6       A.   No.

7       Q.   Any complaints that you made to Undersheriff

8  Walcher regarding Ms. Kluth?

9       A.   Not that I recall, no.

10      Q.   What about Sheriff Spurlock?  Any complaints

11  that you made to him about Ms. Kluth?

12      A.   Not that I recall, no.

13      Q.   Do you ever make any recommendations other

14  than the ones we've talked about with respect to her

15  transfer on or around late February 2021?  Did you

16  make any recommendations other than that regarding

17  Ms. Kluth to Undersheriff Walcher?

18      A.   Not that I recall, no.

19      Q.   What about to Sheriff Spurlock?  Did you

20  ever make any recommendations to him about Ms. Kluth

21  other than in connection with her transfer to

22  detentions?

23      A.   Not that I recall, no.

24      Q.   You never recommended to anyone that

25  Ms. Kluth be terminated?

Steve Johnson
September 23, 2022

```
 1        A.   No.
 2        Q.   You never recommended to anyone that she be
 3   disciplined?
 4        A.   No.
 5        Q.   You never recommended to anyone that she be
 6   transferred out of detentions?
 7        A.   No.
 8        Q.   Did you have any conversations with Sheriff
 9   Spurlock about Ms. Kluth after she was terminated?
10        A.   Not in specific.
11        Q.   What did you talk about with Sheriff
12   Spurlock regarding Ms. Kluth?
13        A.   I don't think I talked to Sheriff Spurlock
14   about anything to be quite honestly with regards to
15   this termination.  If anything, I was probably told
16   she didn't meet my expectations that I had and she
17   wasn't meeting my expectations so I let her go.
18        Q.   Do you recall -- were you told that by
19   Sheriff Spurlock, about that specific conversation?
20        A.   I think at some point, that's what he said
21   to me.
22        Q.   Had you asked why she was terminated?
23        A.   No.
24        Q.   How did it come up?
25        A.   I -- I don't recall how it came up.
```

Steve Johnson
September 23, 2022

1    notetaking reputation.

2        Q.   Do you recall ever hearing about a Twitter

3    war between Ms. Kluth and Jim Jensen?

4        A.   No.

5        Q.   Do you recall anything at all that might be

6    related to a Twitter war between Ms. Kluth and Jim

7    Jensen?

8        A.   No.  You obviously have some information

9    with regards to a Twitter war, but I'm not aware or

10   recalling at this point a Twitter war.

11       Q.   We discussed earlier Ms. Kluth was supposed

12   to go to Tim Moore's office after her transfer, right?

13       A.   (No audible response.)

14       Q.   And we looked at the text message that you

15   sent her about that, right?

16       A.   Yes.

17       Q.   Did you, as far as you recall, make any

18   other requests to her to move her office?

19       A.   I can't recall making other requests.  It

20   doesn't mean that I didn't.

21       Q.   And you don't recall any delay between when

22   Mr. Moore vacated the office and when Ms. Kluth was

23   able to move in?

24       A.   No.  The only thing that I would say is

25   obviously for me to have to send texts, for me to have

Steve Johnson
September 23, 2022

```
 1   Tim gets out his office, I'm going to move into that

 2   office.  So I had to take her at her word.

 3        Q.   And as far as you know, that's appropriate?

 4             MR. O'CONNELL:  Objection to form.

 5             THE WITNESS:  Well, at some point, she got

 6   moved in there.

 7   BY MR. BOHNET-GOMEZ:

 8        Q.   From your perspective, did she do anything

 9   wrong with respect to the office move?

10        A.   Not that I was aware of, no.

11        Q.   Did you ever witness Ms. Kluth receive any

12   verbal admonishment to staff interrupting and

13   interfering with any personnel decisions such as

14   transfer of the deputy to another shift?

15             MR. O'CONNELL:  Objection.

16             THE WITNESS:  I don't know that I'm

17   following your question.

18   BY MR. BOHNET-GOMEZ:

19        Q.   Did you ever witness Ms. Kluth receiving

20   verbal admonishment in your presence?

21        A.   At what level?  As the undersheriff or as

22   the --

23        Q.   Yeah.  Thank you for that.  While she was a

24   captain in detentions, did you ever witness Ms. Kluth

25   receive any verbal admonishment from anyone?
```

Steve Johnson
September 23, 2022

1        A.    From anyone, including myself?

2        Q.    Yeah.

3        A.    I -- I don't know.

4        Q.    Did anyone ever admonish her to stop

5    interfering with the transfer of a deputy from one

6    shift to another while she was a captain at

7    detentions?

