Tony Spurlock
August 31, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CIVIL ACTION DIVISION

CASE NO.: 1:21-CV-3417-NYW


HOLLY KLUTH,

       Plaintiff,

vs.

TONY SPURLOCK, individually and
in his official capacity as Douglas
County Sheriff,

       Defendant.
_____/


DEPOSITION OF TONY SPURLOCK




     DATE TAKEN:    August 31, 2022

     TIME:         9:06 a.m. to 6:07 p.m.
                  MOUNTAIN TIME


     LOCATION:     RATHOD MOHAMEDBAHAI, LLC
                  2701 Lawrence Street, Suite 100
                  Denver, Colorado 80205



Reported By:
Jessica Wharton, Reporter

Tony Spurlock
August 31, 2022

1    employee evaluations?

2         A.   Yes.

3         Q.   Part of being a supervisor is documenting

4    employee performance issues, right?

5         A.   It's one part, yes.

6         Q.   That includes both positive and negative

7    performance issues?

8         A.   Yes.

9         Q.   And for this -- for policy noteworthy

10   negative or positive performance issues are supposed

11   to be documented in Guardian Tracker; is that right?

12        A.   No.  I mean, they could be -- supervisor

13   could document and keep their own file.  It's not

14   something we encourage.  So you -- it's best to upload

15   everything in Guardian Tracker, but I don't think it

16   dictates the mandate of that, like, you shall do this.

17        Q.   So it doesn't always happen that the

18   supervisor will upload its -- his or her --

19        A.   Supervisor documents?

20        Q.   Yeah.

21        A.   That's correct.

22        Q.   If a supervisor maintains their own file for

23   an employee, where would that information be?

24        A.   Ultimately, it would end up in the

25   evaluation, which would ultimately end up here, but it

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1      Q.    Okay.   Did she publicly support your

2  retention in office?

3      A.    I believe so, yes.

4      Q.    So she put aside, essentially, her personal

5  differences with -- or her personal political

6  differences to publicly support your position; is that

7  fair?

8      A.    That's fair.

9      Q.    Now, you discussed your intent to endorse

10  Ms. Neal-Graves with Ms. Kluth prior to your

11  endorsement, right?

12      A.    Yes.

13      Q.    What was her reaction when you informed her

14  of your plan?

15      A.    I have to reflect.   I remember having a

16  conversation in her office.   I think she was cautious

17  with the support of it because I -- she -- she did and

18  I knew and I supported intentions to run for Sheriff,

19  and Douglas County Sheriff's Office has a tendency to

20  have pretty, kind of strict rules about Republicans

21  and you know, those kinds of things.   So I think she

22  was concerned about her future for that.

23          But I -- I -- I made it very clear that I

24  would not nor could I, you know, by any stretch of the

25  means, support him.   And I wanted her just to be aware

Tony Spurlock
August 31, 2022

1    of that.  So as my undersheriff, just this is what I'm

2    going to be doing, so don't get shocked when I go do

3    something, when I go say something.  So it would be

4    fair for her to have that knowledge first.

5         Q.   Right.  You do understand that it might put

6    Ms. -- well, I'm sure you talked about historically

7    the strict rules of the Republican party in Douglas

8    County.  Douglas County hasn't -- has had a Republican

9    Sheriff for the last, what, 50, 60 years; is that

10   right?

11        A.   Yeah, I think Royal McKinster was actually a

12   Democrat.  He was the Sheriff when I first got hired.

13   And no Republican would come up, and he was pretty --

14   at that time, when you were a Democrat, you were

15   probably a Republican anyway.

16        Q.   That was like 40 years ago?

17        A.   Yeah, that was 40-some years ago, but I

18   believe he was actually a registered Democrat.  But

19   for the most part, you're right.

20        Q.   It's fair to say that the Republican

21   candidate for Sheriff has a pretty strong chance of

22   winning in the general election in Douglas County --

23        A.   Oh yeah.

24        Q.   -- agree with that?

25        A.   Without a doubt, yes.

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1   was no surprise she wanted to run for Sheriff, and I

2   wanted to support her.  That's why I went and told her

3   that this could be -- this -- this was happening, and

4   I just wanted her to be aware of it.

5        Q.   Right.

6        A.   Not to say you've got to be on my side or

7   that side.  Just I'm giving you something.  I hope you

8   take it and -- and do appropriate stuff with it.

