IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO.: 1:21-cv-3417-NYW

HOLLY KLUTH,

      Plaintiff,

vs.

TONY SPURLOCK, Individually and in his official capacity as
Douglas County Sheriff,

      Defendant.
_____


DEPOSITION OF KEVIN DUFFY


     DATE TAKEN:  September 19, 2022

     TIME:  9:35 a.m. - 6:33 p.m. MT


     LOCATION:    RATHOD MOHAMEDBHAI, LLC
                  2701 Lawrence Street, Suite 100
                  Denver, Colorado 80205


  Reported By:

  Jessica Wharton, Court Reporter

Kevin Duffy
September 19, 2022

1   binder?

2        A.   Which page?

3        Q.   Topic number 24.

4        A.   Okay.

5        Q.   This topic number 24 covers, DCSO's decision of

6   transfer and/or reassigned 25th, or about February 2021?  Do you

7   see that?

8        A.   Uh-huh.

9        Q.   And is it your understanding that you've been

10  designated to testify on behalf of the Douglas County Sheriff's

11  Office on this topic?

12       A.   I have.

13       Q.   And are you prepared to do so?

14       A.   I am.

15       Q.   Okay.  Let's do that.  And again, when we're done with

16  these 30(b)(6) questions, you know, I'll note that on the

17  record.  So let's start.  Who decided to transfer Ms. Kluth from

18  patrol to (inaudible)?

19       A.   That would be the undersheriff and the sheriff.

20       Q.   So -- so jointly decided?

21       A.   We were all -- the chief, Chief Johnson and I were in

22  the room when it was decided at that time that one of the things

23  the sheriff recognized was the Highlands Ranch Law Enforcement

24  Training Academy critical to the success of The Douglas County

25  Sheriff's Office because we were taking over the largest role

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1  within that academy.  During the last meeting we had when this

2  transfer was decided was upon, was the sheriff made the decision

3  that he needed a captain to be assigned up to the Highlands

4  Ranch Law Enforcement Academy.  We've never had that before.  So

5  he made the decision, and along with the undersheriff, with the

6  agreement, Chief Johnson and myself, that Tim Moore would be

7  transferred from detentions, where he was -- he was the chief.

8  He was sent to detentions as the captain, that he would then go

9  to the Highlands Ranch Law Enforcement Academy as the captain of

10  the academy.  Now, we needed a captain with detentions division,

11  another critical division within the department.

12          So it was discussed at that time, it was agreed upon,

13  that Nicholson-Kluth would be transferred from patrol to the --

14  the -- to the detentions division.  I was in full support of

15  that.

16      Q.   So I wanna ask you a little bit more detail about all

17  these decisions.  It sounds like there was sort of a decision

18  making period that spanned a couple weeks in February; is that

19  fair to say?

20      A.   January and February, but yeah.  Primarily in

21  February.

22      Q.   And it was precipitated by the need to put someone

23  into the academy as you said?

24      A.   Correct.

25      Q.   And as I think you testified earlier in your

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1  individual capacity, there was kind of an interative (sic)

2  process where first, the decision was made to go from two patrol

3  captains down to one, correct?

4      A.   Right.

5      Q.   And Captain Kluth was initially slated to continue on

6  as the patrol division captain?

7      A.   That's correct.

8      Q.   The older one?

9      A.   Right.

10     Q.   And then that changed at some time?

11     A.   With movement of Tim Moore to the academy, a decision

12  was to be made on who's gonna take over as the division

13  commander of the jail.

14     Q.   So the decision making regarding transfers, you said

15  possibly starting in January?

16     A.   More February, but I mean, that's when we started

17  making the, you know, you have to understand, going back to

18  where something in my 33 years never has happened before to

19  where an undersheriff was demoted and the chief was demoted,

20  that's never happened before.  So there was a lot of movement, a

21  lot of newness to this, to the department into the command

22  staff.  So we were making a lot of adjustments during that time

23  period.

24     Q.   And part of that is sort of the unprecedented

25  structure having two to co-captains?

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1      A.   That was one of the -- that was one of the problems,

2  or not problem, but one of the areas that was new was having two

3  patrol captains.

