**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-03417-NYW-SBP

HOLLY KLUTH,

      Plaintiff,

v.

TONY SPURLOCK, in his individual capacity, and
DARREN WEEKLY, in his official capacity,[1]

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

      This matter is before the Court on Defendant[s'] Motion for Summary Judgment [Doc. 30] and Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion for Summary Judgment") [Doc. 33]. Upon review of the Motions and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, Defendants' Motion for

---

[1] The Parties represent that Sheriff Tony Spurlock's term as Douglas County Sheriff has ended and that Sheriff Darren Weekly is now the Sheriff of Douglas County. [Doc. 41 at 1 n.1; Doc. 38 at 24]. The Court substitutes Sheriff Weekly for Sheriff Spurlock under Rule 25(d) insofar as Sheriff Spurlock was sued in his official capacity. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) ("An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works."). For purposes of clarity, the Court continues to refer to Sheriff Spurlock using the "Sheriff" designation. In addition, when addressing arguments raised by Sheriff Spurlock in his briefing but which apply to the claims against Sheriff Weekly, the Court refers to those arguments as having been raised by Sheriff Weekly; defense arguments applicable to both Defendants are construed as having been raised by Defendants jointly.

Summary Judgment is **GRANTED in part** and **DENIED in part** and Plaintiff's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises out of the termination of Plaintiff Holly Kluth ("Plaintiff" or "Ms. Kluth") from her employment with the Douglas County Sheriff's Office (the "Sheriff's Office"). *See generally* [Doc. 1]. Ms. Kluth alleges that Defendant Tony Spurlock ("Sheriff Spurlock"), Plaintiff's then-supervisor, unlawfully terminated her employment in retaliation for her political affiliation and protected speech. [*Id.* at ¶¶ 165–66].

Ms. Kluth initiated this lawsuit on December 21, 2021, asserting four claims for relief: (1) a First Amendment retaliation claim asserted under 42 U.S.C. § 1983 against Sheriff Spurlock in his individual capacity and Darren Weekly ("Sheriff Weekly") in his official capacity ("Claim One"); (2) a Fourteenth Amendment procedural due process claim against Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity ("Claim Two"); (3) a claim under Section 13-21-131 of the Colorado Revised Statutes against Sheriff Spurlock in his individual capacity ("Claim Three"); and (4) a breach of implied contract claim against Sheriff Weekly in his official capacity ("Claim Four").[2] [*Id.* at ¶¶ 160–207].

Ms. Kluth has moved for partial summary judgment with respect to (1) her claim for breach of an implied contract and (2) Defendants' affirmative defense of failure to mitigate damages. [Doc. 33]. Sheriff Spurlock and Sheriff Weekly have also moved for summary judgment in their favor on each of Plaintiff's claims, as well as Plaintiff's request for punitive damages. [Doc. 30]. In her Response to Defendants' Motion for Summary Judgment, Ms. Kluth "concedes" her "due process claims," including her claim under § 13-21-131 insofar as it is based on a due-process

---

[2] *See infra* note 22.

theory.  [Doc. 38 at 2, 25 n.10].  The Court **CONSTRUES** Plaintiff's Response as abandoning Claim Two in its entirety and Claim Three insofar as it is based on a violation of her due process rights and does not address them in this Order.  Defendants are entitled to judgment on these claims.  *See Bagoue v. Dev. Pathways, Inc.*, No. 16-cv-01804-PAB-NRN, 2019 WL 4597869, at *13 n.17 (D. Colo. Sept. 23, 2019) ("[A] party's abandonment of a claim is a sufficient basis to grant summary judgment."); *Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming decision to grant summary judgment in the defendant's favor when the plaintiff abandoned his claim).

## LEGAL STANDARD

Under Rule 56 of the Federal Rule of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard."  *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  However, the summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial.  A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's

claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views each motion "in the light most favorable to its nonmoving party." *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.[3]

1.     Ms. Kluth was employed by the Sheriff's Office as the Douglas County Undersheriff from approximately 2014 until 2020. [Doc. 30 at ¶ 1; Doc. 38 at 2, ¶ 1; Doc. 30-1 at 107:18–21].[4]

---

[3] Both Parties have, in certain instances, disputed only a portion of a statement of fact asserted by the opposing Party. When this is the case, the Court accepts the portions of a Party's assertion of fact that are not specifically contested as undisputed without further note from the Court.

[4] When citing to transcripts, the Court cites to the document number generated by the CM/ECF system but to the page and line numbers appearing on the transcript. In all other instances, the Court cites to the page numbers generated by the CM/ECF system.

2.      Ms. Kluth did not have an express employment contract with the Sheriff's Office. [Doc. 30 at ¶ 3; Doc. 38 at 3, ¶ 3; Doc. 30-1 at 204:7–10].[5]

3.      In September 2020, Sheriff Spurlock publicly endorsed a Democratic candidate for Douglas County Commissioner.  [Doc. 30 at ¶ 7; Doc. 38 at 3, ¶ 7; Doc. 30-4 at 13].

4.      In response to Sheriff Spurlock's endorsement, an individual associated with the Douglas County GOP, Stu Parker, contacted Ms. Kluth and at least one other Sheriff's Office employee, Tim Moore ("Captain Moore"), and asked them to prepare statements in support of Douglas County GOP candidates.  [Doc. 30 at ¶ 8; Doc. 38 at 3, ¶ 8; Doc. 30-4 at 13–14].

5.      Ms. Kluth and Captain Moore exchanged text messages discussing Mr. Parker's request for public statements.  [Doc. 30 at ¶ 10; Doc. 38 at 3, ¶ 10]; *see generally* [Doc. 30-5].

6.      Ms. Kluth was aware that Captain Moore, her subordinate, was soliciting members of the Sheriff's Office command staff to write supportive statements.  [Doc. 30 at ¶ 13; Doc. 38 at 3, ¶ 13; Doc. 30-4 at 14].

7.      Ms. Kluth provided a statement to Mr. Parker "expressing support for Republican candidates."  [Doc. 30 at ¶ 14; Doc. 38 at 4, ¶ 14; Doc. 30-4 at 14; Doc. 30-4 at 14].[6]

8.      Ms. Kluth also posted a message on Facebook, which referenced Sheriff Spurlock, in response to Sheriff Spurlock's endorsement of a Democratic candidate for Douglas County Commissioner.  [Doc. 30 at ¶ 15; Doc. 38 at 4, ¶ 15; Doc. 30-6; Doc. 30-1 at 24:20–25].

---

[5] Defendants assert that "Plaintiff . . . did not have a contract for employment" with the Sheriff's Office.  [Doc. 30 at ¶ 3].  Plaintiff attempts to dispute this fact by stating that the Sheriff's Office "Disciplinary Policy was an implied contract of employment."  [Doc. 38 at 3, ¶ 3].  This is a legal dispute, not a factual one, and no Party disputes that there was no express employment contract between Ms. Kluth and the Sheriff's Office.  The Court thus construes this fact as undisputed.  *See* Fed. R. Civ. P. 56(e)(2).

[6] Neither Party expressly informs the Court of the contents of the statement Ms. Kluth gave to Mr. Parker.  Insofar as Defendants cite to their Exhibit E to reference the statement, the screenshots provided of the statement(s) are illegible.  *See* [Doc. 30-5 at 1–2].

9.     An internal affairs investigation was initiated in late September 2020 or early October 2020 concerning Ms. Kluth's and Captain Moore's conduct.  [Doc. 30 at ¶ 16; Doc. 38 at 4, ¶ 16]; *see generally* [Doc. 30-7].

10.     At the time she was contacted by Mr. Parker, Ms. Kluth's position as the Douglas County Undersheriff required her to be "in sync" with Sheriff Spurlock "on matters related to" the Sheriff's Office.  [Doc. 30 at ¶ 9; Doc. 38 at 3, ¶ 9; Doc. 30-1 at 9:23–10:7].

11.     At an interview during the investigation, Ms. Spurlock acknowledged that she understood her conduct could be perceived as "contrary to the Sheriff" or creating a "split" in the command staff; that she was supposed to be "in sync" with Sheriff Spurlock; and that it "ma[de] sense" that her conduct "would make people think there's a rift in the [Sheriff's Office] internally" and that this was "not good."  [Doc. 30 at ¶ 18; Doc. 38 at 4, ¶ 18; Doc. 30-8 at 22:36–23:40;[7] Doc. 30-7 at 4].

12.     At the end of the investigation, it was determined that Ms. Kluth violated five Sheriff's Office policies: the Participating in Election Campaigns policy; the On-and-Off Duty Conduct policy; the Exercising Discretion policy; the Responsibility for Conduct policy; and the Internet Social Networking and Personal Websites policy.  [Doc. 30 at ¶ 20; Doc. 38 at 4, ¶ 20; Doc. 30-7 at 1].

13.     Ms. Kluth admitted to violating these policies.  [Doc. 30 at ¶ 27; Doc. 38 at 4, ¶ 27; Doc. 30-12 at 1–2].[8]

---

[7] Defendant's Exhibits H, I, and J are conventionally submitted audio or video recordings.  *See* [Doc. 30-8; Doc. 30-9; Doc. 30-10].  The Court cites to the placeholder docket entry for each Exhibit and to the approximate timestamps of the relevant portions of the recordings.

[8] Ms. Kluth states that she did so only "because it was futile to dispute them and she was concerned about further upsetting [Sheriff] Spurlock."  [Doc. 38 at 4, ¶ 27].  Any dispute as to Ms. Kluth's motivation for admitting to policy violations is not material for purposes of this Order.

14.     Ms. Kluth and Sheriff Spurlock had a pre-disciplinary hearing on November 12, 2020.  [Doc. 30 at ¶ 21; Doc. 38 at 4, ¶ 21; Doc. 30-1 at 8:7–11].

15.     At the pre-disciplinary hearing, Ms. Kluth told Mr. Spurlock that she "agree[d]" and "underst[ood]" that "[p]eople have to see [Sheriff Spurlock] and [his] undersheriff as being united."  [Doc. 30 at ¶ 22; Doc. 38 at 4, ¶ 22; Doc. 30-9 at 10:00–10:20, 11:30–12:01].

16.     Ms. Kluth and Sheriff Spurlock had a disciplinary hearing on November 16, 2020.  [Doc. 30 at ¶ 23; Doc. 38 at 4, ¶ 23; Doc. 30-1 at 9:5–8].

17.     In a memorandum dated November 16, 2020, Ms. Kluth stated that she "[took] full responsibility for [her] actions and inactions in this situation" and "apologize[d] for betraying [Sheriff Spurlock's] trust and allowing this to occur."  [Doc. 30 at ¶ 26; Doc. 38 at 4, ¶ 26; Doc. 30-11 at 1; Doc. 30-1 at 32:11–33:5].

18.     She also stated that she did not intend to appeal the discipline and "accept[ed] full responsibility" for what she did and "accept[ed] the outcome."  [Doc. 30 at ¶ 28; Doc. 38 at 5, ¶ 28; Doc. 30-12 at 1–2].

19.     As a result of the policy violations, Ms. Kluth was demoted from Undersheriff to Captain in November 2020.  [Doc. 30 at ¶ 30; Doc. 38 at 5, ¶ 30; Doc. 30-13 at 2].[9]

20.     As a Captain, Ms. Kluth did not owe a duty of political loyalty to Sheriff Spurlock. [Doc. 38 at 9, ¶ 7; Doc. 41 at 5, ¶ 7; Doc. 38-15 at 1; Doc. 38-1 at 59:13–17].

21.     On February 6, 2021, Ms. Kluth informed Sheriff Spurlock that she planned to run for Douglas County Sheriff, and she publicly announced her candidacy on February 13, 2021. [Doc. 33 at ¶¶ 25–26; Doc. 35 at 4, ¶¶ 25–26; Doc. 33-6 at 101:22–102:12].

---

[9] Ms. Kluth's retaliation claim is not based on her demotion.  *See* [Doc. 38 at 23].

22.     During her time as a Captain, Ms. Kluth did not receive any formal performance evaluations.  [Doc. 38 at 9, ¶ 8; Doc. 41 at 5, ¶ 8; Doc. 38-2 at 90:13–23].

23.     In addition, Ms. Kluth was not subject to any internal affairs investigations or personnel complaint actions[10] and did not receive any formal or informal discipline as a Captain. [Doc. 38 at 9, ¶¶ 9, 13; Doc. 41 at 5, ¶¶ 9, 13; Doc. 38-1 at 118:5–23, 220:23–18; Doc. 38-13].

24.     On May 25, 2021, Sheriff Spurlock and Ms. Kluth had a meeting, which was also attended by Laura Leary, the Douglas County Human Resources Director, and Jason Kennedy, the Sheriff's Office Captain of Professional Standards.  [Doc. 30 at ¶ 32; Doc. 38 at 7, ¶ 32; Doc. 30-1 at 164:22–165:3].

25.     At the meeting, Sheriff Spurlock informed Ms. Kluth that she was not meeting his vision, mission, and values.  [Doc. 30 at ¶ 33; Doc. 38 at 8, ¶ 33; Doc. 30-1 at 167:2–14].

26.     He also stated that "nothing had changed since last fall."  [Doc. 33 at ¶ 37; Doc. 35 at 6, ¶ 37; Doc. 33-1 at 16:–22].

27.     Ms. Kluth was familiar with Sheriff Spurlock's vision, mission, and values, and agreed that all command staff members should be in agreement with the Sheriff's vision, mission, and values.  [Doc. 30 at ¶¶ 5–6, Doc. 38 at 3, ¶¶ 5–6; Doc. 30-1 at 49:6–10; 168:15–17].

28.     Sheriff Spurlock offered Ms. Kluth a severance agreement and the opportunity to resign, which Ms. Kluth declined.  [Doc. 30 at ¶ 34; Doc. 38 at 8, ¶ 34; Doc. 30-1 at 166:6–19; Doc. 30-3 at 203:6–17].

---

[10] Sheriff Spurlock described a personnel complaint action as a "low-level" complaint that does not rise to the level of an internal affairs investigation.  *See* [Doc. 38-1 at 28:25–29:16].

29.     Sheriff Spurlock terminated Ms. Kluth's employment with the Sheriff's Office at the May 25, 2021 meeting.  [Doc. 30 at ¶ 2; Doc. 38 at 2, ¶ 2; Doc. 30-1 at 164:22–165:23; Doc. 30-3 at 203:4–7].

30.     At the time of Ms. Kluth's termination, the Sheriff's Office "Disciplinary / Corrective Action Policy" (the "Disciplinary Policy"), which sets forth the procedures governing the termination of Sheriff's Office employees, was in effect.  [Doc. 33 at ¶¶ 10–11; Doc. 35 at 3, ¶¶ 10–11; Doc. 33-1 at 219:25–220:2]; *see generally* [Doc. 33-2].

31.     The Disciplinary Policy states, in pertinent part, that if a supervisor is initiating discipline that involves a two-year letter of reprimand or greater discipline, the Sheriff's Office will conduct a pre-disciplinary hearing and will provide the employee with notice of the hearing, including the "nature of the charge(s) sustained against the [employee] and a description of the intended sanctions," at least 24 hours before the hearing.  [Doc. 33 at ¶¶ 15–16; Doc. 35 at 3, ¶¶ 15–16; Doc. 33-2 at § VII.B].