8        A.    Someone else could have.  I possibly could

9    have.  I don't know.

10       Q.    But you don't recall one way or the other?

11       A.    No, I don't recall one way or the other.

12       Q.    Do you recall any decision that you made to

13   transfer a deputy from one shift to another that

14   Ms. Kluth opposed?

15       A.    No, but there were so many movements.  She

16   could have.  I would -- I would assume she would have

17   done it in a respectful way or I would have -- I would

18   have noted it.

19       Q.    Nothing sticks out to you that -- about her

20   opposing or arguing about a transfer?

21       A.    Not right offhand.

22       Q.    So you don't have any -- you can't point to

23   anything or did not witness anything that would

24   support that she argued against a decision that you

25   and the undersheriff had made about transferring a

Steve Johnson
September 23, 2022

```
1   deputy to another shift despite verbal admonishments

2   to cease interrupting or interfering with the

3   transfer?

4             MR. O'CONNELL:  Objection to form.

5             THE WITNESS:  I don't recall her arguing per

6   se.  I do know that there was a movement of an

7   individual who was a corporal from detective, and

8   for -- it got tenuous from there, but it was also

9   something that Captain Kluth inherited in -- in that

10  movement.

11            But I don't ever recall, to use your

12  terminology, to where I had to say to her, stop

13  arguing with me, or stop disagreeing, or stop

14  interfering.

15            She may have spoken up, and she may have

16  expressed her opinion, and somewhere along the way

17  that's been mischaracterized.

18  BY MR. BOHNET-GOMEZ:

19       Q.   But you think it would mischaracterize what

20  happened from your memory of it that she was

21  interrupting or interfering?

22       A.   I don't ever recall her interrupting it.  I

23  do vaguely recall her asking questions.  Whether she

24  was the undersheriff or she was the captain, she was

25  always very analytical and would pose questions, which
```

Steve Johnson
September 23, 2022

1    is fair and is good to have, as to why something was

2    being done.

3        Q.   And who is the individual that you are

4    recalling who was the subject of this transfer?

5        A.   Oh, I don't even know if it's the same

6    individual that we're talking about.  Obviously, you

7    do.  But we had a corporal, similar to office moves

8    that seemed like it was languishing in how it was

9    moving forward.

10            And again, continuity of operation, it was

11   beginning to impact it, and it was a female corporal

12   by the name of Shawn Sanchez.

13       Q.   What do you recall about Ms. Kluth's

14   involvement in this transfer?

15       A.   Quite frankly, vaguely, that she was

16   questioning why it was going on.

17       Q.   So as you said, she is analytical and she

18   asks a question.  Is that essentially your

19   recollection of what happened?

20       A.   I think it would be more plural, questions,

21   as to what was going on.

22       Q.   And --

23       A.   You know, I'm sorry to interrupt, but I

24   would have to go back over Exhibit 67 because I don't

25   know if that was included on there or if that was

Steve Johnson
September 23, 2022

1   accomplished, and made sure that -- that he gets done.

2          So would Kevin Duffy have met the vision,

3   mission, and values?  If he would have looked at me

4   and said, I'm not apologizing for that; you deserve

5   that paper thrown at you; I should have thrown the

6   chair at you.  That would not be meeting our mission,

7   vision, and values.

8          I feel very passionate about the fact that,

9   yes, this is unacceptable.  Yes, it was unacceptable

10  to the fact that it was documented, but it certainly

11  does not outweigh every single other thing and every

12  shingle hour, minute, and basically 24 hours a day,

13  seven days a week Kevin Duffy has given to the Douglas

14  County Sheriff's Office in representing this office

15  and Sheriff Spurlock to the best of his skill and

16  ability.

17      Q.   So in evaluating whether an employee is

18  meeting the mission, vision, and values, you would

19  have to balance the hard work and positive attributes

20  of the employee against whatever misbehavior there is?

21      A.   Correct.  There is no one, I think, even

22  above myself more loyal to Sheriff Spurlock and the

23  Douglas County Sheriff's Office than -- than Kevin

24  Duffy.

25      Q.   As far as you could tell from your