9        Q.   And you did that because you recognized that

10  it could affect her campaign in the future; is that

11  right?

12       A.   No, I did that to provide her with

13  information that could help her.  I supported her to

14  be the Sheriff on the day that I went into her office

15  and told her that.  So I was, in essence, I'm giving

16  you some intelligence information here.

17       Q.   Right.

18       A.   Yeah.

19       Q.   What did you think that she should have done

20  with that intelligence?

21       A.   Well, I guess all I can say is what I would

22  have done with it is I would have held onto it and

23  then, you know, okay, done nothing in any campaign,

24  gone static.  That often works very well in Douglas

25  County.  And I didn't want her to be shocked at some

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1      A.    Well, an Internal Affairs investigation was

2  immediately started.  Well, I shouldn't say

3  immediately, probably within a short period of time.

4  And then, we reached out to her for an opportunity to

5  be interviewed, and she declined.

6      Q.    If you wouldn't tell her what, specifically,

7  she had done wrong, how was she supposed to have a

8  discussion with you about her termination?

9      A.    You mean at that -- right at that moment?

10      Q.    At the May 25th meeting.

11      A.    She was very clear of the foundational

12  meaning and vision, mission, and values.  It is on

13  every evaluation.  The very first one is J, which is

14  judgment.  And she could have easily said, where -- if

15  I did this, did I, you know, no longer devotion to

16  duty?  Did I make a bad judgment?  That document

17  initially drives any reader to ask additional

18  questions.  And she knew that.  I mean, that

19  document -- she had used that document with other

20  people before.

21      Q.    And she did ask additional questions, right?

22  She asked how did I not live up to this values?

23      A.    Yes.

24      Q.    And you didn't tell her.

25      A.    On advice of counsel not to do that.

Tony Spurlock
August 31, 2022

1    your knowledge?

2         A.   I cannot answer that.  I don't know if the

3    HR director or the captain did.

4         Q.   Can you please look at your -- the complaint

5    on Page 11.

6         A.   Okay.

7         Q.   The allegation in Paragraph 93 is Spurlock

8    stated to Ms. Kluth --

9         A.   Page 11?

10        Q.   Page 11, Paragraph 93.

11        A.   Sorry, my apologies.

12        Q.   It's no problem.

13        A.   Yes, that's true, and I forgot that, yes.

14        Q.   Okay.  So you --

15        A.   I'm sorry, my apologies.

16        Q.   And you told Ms. Kluth that nothing had

17   changed since last fall?

18        A.   Yes, this was -- this was -- this statement

19   was made after she had asked me, can you give me --

20   what have I done?  Tell me what I have done.  And I

21   said, you know, nothing has changed.  Your behavior

22   hasn't changed since last fall.

23        Q.   What had happened last fall?

24        A.   That's when she was demoted from

25   Undersheriff to Captain.

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    Q.   So that comment kind of harkened back to the

2    comment that she engaged in behavior that led to her

3    demotion.

4    A.   The policy --

5         MR. O'CONNELL:  Objection to form.

6         THE WITNESS:  The policy violations.

7    BY MR. CRON:

8    Q.   Okay.

9    A.   And basic just behavior, trust.

10   Q.   Had she in the time between her demotion and

11   her termination, had she continued to instruct

12   subordinates to engage in political activity?

13   A.   No, but that wasn't the issue.

14   Q.   Had she continued to conspire with

15   subordinates behind your back?

16   A.   No.  She continued to not live up to the

17   vision, mission, and values.

18   Q.   Turning back to -- are you still on Exhibit

19   5?

20   A.   Yes, yes.

21   Q.   Still have that up?  Had she violated -- so

22   she was found sustained five specific policy

23   violations on November 16th, 2020?

24   A.   Yes.

25   Q.   Okay.  Had she continued to violate the

Tony Spurlock
August 31, 2022

1    first one, C-101-2-EE, participating in election

2    campaigns?