4      Q.   And then, it was your recommendation to the

5  undersheriff and the sheriff to go back down to one captain?

6      A.   I thought we -- it was my -- I -- I felt that we could

7  do this with one captain on patrol.

8      Q.   And that was the opinion you voiced?

9      A.   It was opinion I voiced based on my experience of

10  having two captains and the conflict that we started having from

11  literally the minute we brought two captains in, they were in

12  conflict from almost the beginning.

13      Q.   And what did you say to Undersheriff Walcher and

14  Sheriff Spurlock about that conflict during this February time

15  period?

16      A.   Well, I -- I -- I keep my undersheriff appraised on

17  what's going on almost on a daily basis.  Different areas that

18  things are going well, different areas that we're trying to

19  improve, different areas that we're -- we're having problems.

20  He's my direct supervisor, plus he needs to be in the know of

21  what's going on personnel-wise.  If there's any changes or

22  movements or problems areas.  So I kept him appraised.  He knew

23  of conflicts that have occurred with -- within -- with the two

24  captains, conflicts that I had personally with Captain Nicholson

25  in regards to conflicts she was having with me.  He was very

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1  well aware of it.

2          So when I voiced my recommendation that I felt now,

3  you know, understanding I'd only been the law enforcement bureau

4  chief since November 19th, that I could -- we could manage the

5  patrol division with one captain, that -- that I can do this,

6  that it would be best for the department to have one captain in

7  the patrol division.  And they were both in agreement, which

8  made the decision at that time, we needed a new captain in the

9  detention division.  It was decided that Nicholson-Kluth would

10 go to detentions.

11     Q.   So -- so is it fair to say that you really discuss the

12 conflict between the patrol captains because you felt that

13 Undersheriff Walcher was already aware of it.

14     A.   Correct.

15     Q.   So the discussion that you, Chief Johnson,

16 Undersheriff Walcher, and Sheriff Spurlock had in deciding these

17 personnel moves didn't involve a discussion of the conflict

18 between the two patrol captains?

19     A.   I'm really -- I'm not quite understanding how you're

20 wording the question, 'cause you asked me if the undersheriff

21 was -- knew of the conflict, and the answer was yes, he'd

22 already known about it.  So specific at that meeting, did he

23 discuss conflict between the two captains?  I would probably say

24 no, because that situation had already been semi-resolved

25 because Captain Jensen had already been placed on administrative

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1    Q.   Okay.  So this is the kind of situation that happens

2  from time to time.

3    A.   It happens.

4    Q.   And this was the first time that had happened with

5  Ms. Kluth.

6    A.   Yep.

7    Q.   Sand that's why you put in here?

8    A.   Right.

9    Q.   Okay.  Let's talk about your final entry here, which

10  begins on the first page of the exhibit, titled comment slash

11  demeanor.  What is this entry?

12    A.   This entry was a -- was made based on what I consider

13  a very serious conflict between the captain and myself.  When I

14  took over the division, one of the things that I told the

15  cap --the two captains, was that I was gonna meet privately with

16  all the lieutenants within the entire law enforcement bureau, so

17  not just patrol, but also investigations and Highlands Ranch

18  industrial, because I wanted to hear from the lieutenants.  This

19  is an opportune time.  Brand new law enforcement bureau chief,

20  new captains.  I wanted to hear from the lieutenants on what

21  they felt were identifying some of the areas of concern they

22  might have, some of the areas that they think we need to work on

23  as a division.

24        So I told the captains that I was gonna meet with

25  lieutenants and I was gonna get their input.  And once I got all

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   their input, then I was gonna sit down with the captains and go

2   through that, which was fine.  But we had a problem with that.

3   Then, as the couple month --more months passed on Captain

4   Jensen's on administrative leave, most likely gonna get demoted

5   or fired.  We're gonna have --we're gonna go back from two

6   captains to one captain.  We're gonna be moving people around.

7   The office is in flux, right?  So I wanted to meet again with

8   the lieutenants privately.  Because one of the things that I'm a

9   firm believer on is core foundation of our department is the

10  leadership of our lieutenants.  Chiefs and captains, we have our

11  roles, we have our duties and responsibilities.  But the rubber

12  meets the road with our lieutenants of all divisions.  They're

13  the ones that take our orders and our direction that we've

14  gotten from the sheriff and the undersheriff, and they make it

15  happy.