32.     No other Sheriff's Office policies address deputies' rights to notice or an opportunity to be heard with respect to termination.  [Doc. 33 at ¶ 13; Doc. 35 at 3, ¶ 23]; *see generally* [Doc. 33-3].

33.     Ms. Kluth was not provided a pre-disciplinary hearing or any notice of her termination prior to the May 25, 2021 meeting.  [Doc. 33 at ¶¶ 35–36; Doc. 35 at 6, ¶¶ 35–36; Doc. 33-1 at 205:9–11, 206:20–23, 222:11–13, 223:11–224:9; Doc. 38-4 at 283:11–20].[11]

---

[11] Ms. Kluth asserts that she did not receive a pre-termination hearing or any notice of her termination prior to the May 25, 2021 meeting.  [Doc. 33 at ¶¶ 35–36].  Sheriff Spurlock "[a]dmit[s] that Sheriff Spurlock believes Plaintiff did not have advance notice that the May 25, 2021 meeting related to her termination."  [Doc. 35 at 6, ¶ 36].  While the Court notes that Ms. Kluth's assertions are supported by citations to Sheriff Spurlock's deposition, Ms. Kluth also testified at her deposition that she did not receive notice of her potential termination prior to the meeting.  [Doc. 38-4 at 283:11–20]; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider

34.     Ms. Kluth initiated this lawsuit on December 21, 2021.  [Doc. 1].

## ANALYSIS

## I.     First Amendment Retaliation

First, Sheriff Spurlock argues that he is entitled to qualified immunity against Ms. Kluth's First Amendment claim.  [Doc. 30 at 8].  The doctrine of qualified immunity protects government officials from individual liability for actions carried out while performing their official duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017).  Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the defendant's action.  *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).  The Court may address the two prongs of the qualified-immunity analysis in either order. *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019).

Because qualified immunity is available only to defendants sued in their individual capacities, *Sanchez v. Hartley*, 810 F.3d 750, 754 n.2 (10th Cir. 2016), the Court construes the qualified-immunity argument as being raised by Sheriff Spurlock in his individual capacity. Defendants also argue, however, that to the extent Ms. Kluth asserts an official-capacity claim, "her claim fails because there is no evidence of an underlying constitutional violation by Sheriff Spurlock."  [Doc. 30 at 23 n.5].  Thus, the Court finds that the arguments related to the first prong

---

only the cited materials, but it may consider other materials in the record.").  Sheriff Spurlock does not cite to any evidence that would create a genuine dispute of fact as to whether Ms. Kluth had pre-termination notice.  *See* [Doc. 35 at 6, ¶ 36].  Accordingly, the Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

of the qualified-immunity analysis apply equally to the claim against Sheriff Weekly in his official capacity.

Sheriff Spurlock's qualified-immunity argument is presented in two parts. First, he contends that to the extent Ms. Kluth's First Amendment claim is based on a violation of her First Amendment right to freedom of speech, Ms. Kluth's claim fails under the five-part *Garcetti/Pickering* test. [Doc. 30 at 10]. He then argues that insofar as Claim One is based on the First Amendment's guarantee of freedom of association, the claim fails under the *Elrod/Branti* line of cases. [*Id.* at 18]. For each First Amendment theory, the Court first assesses whether Ms. Kluth has put forth sufficient evidence of a constitutional violation before turning to whether the constitutional right was clearly established at the time of the alleged violation.

## A.    Freedom of Speech

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests 'in promoting the efficiency of the public services it performs through its employees.'" *Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

To achieve this balance, the Supreme Court has adopted a five-part test, known as the *Garcetti/Pickering* test, to evaluate a public employee's First Amendment claim. The *Garcetti/Pickering* test is comprised of five elements:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the

government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).  The first three elements are questions of law to be decided by the court, while the latter two elements are questions of fact reserved for the factfinder.  *Id.*  Defendants argue that "Plaintiff's retaliation claim fails under the second, third, and fourth steps" of the *Garcetti/Pickering* analysis.  [Doc. 30 at 10].[12]

### 1.    Matter of Public Concern

"Matters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'"  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147–48.  In making this determination, courts look to "whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee."  *Lander v. Summit Cnty. Sch. Dist.*, 109 F. App'x 215, 218 (10th Cir. 2004) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999)).

---

[12] Defendants also assert, in a footnote, that "[e]ven if Plaintiff could withstand summary judgment on [the second, third, and fourth steps of the *Garcetti/Pickering* test], her claim still fails under the fifth step."  [Doc. 30 at 10 n.3].  It is well settled that "[a]rguments raised in a perfunctory manner, such as in a footnote, are waived."  *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002).  Because the defendant bears the burden at step five, *see Meyers v. E. Okla. Cnty. Tech. Ctr.*, 776 F.3d 1201, 1206 (10th Cir. 2015), and because Defendants fail to raise an argument supported by legal authority, legal analysis, or citations to record evidence, the Court deems this argument waived.

Defendants contend that Ms. Kluth's speech—namely, her "communications to Stu Parker . . . and her DCSO subordinate Chief Tim Moore and her Facebook post"—involves a matter of private, not public, concern because the speech was "reasonably perceived by Sheriff Spurlock as being primarily motivated by [Ms. Kluth's] personal interests and concerns rather than a public concern." [Doc. 30 at 12].   More specifically, Defendants argue that Ms. Kluth's speech was "principally motivated by Plaintiff's concerns and interest in salvaging her personal reputation" within the Douglas County GOP, and because Sheriff Spurlock reasonably believed that Ms. Kluth's speech was motivated by personal considerations, he is entitled to qualified immunity on the First Amendment claim.  [*Id.* at 12–13].  This argument is more applicable to the "clearly established" prong of the qualified-immunity analysis, *see Singh v. Cordle*, 936 F.3d 1022, 1036 (10th Cir. 2019) (concluding that the defendant would be entitled to qualified immunity on the second *Garcetti/Pickering* prong if a "reasonable [employer] could have believed that Plaintiff was motivated primarily by personal grievance," such that it was not clearly established that his conduct would result in a constitutional violation), rather than whether the speech itself involved a matter of public concern.

Ms. Kluth states in her Response that her free speech claim is based on three categories of speech: (1) "her September 2020 speech responding to Spurlock's political endorsement,"[13] (2) the Facebook post, and (3) speech relating to her campaign for Sheriff.[14]  [Doc. 38 at 14].  Neither

[13] Ms. Kluth does not clarify in her Response exactly what "her September 2020 speech responding to Spurlock's political endorsement" refers to.  *See generally* [Doc. 38].  She does state that "[a]fter [Sheriff] Spurlock endorsed a Democratic Candidate for County Commissioner, Ms. Kluth and Captain Moore communicated regarding a public statement responding to [the] endorsement."  [*Id.* at 17]; *see also* [*id.* at 3, ¶¶ 8–14].  The Court thus construes "speech responding to Spurlock's political endorsement" to refer to Ms. Kluth's and Captain Moore's communications regarding a public political statement.  *See* [Doc. 30-5].

[14] Defendants do not argue that Ms. Kluth's "speech related to her February 2021 campaign for sheriff" is not a matter of public concern.  *See* [Doc. 30; Doc. 41].  The Court thus need not decide

13

Party addresses whether the Court should analyze the two categories of speech at issue in this
Order together or separately.  "In some cases, a pattern of speech may be considered as a unitary
whole for determining whether it addresses matters of public concern."  *Brammer-Hoelter*, 492
F.3d at 1205.  Determining whether separate instances of speech should be analyzed together is a
fact-specific inquiry and depends on "the time frame in which the speech occurred, the different
audiences to which the speech may have been directed, the continuity of the speech, and the degree
to which the different aspects of speech built upon each other to create a cumulative impact on the
state employer."  *Johnsen v. Indep. Sch. Dist. No. 3*, 891 F.2d 1485, 1492 (10th Cir. 1989).
Because neither Party explains why the speech should be addressed as a collective whole, and
because the Court finds material, dispositive differences between the two types of speech, the
Court finds it appropriate to analyze the speech separately, focusing on the "content, form, and
context" of the speech "as revealed by the whole record."  *Connick*, 461 U.S. at 147–48.

       ***The Facebook Post***.   The Court first considers the <u>content</u> of the Facebook post.
Defendants offer no argument analyzing the content of Ms. Kluth's post, *see* [Doc. 30 at 12–13],
which stated, in full:

> I don't often post political things on Facebook, but in this tumultuous time in our
> County and Country, for those that have been asking for the past couple days where
> I stand, I put this forth:
>
> 1) I've known Sheriff Tony Spurlock for over 30 years, I respect what he has
> sacrificed in his service to the citizens of Douglas County and I respect his desire
> to make the decisions he believes are right for the community and for his own life.
>
> 2) With that said, I have been a registered Republican and GOP volunteer in
> Douglas County for over two decades.

---

whether it is; because Defendants do not move for summary judgment on this theory underlying
Claim One, this portion of the Claim remains.

3) I will support and vote for conservative candidates that I think have the beliefs I do about public safety, government, rights, the law, the constitution, and our Country.

4) In Douglas County, as it is in this nation, whoever is elected by the people, I will respect and keep my service about public safety, law and order, the rights of ALL people, and ensure equal protection under the law.

5) My husband and I have been LE Officers for a combined 70 years and I am proud of that service and proud of our children's desire to serve others in their life in the Ministry and Medical fields.

6) I respect each person's right to believe what they want, support who they want, and I will NEVER hold my association, friendship, or love over them for such reasons.

7) Mostly, I believe that there is only one King and I will try to model my life and leadership after His.

[Doc. 30-6].

The content of Ms. Kluth's Facebook post suggests that this speech is a matter of public concern. "Courts have held that political speech regarding a public election is undoubtedly a matter of public concern." *Brammer-Hoelter*, 492 F.3d at 1205. *See, e.g.*, *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002) (recognizing that "[s]peech about political elections . . . undoubtedly" touches upon matters of public concern); *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998) ("We would be hard pressed to classify the election of a city council member as anything other than a matter of great public concern."); *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996) ("[T]he advocacy of a particular candidate for public office is the type of core political speech the First Amendment was designed to protect."). This includes speech campaigning for or publicly supporting political candidates. *See Duda v. Elder*, No. 18-cv-02890-RBJ, 2020 WL 6290383, at *14 (D. Colo. Oct. 27, 2020), *aff'd*, 7 F.4th 899 (10th Cir. 2021); *Allen v. Okla. Dep't of Lab.*, No. CIV-07-831-C, 2009 WL 10702951, at *4 (W.D. Okla. Apr. 21, 2009).

Ms. Kluth's Facebook post began by first acknowledging the political nature of her comment, discussed an upcoming Douglas County election, and voiced her support for "conservative candidates" who shared her beliefs "about public safety, government, rights, the law, the constitution, and our Country." [Doc. 30-6]. It also referenced a "tumultuous time in [Douglas] County and [the] Country" and demonstrates that for the "couple days" preceding the post, an unknown number of people had asked Ms. Kluth "where [she] [stood]" on the upcoming Douglas County election. [*Id.*]. While Ms. Kluth did not expressly mention any particular candidates in her Facebook post, the Court is not persuaded that this diminishes the public nature of her speech. A person's "assessment of the viability of a potential candidate's campaign and [her] belief about the relative merits of . . . potential candidates for public office" is "at the core of protected speech." *Bass*, 308 F.3d at 1089. The content of Ms. Kluth's speech touches on a subject that "the public or the community is likely to be truly concerned with or interested in," *Lander*, 109 F. App'x at 218, which suggests that it involves a matter of public concern.

Second, the Court considers the <u>form</u> of the speech; again, Defendants raise no argument with respect to the form of Ms. Kluth's speech in this context. *See* [Doc. 30 at 12–13]. "Speech in a form intended for primarily private consumption weighs against . . . a finding [that the speech involved a public concern]; by contrast, speech in a form that may engender public action falls in favor of finding that it did involve a matter of public concern." *Lamb v. Montrose Cnty. Sheriff's Off.*, No. 19-1275, 2022 WL 487105, at *7 (10th Cir. Feb. 17, 2022). It is undisputed that Ms. Kluth posted her election-related statements on her Facebook page, but the Parties direct the Court to no record evidence demonstrating that Ms. Kluth had limited the reach of her post (for instance, whether Ms. Kluth's Facebook post was only viewable by her "friends," and if so, how many people could or did view that Facebook post). The Court must draw all reasonable inferences in

Plaintiff's favor as the non-moving party on this claim, *see Banner Bank*, 916 F.3d at 1326, and based on the evidence detailing Sheriff Spurlock's apparent concern that the Facebook post would cause a rift in the Sheriff's Office, the Court draws the reasonable inference that the Facebook post was viewable and viewed by people in the public and/or in the Sheriff's Office. *See* [Doc. 30-3 at 163:25–164:10]; *cf.* [Doc. 30-4 at 11 (the investigation report stating that "the Republican Party did take parts of Undersheriff Kluth's Facebook post and place it into the Republican Party Facebook page")].

"Similar to writing a letter to a local newspaper, publicly posting on social media suggests an intent to 'communicate to the public or to advance a political or social point of view beyond the employment context.'" *Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011)) (citation omitted). The form of Ms. Kluth's speech, with the reasonable inferences drawn therefrom, weighs in favor of finding that it involved a matter of public concern. *Lamb*, 2022 WL 487105, at *7; *Moreau v. St. Landry Par. Fire Dist. No. 3*, No. 6:18-cv-00532, 2018 WL 4007362, at *5 (W.D. La. Aug. 8, 2018) ("The Court finds that the form of Plaintiff's speech—a public post on Facebook—also weighs in favor of finding that Plaintiff spoke on a matter of public concern. . . . [T]he form of Plaintiff's posts on a medium accessible by the community was primarily public."), *report and recommendation adopted*, 2018 WL 4000928 (W.D. La. Aug. 21, 2018); *cf. Wren v. Spurlock*, 798 F.2d 1313, 1317–18, n.2 (10th Cir. 1986) (finding a material difference between a private complaint to an employee's superior and a "letter from the majority of [a] school's faculty members calling for an investigation," which the Tenth Circuit classified as a "mode of public presentation").

Finally, the Court analyzes the <u>context</u> of Ms. Kluth's post, which is the consideration Defendants direct their arguments to. As explained above, Sheriff Spurlock argues that Ms. Kluth

engaged in speech for the purpose of rehabilitating her reputation.  [Doc. 30 at 12–13].  He does not expressly argue that this fact, alone, renders her speech private in nature, but instead argues that he is entitled to qualified immunity because any reasonable officer in his position would have also believed that the speech was primarily motivated by personal considerations, relying on *Singh v. Cordle*.  [*Id.*]; *see also Singh*, 936 F.3d at 1036.