3         A.   No.

4         Q.   Had she continued to violate Section 2U, on

5    or off-duty conduct?

6         A.   Potentially, yes.

7         Q.   Okay.  We'll get to that.  Had she continued

8    to violate exercise and expression?

9         A.   Yes.

10        Q.   Had she continued to violate responsibility

11   for conduct.

12        A.   The specifics of that policy is has kind of

13   driven away, so I would say no, I didn't consider

14   that.

15        Q.   Had she continued to violate internet,

16   social networking, and personal websites policy?

17        A.   No.

18        Q.   So the second and third policies are the

19   ones that she continued to violate in your opinion.

20        A.    Well, and I want to make it clear, I'm not

21   saying that she continued to do that.  She failed the

22   vision, mission, and values which are part of bad

23   judgment, trust, unity.

24             And those are maybe not these specific, but

25   they are policies of this office, and that's what was

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1  meant when I said, you have not changed your behavior

2  since last fall.  You're still violating policies.

3  They're just different policies.

4       Q.   Did she violate the Law Enforcement Code of

5  Ethics after her demotion?

6       A.   I suppose you could fine-tooth comb it and

7  say yes, but I'm not going to go there.  I'm not going

8  to say -- I didn't -- that -- I didn't make a decision

9  based upon that.

10       Q.   Okay.

11       A.   Yes.

12       Q.   So I mean, she was demoted for specific

13  actions in November of 2020, right, in that she had

14  planned with a subordinate to get other command staff

15  members to write letters for the DC GOP, right?

16  That's the gist of what she did?

17       A.   Yeah.  She violated policies that were

18  surrounding each one of those five policy behaviors.

19       Q.   And just to be clear, she wasn't engaging in

20  that sort of specific type of conduct after she was

21  demoted to captain, right?

22       A.   Not that specific conduct, no.

23       Q.   All right.  So okay, did you -- so you told

24  Ms. Kluth that nothing had changed since last fall,

25  and that she was not living up to your mission,

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1  vision, and values at the May 25th, 2021, meeting,

2  right?

3      A.   Correct.

4      Q.   Did you tell her any other explanation as to

5  why she was being terminated?

6      A.   I did not.

7      Q.   All right.  Let's go to Exhibit 35, which

8  are your response to the interrogatories.  Or no, it's

9  Exhibit 40, sorry.

10     A.   I think you might have them.  I only have

11  39.  Thank you.

12     Q.   But are you aware of the State statute

13  requiring the Sheriff to inform employees of the

14  reason for a termination?

15     A.   Yes.

16     Q.   Okay.  And you're also aware of the

17  statutory requirement that the Sheriff must give the

18  employee an opportunity to be heard?

19     A.   Yes.

20     Q.   Okay.  And you believe that telling

21  Ms. Kluth that she was not living up to the mission,

22  vision, and values of the office satisfied that

23  requirement?

24     A.   That's a clear satisfaction to that

25  requirement.

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1      A.   Yes.  Yeah.  Um-hum.

2      Q.   Let's turn to Question 2 of Exhibit 40,

3  which is your interrogatory responses.

4      A.   Okay.

5      Q.   Starting halfway down Page 3, and actually

6  the -- Question Number 2 asks you to describe each and

7  every material reason you had for terminating

8  Plaintiff's employment at the time you made the

9  decision; do you see that?

10     A.   Yes.

11     Q.   And your substantive response begins on Page

12  3 and continues through halfway up Page 6; is that

13  correct?

14     A.   Yes.  Yes.

15     Q.   All right.  That first paragraph appears to

16  be -- starting with Subject 2, without waiving the

17  foregoing objection, so --

18     A.   Yes.

19     Q.   -- that paragraph seems to be fairly broad

20  critiques; would you agree with that?

21     A.   I would not.

22     Q.   Okay.  Would you agree that the following

23  paragraphs are -- provide more specific examples of

24  problematic conduct?

25     A.   Yes.  Some of those other paragraphs are

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    specific issues that were in that memo, or -- I'm

2    going to call it a memo from Chief Duffey.  I think

3    they were excerpts from that into this response.