16          They're also what's crucial with lieutenants, they are

17  really the pulse of the agency.  They can either be the ones

18  that cause morale to just drop or keep morale and keep spirits

19  up and keep people focused.  And that's what I constantly

20  focused on, is reminding the lieutenants, you, ladies and

21  gentlemen, are the ones who keep this agency moving forward.

22          So I wanted to be lieutenants privately just to send

23  them a message from myself as the law enforcement chief was now

24  more than ever, with all the stuff that this department's going

25  through, stuff that we never gone through in my career.  As I

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   said earlier, we've never demoted an undersheriff before.  We'd

2   never demoted chiefs like this before.  We've never had this

3   much change in command staff.

4          I wanted to meet with the lieutenants privately just

5   to tell them, keep your eye on the ball, keep morale up, tell

6   the troops, everything's gonna be okay.  Just keep doing what

7   you're supposed to be doing.  Right?  It was a real simple

8   concept.  When Captain Nicholson-Kluth found out that I wanted

9   to meet with the lieutenants privately, she emailed me and

10  wanted to know -- she felt it was wrong that I do that, that I

11  meet with the lieutenants privately.  She felt that was a

12  violation of the chain of command, which is not.

13         She also wanted to be there.  And I came back to her

14  and said, no.  I wanna meet with these lieutenants privately

15  because I knew the message that I wanted to send them.

16  Oftentimes, when you start bringing too many bars and stars into

17  the picture, people have a tendency not to speak freely.

18  Trusted my lieutenants.  They trusted me.  I felt they -- if

19  they had anything concerning or wanted to talk about, they would

20  bring it out.  And that wasn't a reflection against Captain

21  Nicholson-Kluth or any of the other captains.  I just had

22  that --I felt I had that rapport with the lieutenants, and I

23  wanted to meet with them privately.  I felt they deserved that.

24  But I also wanted to discuss with them how important I felt they

25  were in making sure that our morale, that our mission is

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   maintained.

2           So I did meet with the lieutenants.  And then, she

3   sent an email to me basically accusing me of policy violations,

4   that I violated policy, which is a serious accusation that I

5   violated policy in this office.  Plus she was upset that I asked

6   the administrative secretary to come to the meeting and not her.

7   Well, the only reason I asked the administrative secretary is I

8   need somebody to take the notes so I could have an open

9   dialogue.  This person over here could take the notes for me,

10  full attention on the notes were gonna be taken, and that I was

11  gonna share that with the captains.  There's no secrets here.  I

12  just wanted to have that meeting face-to-face with just the

13  lieutenants.

14          She came to me in an email accusing me of violating

15  policy.  So I'm now an executive officer for this department

16  who's being accused of violating policy.  What do I do with

17  that?  Right?  I'm not gonna turn myself into internal affairs

18  or go to internal affairs.  So I went to my boss, the

19  undersheriff.  I went to him, said, this is what's going on.

20  This is what I've been accused on.  What do you want me to do

21  here?  You replied back to me, I want you to send me that email.

22  I want look at it, and I'll handle it.  I sent him the email.

23  And then the undersheriff sent a reply back to her basically

24  saying that having --that her allegation that I violated a

25  policy was unfounded and that actually he supported what I was

Kevin Duffy
September 19, 2022

1   trying to do here.  And that, as a chief, I have the full right

2   to go talk to anybody I want to.  And that's something I talk

3   about all the time.

4          So one of the things that I made very, very clear,

5   have always made as a lieutenant and then as a captain, that

6   people have come to me, you know, supervisors saying, hey, Chief

7   Johnson, for example, it's down over here talking to a sergeant,

8   and he didn't come talk to me first.  And I would always look at

9   them, like, he's a chief.  He can go talk to anybody he wants.

10  Or the sheriff is down here talking to deputy, or the

11  undersheriff's down here talking to detective.  I've always had

12  the same attitude.  People above me, they can go talk to anybody

13  they want to about anything.  That's their -- that's -- they're

14  the boss.