While examining the context of speech includes analyzing the motives of the speaker, *Singh*, 936 F.3d at 1035, the Tenth Circuit has "never made the pronouncement that content could trump motive or *vice versa*.  Instead, the court must examine the entire record as a whole." *Oleynikova v. Bicha*, 453 F. App'x 768, 774 (10th Cir. 2011).  Indeed, the speaker's "subjective motivation, standing alone, is not determinative" of the issue; rather, the speaker's motivation helps the Court "assess the content of the speech 'to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.'"  *Arndt v. Koby*, 309 F.3d 1247, 1254–55 (10th Cir. 2002) (quoting *Gardetto*, 100 F.3d at 812).  If the speaker's motive were dispositive, "then the Supreme Court's direction that [courts] examine the content, form, and context of a given statement to determine whether it addresses a matter of public concern would be stripped of its meaning and purpose."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 166 (2d Cir. 2006).  Thus, while the speaker's motivation is relevant to the Court's analysis, it alone does not determine the public or private nature of a person's speech.

Furthermore, in support of his argument, the Court notes that Sheriff Spurlock relies on his own personal opinion statements about his subjective belief as to Ms. Kluth's intentions.  [Doc. 30 at 12–13].  But Defendants direct the Court to no legal authority suggesting that this evidence is sufficient to prove Ms. Kluth's personal motivation.  While this evidence demonstrates what *Sheriff Spurlock believed* Ms. Kluth's intentions to be, and could possibly be evidence of the

reasonableness of Sheriff Spurlock's belief, this evidence does not establish that Ms. Kluth's motivations were in fact primarily personal.  Moreover, and notably, while Defendants rely on statements Sheriff Spurlock made in his November 16, 2020 memorandum to evince his subjective belief of Ms. Kluth's motivations, Defendants noticeably omit his statement—contained in that same memorandum—opining that Ms. Kluth made her public statements "for the purpose[] of . . . attempting to influence a political outcome in the 2020 Douglas County Commissioner election." [Doc. 30-13 at 1]; *see also* [Doc. 30 at 12–13].  Thus, the Court is not persuaded that Sheriff Spurlock's memorandum is particularly convincing, either way, of *the fact* of Ms. Kluth's subjective motivations in speaking.

The Facebook post was made in the midst of an election cycle and was made in response to those who had been "asking for the past couple days where [Ms. Kluth] [stood]" with respect to the election.  [Doc. 30-6].  The Facebook post was clearly made to relay Ms. Kluth's views on the upcoming election and the involved candidates.  Unlike the speech at issue in most cases applying the *Garcetti/Pickering* test, Ms. Kluth's Facebook post did not raise concerns about internal workplace matters and does not appear "calculated to disclose [workplace] misconduct." *Brammer-Hoelter*, 492 F.3d at 1205.  Instead, her post was made "in relation to and in the context of an important community discussion and not as part of any particular employment practice or decision involving" Ms. Kluth, *Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995), and addresses a subject—a public election—that the Supreme Court has stated "occupies the core of the protection afforded by the First Amendment."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (collecting cases).  Even assuming Ms. Kluth was motivated by a desire to preserve her reputation, the context of the speech nevertheless suggests that her post involved a matter of public concern. *See O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1053 (11th Cir.

2022) ("Presumably, in any campaign setting, a candidate and his supporters will have a selfish purpose for speaking, including about rival candidates—namely, winning the election.  But far from undermining their speech's claim to First Amendment protection, that purpose at least arguably strengthens it."); *Vail v. Town of Cayuta*, No. 20-CV-6917-FPG, 2021 WL 1788523, at *4 (W.D.N.Y. May 5, 2021) (finding that the plaintiff's speech was of a public concern where the plaintiff was not "seek[ing] changes in the workplace" but was speaking on "the character and fitness of a candidate seeking re-election to local office").

And at the summary judgment stage, this Court must view any disputed facts—about the extent of dissemination of Ms. Kluth's Facebook post or to her motivations for such posting—in the light most favorable to Ms. Kluth.  *See Duda*, 7 F.4th at 913.  In sum, after considering the content, form, and context of Ms. Kluth's Facebook post, the Court concludes, as a matter of law, that it addressed a matter of public concern.

***The Text Messages***.  Defendants also contend that Ms. Kluth's text messages to Mr. Parker and Captain Moore, which "concerned preparation of statements from Plaintiff and other DCSO command staff in response to Sheriff Spurlock's endorsement of a Democrat for County Commissioner," involved a matter of private concern.  [Doc. 30 at 12].  Ms. Kluth argues generally that her "September 2020 speech" involved a matter of public concern, [Doc. 38 at 21–22]; *see also* [*id.* at 14 (Ms. Kluth stating that her First Amendment claim is "premised on . . . her September 2020 speech responding to Spurlock's political endorsement")], but she does not make any specific arguments identifying the speech specifically or explaining why, based on the content, form, and context of the speech, the speech involved a matter of public concern.  *See* [*id.* at 21–22].

Based on the content, form, and context of the text messages, the Court cannot conclude that Ms. Kluth's text messages involved a matter of public concern.  First, with respect to <u>content,</u>

the text messages involve the coordination and/or planning of political endorsements or statements, but for the most part, they do not directly speak on the merits or ideology of any candidates, platforms, or viewpoints.  *See generally* [Doc. 30-5].  At best, one text message from Ms. Kluth states: "I DONT [sic] specifically endorse Lora or George so that's not true, I support Republican candidates in [Douglas County] as a citizen[.]"  [*Id.* at 12].  But even assuming that "Lora" and "George" were then-candidates for public office, Ms. Kluth's statement that she does not endorse two individuals "*as a citizen*" was made in the <u>context</u> of her attempts to modify the planned public statement(s), *see* [Doc. 30-5 at 12], not in the context of expressing her "belief about the relative merits of . . . potential candidates for public office."  *Bass*, 308 F.3d at 1089.  And finally, as to the <u>form</u> of the messages, the text messages were not public statements, but were instead private messages between individuals; this too weighs against a finding that the text messages involve a matter of public concern.  *Lamb*, 2022 WL 487105, at *7; *see also Lumpkin v. Aransas Cnty.*, 712 F. App'x 350, 357 (5th Cir. 2017) ("The form of the messages—texts—similarly suggests that they should not be considered matters of public concern.  Communications visible to the public are more likely to concern the public.").  And absent any argument from Plaintiff explaining why the text messages specifically address matters of public concern, the Court cannot conclude that they do.  Accordingly, insofar as Ms. Kluth's free-speech claim is based on her text messages, the Court's analysis under *Garcetti/Pickering* ends here.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012).  Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's First Amendment claim, insofar as it raises a free-speech theory based on Ms. Kluth's text messages, as to both Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity.

## 2.      Balance of Interests

Given the conclusion that Ms. Kluth's text messages do not address matters of public concern, the remainder of the Court's analysis on the free-speech claim is limited to Ms. Kluth's Facebook post.    Defendants next challenge Ms. Kluth's free speech claim on the third *Garcetti/Pickering* prong—whether the government employer's interests in promoting the efficiency of public service outweigh the employee's interests in free speech.  *See* [Doc. 30 at 13–16].

The Supreme Court "ha[s] recognized that government employers often have legitimate interests in the effective and efficient fulfillment of their responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service."  *Lane v. Franks*, 573 U.S. 228, 242 (2014) (quotation and brackets omitted).  This interest "is particularly acute in the context of law enforcement, where there is a heightened interest in maintaining discipline and harmony among employees."  *Moore*, 57 F.3d at 934 (quotation and alteration marks omitted).  The third prong of the *Garcetti/Pickering* test requires the Court to determine, as a matter of law, whether the employee's interest in commenting on the issue outweighs the interest of the employer.  *Brammer-Hoelter*, 492 F.3d at 1207. Considerations relevant to this determination include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Id.* (quotation omitted).

The public employer "bears the burden of justifying its regulation of the employee's speech."  *Id.*  That burden "increases in proportion to the value of that speech in the public debate.'" *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (quotation

omitted). Even so, "[m]ost courts that have considered the issue have concluded that the government's interest in regulating the political speech of law enforcement personnel outweighs the individual officer's interest in engaging in certain kinds of political speech." *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1274 (10th Cir. 1998). "Indeed, courts have held that a government employer's power to curtail the political speech of law enforcement personnel extends far enough to ban activities such as attempting to influence voters, endorsing political candidates, and displaying political signs in their yards." *Id.*

The employer's interest against workplace disruption must relate to an employer's *internal* operations or relationships; evidence of an impact on the employer's *external* relationships or operations is not enough. *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989). An employer typically "need not show that the employee's speech *in fact* disrupted internal operations and employment relationships." *Helget v. City of Hays*, 844 F.3d 1216, 1222 (10th Cir. 2017) (emphasis in original). Instead, an employer can meet its burden by showing that the speech "could *potentially* become so disruptive to the employer's operations as to outweigh the employee's interest in the speech." *Id.* (quotation and alteration marks omitted). But different standards apply when the adverse employment action "took place 'long after' the employee spoke on a matter of public concern." *Duda*, 7 F.4th at 912–13. In that case, the Tenth Circuit "require[s] the employer to prove 'actual disruption'" to the workplace. *Id.* at 912; *see also Kent v. Martin*, 252 F.3d 1141, 1146 (10th Cir. 2001) ("If there has been no actual disruption justifying termination during the six months following an employee's protected speech, it is nonsensical to rely ex post facto on a 'prediction' of disruption to tip the balance in favor of an employer's interest in an efficient workplace.").

Here, Defendants argue that the government's interests in regulating Ms. Kluth's speech outweigh her interests in free speech for two reasons: (1) Plaintiff had a high-ranking position at the Sheriff's Office at the time of her speech, [Doc. 30 at 14]; and (2) Plaintiff's speech did not "expose corruption, misconduct, or other unlawful conduct or secret agenda." [*Id.* at 16]. With respect to Defendants' second argument, the line of cases they rely upon in support are not particularly applicable here. As explained above, Ms. Kluth's Facebook post did not concern internal workplace matters or seek to make changes in the workplace; instead, she publicly voiced support for a particular political viewpoint. Thus, the cases cited by Defendants in which the court found the employee's interests in free speech were outweighed because the speech did not seek to expose corruption or misconduct, but instead involved speech airing other workplace grievances, *see Klaassen v. Atkinson*, 348 F. Supp. 3d 1106, 1176 (D. Kan. 2018) ("discount[ing]" the employee's interest in free speech where the employee's speech "disagreed with [her supervisor's] management decisions" but did not disclose misconduct); *Helget*, 844 F.3d at 1224 (rejecting the plaintiff's argument that her interest in free speech was significant because it disclosed government misconduct where there was no evidence that she was disclosing misconduct), are not analogous to this case.

Turning to Defendants' other argument, they contend that Ms. Kluth's speech created a potential for disruption within the Sheriff's Office because as Undersheriff, Ms. Kluth was Sheriff Spurlock's "right-hand" person; "had a high public profile in Douglas County" and sometimes acted as "the face" of the Sheriff's Office; and was involved in Sheriff's Office policymaking. [Doc. 30 at 14]. Defendants note that Ms. Kluth acknowledged that her speech created the "appearance of a rift" between Ms. Kluth and Sheriff Spurlock and that the appearance of a rift "could have" been disruptive to the operations of the Sheriff's Office. [*Id.* at 16]. In response,

Plaintiff notes that Defendants fail to present evidence of actual disruption and argues that, on this basis, they have failed to meet their burden at step three.  [Doc. 38 at 22–23].

The Court agrees with Ms. Kluth that Defendants have not met their burden of demonstrating an actual disruption in internal operations, as required to demonstrate that the government's interests in workplace harmony outweighed Ms. Kluth's interests in speaking freely. Defendants direct the Court to evidence that Ms. Kluth acknowledged that there was "probably" an appearance of a rift between Ms. Kluth and Sheriff Spurlock "as a result of what [she] did," [Doc. 30-1 at 22:3–6]; that it "[made] sense" to Ms. Kluth that her conduct "would make people think there's a rift in the department internally," [Doc. 30-8 at 23:20–35]; and that Ms. Kluth stated that "[p]eople have to see [Sheriff Spurlock] and [his] undersheriff as being united."  [Doc. 30-9 at 11:29–35].  At best, this evidence demonstrates that Ms. Kluth understood that it was important for her to appear united with Sheriff Spurlock and that her Facebook post "probably" created the appearance of a rift between the two.  However, because the adverse action occurred eight months after Ms. Kluth's Facebook post, Defendants must show actual disruption to the workplace, not the mere potential for disruption.  *Duda*, 7 F.4th at 912–13; *Kent*, 252 F.3d at 1144.  Here, Defendants' evidence of a "rift" does not demonstrate the existence of any *actual* disruption within the Sheriff's Office's internal operations, or that any disruption was specifically caused Ms. Kluth's Facebook post.  *See Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014) ("The only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'"  (quoting *Brammer-Hoelter*, 492 F.3d at 1207) (emphasis in original)).

The Court acknowledges that the Sheriff's Office has an interest in "maintain[ing] discipline by superiors and harmony among co-workers, especially where close working

relationships exist for which personal loyalty and confidence are necessary." *Moore*, 57 F.3d at 934. The Court also acknowledges that Ms. Kluth's leadership position at the time of her speech could "increase[] the chance that [her] statements would impact" the Sheriff's Office internal operations. *Id.* at 934–35. But the eight-month gap requires Defendants to prove actual disruption, *Kent*, 252 F.3d at 1144, and they have not done so here. Accordingly, they have not met the burden of demonstrating that the balance of interests tips in the government's favor, and summary judgment on this basis is not appropriate. *See Bailey v. Indep. Sch. Dist. No. 69 of Canadian Cnty. Okla.*, 896 F.3d 1176, 1183 (10th Cir. 2018) (denying employer's motion for summary judgment where, over a year after the protected speech, "no disruption had materialized").

### 3.      Substantial or Motivating Factor

Finally, Defendants argue that Plaintiff's First Amendment free-speech claim fails on the fourth prong of the *Garcetti/Pickering* test, which requires an inquiry into whether Ms. Kluth's protected speech was a substantial or motivating factor in her termination. *Dixon*, 553 F.3d at 1302. Unlike the Court's analysis on the previous elements, the fourth prong involves a question of fact that is typically reserved to the factfinder. *Id.* The question before the Court is whether Plaintiff has adduced sufficient evidence that would permit a reasonable jury to find in her favor on this element. *See Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 484 (10th Cir. 2011).

To demonstrate that speech was a substantial or motivating factor in the employer's adverse employment action, the employee need not prove that her speech was the sole reason for the adverse action. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). "To withstand summary judgment at step [four], . . . an employee must produce evidence linking the employer's action to

the employee's speech." *Id.* Speculation is insufficient to preclude summary judgment at this step. *Id.* at 1189.