4        Q.   Okay.

5        A.   Some of those -- those other paragraphs.

6        Q.   But -- so Captain Duffey's memo, which lists

7    many issues with Ms. Kluth, was -- many of those

8    issues are imported into this interrogatory response;

9    is that right?

10       A.   That is correct.

11       Q.   And these are the reasons that you fired

12   Ms. Kluth, right?

13       A.   Yes.

14       Q.   Let's go through some of them.  We see at

15   the bottom of Page 3 --

16       A.   I'm there.

17       Q.   Well, actually, let me ask you a few more

18   questions.  Sorry, I'm jumping all over, but these are

19   the reasons that were important to your decision to

20   fire Ms. Kluth?

21       A.   These the substantive reasons that were

22   shared with me.  They were not inclusive to the

23   reasons why I terminated her.  Again, the Number 1

24   reason that I terminated her was because she no longer

25   fulfilled the vision, mission, and values of my

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1  office, which involved very important, particular

2  issues, like judgment, and trust, and unity.

3       Q.   These reasons, these specific incidents,

4  contributed to your assessment that Ms. Kluth no

5  longer satisfied the vision, mission, and values of

6  your office; is that right?

7       A.   Yes.

8       Q.   Okay.  In other words, if you hadn't engaged

9  in any of these behaviors, then there might not have

10  been a -- as much of a problem with her employment; is

11  that fair?

12       A.   And these and others that I'm aware of -- if

13  she had not engaged in those -- if she had gone to her

14  job and done what she had done when she was an

15  Undersheriff the first three, four, five years as an

16  Undersheriff, she wouldn't -- we wouldn't be here

17  today.

18       Q.   Okay.  This -- this question asks you to

19  describe each and every material reason you had for

20  terminating Plaintiff's employment; do you see that?

21       A.   Yes.

22       Q.   So can we assume that these reasons in here

23  are material reasons?  Are they -- do -- do you know

24  what I mean by material reasons?

25       A.   Like, I -- I used those to solidify my

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    Q.   So she asked for something, and she was

2    told, no, and then she did not ask again; is that

3    right?

4    A.   To the best of my knowledge.  She didn't ask

5    me.

6    Q.   Is it -- and is there any -- do you have any

7    basic reason to think that she asked Captain Duffey

8    again?

9    A.   I doubt it.

10   Q.   Okay.  Is it problematic for a subordinate

11   to suggest a change or ask for a change?

12   A.   It's problematic that a person who was just

13   demoted from Undersheriff, who denied those types of

14   things to captains for subordinates below her at the

15   time.  Now, she's a captain, and now she's immediately

16   asserting, oh, we need to have this.  That, in my

17   opinion, was, again, conflict to her ability and unity

18   to try to work with the whole department.

19   Q.   Where do you -- where do you see that she

20   asserted that they needed to have it?

21   A.   Or she asked for it.

22   Q.   Okay.

23   A.   Yeah.

24   Q.    When did you learn about this issue?

25   A.   I -- I don't -- I don't recall.  Probably,

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1   obviously, sometime after it, but I don't know when.

2        Q.    Prior to terminating Ms. Kluth?

3        A.    Oh, yeah.

4        Q.    Is there any investigation into this issue?

5        A.    No.

6        Q.    Not a -- not even a PCR investigation?

7        A.    Nope.

8        Q.    Was this issue noted in her Guardian

9   Tracker?

10        A.    That, I don't know.  It was noted in the --

11   in the Chief's notes, so other than that, I don't

12   know.

13        Q.    Was it conveyed to Ms. Kluth that it was

14   problematic for her to ask for this change?

15        A.    I don't know.

16        Q.    Was this behavior so egregious that it would

17   demand termination without following the processes of

18   the corrective action policy?

19        A.    It's one of the collective reasons that I

20   made the decision.

21        Q.    Let's go to the -- another -- the next one.

22   Plaintiff objected to Duffey's assignment to serve as

23   a Sheriff's representative for UNFCL and coordinated

24   UNFCL's board meetings.  That's from your

25   interrogatory response; do you see that?