15      Q.   So -- so other -- you've heard this kind of complaint

16  before from --

17      A.   I've heard it tro -- from troops upward, that, you

18  know, like a lieutenant who gets mad a chief that went down and

19  talked to a sergeant, right?  And I've always, like, made it

20  very, very clear they absolutely can do that.  The only thing

21  that I asked as a respect was absolutely we're open book here.

22  To answer any questions you want -- they ask of me.  Just do me

23  a favor, when you're done with the conversation, just let me

24  know what -- what they're -- what they need so that, again, I'm

25  not caught off guard.  I did the exact same thing.  That's why I

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1  be let go on the will and the pleasure of the sheriff for any

2  reason, for any time.  So it doesn't -- for me there -- there's

3  not a lot of reason that needs to be given.  I knew, always have

4  known, that I worked at the pleasure of the sheriff.

5       Q.   So essentially, another reason would be that she --

6  the sheriff no longer wanted her to work there.  Is that right?

7       A.   It's his final decision.

8       Q.   And beyond the investigation into the records deletion

9  and just the mere fact that Sheriff Spurlock no longer wanted

10  her to work there, are you aware of any other reasons why she

11  was terminated?

12       A.   I think, you know, I've had -- like I said earlier, I

13  did meet pretty much two or three times a week with the

14  undersheriff just appraise him of the operations with inside the

15  law enforcement bureau.  I think the undersheriff recognized

16  that I was dealing with a lot of conflict between the two

17  captains, that there was -- they weren't -- either one of the

18  captains were acting in the manner in which he, as the

19  undersheriff, would expect cap -- captains of that rank and that

20  responsibility to behave.  Obviously, a very serious internal

21  investigation was done on Captain Jensen, which led to his

22  eventual termination, and so I -- I -- I believe, I don't have

23  again, I don't -- not privy to the exact reasons.  But working

24  for this office, as long as I've worked for this office, working

25  for the sheriff, working for the undersheriff, if those two came

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   to me with a termination saying that someone is being

2   terminated, they don't have to give me a justification or a

3   reason.  I take them that they had full justification to take

4   the action that they did.

5       Q.   Did you ever recommend that Ms. Kluth be terminated

6   to --

7       A.   Me, personally?

8       Q.   Yeah.

9       A.   No.

10      Q.   And you mentioned your meetings with Undersheriff

11  Walcher about both Ms. Kluth and Captain Jensen, right?

12      A.   Correct.

13      Q.   How are those connected, in your mind, to her

14  termination?

15      A.   I don't know if they're connected.  I know that

16  the --there was conflict.  There was behavior by two executive

17  officers or captains that is not conducive to what the

18  undersheriff expects of men and women of that rank and the level

19  of experience.  We are placed in these positions for a reason.

20  But we have -- but we're held to a high standard of how we're

21  supposed to maintain ourselves and act.  And if we don't meet

22  them standards or we fail to meet those standards, the sheriff

23  undersheriff are full within the right to terminate us.

24      Q.   So you said that the captains, Captain Kluth and

25  Captain Jensen were not meeting the standard that Undersheriff

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   where I wanted to come in and deliver a message of the direction

2   I wanted to go.  And so, you know, I was hoping that with me

3   coming in and kinda stating my vision of where we wanted to go

4   with the captains present, the lieutenants would understand, or

5   would at least perceived it the way that was meant to be, that

6   the two captains and the chief were all heading this direction.

7   So these are the -- some of the change is subtle, some of the

8   change is not.  It's just, you know, there was -- there was

9   several times where I was challenged on some of the things that

10  were going on in patrol.  But, you know, I would -- sometimes

11  I'd go in and talk to the undersheriff and get his advice on how

12  maybe he would handle certain things and different challenges I

13  was dealing with to get some of his advice.  Those aren't types

14  of things we would sit down and turn and document.  You just

15  kind of learn from.

16       Q.   So other than that email chain where you pointed out

17  that they weren't on the same page, you don't recall a specific

18  time that you would've talked to Ms. Kluth about any conflict

19  with Captain Jensen?

20       A.   Not specifically with Ms. Kluth.  There was several

21  examples of where it was obvious to everyone that they weren't

22  in agreement on certain things that were being done in patrol.