Defendants contend that Plaintiff's speech was not a substantial, motivating factor in her termination because her termination occurred almost eight months after publishing her Facebook post. [Doc. 30 at 17]. According to Defendants, "this lapse of time of more than half a year negates any causal inference that [Ms. Kluth's] allegedly protected speech was a substantial motivating factor in the decision to terminate her employment." [*Id.*]. Furthermore, Defendants assert that multiple intervening events between the Facebook post and her termination broke any causal chain between the speech and the adverse action. [*Id.* at 18].[15]

Ms. Kluth responds that genuine issues of material fact preclude the entry of summary judgment in Defendants' favor, raising a number of arguments advocating for denial of Defendants' Motion. [Doc. 38 at 15–20]. She contends that after she engaged in protected activity, Sheriff Spurlock engaged in a pattern of retaliatory conduct against her that ultimately culminated in her termination. [*Id.* at 15–16]. She also argues that "there is abundant evidence of pretext" contradicting Sheriff Spurlock's stated reasons for her termination. [*Id.* at 17–20].

First, Ms. Kluth points the Court to the fact that at the May 25, 2021 termination meeting, Sheriff Spurlock told Ms. Kluth that "nothing had changed since the fall." [*Id.* at 16]. Ms. Kluth contends that this statement "referred to Ms. Kluth's political activities," which the Court construes as including the Facebook post, because Sheriff Spurlock "admitted that Ms. Kluth did not engage in the same sort of specific conduct, or violate the same policies, that caused her fall 2020

---

[15] Although Defendants also argue in their Reply that Ms. Kluth's speech "relating to" her campaign was not a substantial or motivating factor in her termination, *see* [Doc. 41 at 10], the Court declines to consider arguments raised for the first time in a reply brief. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011).

demotion, and nothing else occurred in the fall of 2020 that [Sheriff] Spurlock could have been referring to." [*Id.* at 11, ¶ 26]. While Defendants argue that "the only credible evidence on this matter comes from Sheriff Spurlock," who explained that this statement meant that Ms. Kluth "continued to not live up to the vision, mission, and values" of the Sheriff's Office, *see* [Doc. 41 at 11], "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Defendants acknowledge that "last fall" referred to when "Plaintiff acted (self-admittedly) in a matter that could be perceived as 'contrary to the sheriff' and *a 'split' in the command staff*"—in other words, when Ms. Kluth engaged in protected speech. *See* [Doc. 41 at 11 (emphasis added)]. A reasonable jury could infer that Sheriff Spurlock's stated basis for Ms. Kluth's termination was a veiled reference to the September 2020 Facebook post.

In addition, Sheriff Spurlock further discussed this statement in his deposition:

Q.     And you told Ms. Kluth that nothing had changed since last fall?

A.     Yes, this was -- this was -- this statement was made after she asked me, can you give me -- what have I done?  Tell me what I have done.  And I said, you know, nothing has changed.  Your behavior hasn't changed since last fall.

Q.     What had happened last fall?

A.     That's when she was demoted from Undersheriff to Captain.

Q.     So that comment kind of harkened back to the comment that she engaged in behavior that led to her demotion.

A.     The policy -- . . . [t]he policy violations. . . .  And basic just behavior, trust.

Q.     Had she in the time between her demotion and her termination, had she continued to instruct subordinates to engage in political activity?

A.     No, but that wasn't the issue.

Q.     Had she continued to conspire with subordinates behind your back?

A.      No.  She continued to not live up to the vision, mission, and values.

[Doc. 38-1 at 213:16–214:17].  Sheriff Spurlock was then specifically questioned whether Ms. Kluth had continued to violate each of the five workplace policies she was found to have violated prior to her demotion in November 2020; he answered that Ms. Kluth had not continued to violate three of the policies, but that she had continued to violate the remaining two.  [*Id.* at 214:21–215:17].  But then when he was asked a clarifying question about the two policies he suggested Ms. Kluth had continued to violate, he stated:

> Well, and I just want to make it clear, *I'm not saying that she continued to do that.* She failed the vision, mission, and values which are part of bad judgment, trust, and unity.  And those are many not these specific, but they are policies of this office, and that's what was meant when I said, you have not changed your behavior since last fall.  You're still violating policies.  They're just different policies.

[*Id.* at 215:18–216:3 (emphasis added)].  Sheriff Spurlock also confirmed that Ms. Kluth "wasn't engaging in that sort of specific type of conduct [that led to her demotion] after she was demoted to captain."  [*Id.* at 216:19–22].  Furthermore, Plaintiff has also presented evidence that she did not receive any formal or informal discipline during her tenure as a Captain.  *See generally* [Doc. 38-13].  A reasonable jury could find an inconsistency between Sheriff Spurlock's stated reason for Ms. Kluth's termination and his subsequent statements suggesting that Ms. Kluth did not continue the conduct that led to her November 2020 demotion, coupled with the absence of formal or informal disciplinary actions in her personnel file, which could help support a finding of a retaliatory motive.  *See Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1554 (10th Cir. 1989) (in First Amendment retaliation case, concluding that the employer's stated reasons for an adverse

employment action "may have been pretextual, as evidenced from the total absence of documentation corroborating the alleged [performance] problem").[16]

Although Defendants counter that Sheriff Spurlock had legitimate, non-retaliatory reasons to terminate Ms. Kluth's employment, *see* [Doc. 30 at 18], this argument is more appropriately considered in the context of the fifth *Garcetti/Pickering* prong, which Sheriff Spurlock has not raised before the Court. *See Roberts v. Winder*, 16 F.4th 1367, 1382 (10th Cir. 2021). In any event, the Court notes that Ms. Kluth's post-demotion conduct is largely in dispute, *see, e.g.*, [Doc. 38 at 12–13, ¶¶ 37–46], such that Defendants have simply identified genuine issues of material fact that cannot be decided on a motion for summary judgment.

Finally, Ms. Kluth has put forth evidence that Sheriff Spurlock "expressed opposition to [her] speech," *see, e.g.*, [Doc. 30-4 at 13–14 (investigation report stating that Ms. Kluth stated that Sheriff Spurlock was upset about the Facebook post and explained to Ms. Kluth "the outward

---

[16] Analysis of "pretext" most often appears in discrimination cases arising under Title VII using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which does not apply to First Amendment retaliation cases. *See Walton v. Powell*, 821 F.3d 1204, 1210 (10th Cir. 2016). This Court could locate no authority expressly *holding* that "pretext" evidence is relevant in the First Amendment retaliation context. However, the Tenth Circuit and district courts within the Circuit have concluded that evidence that an employer's stated reasons for an adverse action were false or inconsistent may be relevant in to retaliation cases. *See, e.g.*, *Seifert v. Unified Gov't of Wyandotte Cnty.*, 779 F.3d 1141, 1157–58 (10th Cir. 2015) (FLSA retaliation); *Copp*, 882 F.2d at 1554 (First Amendment retaliation); *Walker v. Town of Hennessey*, 951 F. Supp. 2d 1263, 1274 (W.D. Okla. 2013) (First Amendment retaliation); *Montgomery v. Bd. of Cnty. Comm'rs of Douglas Cnty.*, 637 F. Supp. 2d 934, 942 (D. Colo. 2009) (First Amendment retaliation). Other Circuit courts have done the same. *See Stephens v. City of Austin*, No. 1:12-CV-659-DAE, 2014 WL 3566537, at *4–7 (W.D. Tex. July 18, 2014) (citing cases from the First, Fifth, Seventh, and Ninth Circuits). Furthermore, Sheriff Spurlock does not argue that, as a matter of law, evidence of pretext is irrelevant to the *Garcetti/Pickering* fourth element. *See generally* [Doc. 41]. The Court agrees that evidence showing an employer's stated reasons for an adverse action are untrue could help support an inference that the employer acted with an illegal motive. *See Seifert*, 779 F.3d at 1157–58 ("In our view, a jury could infer an improper motive for the revocation of Plaintiff's commission because the explanations given by Defendants at the time of the revocation . . . are dubious.").

appearance and implications to the Sheriff's Office by [publicly] sharing the political

differences"); Doc. 30-7 at 5 ("[Ms. Kluth's] behavior in this incident calls into question her

judgement [sic] in not realizing the potential ramifications of her actions until she was confronted

with that behavior by Sheriff Spurlock."); Doc. 38-4 at 83:13–16 (Ms. Kluth stating that the

Facebook post "made Sheriff Spurlock upset")], which may be used to establish causation.

*Maestas*, 416 F.3d at 1189; *see Bird v. W. Valley City*, No. 2:12-cv-00903-EJF, 2017 WL 4326485,

at *6 (D. Utah Sept. 28, 2017) (evidence that the plaintiff's speech "bothered" city officials

suggested that city officials "may have" terminated the plaintiff in retaliation for her speech).

The Court notes the eight-month gap between Ms. Kluth's Facebook post and her

termination and acknowledges that "evidence such as a long delay between the employee's speech

and the challenged conduct, or evidence of intervening events, tend to undermine any inference of

retaliatory motive and weaken the causal link." *Maestas*, 416 F.3d at 1189 (citations omitted).

But while "very close" temporal proximity between protected activity and an adverse action may

demonstrate a causal connection between the two, the lack of such proximity simply means that

the plaintiff must come forward with additional evidence demonstrating causation and cannot rely

upon temporal proximity alone. *Lauck v. Campbell Cnty.*, 627 F.3d 805, 815 (10th Cir. 2010);

*Cheek v. City of Edwardsville*, 514 F. Supp. 2d 1236, 1245 (D. Kan. 2007) ("[N]otwithstanding

the long delay between plaintiff's [protected activity] in March of 2006 and her termination

approximately six months later in September of 2006, the summary judgment record contains

sufficient evidence to create an inference that plaintiff's termination was in retaliation for her

cooperation in the investigation"). And at summary judgment, Ms. Kluth need not establish

liability, but instead must adduce sufficient evidence to create a genuine issue of material fact. *Cf.*

*Long v. Laramie Cnty. Cmty. Coll. Dist.*, 840 F.2d 743, 752 (10th Cir. 1988) (holding that while

the evidence did not establish liability per se, it was error to grant summary judgment when there was a genuine conflict in the testimony).  The Court finds that Plaintiff has met this burden here; she has put forth evidence from which a jury could conclude that Sheriff Spurlock disapproved of her protected speech, that he specifically referenced her protected speech in the termination meeting as a reason for the termination, and that Sheriff Spurlock's stated reasons for her termination were untrue.  While Plaintiff's evidence as currently presented may require the factfinder to draw many inferences in her favor, the Court cannot conclude that any such inferences would be unreasonably drawn.

In sum, the Court concludes that Ms. Kluth has adduced sufficient evidence from which a reasonable jury could find that Sheriff Spurlock's termination decision was improperly motivated by a retaliatory purpose.  Accordingly, Sheriff Spurlock is not entitled to summary judgment on this basis.  Furthermore, insofar as Sheriff Weekly seeks summary judgment in his favor based on a lack of a constitutional violation, Defendants' Motion for Summary Judgment is **DENIED**.

### 4.      Clearly Established Law

In the alternative, Sheriff Spurlock contends that he is entitled to qualified immunity because Ms. Kluth cannot demonstrate a violation of her clearly established rights.  [Doc. 30 at 11–13, 22–23].  This argument shifts the burden to Ms. Kluth to demonstrate a violation of her clearly established rights.  *Puller*, 781 F.3d at 1196.  Even when considering whether the First Amendment right is clearly established, this Court still views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in Ms. Kluth's favor.  *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018).

A right is clearly established if there is a Supreme Court or Tenth Circuit decision on point or if the weight of authority in other courts provides that the right is clearly established.  *See*

*Washington*, 847 F.3d at 1197; *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001). A case is considered "on point" if it involves materially similar conduct to the case at hand or applies "with obvious clarity" to the conduct at issue. *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (quotation and emphasis omitted). Although a case *directly* on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Tenth Circuit has repeatedly warned that, in public employee speech cases, "[c]ourts must not define clearly established law at a high level of generality. Instead, the clearly established law must be particularized to the facts of the case." *See Avant v. Doke*, No. 21-7031, 2022 WL 2255699, at *6 (10th Cir. June 23, 2022) (citation and quotation omitted). In the First Amendment retaliation context, Tenth Circuit has used an element-by-element approach on the "clearly established" prong of the qualified immunity analysis, at least with respect to the first two elements of the *Garcetti/Pickering* test. *See, e.g.*, *Knopf*, 884 F.3d at 949; *Singh*, 936 F.3d at 1035. The Court does the same here and inquires whether it was clearly established that that Ms. Kluth's Facebook post involved a matter of public concern as of 2021. *See Bailey*, 896 F.3d at 1185 (to determine whether qualified immunity was available, assessing whether it was clearly established that a particular type of speech was a matter of public concern at the time of the alleged violation).[17]

Sheriff Spurlock argues that he is entitled to qualified immunity because he subjectively believed that the Facebook post was primarily motivated by Ms. Kluth's personal concerns. [Doc.

---

[17] Sheriff Spurlock's argument is directed toward the second prong of the *Garcetti/Pickering* test— whether Ms. Kluth's speech involved a matter of public concern, *see Singh*, 936 F.3d at 1034–35—and the Court's analysis is similarly limited.

30 at 11–12].[18]  He insists that because this belief was "reasonable under the circumstances," he is

immune from liability on the First Amendment claim.  [*Id.* at 12–13 (citing *Singh*, 936 F.3d at

1036)].

   Ms. Kluth responds that the Facebook post was clearly political speech, and as such, it was

a matter of public concern under clearly established law.  [Doc. 38 at 22].  She further argues that

"none of the cases cited by Defendants holds that that **political** speech is unprotected due to the

speaker's motive."  [*Id.* (emphasis in original)].  She contends that "[t]he Tenth Circuit has

repeatedly 'held that political speech regarding a public election is undoubtedly a matter of public

concern,.'"  [*Id.* at 21 (quoting *Brammer-Hoelter*, 492 F.3d at 1205)].  In so arguing, she cites

*Brammer-Hoelter*, 492 F.3d at 1205; *Bass*, 308 F.3d at 1089; and *Jantzen v. Hawkins*, 188 F.3d

1247 (10th Cir. 1999).  [*Id.*].  She asserts that even if Defendants argue that her speech was

motivated by her own political ambitions, "it was also clearly established that merely because

speech concerns an issue of personal importance does not preclude its treatment as a public

matter."  [*Id.* at 22 (citing *Bailey*, 896 F.3d at 1182; *Deutsch v. Jordan*, 618 F.3d 1093, 1101 (10th

Cir. 2010); and *Jantzen*, 188 F.3d at 1257)].  Finally, she contends that "given the clarity of the

established law protecting political speech, [Sheriff Spurlock's] alleged belief that Ms. Kluth's

speech was unprotected because it was" primarily motivated by personal concerns "was not

'reasonable under the circumstances.'"  [*Id.* at 22 (quoting Doc. 30 at 13)].

   On Reply, Sheriff Spurlock contends that Ms. Kluth's arguments are defined at too high a

level of generality and she has failed to carry her burden to establish that he violated clearly

---

[18] As mentioned above, Sheriff Spurlock raises this argument in the context of arguing there was
no constitutional violation.  *See* [Doc. 30 at 11–13].  However, the Court finds this argument is
directed to whether there was a violation of a clearly established right.

established law with the particularity necessary to avoid the application of qualified immunity. [Doc. 41 at 14–15].[19] For the reasons that follow, the Court respectfully disagrees.