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    Q.   Okay.  So Ms. Kluth was wrong in believing

2    that she had a right to be at this meeting.  Is

3    that --

4    A.   Yes.  This -- this exchange was, you know,

5    in hindsight could -- could have been a -- a bigger

6    issue at the time because she was insubordinate to her

7    boss, and her boss can talk to whoever he wants to,

8    whenever he wants to.  And her, again, behavior, her

9    demeanor was insubordinate.  In hindsight, probably

10   should have listed that as well, but --

11   Q.   I think you did list that.

12   A.   Okay.  Lot to read here.

13   Q.   Yes.

14   A.   Well, then there you go.  I did.

15   Q.   And in fact, I believe that -- I don't have

16   it here, but I believe that Captain Duffey informed

17   her that he believed that she was being insubordinate.

18   Does that --

19   A.   Yes, he did.  I think it's in the email.

20   Q.   Okay.  And this incident is noted in her

21   Guardian Tracker.  Are you aware of that fact?

22   A.   I am not.

23   Q.   Okay.  You would have any reason to

24   disbelieve me if I told you that, right?

25   A.   I would not.

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1      Q.   Okay.  Now, do you have any reason -- can

2   you speculate as to why Chief Duffey would have noted

3   this incident in the Guardian Tracker?

4      A.   Insubordinate is a serious violation for

5   supervisors, particularly at a captain's level.  It is

6   incredibly serious.

7      Q.   This was a big deal.

8      A.   This was a big deal.

9      Q.   Yeah.  And that's, presumably, why he noted

10  it in his Guardian Tracker?

11     A.   Yes.

12     Q.   Okay.  Now, if he did not note something in

13  his Guardian Tracker, could we presume it was less big

14  of a deal?

15     A.   No.  Again, the -- whether it's in Guardian

16  Tracker or not doesn't dictate its severity.  I think

17  each situation must stand on its own.  And so

18  obviously, some things you might think, well, that's

19  not very serious at all and other things, you might.

20  So I don't want to characterize the Guardian Trackers

21  only serve for serious things because, as we said

22  earlier, it's also for good things.  And those could

23  be considered, you know, good serious things.

24     Q.   Okay.  Did you -- when did you learn about

25  this issue?

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    A.   I learned about it, like, right when it

2    happened, I think, or very close proximity to that.  I

3    don't know the date of it that's on the Guardian

4    Tracker, but within close proximity of that time.

5    Q.   Was there an IA investigation into this

6    insubordination?

7    A.   I don't believe so, no.

8    Q.   Okay.  PCR investigation?

9    A.   No.

10    Q.   Okay.  Was Ms. Kluth found to have violated

11    any policies?

12    A.   Well, given that specific time and space,

13    there was no -- there was no investigation or PCR.  So

14    there's no findings.

15    Q.   Okay.  Are you aware of any other Guardian

16    Tracker entries regarding insubordinate by Ms. Kluth?

17    A.   No.

18    Q.   And she was not terminated immediately after

19    this issue, was she?

20    A.   She was not.

21    Q.   Okay.  Okay.  Let's go to -- on Page 4,

22    bottom of Page 4.  Plaintiff using her DCSO Twitter

23    account engaged in a Twitter war with a colleague,

24    Captain Jensen, violating DCSO's policy prohibiting

25    activities that bring discredit to the DCSO.  Do you

Tony Spurlock
August 31, 2022

1  see that?

2      A.   Yes.

3      Q.   This is one of the reasons informing the

4  decision to terminate Ms. Kluth?

5      A.   Yes.

6      Q.   Okay.  This -- this correlates to the bottom

7  of 2374?

8      A.   Yes.

9      Q.   What tweets did Plaintiff send out that were

10  objectionable?

11      A.   I don't recall what the tweets were.  I

12  recall the scenario or scenarios around them that both

13  Jensen and herself were tweeting things back and forth

14  that were not -- one would tweet one thing, and the

15  other would tweet another, and they -- the messages

16  weren't the same, you know, for a social media

17  messaging to go out.  And it became problematic with

18  our social media as, hey, they have Twitter accounts,

19  but they couldn't get together to have the same

20  messaging.  And so it became a -- the -- the -- again,

21  the urban legend, it became a Twitter war between the

22  two of them because to see whoever could tweet the

23  most and whoever could tweet the -- you know,

24  whatever.