23       Q.   What are those obvious examples?

24       A.   Example number one and the most serious one that

25  needed to get rectified right away was our -- how we would

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

 1 | monitor and review pursuits.

 2 |      Q.   Can you explain how it was obvious that there is a

 3 | conflict between them?

 4 |      A.   Well, coming into the law enforcement bureau, I was

 5 | aware of our pursuit policy.  We have a very aggressive pursuit

 6 | policy within the sheriff's office.  We're one of one of the few

 7 | law enforcement agencies in the front range that actually has a

 8 | pursuit policy.  Most of the law enforcement agencies have just

 9 | continued pursuits 100 percent that do not allow their officers

10 | to pursue.  We do.  However, one of the things that came across

11 | my desk that became very, very obvious, again, through Captain

12 | Nicholson-Kluth was that the pursuits were not being reviewed by

13 | the law enforcement bureau chief.  So we have a review process

14 | with the pursuit where the patrol officer or several patrol

15 | officers are involved to pursuit.  We have a very clear and

16 | state policy on that.  Then that pursuit is then reviewed by

17 | the -- going up the chain of command through the sergeant, the

18 | lieutenant, unless the sergeant's involved, the lieutenant

19 | reviews it.  The lieutenant makes a ruling on whether or not the

20 | pursuit is in policy.  It would then go to the captain, and he

21 | would make a review to determine that the pursuit was or was not

22 | in policy.  What I learned from it and what Holly

23 | Nicholson-Kluth learned was that's where it stopped was those

24 | pursuits were never then presented to the law enforcement bureau

25 | chief.

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1    could possibly make it.

2        Q.   And at some point, you instructed Ms. Kluth that she

3    needed to come out one side or the other when she's reviewing --

4        A.   Make a decision.

5        Q.   -- pursuits, correct?

6        A.   Correct.

7        Q.   And after you told her that, was that an issue with

8    her going forward?

9        A.   I -- I think that was an issue still.  I can't

10   remember any specifics.  I believe there was two pursuits.  In

11   fact, I know there was one pursuit that -- where she ruled it as

12   it was clearly out of policy, but it -- because it only lasted a

13   very short amount of time, like a minute and 30 seconds.  She

14   thought it was okay.  We're talking about an officer who was

15   engaged in the pursuit that his car wasn't even working properly

16   His lights weren't working, the siren wasn't working, his

17   body-worn camera wasn't working, knew that it wasn't working.

18   That officer had no business chasing a car.  But because he only

19   did it for a minute and 30 seconds, she was gonna say that it

20   was okay.  And I was like, nope.  That's not okay.  He should've

21   known that and we're gonna do -- we're gonna take some steps.

22       Q.   And so you disagreed on the application of the policy

23   to that pursuit?

24       A.   Yeah.  Yeah.  He was clearly out of policy.  He had no

25   business pursuing a car even if it was only for a minute and 30

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1      A.   I don't think so.

2      Q.   Other than the meeting on of DCSO 89 and 90, that was

3  with the -- the meeting note about the sheriff saying no to

4  captains on patrol being reclassified as essential.

5      A.   Correct.

6      Q.   Other than that meeting, did you ever discuss

7  Ms. Kluth's request with the executive team?

8      A.   No.

9      Q.   Can I turn your attention to -- well let me ask you

10  first.  Do you recall an issue with Ms. Kluth and her Tweets?

11      A.   I remember it came up in a executive officers meeting

12  where, it was either the sheriff or the undersheriff, might've

13  been the, undersheriff, to where they brought to my attention

14  that they believed that the two captains, Captain Jensen and

15  Captain Nicholson-Kluth were engaged in what was referred to as

16  a Twitter war, where they were trying to one-up each other.

17  Again, conflict.  I don't have social media.  I don't tweet.

18  I -- I have a tweet (sic) account, but I've never used it.  I

19  wouldn't know how to use it.  But, basically, the sheriff, I

20  thought it was the sheriff, might've been the undersheriff, they

21  just said that the captains were engaged in the Twitter war,

22  which means it's out in the public and that there was also some

23  concerning tweets that were going out by a deputy, Deputy

24  Shannon Jensen, related to Cole case investigations that she was

25  no longer part of.  And that were you re-tweeted by Captain

Kevin Duffy
September 19, 2022

1  Jensen, and that basically they directed me that this so-called

2  Twitter war between the two captains is gonna come to a halt.

3       Q.   And what did you do after that?

4       A.   I brought it to the captains' attention in a meeting

5  to where it's been brought to my attention that you guys' tweets

6  are being viewed on as, like, a Twitter war.  You're trying to

7  one each -- one-up each other, so stop it.