Sheriff Spurlock's argument in favor of qualified immunity relies primarily on the Tenth Circuit's decision in *Singh*. In that case, a university professor alleged that he was non-renewed after he submitted to the provost a binder containing, *inter alia*, the professor's allegations of workplace discrimination and interference with academic freedom. *Singh*, 936 F.3d at 1032. The provost asserted that he was entitled to qualified immunity against the professor's First Amendment retaliation claim. *Id.* at 1033. At the second step of the *Garcetti/Pickering* test, the Tenth Circuit noted that the binder contained some matters of public concern, such as the allegations of discrimination. *Id.* at 1035. But the Tenth Circuit went on to state that it was "not enough . . . that the public interest was part of the employee's motivation," discussing cases in which the Tenth Circuit "described the relevant legal question as whether the employee's *primary* purpose was to raise a matter of public concern." *Id.* at 1035–36 (emphasis in original). The Tenth Circuit concluded, in light of that precedent, that so long as a reasonable administrator in the provost's position "could have believed that [the professor] was motivated primarily by personal

---

[19] Sheriff Spurlock further argues that the violation was not clearly established because "[n]one of the cases cited by Plaintiff show that a reasonable Sheriff under the circumstances of this case, would know, 'beyond debate,' that terminating a Captain for failing to meet the Sheriff's vision, mission, and values (despite having served for many years as his Undersheriff and enforcing those same values) would violate the First Amendment simply because the employee engaged in alleged 'political' speech and expression of affiliation approximately eight months before; or because she announced her candidacy for Sheriff (in a race where the defendant was not running) roughly three months before." [Doc. 41 at 14]; *see also* [Doc. 30 at 22 (raising the same argument in his Motion)]. This argument is misplaced with respect to whether it was clearly established that Ms. Kluth's Facebook post involved a matter of public concern. Instead, it implicates the fourth and fifth factors of the *Garcetti/Pickering* test, i.e., whether the protected speech was a motivating factor in the adverse employment action and whether the defendant would have reached the same employment decision in the absence of the protected conduct. Both of these questions involve disputed questions of fact, rather than law, and drawing all inferences in favor of Ms. Kluth, are not susceptible to summary judgment on the basis of qualified immunity.

grievance," the provost was entitled to qualified immunity. *Id.* at 1036. After reviewing the contents of the binder and finding that "the great bulk of the materials in the binder" were included for personal reasons, "in light of [Tenth Circuit] precedents it was not contrary to clearly established law to punish Plaintiff for such speech, even though the binder also addressed an issue of public concern." *Id.*

The Court is respectfully unpersuaded by Sheriff Spurlock's contention that *Singh* forecloses his liability in this case. *Singh* is materially distinguishable from this matter because it did not assess qualified immunity in the context of First Amendment retaliation for *political* speech; instead, *Singh* involved speech concerning workplace discrimination. *See id.* at 1035. Indeed, based on this Court's review of Tenth Circuit case law, it appears that the majority of cases evaluating whether a public employee's speech is private or public involve speech discussing internal workplace issues. *See, e.g.*, *Peterson v. Williams*, No. 20-4059, 2022 WL 1421959, at *5 (10th Cir. May 5, 2022) (speech questioning the actions of supervisors and administration); *Joritz v. Gray-Little*, 822 F. App'x 731, 739 (10th Cir. 2020) (speech concerning conditions of employment and workplace discrimination); *Lamb*, 2022 WL 487105, at *7 (speech about dissatisfaction with speaker's employment); *Lighton*, 209 F.3d at 1225 (speech about workplace policy violations). In these cases, courts must draw a line between employment matters that are strictly a private concern and matters that, even though they address workplace issues, are nevertheless matters of public concern. *See, e.g.*, *Lighton*, 209 F.3d at 1224–25 (explaining that "when the identified speech focuses on disclosing a public official's malfeasance or wrongdoing, it is most likely a matter of public concern. Conversely, it is generally not considered protected speech if its aim is simply to air grievances of a purely personal nature." (quotation, citation, and alteration marks omitted)).

But unlike *Singh* and the other cases mentioned above, this case does not involve speech related to workplace matters that may toe the line between public and private speech. Instead, Ms. Kluth's Facebook post (1) was framed as a "political" post; (2) discussed Ms. Kluth's political affiliation and voting history; (3) discussed Ms. Kluth's ideological positions; (4) discussed generally the political profile of the candidates she planned to support; and (5) indicated that Ms. Kluth had been "ask[ed] . . . where she stand[s]" on these issues. [Doc. 30-6]. It was posted on Ms. Kluth's personal Facebook page and reproduced on a political party's Facebook page. [Doc. 30-4 at 11]. Indeed, Sheriff Spurlock admitted in Plaintiff's Second Set of Requests for Admission that "Plaintiff's Facebook post . . . is protected speech or political activity under the First Amendment to the United States Constitution." [Doc. 38-14 at 1]; *see also* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). The Court is not convinced that Sheriff Spurlock's subjective perception about Ms. Kluth's primary motivation in publishing the Facebook post overrides the inherent political nature of her post or that his subjective belief is the beginning and end of the Court's analysis on the clearly established prong.

Nor does the Court believe that *Singh* undercuts other Tenth Circuit case law that clearly establishes the public (and protected) nature of Ms. Kluth's speech. For example, in *Bass*, the plaintiff made statements about his support for a candidate running for county sheriff and his "preference for the [candidate's] political philosophy." 308 F.3d at 1084, 1089. The Tenth Circuit concluded that this speech involved a matter of public concern, noting that the speech "had no relation to matters such as working conditions," but instead "relate[d] to his assessment of the viability of a potential candidate's campaign and his belief about the relative merits of two potential candidates for public office." *Id.* at 1089. The Tenth Circuit determined that this speech

was "at the core of protected speech." *Id.* Similarly, in *Gardetto*, the plaintiff, who was employed by a college, "publicly supported the election of three non-incumbents" who were running for a spot on the college's board of trustees and served as the campaign manager of one of the candidates. 100 F.3d at 809. The Tenth Circuit found that, out of the six incidents of speech addressed in the opinion, "[t]he speech incident that most obviously involve[d] a matter of public concern" was the employee's public support for the candidates. *Id.* at 812. Acknowledging that "the advocacy of a particular candidate for public office is the type of core political speech the First Amendment was designed to protect," the court held that this speech involved a matter of public concern. *Id.* And finally, though not directly on point, in *Jantzen*, an employee announced that he intended to run for sheriff and was immediately fired. 188 F.3d at 1250. The Tenth Circuit concluded that the employee satisfied the public-concern prong,[20] finding that the employee's "political speech—his candidacy for office—undoubtedly relate[d] to matters of public concern." *Id.* at 1257.

These cases, particularly *Bass* and *Gardetto*, involve speech that is "materially similar" to the protected speech in this case. *Lowe*, 864 F.3d at 1208. Indeed, each case involves speech supporting a political candidate running for office; similarly, Ms. Kluth voiced support broadly for a specific category of political candidates in the midst of an election for public office. And even if *Bass* and *Gardetto* are not "directly on point," the contours of the protected nature of Ms. Kluth's speech "were sufficiently definite that any reasonable official in [Sheriff Spurlock's] shoes would have understood" that retaliating against an employee for engaging in this protected public speech

---

[20] At the time *Jantzen* was decided, the Tenth Circuit applied "the four-part . . . *Pickering/Connick* test," which was identical to the *Pickering/Garcetti* test except that it did not assess whether the employee's speech was made in the course of their official duties, which is not at issue in this case. *See Jantzen*, 188 F.3d at 1257.

would violate the employee's First Amendment rights.  *Knopf*, 884 F.3d at 944.[21]  Accordingly, the Court concludes that Sheriff Spurlock is not entitled to qualified immunity on Claim One to the extent it asserts a free-speech claim based on Ms. Kluth's Facebook post.  Defendants' Motion for Summary Judgment is **DENIED** in this respect.

      **B.**      **Freedom of Association**

      Next, Defendants move for summary judgment on Claim One to the extent it is based on an alleged violation of Ms. Kluth's freedom of association.  [Doc. 30 at 18].  "The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."  *Jantzen*, 188 F.3d at 1251 (quotation omitted).  To evaluate claims alleging violations of the freedom of association, courts apply the *Elrod/Branti* test.  *Barker v. City of Del City*, 215 F.3d 1134, 1137 (10th Cir. 2000) (citing *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980)). "Under the *Elrod/Branti* framework, there is a two-part inquiry.  'To survive summary judgment, an employee needs to show a genuine dispute of fact that (1) political affiliation and/or beliefs were "substantial" or "motivating" factors in [her termination], and (2) [her] position did not require political allegiance.'"  *Trujillo v. Huerfano Cnty. Bd. of Cnty. Comm'rs*, 349 F. App'x 355, 359–60 (10th Cir. 2009) (quoting *Poindexter v. Bd. of Cnty. Comm'rs*, 548 F.3d 916, 919 (10th Cir. 2008)).

---

[21] And for this reason, the Court also concludes that, even under *Singh*, Sheriff Spurlock would not be entitled to qualified immunity because any subjective belief that he could fire Ms. Kluth for her Facebook post based on his own subjective perception about her motives would not be "reasonable."  *Singh*, 936 F.3d at 1036.

### 1.    Constitutional Violation

Defendants' sole argument on this portion of Claim One is that "Plaintiff's political affiliation and/or beliefs were not substantial or motivating factors in her termination.  Plaintiff was terminated because she failed to meet Sheriff Spurlock's vision, mission, and values."  [Doc. 30 at 19].  Ms. Kluth responds that there are genuine issues of material fact with respect to the reasons for her termination, [Doc. 38 at 14–20], and the Court agrees.  In addition to the evidence discussed above related to Sheriff Spurlock's stated reasons for the termination, Ms. Kluth has also pointed the Court to evidence that after she announced her run for office in February 2021, Sheriff Spurlock transferred her to what she describes as a "less public-facing role" that same month.  [Doc. 38 at 10, ¶ 16; Doc. 38-4 at 273:25–274:22].  It was Ms. Kluth's assumption that she was transferred after her announcement because

> maybe [Sheriff Spurlock] didn't want me out in the community after I announced my candidacy because that brought attention to me, I was able to see people and so forth; that maybe he wanted to bury me in the jail where I really didn't have those outside meetings with cities and towns and other quasi-government agencies; that I was uncovering things that hadn't been done.  So that was just kind of my impression when I got transferred to the jail.

[Doc. 38-4 at 257:23–258:7].  She was then terminated three months after announcing her candidacy.  [Doc. 33-6 at 101:22–102:12; Doc. 30-3 at 203:4–7].

Causation may be demonstrated through a showing of "a pattern of retaliatory conduct beginning soon after the protected activity."  *Dunn v. Shinseki*, 71 F. Supp. 3d 1188, 1193 (D. Colo. 2014) (FLSA case); *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (in FLSA retaliation case, recognizing that a "pattern of retaliatory conduct [that] begins soon after" protected activity was sufficient to withstand summary judgment).  Again, it is not the Court's role to weigh the strength of Ms. Kluth's evidence, but only to determine whether a reasonable jury could conclude that her termination was politically motivated.  The Court concludes that Ms. Kluth

has met her burden to establish a genuine dispute of fact as to whether the termination decision was motivated by Ms. Kluth's political activity, such that summary judgment on this basis is improper.  Accordingly, Defendants' Motion for Summary Judgment is **DENIED** to the extent Sheriff Weekly seeks judgment on this claim in his official capacity.

**2.      Clearly Established Law**

Next, the Court must determine whether Ms. Kluth has met her burden of demonstrating a violation of her clearly established constitutional rights.  *Puller*, 781 F.3d at 1196.  Ms. Kluth argues, in a footnote, that "[t]o the extent [Sheriff] Spurlock invokes qualified immunity with respect to the political association claim, Ms. Kluth's right not to be terminated for her political association or affiliation was clearly established by *Gann v. Cline*, 519 F.3d 1090 (10th Cir. 2008), among others."  [Doc. 38 at 15 n.5].  Although Ms. Kluth presents her argument to the Court in a perfunctory manner through a footnote, such that the Court could deem it waived, *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002), the Court's "review is not limited to the opinions cited by" Ms. Kluth, but is instead a "de novo review of a legal issue, which requires consideration of all relevant case law."  *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021).  Upon the Court's review of the case law, the Court cannot conclude that Sheriff Spurlock is entitled to qualified immunity on this claim.

The Court agrees that "the First Amendment has long protected public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."  *Tice v. Dougherty*, 846 F. App'x 705, 710 (10th Cir. 2021) (quotation and alteration marks omitted).  As the Tenth Circuit has explained, there are "more than a few published cases explaining that an employer may be liable to an employee in a § 1983 action when the employer takes an adverse employment action based substantially on the employee's

political affiliation." *Id.* (citing *Jantzen*, 188 F.3d 1247; *Dickeson v. Quarberg*, 844 F.2d 1435 (10th Cir. 1988); and *Francia v. White*, 594 F.2d 778 (10th Cir. 1979)). "[T]his general rule has been applied specifically in cases where . . . a sheriff's deputy is fired after campaigning for another candidate for sheriff." *Id.*

It is undisputed that when Ms. Kluth was fired, she was a captain and did not owe a duty of political loyalty to Sheriff Spurlock. [Doc. 38-1 at 59:13–17]. This case is sufficiently similar to *Tice*, where a sheriff's office employee was allegedly terminated for campaigning for another candidate for sheriff. *See* 846 F. App'x at 706–07. Because the *Tice* court "agree[d] that the contours of Plaintiff's First Amendment right to political association were clearly established when she was terminated in November 2016," *id.* at 710, Ms. Kluth's rights were similarly clearly established at the time of her termination in May 2021, rendering the issue "beyond debate." *al-Kidd*, 563 U.S. at 741. Accordingly, Defendants' Motion for Summary Judgment is **DENIED** to the extent that it seeks judgment in Sheriff Spurlock's favor on Plaintiff's free-association claim.

## II.    Plaintiff's State-Law Constitutional Claim

Plaintiff's Claim Three is asserted under section 13-21-131 of the Colorado Revised Statutes, which states:

> A peace officer, as defined in section 24-31-901(3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

Colo. Rev. Stat. § 13-21-131(1). Qualified immunity is not an available defense to a claim arising under this statute. *Id.* § 13-21-131(3). Defendants assert that "[f]or the reasons provided in section I(A)," i.e., their arguments challenging Plaintiff's First Amendment claim, they are entitled to summary judgment on Claim Three. [Doc. 30 at 23].

The Court has already concluded that Ms. Kluth has established a genuine dispute of material fact as to whether her First Amendment rights were violated, both with respect to her right to free speech and her right to free association.  For this reason, and because Defendants' sole basis for seeking summary judgment on Claim Three is based on arguments rejected by the Court, the Court concludes that neither Sheriff Spurlock nor Sheriff Weekly have demonstrated that they are entitled to summary judgment on Claim Three.  Accordingly, Defendants' Motion for Summary Judgment is **DENIED** with respect to Claim Three.