25          And we had to put a stop to it because it

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    A.   Not to my knowledge.

2    Q.   Are there any major incidents that occurred

3    while she was Captain of Detentions?

4    A.   Not that rises -- not that anything that

5    comes to mind.

6    Q.   Were there any -- were there any issues with

7    her performance as Captain in the Detentions Division

8    that contributed to your decision to fire her?

9    A.   I don't recall any right now.  She was there

10   for a very short period of time.

11   Q.   Almost three months, right?

12   A.   Yeah.

13   Q.   Did Chief Johnson ever communicate to you

14   any issues with Ms. Kluth's performance as she was

15   employed as the Detentions Captain?

16   A.   It was one thing that escapes me right now.

17   And I apologize for the -- for the long day.  But I

18   think there was one issue that he said -- that he had

19   mentioned.  But I apologize.  I don't recall,

20   specifically, what the details are.

21   Q.   Okay.  Not -- not -- may assume, from

22   your -- it's not a huge incident?

23   A.   No.  It -- it -- it -- it's not anything

24   that's like we've talked before.

25   Q.   Why was Ms. Kluth transferred to Detentions?

Tony Spurlock
August 31, 2022

```
 1        A.   We, obviously, had to make some changes.
 2   Captain Jensen was terminated.  And of course, that
 3   created a -- a number of issues for us.  We made some
 4   changes at the academy.  And the Arapahoe County
 5   Sheriff's Office stepped away from the academy which
 6   left a void of leadership.  So I made the decision to
 7   move Captain Moore out there, you know.  And then we
 8   decided to move people -- you know, essentially, we
 9   ended up having to move captains around because we
10   ended having to promote a captain.  And --
11        Q.   So it's just a domino.
12        A.   So it's just a domino effect of people.
13        Q.   Who -- was her transfer to Detentions a
14   punitive measure?
15        A.   Oh, no.  The Detentions Division is a --
16   it's the largest division.  It has the large budget.
17   It's not punitive by any means.
18        Q.   So to -- it appears the, you know, the
19   issues that Chief Duffey documented, those were not
20   the reasons that she was moved to Detention?
21        A.   No.
22        Q.   You said Captain Jensen had been fired by
23   the Office?
24        A.   Yes.
25        Q.   Okay.  And when was he fired?
```

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1      Q.    No IA investigation?

2      A.    No.

3      Q.    No PCR investigation?

4      A.    No.

5      Q.    Do you have any knowledge as to whether

6   Chief Johnson expressed his displeasure with Ms. Kluth

7   to her?

8      A.    I have no knowledge of that, what he said to

9   her.

10      Q.    But do you know whether Ms. Kluth had any

11   knowledge as to this performance issue?

12      A.    I don't know what they shared with her.  I

13   just shared nothing with her.

14      Q.    Is that one of the reasons that informed

15   your termination decision?

16      A.    Yes.

17      Q.    Other than that one incident, was there any

18   other specific incidents that occurred between March

19   1st and May 25th?

20      A.    Not that I call -- recall at this point.

21      Q.    In -- in this last election, you supported

22   Captain Darrin Weekly; is that correct?

23      A.    Eventually, I did.  Yes.  Not right off the

24   bat, no.

25      Q.    Okay.  Well, he announced his candidacy in

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1    November of 2021; does that sound right?

2        A.    Yeah.  I think it was -- yeah.  Yes.

3        Q.    And you attended his kickoff campaign event,

4    right?

5        A.    Yes, I did.

6        Q.    Isn't that supporting him right off the bat?

7        A.    Yeah.  I guess I should have said that -- he

8    was talking about running well before then.

9        Q.    Okay.

10       A.    I never really stood up until that day.

11       Q.    I understand.

12       A.    Yeah.

13       Q.    When -- when was he talking about -- when

14   did you first hear him talking about running for sure?

15       A.    Well, I think after Ms. Kluth was

16   terminated, and I believe there was some discussion

17   about, maybe, one -- one, the commissioner and this

18   other person, they might be dropping out, or

19   something.  I don't recall, but that never occurred.