8       Q.   And we've looked at your meeting notes, those are in

9  Exhibit 29.  They tend to be pretty detailed, right?  You said

10 you were known as someone who -- who keeps detailed notes,

11 right?

12      A.   I try to.

13      Q.   So if there's no other mention of -- of a meeting with

14 Captain Jensen and Kluth about their tweets, is it fair to

15 conclude that it didn't happen?

16      A.   That what didn't happen?

17           MR. O'CONNELL:  Objection, form.  Sorry.

18 BY MR. BOHNET-GOMEZ:

19      Q.   If we don't have any meeting notes from you or

20 calendar event about a meeting that you had with them about

21 their tweets, is it fair to conclude no such meeting happened?

22      A.   I'm still not understanding your question.  It was

23 brought to my attention that the captains were having a -- a

24 proceeding in some type of Twitter war where they're trying to

25 one each other and they wanted it to stop.  I believed I brought

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1    Q.   You did not report to them that Ms. Kluth refused to

2    include other captain in the training?

3    A.   I don't -- I don't recall ever going to the executive

4    team on that.  I know that, like I said earlier, this caused

5    some consternation with Captain Jensen and the captain of the

6    training unit in subsequent emails about what needed to be done

7    and who was gonna do what and stuff.  And they pushed back on

8    him pretty hard.  But it was still from the onset of this email,

9    it was still an idea that I supported.

10   Q.   And that -- that consternation was, in essence, that

11   Captain Jensen didn't feel that training was necessary and

12   Captain Kennedy was having to do extra work?

13   A.   Yeah.

14   Q.   Would it be accurate to say that Ms. Kluth refused to

15   share solutions with her colleagues as to the substance of the

16   training?

17   A.   Not sure what you're asking.  Refuse to share

18   solutions?

19   Q.   You don't have any knowledge that Ms. Kluth refused to

20   share the solutions identified in the training, though?  As far

21   as you're --

22   A.   As far as I know, yeah.

23   Q.   As far as you know, this was example of collaboration

24   and good communication on her part?

25   A.   There was a very good example of identifying an issue

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1   endorsed -- I -- I supported him.

2        Q.   And when did he come to you and tell you he was gonna

3   run?

4        A.   I don't recall the exact date.

5        Q.   Was it before he publicly announced?

6        A.   Might've been.  Probably was.

7        Q.   How far in advance of that?

8        A.   I don't recall.  I don't rece -- I don't even recall

9   when he formally announced his candidacy, but whatever date that

10  was, I'm sure it was before that.

11       Q.   And had you formally en -- endorsed him?  In any way?

12       A.   Formally?  No.  He never asked me to.

13       Q.   Okay.  Let's mark this as Exhibit 57.

14            (Exhibit No. 57 marked for identification)

15  BY MR. BOHNET-GOMEZ:

16       Q.   Okay.  You have Exhibit 57 in front of you.  It's a

17  portion of a Facebook post and it's marked KLUTH 1572.  Do you

18  see that?

19       A.   I do.

20       Q.   This is a endorsement of Lisa Neal-Graves for county

21  commissioner by your wife, correct?

22       A.   Correct.

23       Q.   Have you and your wife made a similar endorsement of

24  Darrin Weekly?

25       A.   Again, I don't have any social media, so I have never

1  posted anything.  My wife is a citizen of Douglas County, she

2  can endorse whomever she feels.  This is -- she endorsed Lisa

3  Neal-Graves.  She mentioned me in here.  I have no problem with

4  her doing that, but this was her endorsement of Lisa

5  Neal-Graves.

6      Q.   She run the text of the endorsement by you before?

7      A.   I don't think she ran the text by me.  She just said

8  that she was gonna put something out on Facebook endorsing Lisa

9  Neal-Graves and I was fine with it.  She's a citizen of Douglas

10 County.  She's free to do whatever wants to.

11     Q.   And you were making campaign donations to Darrin

12 Weekly's campaign, correct?

13     A.   I have.

14     Q.   Let's mark this is 58, please.

15          (Exhibit No. 58 marked for identification)

16          THE REPORTER:  Do you want to give me a title?

17          MR. BOHNET-GOMEZ:  Duffy contributions.

18          THE REPORTER:  Thank you.

19 BY MR. BOHNET-GOMEZ:

20     Q.   Okay.  You've got in front of you what's been marked

21 as Exhibit 57.