## III.    Breach of Implied Contract

Both Parties move for summary judgment on Claim Four, Plaintiff's claim for breach of an implied contract, though Plaintiff seeks summary judgment only against Sheriff Weekly in his official capacity.  [Doc. 30 at 23; Doc. 33 at 10].[22]

Under Colorado law, an employee hired for an indefinite period of time is presumed to be an at-will employee, "whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action."  *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).  In some circumstances, however, provisions contained in employee manuals addressing discipline or termination procedures may give rise to a breach of implied contract claim.  *Cummings v. Arapahoe Cnty. Sheriff's Dep't*, 440 P.3d 1179, 1185 (Colo. App. 2018) ("*Cummings I*").

---

[22] Ms. Kluth states that although she also brought a breach of implied contract claim against Sheriff Spurlock in his individual capacity, "she seeks summary judgment only on the official-capacity claim, because any implied contract was between Ms. Kluth and the [Sheriff's Office], not [Sheriff] Spurlock individually."  [Doc. 33 at 10 n.2].  This Court interprets this statement as a concession of Ms. Kluth's contract claim against Sheriff Spurlock in his individual capacity, and therefore, dismisses it without prejudice.

Ms. Kluth bases her breach of implied contract claim on the provisions contained in the Sheriff's Office's Disciplinary Policy. *See* [Doc. 1 at ¶¶ 198–207]. In Plaintiff's Motion for Summary Judgment, she contends that the Disciplinary Policy is "a binding implied contract with respect to Ms. Kluth's employment" at the Sheriff's Office. [Doc. 33 at 11]. She insists that she is entitled to summary judgment on this claim because there is no dispute that then-Sheriff Spurlock failed to comply with the Disciplinary Policy when he terminated her employment. [*Id.* at 16–17]. Sheriff Weekly disputes that any implied contract was ever formed because the Disciplinary Policy "clearly and conspicuously disclaim[s] any contractual rights" arising out of Ms. Kluth's employment. [Doc. 30 at 23–24]. Ms. Kluth disagrees, maintaining that as a matter of law, "the Disciplinary Policy . . . could not be disclaimed" because it "effectuates statutory due process rights as set forth in [Colo. Rev. Stat.] § 30-10-506." [Doc. 33 at 10]. Sheriff Weekly also invokes § 30-10-506, contending that this statute expressly provides a sheriff the right to revoke an employee's employment "at will." [Doc. 30 at 23].

### A.      Section 30-10-506 and Implied Contractual Rights

Section 30-10-506 of the Colorado Revised Statutes states:

> Each sheriff may appoint as many deputies as the sheriff may think proper and may revoke such appointments at will; except that a sheriff shall adopt personnel policies, including policies for the review of revocation of appointments. Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff. Persons may also be deputized by the sheriff or undersheriff in writing to do particular acts.

Colo. Rev. Stat. § 30-10-506. The Colorado Court of Appeals has characterized this statute as "combin[ing] two contradictory concepts—at-will employment for deputies, on the one hand, and the requirement that sheriffs provide at least some binding employment rights to their deputies, on the other." *Cummings I*, 440 P.3d at 1185.

Determining the statute's effect on the at-will employment doctrine, the *Cummings I* court concluded that the statute "unambiguously confers two due process rights" on sheriff deputies with respect to their employment: the right to receive notice of the reasons for a proposed revocation of their employment (e.g., termination) and the right to be heard by the sheriff before their employment is terminated. *Id.* at 1186. And because parties cannot contractually abrogate statutory requirements, a sheriff cannot avoid or disclaim the due process requirements under § 30-10-506; any contractual provision containing any such disclaimer would be against public policy and void. *Id.* at 1187.

The *Cummings I* court also acknowledged that although the statute requires sheriffs to adopt "personnel policies, including policies for the review of revocation of appointments," the statute "says nothing about whether any employment policies promulgated by the sheriffs, beyond notice and a right to be heard, must be binding on the sheriff." *Id.* at 1186; *see also* Colo. Rev. Stat. § 30-10-506. The court, in an attempt to give effect to the entirety of the statute, concluded that although the statute requires sheriffs to create personnel policies, any policies that set forth procedures beyond the two statutory rights conferred by § 30-10-506—pre-termination notice and a pre-termination opportunity to be heard—may, but are not required to be, binding on the sheriff. *Cummings I*, 440 P.3d at 1186. In other words, a clear, conspicuous, and valid disclaimer of any contractual rights created by an employment policy "[may] preclude a successful implied contract claim based on any rights other than those that effectuate the specific due process rights granted by section 30-10-506." *Id.* at 1190. The *Cummings I* court distilled the scope of § 30-10-506 as follows:

- *First*, it "grants two unwaivable rights to the deputies: the right of notification 'of the reason for the proposed revocation' of their employment, and 'an opportunity to be heard by the sheriff' before their employment is terminated."

- *Second*, it requires sheriffs to adopt personnel policies, including policies for review of revocation of appointments, "but except for the two statutory rights noted above, these policies need not be binding and sheriffs may reserve their right to depart from such policies in any particular case or matter."

- *Third*, it permits sheriffs "to promulgate binding employment policies, and if the sheriff elects to do so, those policies are enforceable in accordance with their terms."

*Id.* at 1183.

A few years later, the Colorado Court of Appeals declined to reconsider its holding in *Cummings I. See Cummings v. Arapahoe Cnty. Sheriff's Off.*, 500 P.3d 1140, 1143 (Colo. App. 2021) ("*Cummings II*").  The court reiterated that to the extent a sheriff's personnel policies "effectuate the specific due process provisions of [§ 30-10-506], violation of those policies may form the basis of an implied employment contract claim," *id.* at 1143, and any attempt to disclaim contractual rights arising from those policies would be ineffective.  *Id.* at 1144.  But if a sheriff's employment policies go beyond the due process requirements of § 30-10-506, e.g., if a policy "grants deputies *additional* notice beyond what section 30-10-506 requires," a sheriff may disclaim any implied contractual rights arising from those additional provisions.  *Id.* at 1145.  For example, in *Cummings II*, the court concluded that policies contemplating advanced notice of a disciplinary *investigation* could be validly disclaimed by the sheriff, as those policies went above and beyond the requirements of § 30-10-506.  *Id.*  The court rejected the employee's argument that the policy still effectuated the purposes of § 30-10-506 because an investigation was an "integral" part of the rights protected by § 30-10-506, reasoning that "the statute does not require sheriffs to provide robust notice at all phases of a sheriff's internal disciplinary process; it merely requires that sheriffs—when they intend to revoke a deputy's appointment—notify the deputy of the reasons for that 'proposed revocation' and provide the deputy an opportunity to be heard."  *Id.*

### B.      Whether the Disciplinary Policy Creates Implied Contractual Rights

Ms. Kluth contends that any disclaimers in the Disciplinary Policy are ineffective because "the Disciplinary Policy effectuates statutory due process rights as set forth in § 30-10-506." [Doc. 33 at 10]. Ms. Kluth appears to argue that the entirety of the Disciplinary Policy is a binding implied contract. *See, e.g.*, [*id.* at 11 ("The Disciplinary Policy is . . . a binding implied contract with respect to Ms. Kluth's employment."); *id.* at 14 ("[T]he Disciplinary Policy effectuates the due process rights conferred on deputies by C.R.S. § 30-10-506.")]. Conversely, Sheriff Weekly appears to argue that the Disciplinary Policy, as a whole, "is not an implied contract under Colorado law" because it provides procedures "far beyond what is required by § 30-10-506." [Doc. 35 at 13].

However, *Cummings I* and *Cummings II* make clear that the Court's inquiry is a provision-specific inquiry, such that a blanket ruling that the Disciplinary Policy does or does not create implied contractual rights is improper. Indeed, the *Cummings* courts concluded that only those specific policy provisions that effectuate either (1) the right to pre-termination notice of the reasons for a proposed termination and (2) the pre-termination right to be heard by the sheriff create non-disclaimable contract rights. *See Cummings I*, 440 P.3d at 1185, 1188; *Cummings II*, 500 P.3d at 1144–45. Thus, if the Disciplinary Policy creates any implied contractual rights, it does so only with respect to those provisions that effectuate the due process requirements of § 30-10-506. At the same time, the mere fact that some provisions in a policy go beyond the requirements of § 30-10-506 does not render the entirety of the policy disclaimable under *Cummings*. *See Cummings I*, 440 P.3d at 1187–88; *Cummings II*, 500 P.3d at 1145. Accordingly, the Court reviews the Disciplinary Policy provision-by-provision, focusing only on the four specific examples relied upon by Ms. Kluth in her Motion, *see* [Doc. 33 at 13–14], given that Ms. Kluth bears the burden

of establishing the existence of a contract.  *Steele v. Stallion Rockies Ltd.*, 106 F. Supp. 3d 1205,

1221 (D. Colo. 2015).

First, Ms. Kluth claims that the following provisions "effectuate" the due process

requirements of § 30-10-506:

> Pre-Disciplinary Hearings: The supervisor initiating any discipline which involves
> a 2-year letter of reprimand or more, or any suspension days, shall provide the
> affected member with written notice or verbal notification of the pre-disciplinary
> hearing at least 24 hours before the hearing time.  *The written or verbal notice must
> include the nature of the charge(s) sustained against the member and a description
> of the intended sanctions.*  The pre-disciplinary 24-hour notice may be voluntarily
> waived by the employee.  This must be documented at the beginning of the actual
> pre-disciplinary hearing.
>
> . . .
>
> 2.  Discipline is finalized only after the employee has had an opportunity to reply
> to the charges, and present mitigating information.  The employee's response to the
> charges must be weighed by the supervisor in the decision-making process.

[Doc. 33-2 at §§ VII.B, VII.B.2].  Ms. Kluth contends that the first provision "provides 'procedural

rules concerning the termination hearing,' . . . and addresses the 'form and timing of the notice of

the proposed revocation,' . . . as well as the 'opportunity to be heard by the sheriff'" and the second

"addresses the 'opportunity to be heard by the sheriff.'"  [Doc. 33 at 13–14 (quoting Colo. Rev.

Stat. § 30-10-506)].  Sheriff Weekly does not respond specifically to this argument.  *See generally*

[Doc. 35].

The Court agrees with Ms. Kluth.  The first provision requires notice of a proposed

termination decision and requires that the notice "include the nature of the charge(s) sustained

against the [employee]"—in other words, it requires that the notice include "the reason for the

proposed revocation" of employment, as required by § 30-10-506.  Based on the Court's review

of the Disciplinary Policy, no other provision includes a requirement that the employer provide

notice of the reasons for a *proposed* disciplinary decision to the employee.  *See generally* [Doc.

33-2]; *compare* [*id.* § VII.B.6 (requiring notice of reasons for termination at the time of termination)].  And importantly, it is undisputed that there are no other applicable disciplinary policies governing Ms. Kluth's former employment with the Sheriff's Office.  [Doc. 33 at ¶ 13; Doc. 35 at 3, ¶ 23]; *see generally* [Doc. 33-3].  Contrary to Sheriff Weekly's general argument, this provision does not provide "additional notice and procedures far beyond what is required by § 30-10-506," [Doc. 35 at 13], but instead effectuates the notice provision in the statute.

The second provision listed above states that discipline will only be imposed after the employee has had the opportunity to respond to the charges.  [Doc. 33-2 at § VII.B.2].  This provision does not go beyond the statutory requirements of § 30-10-506 but instead effectuates its requirement that, *prior to discipline*, the employee be given the opportunity to be heard by the sheriff.  *See* Colo. Rev. Stat. § 30-10-506.  The Court thus agrees with Ms. Kluth that these provisions effectuate the statutory due process requirements and thus may form the basis of an implied contract claim.

The Court reaches the opposite conclusion for the remaining provisions cited by Ms. Kluth. She contends that the following Policy language also effectuates the purposes of § 30-10-506:

> 4.  After the pre-disciplinary hearing and review of the employee's response to the charges, the responsible supervisor must prepare, and provide to the employee, written notice stating the final disciplinary decision.  A copy must accompany the original investigative documents to the Office of Professional Standards.
>
> . . .
>
> 6.  If an executive officer demotes or terminates an employee, the date the demotion or termination is to take effect shall be stated in the disciplinary action letter provided to the affected employee by the executive officer.  (The date shall be no earlier than one (1) business day past the five business days that the member has to file an appeal.)  The letter shall also contain a statement citing the reasons(s) for demotion or termination.  In the event the employee is terminated, the letter shall also notify them that Douglas County Human Resources will contact them directly with regard to their fringe and retirement benefits.  A supervisor can be relieved of

their supervisory authority and / or rank prior to the appeal process, if determined by a chief deputy or above, to be in the best interest of the Office.

. . .

2. Sanctions will not be imposed until the employee waives appeal or after the appeal deadline, whichever comes first.

[Doc. 33-2 at §§ VII.B.4, VII.B.6, VIII.E.2].

Ms. Kluth posits that these provisions address the form of the notice of proposed revocation and the timing of the proposed revocation. [Doc. 33 at 14]. The Court respectfully disagrees. These provisions address procedures for the "final disciplinary decision" and the appeals process—not procedures for a *proposed* revocation, as contemplated in § 30-10-506. *See Cummings II*, 500 P.3d at 1145 (explaining that the statute "merely requires that sheriffs—when *they intend* to revoke a deputy's appointment—notify the deputy of the reasons for that '*proposed* revocation' and provide the deputy an opportunity to be heard." (emphasis added)). Indeed, the plain language of these provisions demonstrates that these provisions apply *at* or *after* the revocation decision has been made, governing actions taken "*[a]fter* the pre-disciplinary hearing and review of the employee's response to the charges," "*[i]f* an executive officer demotes or terminates an employee." [Doc. 33-2 at §§ VII.B.4, VII.B.6 ("The letter shall also contain a statement citing the reasons(s) *for demotion or termination*." (emphasis added))]. Similar to *Cummings II*, these provisions do not effectuate "the specific due process rights granted by section 30-10-506," such as "policies addressing the form or timing of the notice of the *proposed* revocation." *Cummings II*, 500 P.3d at 1145 (emphasis added); *compare* Colo. Rev. Stat. § 30-10-506 ("*Before revoking an appointment of a deputy*, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff." (emphasis added)). The fact that the sheriff's revocation decision may not have

immediate effect or that an employee has a right to appeal the decision does not change the fact

that the revocation decision has nevertheless been made, and procedures governing the provision

of notice for the actual termination decision or governing the appeals process do not effectuate the

due-process requirements of § 30-10-506.

In sum, to the extent that the Disciplinary Policy enforces the statutory rights contained in

§ 30-10-506—*see* [Doc. 33-2 at §§ VII.B, VII.B.2]—the Disciplinary Policy "may form the basis

of an implied contract claim" and these provisions cannot be disclaimed.  *Cummings I*, 440 P.3d

at 1187.  For the remainder of the Disciplinary Policy, however, a valid disclaimer will preclude a

claim for breach of implied contract.  *Id.* at 1189.