20   And I know there was some conversation about it.

21           Darrin had come to me and said, I'm thinking

22   about running because none of the other candidates

23   qualify for the job.  And so we -- obviously, we had

24   some discussion about that.  And I don't recall any of

25   that -- was a -- but it was, obviously, after

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

| | |
|---|---|
| 1 | CERTIFICATE OF OATH FOR WITNESS |
| 2 | |
| 3 | |
| 4 | STATE OF COLORADO |
| 5 | COUNTY OF DENVER |
| 6 | |
| 7 | I, Jessica Wharton, Reporter, certify that |
| 8 | on August 31, 2022, TONY SPURLOCK appeared before me |
| 9 | at 9:06 a.m. via video conference; that photo |
| 10 | identification was presented and verified via Colorado |
| 11 | driver's license; and that TONY SPURLOCK was duly |
| 12 | sworn on August 31, 2022. |
| 13 | |
| 14 | |
| 15 | SIGNED this 16th day of September 2022. |
| 16 | |
| 17 | |
| 18 | _____ |
| 19 | Jessica Wharton |

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1

Tony Spurlock
August 31, 2022

1                    CERTIFICATE OF REPORTER

2

3    STATE OF COLORADO

4    COUNTY OF DENVER

5

6        I, Jessica Wharton, Reporter, do hereby certify

7    that I was authorized to and did electronically report

8    the deposition of TONY SPURLOCK; that TONY SPURLOCK

9    was duly sworn on the date indicated; that the

10   questions and answers thereto were reduced to

11   typewriting under my direction; that a review of the

12   transcript was requested; and that the foregoing is a

13   true and accurate electronic recording of the

14   proceedings.

15       I FURTHER CERTIFY that I am not a relative,

16   employee, or attorney, or counsel of any of the

17   parties, nor am I a relative or employee of any of the

18   parties' attorneys or counsel connected with the

19   action, nor am I financially interested in the action.

20       DATED this 16th day of September, 2022.

21

22

23   Jessica Wharton, Reporter

24

25

Tony Spurlock
August 31, 2022

1              CERTIFICATE OF TRANSCRIPTIONIST

2

3        I, WENDY K. SAWYER, do hereby certify that I

4   transcribed the electronic recording produced by

5   Jessica Wharton, Reporter, of the deposition of TONY

6   SPURLOCK; and that the foregoing transcript is a true

7   transcript of said electronic recording.

8

9        I FURTHER CERTIFY that I am not a relative,

10   employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorneys or counsel connected with the action, nor am

13   I financially interested in the action.

14

15        DATED this 16th day of September, 2022.

16

17

18   _____

19   WENDY K. SAWYER, CDLT

20

21

22

23

24

25

Tony Spurlock
August 31, 2022

1              E R R A T A   S H E E T

2    Witness: TONY SPURLOCK
     RE: Holly Kluth vs. Tony Spurlock
3    Date of Proceeding: August 31, 2022
     U.S. Legal Support Reference No.: 6192337

4

5      PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
          REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM

6

7    Page / Line /      Change      / Reason

8    88  / 22  / TU to TDY      /  Correction

9    155 / 16  / obligation to obvious   Wrong word typed

10   169 / 13  / endors to encourage /  wrong word typed

11   173 / 4   / Puppit        / Inaudable Correction

12   203 / 12  / Met           / Missing word

13   _____ / _____ / _____ / _____

14   _____ / _____ / _____ / _____

15   _____ / _____ / _____ / _____

16   _____ / _____ / _____ / _____

17   _____ / _____ / _____ / _____

18   _____ / _____ / _____ / _____

     Under penalties of perjury, I declare that I have
19   read the foregoing transcript and that the facts
     stated in it are true.

20
                                    10/19/2022
21   TONY SPURLOCK                   Date

22   (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
     Sworn and subscribed to before me this 10th day of
23   October       , 20 22.

24                                              JULIE F. BROWNE
                                                Notary Public
                                                State of Colorado
     _____                      Notary ID # 20214019458
25   NOTARY PUBLIC            TONY SPURLOCK      My Commission Expires 05-18-2025

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit C-1