22          THE REPORTER:  58.

23 BY MR. BOHNET-GOMEZ:

24     Q.   58, 58.  Excuse me.  And this is -- represent to you

25 this is a PDF of campaign contributions from Kevin Duffy, the --

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

```
1                        CERTIFICATE OF REPORTER

2

3         STATE OF COLORADO                    )
                                               )
4         COUNTY OF DENVER                      )

5

6      I, Jessica Wharton, Court Reporter, do hereby certify that

7  I was authorized to and did electronically report the deposition

8  of KEVIN DUFFY; that KEVIN DUFFY was duly sworn on the date

9  indicated; that the questions and answers thereto were reduced

10 to typewriting under my direction; that a review of the

11 transcript was requested; and that the foregoing is a true and

12 accurate electronic recording of the proceedings.

13     I FURTHER CERTIFY that I am not a relative, employee, or

14 attorney, or counsel of any of the parties, nor am I a relative

15 or employee of any of the parties' attorneys or counsel

16 connected with the action, nor am I financially interested in

17 the action.

                    DATED this 4th day of October 2022.

19

20         _____
           Jessica Wharton, Court Reporter
21

22

23

24

25
```

SPURLOCK Reply in Support of Motion for Summary Judgment, Exhibit Q-1

Kevin Duffy
September 19, 2022

1                    CERTIFICATE OF TRANSCRIPTIONIST

2

3        I, Monica Walters, do hereby certify that I transcribed the

4    electronic recording produced by Jessica Wharton, court reporter

5    of the Deposition of KEVIN DUFFY; and that the foregoing

6    transcript is a true transcript of said electronic recording.

7        I FURTHER CERTIFY that I am not a relative, employee,

8    attorney, or counsel of any of the parties, nor am I a relative

9    or employee of any of the parties' attorneys or counsel

10   connected with the action, nor am I financially interested in

11   the action.

12            DATED this 4th day of October 2022.

13

14

15        _____

          Monica Walters
16

17

18

19

20

21

22

23

24

25

Kevin Duffy
September 19, 2022

| | |
|---|---|
| 1 | E R R A T A   S H E E T |
| 2 | Witness: KEVIN DUFFY |
| | RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his |
| 3 | official capacity as Douglas County Sheriff |
| | Date of Proceeding: September 19, 2022 |
| 4 | U.S. Legal Support Reference No.: 6192843 |
| 5 | PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE |
| 6 | REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM |
| 7 | Page / Line /      Change      / Reason. |
| 8 | 7 / 20 / I do to I AM / I Am correct Response |
| 9 | 11 / 21 / him to her / It was a female I took home |
| 10 | 17 / 6 / Delete "on duty" Duplication |
| 11 | 20 / 22 / Detections - Detentions   Miss spelling |
| 12 | 22 / 7 / Network to work   work is correct |
| 13 | 28 / 25 / Impartial / correct word |
| 14 | 31 / 17 / Chief Johnson   Miss Spelling |
| 15 | 46 / 17 / Tony to Troy / Correct Name |
| 16 | 54 / 20 / inAudible / Moore |
| 17 | 54 / 22 / inAudible / Law Enforcement Bureau Chief |
| 18 | Under penalties of perjury, I declare that I have |
| 19 | read the foregoing transcript and that the facts stated in it are true. |
| 20 | _KEVIN DUFFY_ 89-05  _10/11/2022_ Date |
| 21 | |
| 22 | (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW) |
| | Sworn and subscribed to before me this 11th day of |
| 23 | October , 20 22. |
| 24 | _Julie Ware_   _KEVIN DUFFY_ 89-05 |
| | Notary Public   KEVIN DUFFY |
| 25 | |