Here, it is undisputed that the Sheriff's Office's Policy and Procedure Manual states:

> The Policies and Procedures set forth in this manual are for the guidance and
> direction of all Douglas County Sheriff's office members.  Additional procedure
> manuals (Division SOPs and the Sheriff's Office GOPs) will supplement and
> augment this manual and will be specific to office responsibilities. *These guidelines
> are not intended to create, nor should they be construed to create a contract
> between the Sheriff's Office and its employees / officials.*  Employment with the
> County and Sheriff's Office is at will.  Employees may leave employment with
> Douglas County at any time and for any reason, and the Sheriff retains an identical
> right.

[Doc. 30-19 at 1 (emphasis added)]; *see also* [Doc. 37 at 4, ¶ 1].  Ms. Kluth does not argue that

this disclaimer is not clear and conspicuous and does not otherwise argue that it is ineffective in

this case. *See generally* [Doc. 33; Doc. 37].  Accordingly, this disclaimer "preclude[s] a successful

implied contract claim on any rights other than those that effectuate the specific due process rights

granted by section 30-10-506"—in this case, sections VII.B and VII.B.2 of the Disciplinary Policy.

*Cummings I*, 440 P.3d at 1190.

C.        Whether Summary Judgment on Plaintiff's Implied Contract Claim is Proper

Having concluded that a limited portion of the Disciplinary Policy can form the basis of an implied contract claim, the Court's next task is to determine whether either Party is entitled to summary judgment on this claim.  Ms. Kluth contends that she is entitled to summary judgment because "there is no genuine dispute of material fact that [Sheriff] Spurlock violated multiple provisions of the Disciplinary Policy that effectuated Ms. Kluth's rights to notice and opportunity to be heard"—specifically, she asserts that it is undisputed that Sheriff Spurlock, *inter alia*, (1) failed to conduct a pre-disciplinary hearing; (2) failed to give 24 hours' notice of a pre-disciplinary hearing; and (3) failed to give 24 hours' notice of the reasons for the proposed termination.  [Doc. 33 at 16–17].  Sheriff Weekly counters that he is entitled to summary judgment on this claim because Sheriff Spurlock complied with the dictates of § 30-10-506 "during his May 25, 2021 meeting with Plaintiff when he twice notified Plaintiff of the reason for her termination and gave her the opportunity to respond."  [Doc. 35 at 11–12].

Turning first to Sheriff Weekly's argument, this argument is insufficient to warrant summary judgment in his favor on Claim Four.  As explained above, the Disciplinary Policy creates an implied contractual right insofar as it requires (1) a pre-disciplinary hearing; (2) 24 hours' notice of the hearing and the proposed reasons for termination; and (3) an opportunity for the employee to be heard before a termination decision is finalized.  The fact that Ms. Kluth was notified of the reason(s) for her termination at the May 25, 2021 disciplinary hearing—after she was informed of the final termination decision—does not establish that Sheriff Spurlock provided Ms. Kluth a pre-disciplinary hearing or timely notice of the reasons for her proposed termination, as required under the Disciplinary Policy and § 30-10-506.  Accordingly, Sheriff Weekly has not

demonstrated that he is entitled to summary judgment on this claim, and Defendants' Motion for Summary Judgment is **DENIED** as to Claim Four.

Plaintiff also moves for summary judgment on this claim; because she bears the ultimate burden of proof at trial, she "must establish, as a matter of law, all essential elements" of her claim before the burden shifts to Sheriff Weekly "to bring forward any specific facts alleged to rebut the movant's case." *Pelt*, 539 F.3d at 1280. To prevail on a claim for breach of implied contract, a plaintiff must demonstrate (1) the existence of a contract; (2) the plaintiff's performance, or justification for the plaintiff's non-performance; (3) the defendant's failure to perform the contract; and (4) damages. *Steele*, 106 F. Supp. 3d at 1221; *see also Trujillo v. City of Colo. Springs*, No. 07-cv-00753-MSK-BNB, 2008 WL 511890, at *3 (D. Colo. Feb. 22, 2008) ("[I]mplied contracts are treated no differently from express contracts.").

*The Existence of a Contract and Defendant's Failure to Perform*. With respect to the first element—the existence of an implied contract—this Court has already concluded that, under *Cummings I* and *Cummings II*, limited provisions of the Disciplinary Policy may form the basis of an implied contract that cannot be disclaimed, such that Ms. Kluth has sufficiently demonstrated the existence of an implied contract with respect to those provisions. Furthermore, it is undisputed that Sheriff Spurlock did not provide Ms. Kluth with a pre-disciplinary hearing or any sort of notice about her possible termination until the May 25, 2021 meeting, [Doc. 33 at ¶¶ 35–36; Doc. 35 at 6, ¶¶ 35–36], and Sheriff Weekly identifies no other dispute of fact relevant to this element. Thus, there is no genuine dispute that Sheriff Spurlock failed to perform his obligations under the implied contract.

*Plaintiff's Performance or Excused Non-Performance*. With respect to the second element of a breach of contract claim—Ms. Kluth's performance—Ms. Kluth contends that the

Disciplinary Policy did not require any particular performance on her part; in the alternative, she contends that she substantially performed any obligations under the Disciplinary Policy. [Doc. 33 at 14]. She contends that by its express terms, the Disciplinary Policy did not impose any performance obligations on her, nor could it, as parties to a contract "may not contract to abrogate statutory requirements and thereby contravene the public policy of this state." [*Id.* at 15 (quoting *Cummings I*, 440 P.3d at 1187)]. Sheriff Weekly does not respond to this argument. *See* [Doc. 35 at 11–15].

The Court agrees with Ms. Kluth. "A contract provision that violates public policy by diluting, conditioning or unduly limiting statutory coverage may be declared void and unenforceable." *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo. 1998). Thus, even assuming that the Disciplinary Policy does impose performance duties on Ms. Kluth (which Defendants do not suggest, *see* [Doc. 35]), any such provisions would necessarily limit the due process rights provided by § 30-10-506 and would be unenforceable. *Peterman*, 961 P.2d at 492; *Cummings I*, 440 P.3d at 1187. Ms. Kluth has established this element of her claim to the Court's satisfaction.

***Damages***. Finally, damages—Ms. Kluth argues that "[t]he resulting damages of such breach should be determined by a jury" and contends that proof of actual damages is not an essential element of a contract claim. [Doc. 33 at 17 n.5]. In response, Sheriff Weekly contends that Ms. Kluth "has failed to present any evidence of damages caused by the [Sheriff's Office's] alleged failure to follow all provisions of the Disciplinary Policy," suggesting that summary judgment should be denied on this basis. [Doc. 35 at 13 n.9]. To the extent Sheriff Weekly contends that a failure to present evidence of damages precludes summary judgment in Ms. Kluth's favor, the Court disagrees. Under Colorado law, "[p]roof of actual damages is not an essential

element of a breach of contract claim." *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 818 (Colo. App. 2003). "Nominal damages are recoverable for a breach of contract even if no actual damages resulted or if the amount of actual damages has not been proved." *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 481 (Colo. App. 2003); *see also* Colo. Jury Instr., Civil 30:10 (providing three elements of a breach of contract claim: the existence of a contract; the defendant's non-performance; and the plaintiff's performance). "When a plaintiff establishes breach, but does not prove actual damages, the plaintiff is entitled to nominal damages." *Interbank Invs.*, 77 P.3d at 818. Stated differently, Ms. Kluth need not provide evidence of actual damages to demonstrate that she is entitled to summary judgment on Claim Four.

Because the Court has concluded that Ms. Kluth has met her burden to "establish, as a matter of law, all essential elements of" her claim, the burden shifts to Sheriff Weekly to "bring forward . . . specific facts . . . to rebut the movant's case." *Pelt*, 539 F.3d at 1280.

**After-Acquired Evidence**. Sheriff Weekly does not expressly challenge any of the elements of Ms. Kluth's contract claim. *See generally* [Doc. 35]. Instead, he argues that, based on his affirmative defense invoking the after-acquired evidence doctrine, genuine issues of material fact preclude summary judgment in Plaintiff's favor. [*Id.* at 13]; *see also* [Doc. 13 at 18, ¶ 19 ("Evidence acquired after Plaintiff's termination provides additional confirmation of Plaintiff's performance deficiencies and failure to comply with Douglas County Sheriff's Office policies and procedures and would have been a reason for termination had they been known at the time of her termination.")]. Notably, Sheriff Weekly does not move for summary judgment on this affirmative defense, *see generally* [Doc. 30; Doc. 35 at 13], such that Defendant need not establish ultimate success on this affirmative defense at this stage in the litigation. *See, e.g., Helm*

*v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011) (noting that when a defendant moves for summary judgment on an affirmative defense, the defendant "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." (quotation omitted)).   Instead, Sheriff Weekly invokes this affirmative defense to contend that genuine issues of fact preclude summary judgment in Plaintiff's favor; thus, to avoid summary judgment in favor of Ms. Kluth, Sheriff Weekly must bring forth evidence of "specific facts" to rebut Ms. Kluth's case.  *Pelt*, 539 F.3d at 1280.

"The after-acquired evidence doctrine shields an employer from liability or limits available relief where, after a termination, the employer learns for the first time about employee wrongdoing that would have caused the employer to discharge the employee."  *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997).   Typically, the after-acquired evidence doctrine does not outright preclude an employee's relief, but is instead relevant to the determination of damages.  *Hallmon v. Advance Auto Parts, Inc.*, 921 F. Supp. 2d 1110, 1121 (D. Colo. 2013).   However, the Colorado Supreme Court has recognized that "[w]here the employee's misconduct consists of resume fraud, the after-acquired evidence doctrine affords an employer a defense if the employer would not have hired the employee if it had known of the fraud."  *Crawford*, 938 P.2d at 547.  "[R]esume fraud, even when discovered after termination, may serve as a defense to claims of wrongful discharge predicated on contract or equity."  *Id.* at 548.

Sheriff Weekly contends that evidence discovered by the Sheriff's Office after Ms. Kluth's termination "determined that Plaintiff committed . . . deceptive acts during her application process at the [Sheriff's Office]."  [Doc. 35 at 14].   Specifically, Sheriff Weekly directs the Court to evidence that Ms. Kluth "falsely stated" on her employment application "that she worked for the Arapahoe County Sheriff's Office when in fact she worked for the Arapahoe Community

Treatment Center and omitted from" her employment application information related to her involvement in a domestic violence/felony menacing incident with her former husband.  [*Id.* at 14–15]; *see also* [Doc. 35-3].  Ms. Kluth responds that Defendant's affirmative defense does not preclude summary judgment in her favor because (1) *Crawford* does not apply to her implied contract claim and (2) it is undisputed that Sheriff Spurlock never reviewed Ms. Kluth's employment application and, in any event, the alleged misrepresentations are immaterial or were known at the time she was hired.  [Doc. 37 at 11–13].

With respect to her first argument, Ms. Kluth contends that *Crawford* does not apply in this case because her implied contract claim is "based in statute" and is "thus distinct from the ordinary implied contract claims considered in Crawford, which are based on the contract principles of offer and acceptance."  [*Id.* at 11].  Ms. Kluth calls out two statements from the Colorado Supreme Court's *Crawford* decision in support of her argument.  First, she notes that the court "described its holding as 'preventing an employee from using fraud to take advantage of the *Keenan* exception to employment at-will by allowing the employer to rescind its agreement to adhere to termination procedures contained in an employment manual.'"  [*Id.* (quoting *Crawford*, 938 P.2d at 547)].  She contends that *Crawford* is distinguishable from this case because Ms. Kluth's claim is not based on "the *Keenan* exception to at-will employment," but is instead based on the statutory provisions of § 30-10-506.  [*Id.*].  Second, she notes that the *Crawford* court highlighted that the plaintiff's implied contract claim "relate[d] to a private contract or promise between an employer and employee and [did] not raise any public-policy concerns, other than the general interest society has in the integrity of the employment relationship between employer and employee."  [*Id.* at 12 (quoting *Crawford*, 938 P.2d at 549) (emphasis omitted)].  Plaintiff argues that her implied contract claim is "not [based on] a private contract at all" but is instead "based in statute (§ 506) and do[es]

implicate significant public policy concerns, such that permitting a sheriff to waive or disclaim the contract would 'contravene the public policy of this state.'" [*Id.* (quoting *Cummings I*, 440 P.3d at 1187)].

The Court could locate no Colorado authority specifically addressing whether *Crawford* applies to implied contract claims in the sheriff-deputy context. Ultimately, the Court is respectfully unpersuaded by Plaintiff's arguments. As explained by the *Crawford* court, "[t]he after-acquired evidence doctrine has its foundation in the logic that an employee cannot complain about being wrongfully discharged because the individual is no worse off than he or she would have been had the truth of his or her misconduct been presented at the outset." 938 P.2d at 547 (quoting *Gassman v. Evangelical Lutheran Good Samaritan Soc'y*, 921 P.2d 224, 226 (Kan. App. 1996)). "Basic principles of law and equity support a rule allowing an employer to avoid liability for breach of implied contract or promissory estoppel claims arising from an employment relationship induced by an employee's fraud." *Id.* While § 30-10-506 creates "some binding [and non-disclaimable] employment rights" provided to Ms. Kluth in the course of her termination, *Cummings I*, 440 P.3d at 1185, and precludes the Sheriff's Office from now disclaiming those protections, under Defendant's theory of the case, without Ms. Kluth's alleged resume fraud, there would be *no* employment relationship between Ms. Kluth and the Sheriff's Office—in other words, absent Ms. Kluth's alleged resume fraud, the protections afforded by § 30-10-506 would not be available to Ms. Kluth and she would be "no worse off than . . . she would have been had the truth of . . . her misconduct been presented at the outset." *Crawford*, 938 P.2d at 547. The statements from the *Crawford* opinion excerpted by Plaintiff do not convince the Court otherwise,[23] and the

---

[23] Indeed, the Court is respectfully unpersuaded by Plaintiff's argument that her implied contract claim "implicate[s] significant public policy concerns, such that permitting a sheriff to waive or disclaim the contract would contravene the public policy of this state." [Doc. 37 at 12 (quotation

Court is not persuaded that it may ignore the guidance of *Crawford* here, absent any directive from a Colorado state court limiting that decision in the way Ms. Kluth requests.

In the alternative, Ms. Kluth insists that any alleged resume fraud could not have constituted material fraud because "it is undisputed that [Sheriff] Spurlock never looked at Ms. Kluth's 1988 employment application materials until after she was terminated" and that "the only applicable evidence of resume fraud here is Ms. Kluth's alleged mislabeling of a prior employer on her 1988 employment application," because "[t]he information Ms. Kluth otherwise provided about this job was correct." [Doc. 37 at 12–13]. Ms. Kluth also asserts that the Sheriff's Office had knowledge of the domestic violence incident at the time it hired Ms. Kluth, such that any omission of this information from her employment application "cannot constitute resume fraud." [*Id.* at 13].