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023

U.S. Legal Support | www.uslegalsupport.com                259

Kevin Duffy
September 19, 2022

1          E R R A T A   S H E E T

2  Witness: KEVIN DUFFY
   RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
3  official capacity as Douglas County Sheriff
   Date of Proceeding: September 19, 2022
4  U.S. Legal Support Reference No.: 6192843

5       PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
            REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
6

7       Page / Line /      Change      / Reason.

8   55 / 6 / inaudible      / Law Enforcement Bureau

9   57 / 1 / Patrols        / drop the S

10  61 / 23 / Control       / Patrol

11  75 / 1 /    a           / drop the a

12  105 / 15 / inaudible    / acredited

13  105 / 22 / CF--CSB      / to   CSV

14  122 / 16 / give to get  / proper wording

15  122 / 21 / Save to Solve / Proper wording

16  123 / 18 / industrial to division  Proper word

17  154 / 11 / gonna to going to   Proper wording

18  Under penalties of perjury, I declare that I have
    read the foregoing transcript and that the facts stated in it
19  are true.
    _____  10/11/2022
20  KEVIN DUFFY                    Date

21

22  (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
    Sworn and subscribed to before me this 11th day of
23  October        , 20 22 .

24  _____      _____
    Notary Public                 KEVIN DUFFY

25

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2025

Kevin Duffy
September 19, 2022

```
 1              E R R A T A   S H E E T
 2  Witness: KEVIN DUFFY
    RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
 3  official capacity as Douglas County Sheriff
    Date of Proceeding: September 19, 2022
 4  U.S. Legal Support Reference No.: 6192843

 5      PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
            REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
 6

 7      Page / Line /     Change     / Reason.

 8   164 / 12 / drop "a--as a very" / Proper wording

 9   165 / 7 / drop other to on / Proper wording

10   185 / 6 / Would not be / correct statement

11   185 / 6 / Change there to either / Proper wording

12   187 / 16 / going to be / Proper wording

13   210 / 6 / BRAWNER to BRONNER / Miss Spelling

14   210 / 12 / "    "    "    "    "

15   210 / 19 / ".   "    "    "    "

16   211 / 5 / "    "    "    "    "

17   211 / 6 / "    "    "    "    "

18  Under penalties of perjury, I declare that I have
    read the foregoing transcript and that the facts stated in it
19  are true.

20  KEVIN DUFFY              10/11/2022
                            Date
21

22  (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
    Sworn and subscribed to before me this 11th day of
23  October          , 20 22.

24  _____    _____
    Notary Public          KEVIN DUFFY
25
```

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 2015400678F
MY COMMISSION EXPIRES 02/17/2023

Kevin Duffy
September 19, 2022

1                    E R R A T A    S H E E T

2   Witness: KEVIN DUFFY
    RE: HOLLY KLUTH vs. TONY SPURLOCK, Individually and in his
3   official capacity as Douglas County Sheriff
    Date of Proceeding: September 19, 2022
4   U.S. Legal Support Reference No.: 6192843

5        PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
            REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
6

7        Page / Line /      Change      / Reason.

8   212 / 10 / BRAWNER to BRONNER   Miss Spelling

9   212 / 12 /    "        "   /  "        "        "

10  213 / 2 /    "         "   /"        "        "

11  213 / 13 / LORi BRONNER   Miss Spelling

12  214 / 9 /   "         "   /      "      "     "

13  214 / 10 / Jensen to Kennedy   Proper Person

14  236 / 8 / DARRiN to DARREN   Miss Spelling

15  236 / 15 /   "      "    "/   "        "

16  236 / 19 /   "      "    "/    "       "

17  237 / 2 /   "      "    "/   "       "

18  Under penalties of perjury, I declare that I have
    read the foregoing transcript and that the facts stated in it
19  are true.
                                      10/11/2022
20  KEVIN DUFFY                    Date

21

22  (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
    Sworn and subscribed to before me this 11th day of
23  October       , 20 22

24  Julie Ware
    Notary Public              KEVIN DUFFY

25

JULIE WARE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154006786
MY COMMISSION EXPIRES 02/17/2023