In *Crawford*, the Colorado Supreme Court stated that "[t]o assert the defense of after-acquired evidence of resume fraud, an employer must prove that the employee's fraud was material and that a reasonable, objective employer would not have hired the employee if it had discovered the misrepresentation at the outset." 938 P.2d at 549. The court identified the following questions relevant to this determination:

> First, would a reasonable employer have regarded the misstated or omitted fact as important? The nature of the misrepresentation and the extent to which it relates to qualifications for the job may bear on this issue. Information about the employer's past conduct or policies may also bear upon this issue by focusing on what the employer regarded as important in a non-adversarial context. The second factor is whether the employee concealed or misrepresented the fact or facts with the intent of creating a false impression in the mind of the employer.

---

omitted)]. The Court finds a material distinction between permitting an employer to disclaim non-disclaimable due-process protections afforded to an employee by statute, which would negate the existence of any binding implied contract and preclude the employee's claim outright, and permitting an employer to assert an affirmative defense of after-acquired evidence, which places a high burden on the employer to demonstrate that "the employee's concealment undermined the very basis upon which he or she was hired." *Crawford*, 938 P.2d at 549.

*Id.* (citation omitted).  "An employer can rely on after-acquired evidence of resume fraud as a complete defense only if it can prove that the employee's concealment undermined the very basis upon which he or she was hired."  *Id.*

Consideration of these questions, and the ultimate question whether Sheriff Weekly can prove his affirmative defense, must be answered by the jury.  As a preliminary matter, while Ms. Kluth asserts that certain facts are "undisputed" and cites to evidence in support, *see, e.g.*, [Doc. 37 at 6, ¶ 12], these assertions are raised for the first time in her reply brief and have not been admitted or disputed by Sheriff Weekly; thus, the Court does not construe these as "undisputed material facts" that may support the grant of summary judgment as contemplated by Rule 56. Furthermore, although Ms. Kluth asserts that the alleged misidentification of her former employer is not material, the Court cannot make this determination; it is the jury that must determine whether "a reasonable employer [would] have regarded the misstated or omitted fact as important." *Crawford*, 938 P.2d at 549.  And finally, Sheriff Weekly has submitted evidence that a domestic violence incident involving Ms. Kluth was omitted from her employment application.  [Doc. 35-3 at 4].  While Ms. Kluth insists that the Sheriff's Office had knowledge of the domestic violence incident at the time she was hired, this assertion simply identifies a dispute of fact that must be resolved by the factfinder, not this Court.[24]

In sum, the Court concludes that Sheriff Weekly has failed to create a genuine dispute of material fact as to the elements of Ms. Kluth's breach of contract claim, but he has established a

---

[24] Moreover, the evidence Ms. Kluth cites in support of her assertion is a one-page excerpt from a deposition transcript that references an "incident" that was known to the Sheriff's Office prior to Ms. Kluth's employment; however, this limited excerpt does not provide any clear context demonstrating that the referenced "incident" was the aforementioned domestic violence incident. *See* [Doc. 37-6 at 71:1–24].  The Court cannot construe inferences in Ms. Kluth's favor and declines to fill gaps in the submitted evidence.

genuine dispute of material fact with respect to his affirmative defense on this claim.  Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED** to the extent it seeks judgment on Claim Four.  However, the Court expressly advises the Parties that based on the Court's ruling in this Order, the only issue remaining on this claim for trial is whether Sheriff Weekly can establish the applicability of his after-acquired evidence defense (and, if applicable, damages).[25]

## IV.   Failure to Mitigate Damages

Next, Plaintiff contends that she is entitled to summary judgment on Defendants' affirmative defense of failure to mitigate damages because Defendants "ha[ve] failed to produce any admissible evidence on an essential element of the affirmative defense."  [Doc. 33 at 17].

"Employees claiming entitlement to back pay and benefits are required to make reasonable efforts to mitigate damages."  *Aguinaga v. United Food & Com. Workers Int'l Union*, 993 F.2d 1463, 1474 (10th Cir. 1993).  The employer bears the burden of establishing this defense; to do so, the employer must demonstrate that (1) there were suitable employment positions for which the plaintiff was qualified and which the plaintiff could have discovered, and (2) the plaintiff failed to use reasonable diligence in seeking such employment positions.  *Id.*

Ms. Kluth argues that she is entitled to summary judgment on Sheriff Spurlock's mitigation defense because he has failed to adduce any evidence "about the existence and availability of any suitable positions which Ms. Kluth could have obtained."  [Doc. 33 at 18].  It is undisputed that (1) Ms. Kluth propounded an interrogatory on Sheriff Spurlock asking about the factual basis for his mitigation defense, and Sheriff Spurlock's response did not identify any comparable employment positions that Plaintiff could have discovered or was qualified for, *see* [Doc. 33-11 at

---

[25] The Parties shall be mindful of this advisement when submitting their proposed jury instructions and shall submit proposed instructions that account for the fact that the jury will not be tasked with determining whether Plaintiff has established the elements of her implied contract claim.

12]; (2) Sheriff Spurlock did not produce any documents in response to Ms. Kluth's request for production of documents evincing the factual basis for Sheriff Spurlock's mitigation defense, [Doc. 33-12 at 7–8]; (3) Sheriff Spurlock has not endorsed any expert witnesses to testify on subjects related to his mitigation defense, [Doc. 33-14 at ¶ 3]; and (4) Sheriff Spurlock's initial disclosures did not include any documents regarding other suitable employment positions.  [Doc. 30-13; Doc. 33-14 at ¶ 2]; *see also* [Doc. 33 at ¶¶ 45–48; Doc. 35 at 7, ¶¶ 45–48].

In their Response, Defendants argue that summary judgment in Plaintiff's favor is inappropriate because an employer may meet its burden on this affirmative defense "by demonstrating that the plaintiff made no effort to secure employment." [Doc. 35 at 15].  In support of this argument, Defendants cite an unpublished Tenth Circuit decision, *Sanchez v. Mora-San Miguel Electric Cooperative Inc.*, 173 F.3d 864 (Table), 1999 WL 176151 (10th Cir. 1999), and two decisions from the District of Kansas, *see* [Doc. 35 at 15–16], as well as a number of cases from other Circuits reaching this conclusion.  *See* [*id.* at 16 n.11].

It is well established that to meet its burden on this affirmative defense, an employer must prove *both* that there were suitable, discoverable employment positions for the plaintiff *and* that the plaintiff failed to use reasonable diligence in seeking such employment positions.  *Aguinaga*, 993 F.2d at 1474; *see, e.g.*, *Wilson v. Union Pac. R.R. Co.*, 56 F.3d 1226, 1232 (10th Cir. 1995) ("Mr. Wilson's general failure to seek employment for eighteen months before trial does not alone suffice to justify a mitigation instruction; the defendant *must also show* that appropriate jobs were available." (emphasis added)); *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1214 (10th Cir. 2000) (concluding that the district court erred in finding that the plaintiff failed to mitigate damages where the employer "ha[d] not established that positions were available to [the plaintiff] in her circumstances"); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980) ("Sandia has

not been able to bring forward any evidence indicating that other comparable positions were available for the claimants. . . .  We conclude that Sandia has not satisfied its burden to show that reasonable efforts to mitigate damages were not made.").

Insofar as Defendants rely on an unpublished Tenth Circuit decision and out-of-Circuit cases to argue that Ms. Kluth's failure to seek alternative employment, alone, is sufficient to establish that Plaintiff failed to mitigate her damages, the Court is unpersuaded.  First, unpublished Tenth Circuit decisions are not precedential, *see* 10th Cir. R. 32.1(A), and the Court must follow the binding precedent set by the Tenth Circuit.  *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("A published decision of one panel of this court constitutes binding circuit precedent constraining subsequent panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court."); *see also Pena-Flores v. Valley View Hosp. Ass'n*, No. 18-cv-00030-RBJ, 2020 WL 136661, at *5 (D. Colo. Jan. 13, 2020) ("I will not rely on *Sanchez* when there is a significant amount of binding Tenth Circuit precedent that requires VVH to provide evidence establishing that there were suitable, available positions which Ms. Pena-Flores could have discovered and for which she was qualified.").  Second, the Court notes that in *Sanchez*, while the Tenth Circuit stated that the defendants were required to "prove [the] plaintiff failed to exercise reasonable diligence to minimize her damages by seeking the same type and grade of employment from which she was discharged," the court did not expressly hold that this is all that is required to establish a mitigation defense.  *See Sanchez*, 1999 WL 176151, at *7.  Nor will the Court follow out-of-Circuit decisions or other district court decisions over binding Tenth Circuit precedent.  *See Carrasco v. Centura Health Corp.*, No. 19-cv-00357-LTB-KMT, 2021 WL 4913983, at *3 (D. Colo. June 18, 2021) (finding "no indication from the Tenth Circuit that it is inclined to adopt this 'emerging' trend and depart from its clear holding in *Aguinaga* that a defendant must establish

**both** prongs of the two-part test." (emphasis in original)); *Camreta v. Greene*, 563 U.S. 692, 714 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

Accordingly, this Court agrees with other courts within this district which have held that a successful failure-to-mitigate defense requires proof of both elements: first, that the employee failed to make reasonable efforts to seek suitable employment; and second, that such suitable employment options were available to the plaintiff. *See Pena-Flores*, 2020 WL 136661, at *5 (denying the employer's motion for summary judgment on mitigation defense "[d]espite [the plaintiff's] apparent self-admitted lack of due diligence" because the defendant "ha[d] failed to produce evidence indicating that there were suitable positions which [the plaintiff] could have discovered and for which she was qualified."); *Carrasco*, 2021 WL 4913983, at *5 (denying the defendant's request for summary judgment on mitigation defense "because Defendants are required to establish not only that jobs were available, but also that the jobs were suitable" and the defendants had not made that showing).

Plaintiff argues that Defendants have no evidence supporting an essential prong of their affirmative defense, and in response, Defendants direct the Court to no evidence contradicting Ms. Kluth's contention. *See generally* [Doc. 35 at 15–17]. Accordingly, Defendants have not demonstrated a genuine dispute of fact precluding summary judgment in Plaintiff's favor on the failure-to-mitigate defense. Plaintiff's Motion for Summary Judgment is **GRANTED** to the extent she seeks judgment in her favor on the affirmative defense of failure to mitigate damages.

## V.    Punitive Damages

Finally, Sheriff Spurlock argues that he "is entitled to summary judgment on Plaintiff's request for punitive damages because there is no evidence that Sheriff Spurlock acted with malice,

evil intent or motive, or knew that his actions were unconstitutional (which they were not)." [Doc. 30 at 25]. This is the entirety of Sheriff Spurlock's argument. Ms. Kluth responds in similar fashion, stating only that "a jury could reasonably determine that [Sheriff] Spurlock's decision was motivated by unlawful retaliation," and because Sheriff Spurlock "has claimed otherwise, the jury could reasonably find that he was dishonest." [Doc. 38 at 25]. The Court notes that punitive damages are not available for breach of contract, *see Residences at Olde Town Square Ass'n v. Travelers Cas. Ins. Co. of Am.*, 413 F. Supp. 3d 1070, 1074 (D. Colo. 2019), or for claims against municipalities, *Miller v. City of Mission*, 705 F.2d 368, 377 (10th Cir. 1983), and thus addresses this argument in the context of Ms. Kluth's remaining constitutional claims against Sheriff Spurlock in his individual capacity only.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). To be liable for punitive damages, "it [is] not necessary that [the defendant] engage in any intentional misconduct beyond that required for him to be liable for compensatory damages under § 1983," and a finding of "egregious misconduct" is not required. *Eisenhour v. Weber Cnty.*, 897 F.3d 1272, 1281 (10th Cir. 2018). However, punitive damages are available only if the defendant "acted 'in the face of a perceived risk that [his] actions will violate federal law.'" *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). And under Colorado law, exemplary damages are available if "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102(1)(a). Willful and wanton conduct "means conduct purposefully committed which the actor must have realized as dangerous, done

heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id.* § 13-21-102(b).

Ms. Kluth raises no argument under the applicable standards—whether Sheriff Spurlock acted in the face of a perceived risk that his actions would violate federal law or acted willfully and wantonly. Nor does Ms. Kluth direct the Court to any *specific evidence* from which she contends the jury could infer that Sheriff Spurlock subjectively knew his conduct would constitute a constitutional violation; Ms. Kluth's simple assertion that "the jury could reasonably find that he was dishonest" is insufficient to "set forth specific facts showing that there is a genuine issue for trial" with respect to Sheriff Spurlock's subjective state of mind or knowledge about the potential illegality of his alleged conduct. *Anderson*, 477 U.S. at 250. For these reasons, Ms. Kluth has not made a showing sufficient to preclude summary judgment on the issue of punitive damages. Defendants' Motion for Summary Judgment is **GRANTED** to the extent it seeks judgment in Sheriff Spurlock's favor on the issue of punitive damages.

## VI.     Remaining Claims

Having resolved the pending Motions, the Court finds it appropriate to briefly summarize, for purposes of clarity, the Court's ruling in this Order and the claims remaining in this case:

Defendants' Motion for Summary Judgment is **GRANTED** with respect to (a) Claim One, only to the extent it asserts a free speech claim based on Plaintiff's text messages; (b) Claim Two; (c) Claim Three, to the extent it is based on a due-process theory; and (d) Plaintiff's request for punitive damages. Defendants' Motion for Summary Judgment is **DENIED** as to (a) the remainder of Claim One; (b) Claim Three, insofar as it is based on a First Amendment violation; and (c) Claim Four. Plaintiff's Motion for Summary Judgment is **GRANTED** with respect to Defendant's affirmative defense of failure to mitigate damages. Plaintiff's Motion for Summary

Judgment is **DENIED** with respect to Claim Four.  In addition, Plaintiff's breach of implied contract claim against Sheriff Spurlock in his individual capacity is **DISMISSED without prejudice**.  As such, the following claims remain in this case:

- <u>Claim One</u> remains (1) to the extent it is based on "speech relating to [Ms. Kluth's] February 2021 campaign for sheriff" and is asserted against both Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity; (2) to the extent it is based on Ms. Kluth's September 2020 Facebook post and is asserted against both Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity; and (3) to the extent it is based on a free-association theory and is asserted against both Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity.

- <u>Claim Three</u> remains to the extent it is based on a violation of article II, § 10 of the Colorado Constitution and is asserted against Sheriff Spurlock in his individual capacity and Sheriff Weekly in his official capacity.

- <u>Claim Four</u> remains to the extent it is asserted against Sheriff Weekly in his official capacity, but Sheriff Weekly's affirmative defense of after-acquired evidence remains available.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Defendant[s'] Motion for Summary Judgment [Doc. 30] is **GRANTED in part** and **DENIED in part**;

(2)   Plaintiff's Motion for Partial Summary Judgment [Doc. 33] is **GRANTED in part** and **DENIED in part**; and

(3)   A telephonic Status Conference is **SET** for **October 17, 2023 at 10:30 AM**.  At this Status Conference, the Court will set a joint Final Pretrial/Trial Preparation Conference and a trial date in this case.  The Parties shall participate using the following dial-in information: **888-363-4749; Access Code: 5738976#**.

DATED:  September 22, 2023                    BY THE COURT:

Nina Y. Wang
United States District Judge